IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

In re Application of

LINDA FISCHER

                Applicant,

To Issue a Subpoena for the Taking of a
Deposition and The Production of Documents.

## DECLARATION OF LINDA FISCHER

Linda Fischer, being duly sworn, deposes and says as follows:

1. My name is Linda Fischer. I have personal knowledge of the facts and matters discussed in the affidavit.

2. I am a German citizen and I reside in the United Kingdom. I was born in 1953 to two Holocaust survivors. Starting in childhood, I have suffered from a number of debilitating, and at times life-threatening, health issues, likely due to my parents' experiences in the Holocaust. My mother was a victim of Joseph Mengele's human experimentation program, and she never fully recovered from the physical and mental trauma of this experience.

3. When my father died in 2000, I learned that I would inherit tens of millions of dollars. Up to this point, I had been struggling to support myself and my daughter and afford my medical expenses. When I found out about my father's inheritance, I was overwhelmed. I turned to my brother, Michael Fischer, for advice and guidance.

4. While we were waiting until my father's estate was sorted out, Michael arranged to set up various British Virgin Islands-based holding companies to manage our inheritance. Among other things, Michael flew me to the British Virgin Islands to open bank accounts and

explained in substance to certain people there that Michael and I were going to be partners in business. We also set up bank accounts for these British Virgin Islands companies at Lombard Odier in Switzerland. Michael and I decided to be joint signatories on each other's accounts, in case anything happened to either of us.

5. I understood and observed that Michael had extensive experience and success in prior real estate investments. When we learned about the inheritance, Michael suggested pooling some of our resources to make a series of co-investments in real estate. He introduced me to Jeffrey Slavet as our family lawyer, and told Slavet that Slavet would be the family lawyer for Michael and me, and our families, and watch over me to help us invest, protect my investments, and act in my best interests.

6. At this time, I was not familiar with financial or real estate investing, and found the prospect of investing to be overwhelming. I trusted that Michael knew what he was doing, and he promised me he would look out for my interests and grow each of our respective family's assets. We agreed that Michael would select the real estate properties, and subject to my agreement, Michael and I would both invest money co-equally and share in the equity and profits co-equally. I thought that my brother, and only surviving family member, would do everything he could to protect my interests and act as a fiduciary who would look out for me and my family, protect me and my family, be honest with me, oversee my money and investments, and make sure that he acted in my best interests. Based on everything Michael said to me, I trusted him. During these years, I also suffered from health problems and trusted Michael with our investments during this time as I did not have the strength to look after my investments.

7. Michael and I agreed to jointly invest in a number of specific real estate properties. Under our agreement, I partially funded the purchase of multiple properties,

including but not limited to two units in a residential cooperative in New York and specific properties in South Beach, Florida including but not limited to a Miami apartment building.  Michael showed me and told me about properties we purchased together, because our agreement was I had to agree to the purchase of any of the specific properties before the investments were made. Michael ultimately persuaded me to invest at least $5 million dollars in various properties.  I understood that, per my agreement with Michael, I was a 50% owner of all the properties purchased based in substantial part on my money.  I trusted my brother and let him handle the structure of these investments.  In fact, Michael said that I could cash out if I no longer wanted to invest.

8. I later found out that Michael had not properly recorded my ownership interests in most of the properties that I co-invested in with him.  I learned certain properties I thought I owned, certain of which I spent time living in and using as an owner, were actually owned by a complicated web of shell companies that could be traced back to Michael and his associates yet had no paper connection to me.  I had even spent substantial sums of money on property upkeep—and yet all the while these payments were going to an entity that I apparently had no record interests in.

9. I have tried to uncover the record ownership of these properties but it has not been easy.  Michael made every effort to prevent me from learning the truth and continued to lie to me.  People who helped Michael did the same, sometimes outright lying and other times misleading me. I have suffered numerous serious medical conditions, including 10 auto immune diseases, such as systemic lupus, muscular dystrophy, and relapsing polychondritis.  I have undergone a number of life threatening surgeries, including multiple heart surgeries and multiple back surgeries, that made it physically impossible for me to pursue Michael's deception.

10. I have since discovered, however, that the properties I thought I owned at least 50 percent of are owned by holding companies in which I apparently am not a shareholder or director—including I understand a company called Lombardy 711, Inc., and Blackstone Equities, LLC. I have learned that both of those companies are owned by a British Virgin Islands entity, Viterbi Services Ltd., and that there are other British Virgin Islands entities to which my brother may have funneled my money. As a result, Michael and his associates have stolen millions of dollars in my investments, a lot of money given to Michael as loans for which he never paid me back, and all of the increase in the equity value of all our joint real estate investments which amount to millions of dollars more.

11. I also discovered that, following our initial real estate investments, and during the time period which I was very ill and spent a significant amount of time hospitalized and bedridden, Michael was secretly wiring millions of dollars out of my bank accounts. Putting aside and unrelated to the amounts invested as described above in paragraphs 5 through 8, Michael caused at least approximately $5 million to be wired out of our joint accounts into the accounts of companies that he owned, including entities that I understand to be based in the British Virgin Islands.

12. Michael along with his associates, including Jeffrey Slavet and Svetlana Astafurova, rebuffed my attempts to get information about my properties and determine the true ownership of the properties I invested in and what happened to the stolen money. I have subsequently hired private investigators as well as counsel in the British Virgin Islands to prepare for litigation in that forum against the entities to which Michael funneled my stolen funds.

13. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

14. Executed in Cornwall, the United Kingdom, on the 8th day of February, 2021.

*Linda Fischer* (signature)

Linda Fischer