IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

-----------------------------------------------------------------------------X

In re Application of

LINDA FISCHER
     Applicant,

                              Civil Action No:

To Issue a Subpoena for the Taking of a
Deposition and The Production of Documents

-----------------------------------------------------------------------------X

**DECLARATION OF MARTIN S. KENNEY**

**IN SUPPORT OF LINDA FISCHER'S *EX PARTE* APPLICATION FOR DISCOVERY**

**PURSUANT TO 28 U.S.C. § 1782**

**I**  **INTRODUCTION**

I, Martin S. Kenney, declare as follows: -

1. I am the managing partner of the British Virgin Islands ("**BVI**") law firm of Martin Kenney & Co., Solicitors ("**MKS**"). I am admitted to practice as a legal practitioner in the Eastern Caribbean Supreme Court, BVI and as a solicitor advocate in the Senior Courts of England and Wales. I am instructed in this matter by Linda Fischer ("**Ms. Fischer**") and I am duly authorised to make this Declaration on her behalf. I was initially called to the Bar of British Columbia, Canada as a barrister and solicitor in 1984. I was then admitted to the Roll of Solicitors of England & Wales in 1992; qualified as a solicitor-advocate (England & Wales) in 2005; and admitted as a BVI legal practitioner in 2005. My practice for the past 30 years has involved the representation of the victims of complex cross-border fraud and corruption with a view to investigating such unworthy activities and seeking to recover the value lost.

1

2. I respectfully submit this Declaration in support of Ms. Fischer's application for discovery pursuant to 28 USC § 1782 (the "**1782 Application**") seeking discovery by subpoena for the production of documents that are located in the United States and which are in the possession custody, and control of the following parties, for use in contemplated foreign proceedings: -

   a. the Estate of an individual, Mr. Michael Fischer, ("**Mr. Fischer**") a businessman and Ms. Fischer's brother, who has a residence in Miami Florida and passed away on or about 5 February 2021;
   b. an individual Svetlana Astafurova, ("**Ms. Astafurova**"), Mr. Fischer's significant other and also has a residence in Miami Florida;
   c. XL Funding Inc. ("**XL Funding**") a corporation registered to do business in Florida and which owns property there; and
   d. Blackstone Equities LLC ("**Blackstone**") a corporation registered to do business in Florida and which owns property there.

   (together the "**1782 Respondents**").

3. The matters to which I refer in this Declaration are, unless stated otherwise, within my personal knowledge and true. If a matter is not in my direct knowledge, I state the source of my information and I genuinely believe that information is true and accurate.

4. My knowledge of the facts in this Declaration derives from my review of the instructions and documentation received from Ms. Fischer's United States attorneys, Gibson Dunn and Crutcher LLP ("**GDC**"), and from my review of the corporate searches done by my firm of the BVI Corporate Registry.

5. Now produced, shown to me and marked **Exhibit "MSK-1"** is a paginated bundle of documents that make up the exhibits to this Declaration. References in bold square brackets are references to pages within exhibit MSK-1 **[eg., MSK-1/pp].**

## II  BACKGROUND SUMMARY

6. I have been advised by GDC about certain background facts which are relevant to Ms. Fischer and the ultimate claim which underpins this 1782 Application. In particular GDC advises that Ms. Fischer's case is ultimately connected to the ongoing misappropriation of significant value which she was at all times rightly and beneficially entitled to, by one and more people who have been in a position of trust and have been at all material times her fiduciary.

7. I am instructed by GDC that Ms. Fischer's mother was a prisoner who was liberated from the Nazi camp in Auschwitz when Soviet forces arrived in Poland in 1945. After the war and her liberation from Auschwitz Ms. Fischer's mother had two children, Mr. Fischer and Ms. Fischer. Her time of imprisonment in this concentration camp (during which Ms. Fischer's mother was tortured and experimented on) resulted in deep physical and psychological wounds to Ms. Fischer's mother which extended to future generations and indeed, had a profound influence on Ms. Fischer's own life and well-being.

8. In particular, MKS are instructed that Ms. Fischer has been seriously ill since her childhood and has been diagnosed with numerous autoimmune diseases. She has suffered from life-threatening heart, lung and bone complications, and has had to undergo multiple risky surgeries, including around a half dozen serious surgeries in the past few years alone. Ms. Fischer has, as a result of this life-long illness, been admitted for long periods of time in hospital. She therefore spent significant portions of her life struggling financially and personally as she tried to support a daughter on her own while battling with chronic illness and debilitating health issues.

9. Mr. Fischer by contrast claimed to have garnered some success in a real estate investment business which he managed in Miami, Florida. Indeed, I am informed that he used his knowledge of this business to apparently defraud Ms. Fischer to this day.

10. GDC confirms that in the year 2000, Ms. Fischer learned that her biological father, Jakob Fischer, was terminally ill and so she and Mr. Michael Fischer went to visit him. Mr. Jakob Fischer passed away shortly after the visit and Ms. Fischer was subsequently advised by the Geneva, Switzerland based bank Lombard Odier that Jakob Fischer had left equal parts of a substantial estate for her and her five siblings. The estate was substantial enough so that each beneficiary would have expected to receive upwards of $40 million of value when the estate was eventually probated.

11. As they were preparing to receive their respective inheritances, Mr. Fischer proposed to Ms. Fischer that they pool certain of their resources to make a series of co-investments. He stated, in sum and substance, that Ms. Fischer had no financial acumen, and that he with the help of his (and soon to be Ms. Fischer's) lawyer and associate Jeffrey Slavet ("**Mr. Slavet**"), was perfectly situated to manage the Fischer siblings' inheritance.

12. Mr. Fischer assured Ms. Fischer that he was an investment professional and that he would act as her fiduciary and only proceed in a manner which was consistent with her best interests. Mr. Fischer's plan was not complicated on its face. He indicated to Ms. Fischer that he would with Mr. Slavet's help, source and purchase real estate on the siblings' behalf. He claimed that this partnership, under his management, would facilitate growth of Ms. Fischer's principal investment whilst relieving her of the burden of day-to-day management of the investment.

13. Mr. Fischer assured Ms. Fischer that (i) he would arrange to establish companies for both siblings to hold their real estate assets, and (ii) Ms. Fischer would retain her interest in these investments. Based on these assurances and with the agreement that Ms. Fischer had to approve of the purchase of the specific real estate properties in advance, Ms. Fischer provided access to at least $5 million for investment in the properties which Mr. Fischer claimed would be jointly owned.

14. For the period of time that Mr. Fischer was purportedly managing Ms. Fischer's interests, he and Mr. Slavet, as well as others, offered continuous assurances that they had been investing and purchasing investment properties as they promised. They lulled her into thinking they

4

were faithful fiduciaries by purchasing apartments purportedly for Ms. Fischer to use and yet secretly placed those properties in the names of companies in which she had no legal interest and then continued to mislead her even when those properties were not placed in her name. Further, among other things, over the years, Mr. Fischer, who had signatory authority over a number of Ms. Fischer's bank accounts, made an additional at least $5 million in unauthorized withdrawals from her bank accounts during times in which she was seriously ill and bedridden.

15. MKS are instructed that Mr. Fischer (and other associates of Mr. Fischer) ultimately breached and continue to breach trust and fiduciary duties to Ms. Fischer by funneling money into the capital of certain BVI companies in which she lacked any legal interest.

### III  A BVI COMPANY WAS LIKELY USED TO DEPRIVE MS. FISCHER OF VALUE IN HER INHERITANCE FUND

16. As Ms. Fischer's numerous illnesses abated somewhat, she discovered certain elements of her brother's deception (with his associates) in certain respects and she sought to enforce her rights and take steps to with respect to her rights in certain property, investments and interests. In late 2019, MKS are instructed that she retained private investigators to learn more about the complicated corporate structure relating to the investment properties. The resulting investigations ultimately revealed that certain companies received the proceeds of Mr. Fischer's apparent misappropriation including entities in New York and Florida as well as their ultimate parent company which is registered and domiciled in the BVI, and that Mr. Fischer and his accomplices have continued to breach their fiduciary duties to Ms. Fischer.

17. In particular MKS is instructed that, for example, certain property located in New York that Ms. Fischer was led to believe belonged to her, did not reflect her ownership on the corporate records. Rather, Mr. Fischer had purchased a cooperative apartment in New York City in the name of a New York Corporation styled Lombardy 711, Inc., in turn owned by a Delaware Corporation called XL Funding, that was in turn owned by a BVI company named Viterbi Services Ltd. ("**Viterbi**").

18. Separately, for example, another property in Miami in which Mr. Fischer told Ms. Fischer that he had invested her money was held indirectly by Viterbi as well.

19. MKS are instructed that Mr. Fischer owned and/or controlled Viterbi. It seems, therefore, that Mr Fischer invested not for his sister but in himself and his associates, seemingly misappropriating and continuing to misappropriate certain of her funds without telling her and placing them into complex corporate structures ultimately owned by his own BVI entity. I am advised by GDC that (as stated herein) Mr. Fischer passed away on or about 5 February 2021. As a matter of BVI law however, this fact does not prevent Ms. Fischer from making any claims (even for breach for trust and/or fiduciary duty) against his Estate. These potential claims would fall to be handled by an executor of Mr. Fischer's Estate (if he left a will) or a duly appointed administrator, in the event that Mr. Fischer died intestate. Further to the extent that Mr. Fischer is the shareholder of Viterbi, his representative (whether executor or administrator) would need to be recognized in the BVI before any steps can be taken in relation to Viterbi's shares.

## IV    GENERAL PRINCIPLES OF BVI LAW

20. Generally, the law of the BVI[1] is based on the English legal system and even though English judgments are not binding on the Eastern Caribbean Supreme Court[2], they are influential and BVI courts take cognizance of them. In that regard and to the extent that I refer to any judgments out of the High Court of England and Wales, I can confirm that the BVI Court would take note of these judgments as a persuasive form of authority. Equally, the BVI High Court is bound by precedents set by the Court of Appeal of the Eastern Caribbean Supreme Court and by the Judicial Committee of Her Majesty's Privy Council in London, our final level of appeal.

21. Ms. Fischer asserts that she has a *prima facie* case of ongoing fraud, breach of fiduciary duty and malfeasance, among other potential causes of action, against Mr. Fischer and by extension

---

[1] Particularly as it relates to the common law.
[2] The Eastern Caribbean Supreme Court is the High Court which has jurisdiction over a regional block called the Organisation of Eastern Caribbean States. The BVI is one of 9 Eastern Caribbean States which fall within the jurisdiction of the Eastern Caribbean Supreme Court.

6

the individuals and entities believed to have knowingly assisted him. These knowing assistants include the BVI companies involved in the holding of assets in which Ms. Fischer claims to have an equitable proprietary interest. Under BVI law, these types of serious allegations require a claimant to plead his or her case with detailed particularity. To bring a claim for relief in the BVI, Ms Fischer must meet these high pleading standards. Fraud cannot be pleaded on information or belief and essentially the BVI High Court requires that;

> *"An allegation of fraud must be specifically pleaded and particularised. **The mere averment of fraud in general terms is not sufficient; there must be allegations of definite facts or specific conduct.** In this case, fraud was not pleaded and was not being asserted by the respondent."*[3]

22. As a consequence, if a party fails to set out sufficient particulars of fraud or malfeasance in his or her pleaded case that party may be barred from later relying on allegations of fraud even if they are purported to be set out in witness evidence[4]. Moreover, it would be a professionally disreputable and unethical act for a BVI legal practitioner to sign a grounding pleading in a civil case alleging fraud or dishonesty on the part of a defendant absent a well particularised claim supported by cogent evidence. I should also indicate that as an English Solicitor-advocate, I am bound by the English Solicitors Regulation Authority. IB (Indicative Behaviors) 5.7 of the SRA Rules of Conduct provides as follows:

> *"Acting in the following way(s) may tend to show that you have not achieved these outcomes and therefore not complied with the Principles:*[5] *[of the SRA] IB(5.7) constructing facts supporting your client's case or drafting any documents relating to any proceedings containing:*
> 
> *(a)    any contention which you do not consider to be properly arguable; or*
> 
> *(b)    **any allegation of fraud, unless you are instructed to do so and you have material which you reasonably believe shows, on the face of it, a case of fraud**"*[6] (emphasis added).

---

[3] *Albert Voisin v. Elizabeth William* SLUHCV2015 which was quoting from *The Castries Constituency Council V Lambert Nelson* SLUHCVAP2014/0016 [see pages 1 to 7 of MSK-1 and in particular page 4 at paragraph 17.
[4] As was the case in *Albert Voisin v. Elizabeth William*
[5] These principles are set out at pages 259-260 of MSK-1.
[6] See page 261 of MSK-1.

23. In the circumstances and given the detailed level of pleading which, by law, any BVI claim would be required to contain (as well as the cogent evidence required to be in hand in support of it), it is my opinion that this 1782 Application is reasonable, proportionate and necessary for Ms. Fischer to meet her obligations in relation to BVI claims which she intends to instruct her attorneys to file as soon as that ever may be possible.

## V   THERE ARE VIABLE APPARENT CLAIMS AGAINST VITERBI WHICH OUGHT TO BE FURTHER INVESTIGATED

24. Viterbi is a BVI company which was incorporated on 23 August 2000 pursuant to the terms of the BVI Business Companies Act. Viterbi's BVI registered agent[7] is Trident Trust Company (BVI) Ltd. ("**Trident**") and its registered office at Trident Chambers in Road Town Tortola, BVI. The company is currently in good standing and is capable of being sued in the Commercial Division of the Eastern Caribbean Supreme Court at the BVI (the "BVI High Court").[8] On 4 February 2020 I instructed Dian Alphonse, a paralegal at MKS, to complete a corporate records search for Viterbi. A copy of the documents produced from this search at the BVI Companies Registry is attached at pages 8 to 85 of MSK-1.

25. As a matter of BVI and English law it is my professional opinion that, based on the instructions and factual account I have been provided with by GDC, there are putative claims which Ms. Fischer might advance before the BVI High Court against Viterbi and/or any other BVI company alleged to have participated in the ongoing misappropriation of her property in the manner described in paragraphs 16 to 19 hereof. However, these claims are in need of further fact and evidentiary development before they can be properly pled and launched in the BVI. Under BVI law, pre-action discovery measures would (where appropriate and available such

---

[7] BVI Business Companies are required by law to have a licensed registered agent responsible for accepting service of documents, maintaining copies of director, shareholder and other corporate registers and liaising with the local regulators.

[8] Companies which have been struck from the corporate register for periods of seven years or longer may be dissolved by the Registrar of Companies. A dissolved company cannot be sued.

as in a case like this), ordinarily be pursued wherever the evidence may be found to advance the claim construction process. Under BVI and English law, we use *Norwich Pharmacal / Bankers Trust* disclosure orders for this purpose - to investigate **apparent** wrongs in an attempt to right those wrongs. Where evidence may be found in the United States to further a pre-action investigation in an apparent fraud or corruption case, I have, with the assistance of US qualified lawyers, counselled clients to apply for pre-action discovery relief under 28 USC 1782 in aid of the development of a putative BVI claim[see at pages 262-284 of MSK-1 the Memorandum Opinion of Judge Royce C. Lamberth in a matter involving the BVI Government and a United States attorney [Lester Hyman] from whom 28 USC § 1782 disclosure was sought].

26. I ought first to point out that Mr. Fischer appears to have had fiduciary and/or trustee type duties in relation to Ms. Fischer until his death, along with certain of his associates. He apparently undertook to invest certain amounts of her inheritance money on her behalf and in a manner which ought to have preserved her legal and beneficial interest in any property acquired and/or realized from the investment. Whilst it might be assumed that this relationship is governed by US law, there is an equivalent English/BVI legal principle which fixes Mr. Fischer with trustee/fiduciary duties in relation to Ms. Fischer for any period that he was handling her affairs. In particular, that portion of Mr. Fischer's wealth which derived from Ms. Fischer's inheritance fund (plus any gains accumulated thereon), is arguably subject to what BVI law refers to as a constructive trust. And Mr. Fischer would have stood as a trustee *de son tort* - a constructive trustee over such assets. As would the BVI holding companies involved in Mr. Fischer's apparent misappropriation scheme, which remains ongoing. Under BVI law, they could be characterised as 'knowing recipients of trust property' because they are capable of being imputed with the same knowledge of the apparently dishonest breaches of trust visited on Ms. Fischer by Mr. Fischer - to the extent that it can be established that Mr. Fischer was a *de jure* or *de facto* director of the BVI companies, or their controlling mind.

27. A constructive trust arises in BVI/English law where it would be unconscionable to allow one party to retain the beneficial interest in property. The doctrine in many respects operates to prevent the unjust enrichment of one party at the expense of another. Essentially, "*in the case of a trust, the conscience of the legal owner requires him to carry out the purposes for which*

9

*the property was vested in him (express or implied trust)* ***or which the law imposes on him by reason of his unconscionable conduct (constructive trust)***"[9](emphasis added).

28. In the circumstances, it seems that Mr. Fischer was fixed with a specific responsibility as it relates to any portion of Ms. Fischer's inheritance which he undertook to manage and invest on her behalf. He was her trustee and was required to invest her inheritance for her ultimate benefit. To the extent that it can be established that he used Ms. Fischer's inheritance for his own purposes and/or continued to misuse her funds and equity in the co-investments, he breached his ongoing trust and fiduciary duties owed to her under BVI / English law.

29. As it relates to Viterbi, and based on our instructions, Ms. Fischer likely has a claim in unjust enrichment[10] against the company, as a matter of BVI law. The main elements of a claim in unjust enrichment are set out in the English case of <u>Banque Financière de la Cité v Parc (Battersea) Ltd</u> [1999] 1 AC 221 [see pages 133 to 256 of MKS-1. In the <u>Banque Financière</u> case the Court asked four main questions[11] when considering whether an unjust enrichment had occurred and these were;

    (i)     Has the defendant been enriched?

    (ii)    Was the enrichment at the claimant's expense?

    (iii)   Was the enrichment unjust?

    (iv)    Are there any defences?

30. Applying this approach to Ms. Fischer's case it is apparent that Viterbi has been enriched to the extent that it has received valuable property in the form of the shares (or an increase in value of these shares) of entities which hold investment real estate in Miami and New York. As a matter of BVI/English law, enrichment covers not only cash payments, but any benefit, profits or other value vested in a defendant. In the circumstances, and to the extent that the

---

[9] See <u>Westdeutsche Landesbank Giroozentrale v Islington London Borough Council</u> [1996] AC 669 at pages 86-132 of MSK-1 and in particular at page 109.
[10] This is a claim based on the law of restitution and to the extent that Mr. Fischer retains Ms. Fischer's property or value represented by it, he would also be liable in unjust enrichment.
[11] These questions were posed by Lord Steyn at page 138 of MSK-1.

corporate structure comprised of Lombardy 711, Inc., XL Funding, Blackstone and Viterbi was set up to hold valuable real estate, Viterbi can reasonably be said to have been and continues to be enriched. This is because the value of the share capital in Viterbi is directly connected to the value vested in the structure it sits on top of.

31. Further, the fact that the ultimate property was acquired in whole or in part with Ms. Fischer's inheritance funds means that the enrichment occurred at her expense.

32. There is also a sound basis to presume that the enrichment in this case is unjust. Firstly, the acquisition of certain property is directly linked to Mr. Fischer's apparently dishonest breaches of trust and fiduciary duties owed to Ms. Fischer. Further, I am instructed that Mr. Fischer was at all material times the ultimate owner and/or controller of the share capital of Viterbi and as such his state of mind and knowledge of his breaches can be reasonably attributed to Viterbi. Ms. Fischer is therefore able to follow or trace her property into value held by Viterbi[12]. Indeed, in the case of *Investment Trust Companies (In Liquidation) v. Revenue and Customs Commissioners* [2012] STC 1150 [see pages 157 to 187 of MSK-1], the English Supreme Court found that a third party could be liable in unjust enrichment even though the party did not have direct dealings with the Claimant. In addressing the question of third parties' liability for unjust enrichment, the court found that *"there are also situations where the **defendant receives property from a third party into which the claimant can trace an interest. Since the property is, in law, the equivalent of the claimant's property, the defendant is therefore treated as if he had received the claimant's property**"* [13] (emphasis added).

33. Finally, as it relates to potentially viable defences, on the available facts as I understand them, there would appear to be none which would have been available to Mr. Fischer or his BVI companies or his accomplices, and the analysis applies similarly to Mr. Fischer's Estate. As stated in paragraph 32 above, Mr. Fischer was at all material times reasonably believed to be the ultimate owner and/or controller of Viterbi (whether directly or through nominees and/or

---

[12] Tracing in BVI law is the process by which a Claimant is able to follow value which he or she is entitled to notwithstanding the fact that the value has changed hands and/or form.
[13] See *Investment Trust Companies v. Revenue and Customs Commissioners Ltd* [2017] 3 All ER 113 at page 174 paragraph 48.

11

accomplices). The company is therefore deemed to have been aware of his actions and his breaches of duty to Ms. Fischer.[14]

34. Further, and of equal importance, it is unlikely that Viterbi offered valuable consideration to Ms. Fischer for any interest it received from her and which flowed into the New York and Miami properties it holds through the corporate structure which Mr. Fischer set up. This is relevant because English courts have previously held "...*that an innocent recipient of stolen money was obliged to pay an equivalent sum to the true owner where he had not given full consideration for it and had thus been unjustly enriched at the expense of the true owner.*"[15] It can reasonably be assumed that the same principle would apply to the non-cash value received by an innocent third party.

35. It is therefore my opinion that even if Mr. Fischer's knowledge of his breaches of duty was not attributable to Viterbi (and I am advised that they likely are), Ms. Fischer would still have a viable unjust enrichment claim against Viterbi because it is unlikely that the company offered any (or any sufficient) consideration for the value it holds in the layered corporate structure set up by Mr. Fischer. It therefore may well be unconscionable for Viterbi to be allowed to retain this property indirectly through its down-stream subsidiaries.

36. Quite separate from Ms. Fischer's viable unjust enrichment claim against Viterbi, on the available facts as I understand them, she also has a potential claim in knowing receipt against the company. Claims in knowing receipt are personal claims against a third party who has received property, which was transferred in breach of a trustee's duties to his beneficiary.

37. The essential elements of the claim are set out in the English Court of Appeal case of <u>El Ajou v. Dollar Land Holdings plc and Another</u> [1994] B.C.C. 143 [see pages 223 to 239 of MSK-1]. In <u>El Ajou</u> Lord Justice Hoffman confirmed that in order to enforce a constructive trust on the basis of knowing receipt a claimant "...*must show, first, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are*

---

[14] This has implications for other potential claims against Viterbi which are discussed later in this Declaration.
[15] See Lipkin Gorman v. Karpnale Ltd [1991] 2 AC at pages 188-222 of MSK-1 and in particular at page 189.

*traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.*"[16]

38. Applying the *El Ajou* principles to Ms. Fischer's case it, appears that a substantial portion of Ms. Fischer's inheritance fund was transferred and retained by Mr. Fischer in breach of his fiduciary/trust duties. The apparent facts of this case lead me to believe that Mr. Fischer never had any intention to vest Ms. Fischer with her ultimate beneficial interest in any asset acquired using her inheritance fund. As such, as soon as the New York and Miami properties were acquired and/or vested in the layered corporate structure held by Viterbi as the parent in the group, Mr. Fischer would appear to have breached his duty of loyalty to Ms. Fischer and Viterbi was a recipient of value directly attributable to Mr. Fischer's breach of his duty.

39. In that regard it is also apparent that the shares held by Viterbi in the entities lower down in the layered corporate structure, represent traceable assets ultimately belonging (at least in part) to Ms. Fischer.

40. Finally, assuming that Mr. Fischer (and/or any person who assisted his breach of duty) was the directing mind and will of Viterbi (or other entities in the structure), then his knowledge of his own breach of trust can be directly attributed to Viterbi. The origins of the directing mind and will theory were examined by Lord Justice Hoffman in *El Ajou* who acknowledged that the directing mind and will in its original conception was deemed to be "...*someone whose action (or knowledge) is that of the company itself.*" [17] As it relates to different corporate activities Hoffman LJ accepted that relevant judicial authorities confirm that "...*different persons may for different purposes satisfy the requirements of being the company's directing mind and will.*"[18]

---

[16] See page 234 of MSK-1.
[17] See page 237 of MSK-1.
[18] See page 238 of MSK-1.

13

41. Ultimately the Court was of the view that the question of fact which needed to be answered in relation to a given transaction was whether "...*an individual exercised powers on behalf of the company which so identified him*"[19] as its controlling mind and will.

42. On the facts as I understand them, Mr. Fischer (along with accomplices) appears to have been one of the key controlling minds and forces behind the entire corporate structure held by Viterbi. Ms. Fischer would therefore appear to be within her rights to pursue Viterbi in knowing receipt for any property/value it received as a result of the transfers of the New York or Miami properties into the structure, once the instant pre-action investigation has been concluded. And the particulars of the acts of wrongdoing complained of can be pled to a BVI standard.

## VI    MS. FISCHER'S CLAIMS AGAINST VITERBI ARE NOT LIKELY TO BE STATUTE BARRED UNDER BVI LAW.

43. Generally, claims in contract or tort are statutorily limited to six years from the date when the cause accrued pursuant to section 4 (1) (a) of the BVI Limitation Act 1961 (the "**Limitation Act**") [see page 241 of MSK-1].

44. Among other things, there are however statutory extensions to these general limits. By way of example, section 19 of the Limitation Act states that "...***no period of limitation*** ...*shall apply to any action by a beneficiary under a trust, being an action (a) in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or (b) to recover from the trustee trust property or the proceeds thereof in the possession of the trustee or previously received by the trustee and converted to his use*" [see page 242 of MSK-1]. As a consequence, any claim which Ms. Fischer brought against Mr. Fischer (and his Estate) in the BVI for breaches of his trust, would not be statute barred.

45.   Separately, section 25 of the Limitation Act states that;

---

[19] See page 238 of MSK-1.

> *"where, in the case of any action for which a period of limitation is prescribed by the Ordinance, either;*
> 
> > *(a)   the action is based upon **the fraud of the defendant or his agent** or any person through whom he claims or his agent; or*
> > *(b)   **the right of action is concealed by the fraud of any such person as aforesaid**; or*
> > *(c)   the action is for relief from the consequences of a mistakes;*
> 
> *the period of limitation shall not begin to run until the plaintiff has discovered the fraud or mistake or could have with reasonable diligence have discovered it."* [See pages 243-244 of MSK-1].

46. On the available facts of Ms. Fischer's case, it seems quite possible to argue that Viterbi (through Mr. Fischer's directing mind and will) actively participated in the scheme to deprive Ms. Fischer of the value misappropriated from her inheritance fund. If one assumes that this structure was set up in part or for the sole purpose of defrauding Ms. Fischer, the question of when limitation begins to run against Viterbi is arguably a function of when Ms. Fischer could reasonably have discovered that Mr. Fischer was actively breaching his duties to her and whether the fraud was ongoing.

47. This is a fact sensitive inquiry. It bears noting that, among other things, Mr. Fischer apparently actively assured Ms. Fischer that her investments were being properly handled and prudently managed. Further on these facts it is wholly appropriate to consider that Ms. Fischer's various debilitating illnesses directly affected her ability to reasonably investigate her affairs which she was actively led to believe were being considered by a fiduciary.

48. It is therefore reasonably arguable that even if Viterbi did not have trust obligations to Ms. Fischer, its participation in an ongoing scheme to defraud her may very well extend the limitation so that a BVI claim against it is still valid.

## VII   THE EASTERN CARIBBEAN SUPREME COURT CAN BE EXPECTED TO FAVOURABLY CONSIDER ANY EVIDENCE DISCLOSED BY THE 1782 APPLICATION

49. As a matter of fact, the Eastern Caribbean Supreme Court and the English Court have a long history of accepting evidence obtained in foreign jurisdictions including in the United States of America.

50. In the case of *South Carolina Insurance Co. v Assurantie Maatschappij de Zeven Provincien N.V.* [1987] AC 24 [see pages 245 to 258 of MSK-1] the English House of Lords considered an injunction which was sought to prevent the Defendants from obtaining discovery in the United States pursuant to 28 U.S.C. § 1782 to obtain documentation relevant to the English case. In considering the matter, Lord Brandon of Oakbrook expressed the following view;

> *"Under the civil procedure of the High Court **the court does not, in general, exercise any control over the manner in which a party obtains the evidence which he needs to support his case**. The court may give him help, certainly; for instance by discovery of documents inter partes under R.S.C., Ord. 24; by allowing evidence to be obtained or presented at the trial in various ways under Orders 38 and 39 ; and by the issue of subpoenas under Part II of Order 38 , to which I referred earlier. **Subject, however, to the help of the court in these various ways, the basic principle underlying the preparation and \*42 presentation of a party's case in the High Court in England is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are use…***
>
> ***I cannot see that the re-re-insurers, by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case."*** [See page 256 of MSK-1.]

51. In rendering its judgment, the Court refused to prevent a party to English proceedings from obtaining documentation in the United States pursuant to 28 U.S.C. § 1782 and by extension accepted that the evidence would be considered in the same way that any locally obtained evidence would be considered.

52. It should also be noted that as a matter of BVI law and procedure (as with England), there is no law or procedural rule which is breached by obtaining discovery via the 1782 Application for use in a BVI claim.

16

53. It is therefore expected that the Eastern Caribbean Supreme Court would adopt an approach similar to the court *South Carolina Insurance Co* as it relates to any claim brought by Ms. Fischer in the BVI based on documents obtained in the 1782 Application. This is so even where, as is the case here, US federal court discovery rules (permitting, as I am given to understand, the discovery of any material reasonably calculated to lead to admissible evidence), are much more generous for a discovering party than under BVI law (where the pre-trial discovery of documents is limited to documents strictly relevant to a pleaded case and where pre-trial depositions of witnesses are not permitted).

## VII   THE EASTERN CARIBBEAN SUPREME COURT CANNOT COMPEL A FOREIGN PARTY TO PRODUCE EVIDENCE FOR LOCAL PROCEEDINGS

54. The Eastern Caribbean Supreme Court does not exercise extra-territorial jurisdiction lightly and it has no power to compel the respondents to the 1782 Application to produce documentation locally unless the relevant respondent is a party to a properly pleaded and fully particularized claim.

55. For the avoidance of doubt in order for the Eastern Caribbean Supreme Court to extend its jurisdiction over a party who is resident or generally located out of the jurisdiction, a claimant has to establish a properly pleaded and viable cause of action which complies with various procedural rules that govern permission to serve a party out of the jurisdiction. It is only after successfully obtaining permission to serve a party out and effecting service that the Eastern Caribbean Supreme Court would consider imposing disclosure obligations on a foreign party.

56. Since at least several of the 1782 Respondents are not likely to be parties to any proceeding brought in the BVI it is unlikely that the disclosure sought in the 1782 Application could be reasonably obtained through another route or procedure. In addition, even if Mr. Fischer's Estate may ultimately be subject to suit in the BVI, such discovery may not be presently

available to Ms. Fischer in light of the high pleading standards at issue to bring her *prima facie* claims.

## VIII JURISDICTION

57. In my opinion, and based on the available facts, the BVI High Court would have an adequate basis to take personal jurisdiction over the BVI companies and Mr. Fischer's Estate to hear a claim brought by Ms. Fischer in the BVI. First, the BVI companies are domiciled in the BVI. As such, the BVI High Court has jurisdiction over their management, administration, affairs and ownership. Secondly, under section 245 of the BVI Business Companies Act 2004[20], the situs of the shares of a BVI company is deemed to be located at the office of the registered agent of such a company. Also, under Part 7.3 (6) of the Civil Procedure Rules of the Eastern Caribbean Supreme Court[21] (the "**CPR**"), a gateway exists for the Court to take personal jurisdiction over a foreign resident defendant to the extent that what is in dispute is ownership over property located in the BVI.

58. A properly pleaded claim brought by Ms. Fischer seeking a declaration that she is the true beneficial owner of a proportionate share of the share capital of the BVI companies involved in this matter, and that such property ought to be turned over to her, ought to activate this jurisdictional gateway. The BVI Court would also have the power to appoint a receiver over the affairs of the BVI companies relevant to this matter either on an interim basis to preserve value during the pendency of a claim brought by Ms. Fischer; or as a liquidating receiver should her putative equitable proprietary share ownership claim be successful. Also, in my opinion, and based on the available facts, the BVI High Court would be the most natural forum to resolve such an *in rem* dispute.

59. Moreover, under Part 7.3 (2) of the CPR[22], a further jurisdictional gateway exists for the taking of personal jurisdiction over a non-resident defendant to the extent that he or she is a "necessary

---

[20] See page 286 of MSK-1.
[21] See page 289 of MSK-1.
[22] See page 288 of MSK-1.

and proper party" to a proceeding before the Court. Arguably, Mr. Fischer will be a proper and necessary party to any claim cogently brought in the BVI by Ms. Fischer as against the BVI companies relevant to this matter.

## VIII CONCLUSION

60. Having considered the available facts of Ms. Fischer's case it is my professional opinion that;

(i) Ms. Fischer, on balance, has *prima facie* viable BVI claims against Mr. Fischer (which survive his passing) and/or any BVI entity which he specifically used to deprive her of her inheritance fund including Viterbi;

(ii) Ms. Fischer's putative claims lie in unjust enrichment and/or knowing receipt;[23]

(iii) Based on the available facts of this case, Ms. Fischer's claims are not likely statute barred by virtue of, among other things, the various extensions set out in the Limitation Act (BVI);

(iv) To the extent that this pre-action 1782 Application is successful, I can confirm that any relevant documents disclosed pursuant to 1782 subpoenas will likely be admissible in the Eastern Caribbean Supreme Court as evidence of the wrongs of which Ms. Fischer now complains;

(v) The Court in the BVI does not have the power to compel any of the 1782 Respondents to produce documentation in the current circumstances;

(vi) None of the information sought by this 1782 Application has been made available to the Applicant and is not available prior to filing the contemplated proceedings in the BVI Court;

(vii) Under BVI law, Ms Fischer's putative claims outlined above, albeit viable on a *prima facie* examination, require further particularisation and fact development before serious charges of dishonest breach of trust or fraud against Mr. Fischer and

---

[23] Among other things, Ms. Fischer also possibly has a dishonest assistance of breach of trust claim against Viterbi if it can be established that the company actively participated in depriving her of sums from her inheritance fund.

      his knowing assistants can properly be pleaded and launched before the BVI High Court; and

(viii)  There appears to be a sound jurisdictional basis to venue the claims discussed above before the BVI High Court once our local pleading standards can be met.

61. Pursuant to section 1746 of Title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Dated: February 8th 2021

Road Town, Tortola, British Virgin Islands

By: MARTIN S KENNEY