IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____/ASSIGNED DIST. JUDGE/MAGISTRATE JUDGE

```
-----------------------------------------------------------X
In re Application of                         :
                                             :
LINDA FISCHER                                :
                    Applicant,               :
                                             :        Civil Action No:
To Issue a Subpoena for the Taking of a      :
Deposition and The Production of Documents   :
                                             :
                                             :
                                             :
-----------------------------------------------------------X
```

**EXHIBIT MSK-1 TO**

**THE DECLARATION OF MARTIN S. KENNEY**

I declare that these are the exhibits marked MSK-1 referred to in my Declaration of 8 February 2021 under penalty of perjury under the laws of the United States and that this Declaration was executed on February 2021 in Road Town, Tortola, British Virgin Islands

_____

Martin Steven Kenney

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

SAINT LUCIA

CLAIM NO.: SLUHCV2015/0537

BETWEEN:

**ALBERT VOISIN**

**Claimant**

and

**ELIZABETH WILLIAM**

**Defendant**

APPEARANCES:    Ms. Sylma Finisterre of counsel for the claimant
Ms. Alberta Richelieu of counsel for the defendant

-----------------------------------
**2019: May 23
October 30**
-----------------------------------

RULING

1.  The claimant issued proceedings for the partition of Block 0643B Parcels 394, 395, 396 and 397, and all orders pursuant to **Articles 653A-653L of the Civil Code[1]**.

2.  The claimant is entitled as co-owner of a one-seventy fifth (1/75th) share in Block 0643B Parcels 394 and 395, consisting of 0.16 hectares and 2.44 hectares respectively. The claimant also claims to be the grandson and lawful heir of Vosen Severin Joseph who is the beneficiary of a one-fifteenth (1/15) share in Block 0643 B Parcels 396 and 397, consisting of 0.08 and 1.42 hectares respectively.

3.  The claimant avers that the defendant, who is recorded with one-fifteenth (1/15) share in each of the above referenced parcels, has asserted authority over all the

---

[1] Cap 4.01 (Revised Laws of Saint Lucia

1

parcels restricting the claimant and other beneficiaries of the use and occupation of the said parcels.

4. The defendant filed a defence denying the claimant's entitlement to the aforesaid parcels.

**Procedural Defects**

5. It is necessary to highlight several procedural defects in the defendant's defence before considering the claimant's claim.

6. At paragraph three (3) of the claim, the claimant pleads that he is the son of Agnes Laurent who was the daughter of late Vosen Severin Joseph. The claimant states that he obtained Letters of Administration for his mother's estate and has lived on Parcel 394 for the past twenty-three (23) years, along with numerous other family members (including the defendant).

7. At paragraph 4 of the claim, the claimant states that the defendant is a beneficiary of an undivided one-fifteenth (1/15th) share of the parcels. Paragraph 5 states that the defendant had for the last ten (10) years erroneously asserted authority over all the family lands and has restricted the claimant and the other family members from accessing crops which they harvested on the land.

8. The defendant filed a defence making a bald assertion that "Paragraphs 3,4, & 5 are denied".

9. At paragraph 7 of the claim, the claimant states: that he had not been able to enjoy the use of the land; is desirous of ending the undivided ownership; the defendant is not receptive to the claimant or any other family member being granted their lawful entitlement and acts as if all the land belongs to her alone.

10. The defendant in her defence responds "there is no claim for partition order".

11. At paragraph 8, the claimant states that he is no longer willing to remain in undivided ownership and seeks an order from the court for a partition in accordance with his beneficial interest.

12. The defence states "the claimant has not taken any action to improbate the defendant's designation and vesting deed registered in the land registry as instrument 2893/2008, as the vesting deed is valid unless set aside by the court".

13. Counsel for the defendant, in submissions filed after the trial, focused mainly on **Article 579 of the Civil Code**. **Article 579** was amended in 1988 to enable illegitimate children to inherit from the intestate successions of single parents. Counsel contends that the claimant's mother died on the 30th September 1986, prior to the amendment and therefore the claimant is incapable of inheriting under the provisions of **Article 579**. In her witness statement, the defendant alleges that the claimant fraudulently obtained title to the parcel through a consent order and a change of name to enable him to be an heir.

## THE LAW

14. **CPR 10. 5 (1)** requires a defence to set out all the facts on which the defendant relies to dispute the claim. The defendant must state whether the allegations in the claim are admitted, denied, neither admitted nor denied, and wishes the claimant to prove. **(10.5 (3).** If the defendant denies any of the allegations in the claim form the defendant **must** state the reasons for doing so; and if the defendant intends to prove a different version of events from that given by the claimant; the defendant's own version must be set out in the defence. **(CPR 10.5 (4).**

15. Barrow JA in the Court of Appeal case in **East Caribbean Flour Mills Limited v Ormiston Ken Boyea**[2] states that "The basic purpose of pleadings is to enable the opposing party to know what case is being made in sufficient detail to enable that party properly to prepare to answer it".

---

[2] SVGHCAV 12 of 2006 delivered 16 July 2007

16. The defendant's defence fails to plead the claimant's incapacity to inherit pursuant to **Article 579 of the Civil Code**. This issue was only raised at trial and in the further submissions filed after trial.  It is also noted that the alleged particulars of fraud were first raised in the defendant's witness statement but were not pleaded in the defence.

17. It is trite law that particulars of fraud are to be specifically pleaded. Webster JA (Ag) in the Court of Appeal decision in **The Castries Constituency Council V Lambert Nelson**[3] states :

> "The law relating to the treatment of allegations of fraud by the courts is settled.  An allegation of fraud must be specifically pleaded and particularised.  The mere averment of fraud in general terms is not sufficient; there must be allegations of definite facts or specific conduct.  In this case, fraud was not pleaded and was not being asserted by the respondent".

18. The defendant, having failed to plead the particulars of fraud in her defence cannot rely on the allegations in witness statement or in submissions to defeat the claimant's claim.

19. Paragraphs 3, and 4 of the defence in response to paragraphs 3, 4 & 5 of the claim form consist of bare denials in breach of the mandatory requirements of Rule 10.5 (4).  The defence also proffers an answer that fails to address the claimant's pleaded facts at paragraphs 7 & 8 of the claim.

20. The defendant in her witness statement is asking the court for the improbation of the claimant's deed and to declare the defendant as sole owner of the property.

21. The court rejects the ingenious attempts by counsel for the defendant to expand and introduce new matters into the claim which had not been pleaded in the

---

[3] SLUHCVAP2014/0016

defence. The authorities are replete and need not be re-emphasized. Pleading are to be made in a statement of case and not in submissions or witness statements. The Civil Code of Procedure provides the process for the improbation of a deed. The purpose of witness statements is to replace oral testimony and not to plead cases. The defendant could only proceed on the pleadings in the defence.

22. In my view, the defence does not comport with the requirements of the **CPR 10. 5.** The defence as it stands consists of bare denials without any coherent statement of facts in response to the claimant's pleadings.

### The claimant's claim

23. The claimant seeks an order for partition of Block 0643 B Parcels 395-397 and all orders in accordance with Articles 653A – 653L of the Civil Code. The list of proprietors for the parcels indicates nineteen (19) co-owners with the claimant recorded as having a 1/75th share and the defendant with 1/45 share respectively in Block 0643 B Parcels 394 & 395. Vosen Severin Joseph, the purported grandfather of the claimant, is recorded with 1/15th share and the defendant with 1/45th 0643B Parcels 396 & 397.

24. An amendment to **Article 653 of the Civil Code** created subsection 653A which reads:

> **Special Provisions with Respect to Partition Actions**
>
> (Added by Act 34 of 1956)

> 1. In an action for partition, where, if this section had not been passed, a decree for partition might have been made, then if it appears to the Court that by reason of the nature of the property to which the action relates, or of the number of the parties interested or presumptively interested therein, or of the absence or disability of some of those parties, or of any other circumstance, a sale of the property and a distribution of the proceeds would be more beneficial for the parties interested than a division of the property between or among them, the Court may, if it thinks fit, on the request of any

5

of the parties interested, and notwithstanding the dissent or disability of any others of them, direct a sale of the property accordingly, and may give all necessary or proper consequential directions.

2. Where the land sought to be partitioned in subsection (1) is capable of partition generally, but the resultant share of any of the parties interested would be so small that it would adversely affect the proper use of the land, the Judge may in lieu of directing a sale of the property add such share to the share of any other person interested or distribute such share between two or more other persons interested in such proportion as he thinks fit.

3. Where the Judge proceeds in accordance with subsection (2) he shall assess the value of the share added or distributed and shall order that there be paid to the proprietor of the share, by each proprietor who has received an addition to his share, the value of such addition.

4. Where any sum becomes payable under subsection (3) the Registrar may order that such sum be secured by way of hypothec on the share of the person liable to pay it.

25. **Article 653A** makes special provisions for the court to order a sale in complex partitions with many co-owners or where the resultant share entitlement is trivial. The court may order a sale where it is of the view that the sale of the property and a distribution of the proceeds would be more beneficial for the parties interested than a division of the property. The court may also increase the share entitlement and direct compensation by interested parties in circumstances where the resultant share in a proposed partition maybe too small.

26. It is axiomatic that to reach such a conclusion it is necessary for the applicant to provide the court with the relevant evidence to determine the proposed partition. The claimant has, in his witness statement, given an estimation of his share entitlement. The claimant also seeks to partition the share entitlement of Vosen Severin Joseph, his putative grandfather, but has failed to provide evidence of a vesting assent or a transmission of the property into his name as sole heir. In my

view, the claimant has not made a case for partition or to engage the court's jurisdiction to make any of the orders contemplated in **Articles 653A-653L**.

27. I am of the view that both parties have failed to comply with the basic requirements of the Civil Code and the CPR 2000, respectively. In the circumstances, the court is left with no other option but to dismiss the claim.

### Order

27.   In summary, it is ordered that claimant's case stands dismissed and each party shall                              bear                              their own costs.

**Agnes Actie**

**High Court Judge (Ag)**

**BY THE COURT**

**REGISTRAR**

7



**BVI Financial Services Commission, Registry of Corporate Affairs**
## Register of Companies Search Report

**Date of Search :** 04/02/2021
This search is accurate as at the Search Date above.

| | |
|---|---|
| Company Name : | VITERBI SERVICES LIMITED |
| Company Number : | 402637 |
| Company Type : | BC Re-registration |

**Date of Incorporation / Registration :** 23/08/2000

| | |
|---|---|
| Status Description: | Active |
| Status Date: | 20/01/2021 |
| Re-registration Type: | Automatic |
| Re-registration date: | 01/01/2007 |
| Current Registered Agent: | TRIDENT TRUST COMPANY (B.V.I.) LIMITED |
| Current Registered Agent Address: | Trident Chambers<br>P.O. Box 146<br>Road Town<br>Tortola<br>VG1110<br>VIRGIN ISLANDS, BRITISH |
| Current Registered Agent Phone Number: | 284-494-2434 |
| Current Registered Agent Fax Number: | 284-494-3754 |
| Current Registered Office : | Trident Trust Co. (B.V.I.) Ltd.<br>P.O. Box 146, Trident Chambers,<br>Road Town, Tortola, B.V.I.<br>Road Town, Tortola, B.V.I.<br>VIRGIN ISLANDS, BRITISH |
| Telephone: | |
| Agent Fax: | |
| Director Register Type : | Private |

Maximum Number of Shares the company is authorized to issue:   50,000
Ability to Issue Bearer Shares:   No

| S.No | Previous Name | Foreign Character Name | Date Range or Cease Date From | To |
|---|---|---|---|---|
| 1 | VITERBI SERVICES LIMITED | | 23/08/2000 | |

| S.No | Date | Transaction Number | Description | Status | Eforms/Attachments |
|---|---|---|---|---|---|
| 1 | 23/08/2000 | T000003076 | Application for Incorporation (IBC) | Approved | General Filing<br>General Filing - General Filing |
| 2 | 29/04/2008 | T080250705 | Annual Fee Submission (BC) | Approved | Annual Submission |

8

| 3 | 04/09/2014 | T140606249 | Annual Fee Submission (BC) | Approved | Annual Submission |
|---|---|---|---|---|---|
| 4 | 07/11/2014 | T140754485 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 5 | 24/12/2015 | T150950772 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 6 | 29/08/2016 | T160599663 | Register of Members or Directors | Approved | Register of Directors |
| 7 | 31/08/2016 | T160609303 | Request for Certifications (BC) | Approved | Request for Certifications |
| 8 | 31/08/2016 | T160609304 | Request for Certificate of Goodstanding | Approved | Request for Certificate of Good Standing |
| 9 | 18/11/2016 | T161026283 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 10 | 21/11/2016 | T161035770 | Request for Certificate of Goodstanding | Approved | Request for Certificate of Good Standing |
| 11 | 24/01/2017 | T170063963 | Request for Certificate of Goodstanding | Approved | Request for Certificate of Good Standing |
| 12 | 20/04/2017 | T170622314 | Request for Certificate of Goodstanding | Approved | Request for Certificate of Good Standing |
| 13 | 20/11/2017 | T171274356 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 14 | 09/11/2018 | T180872513 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 15 | 19/11/2019 | T190799313 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 16 | 21/07/2020 | T200465953 | Notice of Election to Disapply Part IV Transitional Provisions | Approved | Notice Of Election To Disapply Part IV |
|  |  |  |  |  | New memorandum and articles signed by us as registered agent |
|  |  |  |  |  | Declaration that there are no bearer shares in the company in issue |
|  |  |  |  |  | Details of the amendment are set out on the attached sheet |
| 17 | 20/01/2021 | T210039465 | Annual Fee Submission (BC) | Approved | Annual Submission |

| S.No | Transaction No. | Type of Certificate | Date of Filing |
|---|---|---|---|
| 1 | T140606249 | Certificate of Restoration | 04/09/2014 |
| 2 | T160609303 | Duplicate Certificate of Incorporation - IBC - Sections 14 & 15 | 31/08/2016 |
| 3 | T160609304 | Certificate of Good Standing | 31/08/2016 |
| 4 | T161035770 | Certificate of Good Standing | 21/11/2016 |
| 5 | T170063963 | Certificate of Good Standing | 24/01/2017 |
| 6 | T170622314 | Certificate of Good Standing | 20/04/2017 |
| 7 | T200465953 | Certificate of Disapplication | 21/07/2020 |

**DISCLAIMER:**

Although care has been taken to ensure the accuracy, completeness and reliability of the information provided through the use of this service ("the Information"), neither the Registrar of Corporate Affairs ("the Registrar") nor the Financial Services Commission ("the Commission") assumes any responsibility for the accuracy, completeness and reliability of the Information. This report does not reflect any transactions that may be submitted and not yet registered, or other changes for which the Registrar has not received notice. The user of the Information agrees that the Information is subject to change without notice, and neither the Registrar nor the Commission is responsible for any discrepancies that may result if a transaction is approved for filing after the issuance of this report. Neither the Registrar nor the Commission assumes any responsibility for the consequences of use of the Information, nor for any infringement of third party intellectual property rights which may result from its use. In no event shall the Commission or the Registrar be liable for any direct, indirect, special or incidental damage resulting from, arising out of or in connection with the use of the Information.

**VIRRGIN**

Page 1 of 2

## POST-INCORPORATION TRANSACTIONS

## GENERAL FILING

| | | |
|---|---|---|
| BVI Company No. | : | 402637 |
| Company Name | : | VITERBI SERVICES LIMITED |
| Processing on behalf of: | : | Trident Trust Co. (B.V.I.) Ltd. |
| Foreign Character Name | : | |
| Transaction Description | : | Application for Incorporation (IBC) |
| Date of Change | : | |
| Change Description | : | IBC Incoporation |
| Remark | : | |
| Attachment (in English) | : | 20140718144331rbtqmkwsawn26te9zq3otzwb4i.pdf |
| Attachment (Foreign Language) | : | |
| Agent | : | Trident Trust Co. (B.V.I.) Ltd. |
| | | Trident Chambers |
| | | P.O. Box 146 |
| | | Road Town |
| | | Tortola |
| | | VG1110 |
| | | VIRGIN ISLANDS, BRITISH |

We, Financial Services Commission, processing on behalf of Trident Trust Co. (B.V.I.) Ltd., hereby confirm that information provided is true and correct to our knowledge.

| | | |
|---|---|---|
| Authorised Signatory Name | : | Financial Services Commission on behalf of Trident Trust Co. (B.V.I.) Ltd. |

**VIRRGIN**

Page 2 of 2

## POST-INCORPORATION TRANSACTIONS

| | | |
|---|---|---|
| Name | : | User4, FSC Super |
| User No. | : | 26 |
| User Name | : | Trident Trust Co. (B.V.I.) Ltd. |
| User Address | : | Trident Chambers |
| | | P.O. Box 146 |
| | | Road Town |
| | | Tortola |
| | | VG1110 |
| | | VIRGIN ISLANDS, BRITISH |
| User Voice No. | : | 284-494-2434 |
| User Email | : | kpenn@tridenttrust.com |

| | | |
|---|---|---|
| BVI Company No. | : | 402637 |
| Date of Filing | : | 23/08/2000  0:00:00 |
| Transaction No. | : | T000003076 |
| Receipt No. | : | 166706 |

11

TERRITORY OF THE BRITISH VIRGIN ISLANDS
BVI BUSINESS COMPANIES ACT, 2004

CERTIFICATE OF RESTORATION TO THE REGISTER
(SECTION 217)

The REGISTRAR OF CORPORATE AFFAIRS of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of restoration of a company to the Register of Companies having been complied with,

**VITERBI SERVICES LIMITED**

BVI COMPANY NUMBER 402637

is restored to the Register of Companies this 4th day of September, 2014.

REGISTRAR OF CORPORATE AFFAIRS
4th day of September, 2014

12

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE INTERNATIONAL BUSINESS COMPANIES ACT**
**(CAP. 291)**

**CERTIFICATE OF INCORPORATION (SECTIONS 14 AND 15)**

No.402637

The Registrar of Corporate Affairs of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the International Business Companies Act, Cap. 291 that all the requirements of the Act in respect of incorporation having been satisfied,

**VITERBI SERVICES LIMITED**

is incorporated in the British Virgin Islands as an International Business Company this 23rd day of August, 2000)

Given under my hand and seal at
Road Town, in the Territory of the
British Virgin Islands

SGD: Brenda Smith
Asst. REGISTRAR OF COMPANIES



**DUPLICATE COPY OF ORIGINAL CERTIFICATE**
This company was automatically re-registered under the BVI Business Companies Act, 2004 on the 1st day of January, 2007 with Company No. 40263'

13



# TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP. 291)

## CERTIFICATE OF INCORPORATION    (SECTIONS 14 AND 15)

No. 402637

*The Registrar of Companies of the British Virgin Islands* HEREBY CERTIFIES *that all pursuant to the International Business Companies Act, Cap. 291 that all the requirements of the Act in respect of incorporation having been satisfied,*

### VITERBI SERVICES LIMITED

is incorporated in the British Virgin Islands as an International Business Company this 23rd day of August, 2000.

Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands



REGISTRAR OF COMPANIES

CRTI001E



14



**TRIDENT TRUST**

COMPANY FORMATIONS

RECEIVED
AUG 23 2000

B V I COMPANY FORMATIONS LTD

Trident Chambers
Wickhams Cay
P O Box 146
Road Town Tortola
British Virgin Islands
Tel  1-264-494-2434
Fax  1-264-494-4754
Email bvi@tridentrust.com
Web  www.tridentrust.com

August  23, 2000

Mrs  Myrna P  Herbert
Registrar of Companies
Government of the B V I
Road Town, Tortola
British Virgin Islands

Dear Mrs  Herbert,

**VITERBI SERVICES LIMITED**

Please find enclosed our cheque for $300 00 to cover the government registration fees on the incorporation of the Memorandum & Articles of Association for the above named company

We look forward to receiving two original copies for the company in due course

Yours sincerely.
TRIDENT TRUST COMPANY (B V I ) LIMITED
Per

Encs

A MEMBER OF THE TRIDENT TRUST GROUP

BAHAMAS • BARBADOS • BRITISH VIRGIN ISLANDS • CAYMAN ISLANDS • CYPRUS • GUERNSEY • HONG KONG
ISLE OF MAN • JERSEY • MAURITIUS • SWITZERLAND • UNITED KINGDOM • UNITED STATES • US VIRGIN ISLANDS

15

**INTERNATIONAL BUSINESS COMPANIES ACT, CAP. 291**
(as amended)

Section (14) 1

Certificate of Compliance with Requirements on Application for
Registration

To      Registrar of Companies

Re      **VITERBI SERVICES LIMITED**

We, TRIDENT TRUST COMPANY (B V I) LIMITED of P O BOX 146, ROAD TOWN, TORTOLA, BRITISH VIRGIN ISLANDS as registered agent of the above company, hereby certify that all the requirements of the above act in respect of the registration of the above company have been complied with

Dated the 23rd day of August, 2000

**LENIA LETTSOME**
TRIDENT TRUST COMPANY (B V I) LIMITED

_____

For official use

16

```
23-08-00          Government of the British Virgin Islands          IN0001-A
10 15 08                    Commercial Registry                     A#26
      26          Registered Agent Transaction Register             Page   1
                  Company Name Reservation Confirmation


                    Agent: Trident Trust Co. (B V I ) Ltd
                    User:  Freeman, Mayjoune


Date/                                          Res  Exp              Fee
Time         Name Reserved                     Days Date   Ref #     Amt


23-08-00
10 15.08 1  1   VITERBI SERVICES LIMITED        10  2-09-00 765827   ,00


                1 Name Reserved             Total Amount             ,00


      Please submit a copy of this receipt with incorporation documents
```

No    402637

British Virgin Islands
The International Business Companies Act
(Cap, 291)

# MEMORANDUM OF ASSOCIATION
# AND
# ARTICLES OF ASSOCIATION
# OF
## VITERBI SERVICES LIMITED

Incorporated the   **23rd**   day of   **August,**   **2000**



### B.V. I. COMPANY FORMATIONS LTD
P O Box 146
Road Town
Tortola
British Virgin Islands



# MEMORANDUM OF ASSOCIATION

## OF

## VITERBI SERVICES LIMITED

### INDEX

| CLAUSE | | PAGES |
|---|---|---|
| 1 | Name | 1 |
| 2 | Registered Office | 1 |
| 3 | Registered Agent | 1 |
| 4 | General Objects and Powers | 1 |
| 5 | Exclusions | 1-2 |
| 6 | Share Capital | 3-4 |
| 7 | Amendments | 4 |
| 8 | Definitions | 4 |



TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

MEMORANDUM OF ASSOCIATION

OF

VITERBI SERVICES LIMITED

1      **NAME**

The name of the Company is Viterbi Services Limited

2      **REGISTERED OFFICE**

The Registered Office of the Company will be the offices of Trident Trust Company (B V I) Limited, Trident Chambers, P O Box 146, Road Town, Tortola, British Virgin Islands or such other place within the British Virgin Islands as the Company from time to time may determine by a resolution of directors

3      **REGISTERED AGENT**

The Registered Agent of the Company will be Trident Trust Company (B V I) Limited or such other qualified person in the British Virgin Islands as the Company from time to time may determine by a resolution of directors

4      **GENERAL OBJECTS AND POWERS**

The object of the Company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands

The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands which are necessary or conducive to the conduct, promotion or attainment of the object of the Company

5      **EXCLUSIONS**

5 1     The Company has no power to

5 1 1     carry on business with persons resident in the British Virgin Islands,

1

20

5 1 2   own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph 5 2 5 of sub clause 5 2,

5 1 3   carry on banking or trust business unless it is licensed under the Banks and Trust Companies Act, 1990,

5 1 4   carry on business as an insurance or reinsurance company, insurance agent or insurance broker unless it is licensed under an enactment authorising it to carry on that business,

5 1 5   carry on business of company management, unless it is licensed under the Company Management Act, 1990, or

5 1.6   carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands

5 2   For the purposes of paragraph 5 1.1 of sub clause 5.1, the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if,

5 2 1   it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands,

5 2 2   it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands,

5 2 3   it prepares or maintains books and records within the British Virgin Islands,

5 2.4   it holds, within the British Virgin Islands, meetings of its directors or members,

5 2 5   it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained,

5 2 6   it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Act, or

5 2 7   shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act

2

6      **SHARE CAPITAL**

6 1      CURRENCY

Shares in the Company shall be issued in the currency of The United States of America

6 2      AUTHORISED CAPITAL

The Authorised Share Capital of the Company is US$50,000 00 divided into 50,000 shares of US$1 00 each, with one vote per share

6.3      CLASSES OF SHARES

The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series

6.4      RIGHTS, QUALIFICATIONS OF SHARES

The directors shall by resolution have the power to issue any class or series of shares that the company is authorised to issue in its capital, original or increased, with or subject to any designations, powers, preferences, rights, qualifications, limitations and restrictions.

6 5      REGISTERED OR BEARER SHARES

6 5.1      The directors are authorised at their discretion to determine by resolution whether shares are to be issued as registered shares or as shares to bearer or both

6 5.2      Shares issued as registered shares may be exchanged for shares issued to bearer   Shares issued to bearer may be exchanged for registered shares

6 5 3      Notice to the holders of shares issued to bearer shall be sent by prepaid registered post addressed to the addressee to which the original bearer shares were despatched and notice to such address shall constitute proper service upon the bearer of such shares

6 6      TRANSFER OF SHARES

Registered shares in the Company may be transferred subject to the prior or subsequent approval of the Company as evidenced by a resolution of directors or

3

by a resolution of members

7   **AMENDMENTS**

The Company may amend its Memorandum of Association and Articles of Association in any way permitted by the International Business Companies Act by a resolution of members or a resolution of directors

8   **DEFINITIONS**

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto

We, the undersigned, of the address stated below, for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association this 23rd day of August, 2000 in the presence of the undersigned witness

NAME AND ADDRESS
OF WITNESS

Mayjoune Freeman
c/o P O, Box 146
Road Town, Tortola
British Virgin Islands

SUBSCRIBER

Lenia Lettsome
For and on behalf of
Trident Trust Company (B V I) Limited
Trident Chambers
P O Box 146
Road Town, Tortola
British Virgin Islands

4

23

# ARTICLES OF ASSOCIATION

## OF

## VITERBI SERVICES LIMITED

| CLAUSE | INDEX | PAGES |
|---|---|---|
| 1 | Interpretation | 1-3 |
| 2 | Registered Shares | 3 |
| 3 | Bearer Shares | 4-6 |
| 4 | Shares, Authorised Capital and Capital | 6-8 |
| 5 | Transfer of Shares | 8 |
| 6 | Transmission of Shares | 8-9 |
| 7 | Reduction or Increase in Authorised Capital or Capital | 9-10 |
| 8 | Mortgages and Charges of Registered Shares | 10-11 |
| 9 | Forfeiture | 11 |
| 10 | Meetings and Consents of Members | 11-14 |
| 11 | Directors | 14-15 |
| 12 | Powers of Directors | 15-17 |
| 13 | Proceedings of Directors | 17-18 |
| 14 | Officers | 18-19 |
| 15 | Conflicts of Interest | 19 |
| 16 | Indemnification | 19-20 |
| 17 | Seal | 20 |
| 18 | Dividends | 20-21 |
| 19 | Accounts | 21 |
| 20 | Audit | 21-22 |
| 21 | Notices | 22-23 |
| 22 | Pension and Superannuation Funds | 23 |
| 23 | Arbitration | 23 |
| 24 | Voluntary Winding Up and Dissolution | 23 |
| 25 | Continuation | 24 |

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE INTERNATIONAL BUSINESS COMPANIES ACT**
**(CAP. 291)**

**ARTICLES OF ASSOCIATION OF**

**VITERBI SERVICES LIMITED**

1    **INTERPRETATION**

In these Articles, if not inconsistent with the context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof

|  | **Expression:** | **Meaning:** |
|---|---|---|
| 1 1 | **capital** | The sum of the aggregate par value of all outstanding shares with par value of the Company and shares with par value held by the Company as treasury shares plus |
|  |  | 1 1 1   the aggregate of the amounts designated as capital of all outstanding shares without par value of the Company and shares without par value held by the Company as treasury shares, and |
|  |  | 1 1 2   the amounts as are from time to time transferred from surplus to capital by a resolution of directors |
| 1 2 | **member** | A person who holds shares in the Company |
| 1 3 | **person** | An individual, a corporation, a trust, the estate of a deceased individual, a partnership or an unincorporated association of persons |
| 1 4 | **resolution of directors** | 1 4 1   a resolution approved at a duly constituted meeting of directors or of a committee of directors of the Company, by affirmative vote of a simple majority of the directors present at the meeting who voted and did not abstain, or |
|  |  | 1.4 2   a resolution consented to in writing by all the directors or all the members of the committee, as the case may be, |
|  |  | 1.4.3   where a director is given more than one vote in any circumstances, he shall in the circumstances be counted for the purposes of establishing a majority by the number of votes he casts |

1

| 1 5 | resolution of members | 1 5 1 | A resolution approved at a duly constituted meeting of the members of the company by the affirmative vote of |
|---|---|---|---|

|  |  | 1 5 1 1 | a simple majority, or such larger majority as may be specified in the Articles, of the votes of the shares that were present at the meeting and entitled to vote thereon and were voted and did not abstain, or |
|---|---|---|---|
|  |  | 1 5 1 2 | a simple majority, or such larger majority as may be specified in the Articles, of the votes of each class or series of shares which were present at the meeting and entitled to vote thereon as a class or series and were voted and not abstained and of a simple majority, or such larger majority as may be specified in the Articles, of the votes of the remaining shares entitled to vote thereon that were present at the meeting and were voted and not abstained, or |

| | | 1 5 2 | a resolution consented to in writing by |
|---|---|---|---|

|  |  | 1.5 2 1 | a majority, or such larger majority as may be specified in the Articles, of the votes of shares entitled to vote thereon, or |
|---|---|---|---|
|  |  | 1 5 2 2 | a majority, or such larger majority as may be specified in the Articles, of the votes of each class or series of shares entitled to vote thereon and of a majority, or such larger majority as may be specified in the Articles, of the votes of the remaining shares entitled to vote thereon |

| 1 6 | securities | Shares and debt obligations of every kind, and options, warrants and rights to acquire shares, or debt obligations |
|---|---|---|
| 1 7 | surplus | The excess, if any, at the time of the determination of the total assets of the Company over the aggregate of its total liabilities, as shown in its books of accounts, plus the Company's capital |
| 1 8 | the Act | The International Business Companies Act (Cap 291), including any modification, extension, re-enactment or renewal thereof and any regulations made thereunder |
| 1 9 | the Memorandum | The Memorandum of Association of the Company as originally framed or as from time to time amended |

2

| 1 10 | the Seal | Any seal which has been adopted as the Seal of the Company |

1 10 **the Seal**  Any seal which has been adopted as the Seal of the Company

1 11 **these Articles**  These Articles of Association as originally framed or as from time to time amended

1 12 **treasury shares**  Shares in the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled

1 13 **"Written"** or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or re-presented or reproduced by any mode of representing or re-producing words in a visible form, including telex, telegram, facsimile, cable or other form of writing produced by electronic communication

1 14 Save as aforesaid any words or expressions defined in the Act shall bear the same meaning in these Articles

1 15 Whenever the singular or plural number, or the masculine, feminine or neuter gender is used in these Articles, it shall equally, where the context admits, include the others

1 16 A reference in these Articles to voting in relation to shares shall be construed as a reference to voting by members holding the shares except that it is the votes allocated to the shares that shall be counted and not the number of members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction

1 17 A reference to money in these Articles is, unless otherwise stated, a reference to the currency in which shares in the Company shall be issued according to the provisions of the Memorandum

2                              **REGISTERED SHARES**

2 1 The Company shall issue to every member holding registered shares in the Company a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him and the signature of the director or officer and the Seal may be a facsimile

2 2 Any member receiving a share certificate for registered shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of the wrongful or fraudulent use or representation made by any person by virtue of the possession thereof If a share certificate for registered shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors

2 3 If several persons are registered as joint holders of any shares, any one of such persons may be given receipt for any dividend payable in respect of such shares

3

27

3                           **BEARER SHARES**

3 1     Subject to a request for the issue of bearer shares and to the payment of the appropriate consideration for the shares to be issued, the Company may, to the extent authorized by the Memorandum, issue bearer shares to, and at the expense of, such person as shall be specified in the request  The Company may also upon receiving a request in writing accompanied by the share certificate for the shares in question, exchange registered shares for bearer shares or may exchange bearer shares for registered shares  Such request served on the Company by the holder of bearer shares shall specify the name and address of the person to be registered and  unless the request is delivered in person by the bearer shall be authenticated as hereinafter provided  Such request served on the Company by the holder of bearer shares shall also be accompanied by any coupons or talons which at the date of such delivery have not become due for payment of dividends or any other distribution by the Company to the holders of such shares  Following such exchange the share certificate relating to the exchanged shares shall be delivered as directed by the member requesting the exchange

3 2     Bearer share certificates shall be under the Seal and shall carry an identifying number and state that the bearer is entitled to the shares therein specified, and may provide by coupons, talons, or otherwise for the payment of dividends or other monies on the shares included therein

3.3     Subject to the provisions of the Act and of these Articles the bearer of a bearer share certificate shall be deemed to be a member of the Company and shall be entitled to the same rights and privileges as he would have had if his name had been included in the share register of the Company as the holder of the shares

3.4     Subject to any specific provisions in these Articles, in order to exercise his rights as a member of the Company, the bearer of a bearer share certificate shall produce the bearer share certificate as evidence of his membership of the Company  Without prejudice to the generality of the foregoing, the following rights may be exercised  in the following manner

       3 4 1   for the purpose of exercising his voting rights at a meeting, the bearer of a bearer share certificate shall produce such certificate to the chairman of the meeting;

       3 4 2   for the purpose of exercising his vote on a resolution in writing, the bearer of a bearer share certificate shall cause his signature to any such resolution to be authenticated as hereinafter set forth

       3 4 3   for the purpose of requisitioning a meeting of members, the bearer of a bearer share certificate shall address his requisition to the directors and his signature thereon shall be duly authenticated as hereinafter provided, and

       3 4 4   for the purpose of  receiving dividends, the bearer of the bearer share certificate shall present at such places as may be designated by the directors any coupons or talons issued for such purpose, or shall present the bearer share certificate to any paying agent authorised to pay dividends

3 5     The signature of the bearer of a bearer share certificate shall be deemed to be duly authenticated if the bearer of the bearer share certificate shall produce such certificate to a

notary public or a bank manager or a director or officer of the Company (herein referred to as an "authorised person") and if the authorised person shall endorse the document bearing such signature with a statement

3 5 1   identifying the bearer share certificate produced to him by number and date and specifying the number of shares and the class of shares (if appropriate) comprised therein,

3 5 2   confirming that the signature of the bearer share certificate was subscribed in his presence and that if the bearer is representing a body corporate he has so acknowledged and has produced satisfactory evidence thereof, and

3 5 3   specifying the capacity in which he is qualified as an authorised person and, if a notary public, affixing his seal thereto or, if a bank manager, attaching an identifying stamp of the bank of which he is a manager

3 6   Notwithstanding any other provisions of these Articles, at any time, the bearer of a bearer share certificate may deliver the certificate for such shares into the custody of the Company at its registered office, whereupon the Company shall issue a receipt therefor under the Seal signed by a director or officer identifying by name and address the person delivering such certificate and specifying the date and number of bearer share certificates so deposited and the number of shares comprised therein Any such receipt may be used by the person named therein for the purpose of exercising the rights vested in the shares represented by the bearer share certificate so deposited including the right to appoint a proxy Any bearer share certificate so deposited shall be returned to the person named in the receipt or his personal representative if such person be dead and thereupon the receipt issued therefor shall be of no further effect whatsoever and shall be returned to the company for cancellation or, if it has been lost or mislaid, such indemnity as may be required by resolution of directors shall be given to the Company.

3 7   The bearer of a bearer share certificate shall for all purposes be deemed to be the owner of the shares comprised in such certificate and in no circumstances shall the Company or the Chairman of any meeting of members or the Company's registrars or any director or officer of the Company or any authorised person be obliged to inquire into the circumstances whereby a bearer share certificate came into the hands of the bearer thereof, or to question the validity or authenticity of any action taken by the bearer of a bearer share certificate whose signature has been authenticated as provided herein

3.8   If the bearer of a bearer share certificate shall be a corporation, then all the rights exercisable by virtue of such shareholding may be exercised by an individual duly authorised to represent the corporation but unless such individual shall acknowledge that he is representing a corporation and shall produce upon request satisfactory evidence that he is duly authorised to represent the corporation, the individual shall for all purposes hereof be regarded as the holder of the shares in any bearer share certificate held by him

3 9   The directors may provide for payment of dividends to the holders of bearer shares by coupons or talons and in such event the coupons or talons shall be in such form and payable at such time and in such place or places as the directors shall resolve The Company shall be entitled to recognise the absolute right of the bearer of any coupon or talon issued as aforesaid to payment of the dividend to which it relates and delivery of the coupon or talon to the Company or its agents shall constitute in all respects a good

5

discharge of the Company in respect of such dividend

3 10    If any bearer share certificate, coupon or talon be worn out or defaced, the directors may, upon the surrender hereof for cancellation, issue a new one in its stead, and if any bearer share certificate, coupon or talon be lost or destroyed, the directors may upon the loss or destruction being established to their satisfaction, and upon such indemnity being given to the Company as it shall by resolution of directors determine, issue a new bearer share certificate in its stead, and in either case on payment of such sum as the Company may from time to time by resolution of directors require   In case of loss or destruction the person to whom such new bearer share certificate, coupon or talon is issued shall also bear and pay to the Company all expenses incidental to the investigation by the Company of the evidence of such loss or destruction and to such indemnity

## 4                                     SHARES, AUTHORISED CAPITAL AND CAPITAL

4 1     Subject to the provisions of these Articles and any resolution of members the unissued shares of the Company shall be at the disposal of the directors who may, without limiting or affecting any rights previously conferred on the holders of any existing shares or class or series of shares, offer, allot, grant options over or otherwise dispose of the shares to such persons, at such times and upon such terms and conditions as the Company may by resolution of directors determine

4 2     No share in the Company may be issued until the consideration in respect thereof is fully paid, and when issued the share is for all purposes fully paid and non-assessable save that a share issued for a promissory note or other written obligation for payment of a debt may be issued subject to forfeiture in the manner prescribed in these Articles

4 3     Shares in the Company shall be issued for money, services rendered, personal property, an estate in real property, a promissory note or other binding obligation to contribute money or property or any combination of the aforegoing as shall be determined by a resolution of directors

4 4     Shares in the Company may be issued for such amount of consideration as the directors may from time to time by resolution of directors determine, except that in the case of shares with par value, the amount shall not be less than the par value, and in the absence of fraud the decision of the directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved   The consideration in respect of the shares constitutes capital to the extent of the par value and the excess constitutes surplus

4 5     A share issued by the Company upon conversion of, or in exchange for, another share or a debt obligation or other security in the Company, shall be treated for all purposes as having been issued for money equal to the consideration received or deemed to have been received by the Company in respect of the other share, debt obligation or security

4 6     Treasury shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with these Articles) as the Company   may by   resolution of directors   determine

6

4 7     The Company may issue fractions of a share and a fractional share shall have the same corresponding fractional liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole share of the same class or series of shares

4 8     Upon the issue by the Company of a share without par value, if an amount is stated in the Memorandum to be authorized capital represented by such shares then each share shall be issued for no less than the appropriate proportion of such amount which shall constitute capital, otherwise the consideration in respect of the share constitutes capital to the extent designated by the directors and the excess constitutes surplus, except that the directors must designate as capital an amount of the consideration that is at least equal to the amount that the share is entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company

4 9     The Company may, subject to any limitations imposed by the Act, purchase, redeem or otherwise acquire and hold its own shares but only out of surplus or in exchange for newly issued shares of equal value

4.10    Subject to provisions to the contrary in

    4 10 1  the Memorandum or these Articles,

    4 10 2  the designations, powers, preferences, rights, qualifications, limitations and restrictions with which the shares were issued, or

    4 10 3  the subscription agreement for the issue of the shares, the Company may not purchase, redeem or otherwise acquire its own shares without the consent of the members whose shares are to be purchased, redeemed or otherwise acquired

4 11    No purchase, redemption or other acquisition of shares shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved

4 12    A determination by the directors under the preceding Regulation is not required where shares are purchased, redeemed or otherwise acquired

    4 12 1  pursuant to a right of a member to have his shares redeemed or to have his shares exchanged for money or other property of the Company,

    4 12 2  by virtue of a transfer of capital pursuant to Regulation 7 3;

    4 12 3  by virtue of the provisions of Section 83 of the Act, or

    4 12 4  pursuant to an order of the Court

4 13    The Company may purchase, redeem or otherwise acquire its shares at a price lower than the fair value if permitted by, and then only in accordance with, the terms or

    4 13 1    the Memorandum or these Articles, or

    4 13 2    a written agreement for the subscription for the shares to be purchased, redeemed or otherwise acquired

4 14    Shares that the Company purchases, redeems or otherwise acquires pursuant to the preceding Regulations may be cancelled or held as treasury shares   Upon the cancellation of a share, the amount included as capital of the Company with respect to that share shall be deducted from the capital of the Company

4 15    Where shares in the Company are held by the Company as treasury shares or are held by another company of which the Company holds, directly or indirectly, shares having more than 50 percent of the votes in the election of directors of the other company, such shares of the Company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose except for purposes of determining the capital of the Company

## 5                    TRANSFER OF SHARES

5 1    Subject to any limitations in the Memorandum, registered shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the directors may accept such evidence of a transfer of shares as they   consider appropriate

5 2    The Company shall not be required to treat a transferee of a registered share in the Company as a member until the transferee's name has been entered in the share register

5 3    Subject to any limitations in the Memorandum, the Company must, on the application of the transferor or transferee of a registered share in the Company, enter in the share register the name of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of directors determine provided always that such registration shall not be suspended and the share register closed for more than 60 days in any period of 12 months

## 6                    TRANSMISSION OF SHARES

6 1    The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognised by the Company as having any title to his share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the next following two regulations

6 2    Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered

as a member upon such evidence being produced as may reasonably be required by the directors   An application by any such person to be registered as a member shall be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such

6 3    Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer

6 4    What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case

## 7    REDUCTION OR INCREASE IN AUTHORISED CAPITAL OR CAPITAL

7 1    The Company may by a resolution of members or a resolution of directors amend the Memorandum to increase or reduce its authorised capital and in connection therewith the Company may in respect of any unissued shares increase or reduce the number of such shares, increase or reduce the par value of any shares or effect any combination of the foregoing.

7 2    The Company may amend the Memorandum to

7 2 1    divide the shares, including issued shares, of a class or series into a larger number of shares of the same class or series, or

7 2 2    combine the shares, including issued shares, of a class or series into a smaller number of shares of the same class or series,

provided however, that where shares are divided or combined under this Regulation, the aggregate par value of the new shares must be equal to the aggregate par value of the original shares

7 3    The capital of the Company may by a resolution of directors be increased by transferring an amount of the surplus of the Company to capital

7 4    Subject to the provisions of Regulations 7 5 and 7 6 the capital of the Company may by resolution of directors be reduced by transferring an   amount of the capital of the Company to surplus

7 5    No reduction of capital shall be effected that reduces the capital of the Company to an amount that immediately after the reduction is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company

7 6    No reduction of capital shall be effected unless the directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due

9

33

in the ordinary course of its business and that the realisable assets of the Company will not be less than its total liabilities. other than deferred taxes, as shown in the books of the Company and its remaining capital, and, in the absence of fraud, the decision of the directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved

7 7    Where the Company reduces its capital the Company may

    7 7 1    return to its members any amount received by the Company upon the issue of any of its shares,

    7 7 2    purchase, redeem or otherwise acquire its shares out of capital, or

    7 7 3    cancel any capital that is lost or not represented by assets having a realisable value

7 8    The Company may by a resolution of directors include in the computation of surplus for any purpose the unrealized appreciation of the assets of the Company, and, in the absence of fraud, the decision of the directors as to the value of the assets is conclusive, unless a question of law is involved

## 8.    MORTGAGES AND CHARGES OF REGISTERED SHARES

8 1    Members may mortgage or charge their registered shares in the Company and upon satisfactory evidence thereof the Company shall give effect to the terms of any valid mortgage or charge except insofar as it may conflict with any requirements herein contained for consent to the transfer of shares

8 2    In the case of the mortgage or charge of registered shares there may be entered in the share register of the Company at the request of the registered holder of such shares

    8 2 1    a statement that the shares are mortgaged or charged,

    8 2 2    the name of the mortgagee or chargee; and

    8 2 3    the date on which the aforesaid particulars are entered in the share register

8 3    Where particulars of a mortgage or charge are registered, such particulars shall be cancelled

    8 3.1    with the consent of the named mortgagee or chargee or anyone authorized to act on his behalf, or

    8 3 2    upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable

8 4    Whilst particulars of a mortgage or charge are registered, no transfer of any share comprised therein shall be effected without the written consent of the named mortgagee or chargee or anyone authorized to act on his behalf

10

34

8 5    The provisions of this Regulation 8 shall be without prejudice to the rights of the holder of bearer shares to mortgage such shares in the manner provided in the Act

## 9                      FORFEITURE

9 1    When shares issued for a promissory note or other written obligation for payment of a debt have been issued subject to forfeiture, the following provisions shall apply

9 2    Written notice specifying a date for payment to be made and the shares in respect of which payment is to be made shall be served on the member who defaults in making payment pursuant to a promissory note or other written obligations to pay a debt

9 3    The written notice specifying a date for payment shall

    9 3 1    name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which payment required by the notice is to be made, and

    9.3 2    contain a statement that in the event of non-payment at or before the time named in the notice the shares, or any of them, in respect of which payment is not made will be liable to be forfeited

9 4    Where a written notice has been issued and the requirements have not been complied with within the prescribed time, the directors may at any time before tender of payment forfeit and cancel the shares to which the notice relates

9 5    The Company is under no obligation to refund any moneys to the member whose shares have been forfeited and cancelled pursuant to these provisions   Upon forfeiture and cancellation of the shares the member is discharged from any further obligation to the Company with respect to the shares forfeited and cancelled

## 10                  MEETINGS AND CONSENTS OF MEMBERS

10.1    The directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the directors consider necessary or desirable

10 2    Upon the written request of members holding 10 percent or more of the outstanding voting shares in the Company the directors shall convene a meeting of members

10 3    The directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting   The directors may fix the date notice is given of a meeting of members as the record date for determining those shares that are entitled to vote at a meeting

10 4    A meeting of members held in contravention of the requirement in Regulation 10 3 is valid

11

35

10 4 1  if members holding not less than 90 percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or 90 percent of the votes of each class or series of shares where members are entitled to vote thereon as a class or series together with not less than a 90 percent majority of the remaining votes, have agreed to shorter notice of the meeting, or

10 4 2  if all members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver

10 5   The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting

10 6   A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member

10 7   The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote

10 8   An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy

(Name of Company)

I/We_____

being a member of the above Company with_____

shares HEREBY APPOINT_____

of_____ or failing him_____

of
_____

to be my/our proxy to vote for me/us at the meeting of members to be held on the

day_____ 20____ and,_____ at any

adjournment thereof

(Any restrictions on voting to be inserted here)

Signed this day of _____, _____

_____
Member

10 9   The following shall apply in respect of joint ownership of shares

12

36

10 9 1  if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member,

10 9 2  if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and,

10 9 3  if two or more of the joint owners are present in person or by proxy they must vote as one

10 10  A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

10 11  A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the shares or class or series of shares entitled to vote on resolutions of members to be considered at the meeting   If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person, then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members

10 12  If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved, in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved

10 13  At every meeting of members, the Chairman of the Board of Directors shall preside as chairman of the meeting   If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting, the members present shall choose someone of their number to be the chairman   If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair

10 14  The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place

10 15  At any meeting of the members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof   If the chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any member present in person or by proxy

13

37

who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken  If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman

10 16   Any  person other than an individual shall be regarded as one member and subject to Regulation 10 17 the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence  In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any member

10 17   Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise if it were an individual member of the Company

10 18   The chairman  of  any  meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded

10 19   Directors of the Company may attend and speak at any meeting of members of the Company and at any separate meeting of the holders of any class or series of shares in the Company

10 20   An action that may be taken by the members at a meeting may also be taken by a resolution of members consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication, without the need for any notice, but if any resolution of members is adopted otherwise than by the unanimous written consent of all members, a copy of such resolution shall forthwith be sent to all members not consenting to such resolution  The consent may be in the form of counterparts, each counterpart being signed by one or more members

11                              **DIRECTORS**

11 1   The  first directors  of  the  Company  shall  be  elected  by  the  subscribers  to  the Memorandum, and thereafter, the directors shall be elected

11 1 1  by the members for such terms as the members determine, or

11 1 2  by the directors for such terms as the directors may determine

11 2   Until directors are appointed the subscribers to the Memorandum of Association shall have the power to act as directors

11 3   The minimum number of directors shall be one and the maximum number shall be

14

38

twenty

11 4    Each director shall hold office for the term, if any, fixed by resolution of members or directors, as the case may be   In the case of a director who is an individual the term of office of a director shall  terminate on the director's death, resignation or removal   The bankruptcy of a corporate director shall terminate the term of office of such director

11 5    A director may be removed from office, with or without cause, by a resolution of members or, with cause, by a resolution of directors

11 6    A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice

11 7    A vacancy in the Board of Directors may be filled by a resolution of members or by a resolution of a majority of the remaining directors

11 8    With the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the  Company

11 9    A director shall not require a share qualification, and may be an individual or a company.

11.10  The Company may determine by resolution of directors to keep a register of  directors containing

    11.10 1  the names and addresses of the persons who are directors of the Company,

    11 10 2  the date on which each person whose name is entered in the register was appointed as a director of the Company, and

    11 10 3  the date on which each person named as a director ceased to be a director of the Company

11 11   If the directors determine to maintain a register of directors, a copy thereof shall be kept at the registered office of Company and the Company may determine by resolution of directors to register a copy of the register with the Registrar of Companies

12                          **POWERS OF DIRECTORS**

12 1    The business and affairs of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the members of the Company, subject to any delegation of such powers as may authorised by these Articles and to such requirements as may be prescribed by a resolution of members, but no requirement made by a resolution of members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been  made

15

12 2   The directors may, by a resolution of directors, appoint any person, including a person who is a director, to be an officer or agent of the Company   The resolution of directors appointing an agent may authorize the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent  by the Company

12 3   Every officer or agent of the Company has such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the matters requiring a resolution of directors under the Act

12 4   Any director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the Board of Directors or with respect to unanimous written  consents

12 5   The continuing directors may act notwithstanding  any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of directors, the continuing directors or director may appoint directors to fill any vacancy that has arisen or summon a meeting  of members

12 6   The directors may by resolution of directors exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings and property or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

12 7   All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of directors.

12 8   The directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons whether appointed directly or indirectly by the directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Regulations) and for such period and subject to such conditions as they may think fit and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with such attorney or attorneys as the directors may think fit and may also authorise any such attorney or attorneys to delegate all or any powers, authorities and discretions vested in them

12.9   The Company may determine by resolution of directors to maintain at its registered office a register of mortgages, charges and other encumbrances in which there shall be entered the following particulars regarding each mortgage, charge and other encumbrance

12 9 1  the sum secured;

12 9 2  the assets secured,

12 9 3  the name and address of the mortgagee, chargee or other encumbrancer,

16

12 9 4  the date of creation of the mortgage, charge or other encumbrance, and

12 9 5  the date on which the particulars specified above in respect of the mortgage, charge or other encumbrance are entered in the register

12 10  The Company may further determine by a resolution of directors to register a copy of the register of mortgages, charges or other encumbrances with the Registrar of Companies

13.                                   **PROCEEDINGS OF DIRECTORS**

13 1  The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable

13 2  A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other

13 3  A director shall be given not less than 3 days notice of meetings of directors, but meeting of directors held without 3 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend, waive notice of the meeting, and for this purpose, the presence of a director at the meetings shall be deemed to constitute waiver on his part. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting

13 4  A director may by a written instrument appoint an alternate who need not be a director and an alternate is entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director

13 5  A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate more than one half of the total number of directors.

13 6  If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of directors   Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes

13.7  At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting   If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting the Vice Chairman of the Board of  Directors shall preside  If there is no Vice Chairman of the Board of Directors or if the Vice Chairman of the Board of Directors is not present at the meeting the directors present shall choose someone of their number to be chairman of the meeting.

17

13 8    An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution of directors or a committee of directors consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication by all directors or all members of the committee, as the case may be, without the need for any notice   The consent may be in the form of counterparts, each counterpart being signed by one or more directors

13 9    The directors shall cause the following corporate records to be kept

13 9 1   minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members,

13 9 2   copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members, and

13 9 3   such other accounts and records as the directors by resolution of directors consider necessary or desirable in order to reflect the financial position of the Company

13 10   The books, records and minutes shall be kept at the registered office of the Company, its principal place of business or at such other place as the directors determine

13 11   The directors may, by a resolution of directors, designate one or more committees, each consisting of one or more directors

13 12   Each committee of directors has such powers and authorities of the directors, including the power and authority to affix the Seal, as are set forth in the resolution of directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles to appoint directors or fix their emoluments, or to appoint officers or agents of the Company

13.13   The meetings and proceedings of each committee of directors consisting of 2 or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution establishing the committee

## 14                                      OFFICERS

14 1    The Company may by resolution of directors appoint officers of the Company at such times as shall be considered necessary or expedient   Such officers may consist of a Chairman of the Board of Directors, a Vice Chairman of the Board of Directors, President and one or more Vice Presidents, Secretaries and Treasurers and such other officers as may from time to time be deemed desirable   Any number of offices may be held by the same person

14 2    The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of

18

42

Directors to preside at meetings of directors and members, the Vice Chairman to act in the absence of the Chairman, the President to manage the day to day affairs of the Company, the Vice Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company

14 3    The emoluments of all officers shall be fixed by resolution of directors

14 4    The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors   Any vacancy occurring in any office of the Company may be filled by resolution of directors

15                              **CONFLICTS OF INTEREST**

15 1    No agreement or transaction between the Company and one or more of its directors or any person in which any director has a financial interest or to whom any director is related, including as a director of that other person, is void or voidable for this reason only or by reason only that the director is present at the meeting of directors or at the meeting of the committee of directors that approves the agreement or transaction or that the vote or consent of the director is counted for that purpose if the material facts of the interest of each director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other directors

15 2    A director who has an interest in any particular business to be considered at a meeting of directors or members may be counted for purposes of determining whether the meeting is duly constituted

16                                **INDEMNIFICATION**

16 1    Subject to the limitations hereinafter provided the Company may indemnify against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who

   16 1 1   is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company, or

   16 1 2   is or was, at the request of the Company, serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise

16 2    The Company may only indemnify a person if the person acted honestly and in good faith

with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful

16 3    The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful, is in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved

16 4    The termination of any proceedings by any judgement, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful

16 5    If a person to be indemnified has been successful in defence of any proceedings referred to in that Regulation the person is entitled to be indemnified against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings

16 6    The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under Regulation 16 1

17                              **SEAL**

The directors shall provide for the safe custody of the Seal  An imprint of the Seal shall be kept at the registered office of the company  The Seal when affixed to any written instrument shall be witnessed by a director or any other person so authorised from time to time by resolution of directors  The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

18                              **DIVIDENDS**

18 1    The Company may by a resolution of directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus  In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorising the dividends, a fair and proper value for the assets to be so distributed

18.2    The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the Company

18 3    The directors may, before declaring any dividend, set aside out of the profits of the

20

44

Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select

18 4    No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital  In the absence of fraud, the decision of the directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved

18 5    Notice of any dividend that may have been declared shall be given to each member in manner hereinafter mentioned and all dividends unclaimed for 3 years after having been declared may be forfeited by resolution of directors for the benefit of the Company

18 6    No dividend shall bear interest as against the Company and no dividend shall be paid on shares described in Regulation 4 15

18 7    A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred to capital upon the issue of the share

18 8    In the case of a dividend of authorised but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution

18 9    In the case of a dividend of authorized but unissued shares without par value, the amount designated by the directors shall be transferred from surplus to capital at the time of the distribution, except that the directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

18 10   A division of the issued and outstanding shares of a class or series of shares into a larger number of shares of the same class or series having a proportionately smaller par value does not constitute a dividend of shares

## 19         ACCOUNTS

The Company shall keep such accounts and records as the directors consider necessary or desirable in order to reflect the financial position of the Company

## 20         AUDIT

20 1    The Company may by resolution of members call for the accounts to be examined by auditors in which event the remaining provisions of this Regulation 20 shall apply to the appointment and activities of the auditors

20 2    The first auditors shall be appointed by resolution of directors; subsequent auditors shall be appointed by a resolution of members

21

45

20 3   The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office

20 4   The remuneration of the auditors of the Company

20 4 1   in the case of auditors appointed by the directors, may be fixed by resolution of directors,

20 4 2   subject to the foregoing, shall be fixed by resolution of members or in such manner as the Company may by resolution of members determine

20 5   The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not

20 5 1   in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period,

20 5 2   all the information and explanations required by the auditors have been obtained

20 6   The report of the auditors shall be annexed to the accounts and shall be read at the meeting of members at which the accounts are laid before the Company or shall be served on the members.

20 7   Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors

20 8   The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented

21                  **NOTICES**

21 1   Any notice, information or written statement to be given by the Company to members may be served in the case of members holding registered shares in any way by which it can reasonably be expected to reach each member or by mail addressed to each member at the address shown in the share register and in the case of members holding shares issued to bearer, in the manner provided in the Memorandum

21 2   Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company

21 3   Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons,

22

notice, order, document, process, information or written statement was delivered to the registered office or the registered agent of the Company or that it was mailed in such time as to admit to its being delivered to the registered agent of the Company in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid

## 22              PENSION AND SUPERANNUATION FUNDS

The directors may establish and maintain or procure the establishment and maintenance of any non-contributory or contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to, any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is or has been at any time interested, and to the wives, widows, families and dependents of any such person, and may make payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid  Subject always to the proposal being approved by resolution of members, a director holding any such employment or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension, allowance or emolument

## 23              ARBITRATION

23 1      Whenever any difference arises between the Company on the one hand and any of the members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Act, touching anything done or executed, omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these Articles, or to any Act or Act affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to two arbitrators one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire

23 2      If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for 10 days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party

## 24             VOLUNTARY WINDING UP AND DISSOLUTION

The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of directors

23

25                    **CONTINUATION**

The Company may by resolution of members or by resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws

We, the undersigned, of the address stated below, for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association this 23rd day of August, 2000 in the presence of the undersigned witness

NAME AND ADDRESS                           SUBSCRIBER
OF WITNESS

Mayjoune Freeman                           Lenia Lettsome
c/o P. O Box 146                           For and on behalf of
Road Town, Tortola                         Trident Trust Company (B V I) Limited
British Virgin Islands                     Trident Chambers
                                           P O Box 146
                                           Road Town, Tortola
                                           British Virgin Islands

**VIRRGIN**

Page 1 of 4

## POST-INCORPORATION TRANSACTIONS

### Notice of Election to Disapply Part IV

BVI Company No.     :     402637

Company Name     :     VITERBI SERVICES LIMITED

## Shares Information

**Authorisation to Issue Shares :**

The company is authorised to issue shares

Unlimited No. of Shares     :     ☐

Number of Shares:     :     50,000.00

Par value Shares:     :     �toggle Yes     ☐ No

**Is the company authorised to issue, convert or exchange registered shares for bearer shares?**

☐ Yes     ● No

Have bearer shares been issued?     Yes     No

☐ Bearer shares are held by a qualifying custodian within the meaning of Paragraph II of Schedule I, Part III

☐ Bearer shares are held by an authorized or recognized non-qualifying custodian

### List of Existing Custodians

| S.No | Custodian Name | Identification No. |
|---|---|---|
| | No Existing Custodian | |

### List of Custodians

| S.No | Custodian Name | Identification No. |
|---|---|---|
| | No Existing Custodian | |

## Declaration

I / We, TRIDENT TRUST COMPANY (B.V.I.) LIMITED, hereby declare that:

(a) the above company is a former Act IBC that was automatically re-registered as a BVI business company under Part III of Schedule 2 on 1st January 2007;

(b) the company has adopted a new memorandum and articles that complies with the BVI Business Companies Act, including paragraph 12(3) and (4) of Schedule 2;

(c) the company is a company limited by shares:

(d) the company elects to disapply Part IV of Schedule 2 of the Act:

(e) the election to disapply and the new memorandum and articles have been approved:

**VIRRGIN**

## POST-INCORPORATION TRANSACTIONS

by resolution of members dated                    :

by resolution of directors dated                  :   15/07/2020

(f) where the memorandum and articles has been approved by resolution of directors, the directors would have been authorised to make amendments to the original memorandum and articles having the same effect as the new memorandum and articles; and

(g) we will continue to be registered agent of the company on the registration of this notice and the company will continue to have the same registered office in the registration of this notice.

(h) I hereby certify that the information stated on this form is correct.

New memorandum and articles signed by us
as registered agent: (In English)                 :   20200721124205fxjpwirxuli3wghs7t7ta.pdf

New memorandum and articles signed by us
as registered agent: (Foreign Language)           :

## Attachment (If company is authorized to issue bearer shares, attach one of the following two options)

A declaration that, at the date of this notice,
all the bearer shares in the company in issue
have been delivered to, and are in the           :
custody of, an authorized or recognized
custodian: (In English)

A declaration that, at the date of this notice,
all the bearer shares in the company in issue    :
have been delivered to, and are in the
custody of, an authorized or recognized
custodian: (Foreign Language)

## OR

A declaration that, there are no bearer
shares in the company in issue: (In English)     :   20200721134331o6d6k8zovsg0ytjnssaoc.pdf

A declaration that, there are no bearer
shares in the company in issue: (Foreign         :
Language)

[✓]   **If amendment to Memorandum and Articles of Company has been made, complete the following :**

The above company has amended its:(choose at least one of the first two options)

[✓]   Memorandum

[✓]   Article

by resolution dated:              15/07/2020

[ ]   Authorization to revert to registered shares

VIRRGIN

Page 3 of 4

## POST-INCORPORATION TRANSACTIONS

Attach declaration that the company has no bearer shares in issue on the date of filing this notice:(In English)    :

Attach declaration that the company has no bearer shares in issue on the date of filing this notice:(Foreign Language)    :

### Declaration (attach one of the following four options)

Details of the amendment are set out on the attached sheet:(In English)    :    20200721134331wxjpbg0hnwee2z4jve1gc.pdf

Details of the amendment are set out on the attached sheet:(Foreign Language)    :

**OR**
Restated memorandum: (In English)    :

Restated memorandum: (Foreign Language)    :

**OR**
Restated articles: (In English)    :

Restated articles: (Foreign Language)    :

**OR**
The restated memorandum and articles incorporating the amendments made:(In English)    :

The restated memorandum and articles incorporating the amendments made: (Foreign Language)    :

Translator's Certificate:    :

Agent    :    TRIDENT TRUST COMPANY (B.V.I.) LIMITED

Trident Chambers

P.O. Box 146

Road Town

Tortola

VG1110

VIRGIN ISLANDS, BRITISH

51

**VIRRGIN**

Page 4 of 4

## POST-INCORPORATION TRANSACTIONS

### Additional Request

| S/No. | Document Type | Quantity |
|---|---|---|
| | No Additional Request | |

### Remarks

Please note that these comments will have no legal implications, nor form any part of the Company's Profile

I / We, TRIDENT TRUST COMPANY (B.V.I.) LIMITED, hereby confirm that information provided is true and correct to our knowledge.

Authorised Signatory Name          :    Penn, Kendra

| Name | : | Penn, Kendra | BVI Company No. | : | 402637 |
|---|---|---|---|---|---|
| Agent No. | : | 26 | Date of Filing | : | 21/07/2020   19:50:10 |
| Agent Name | : | TRIDENT TRUST COMPANY (B.V.I.) LIMITED | Transaction No. | : | T200465953 |
| Agent Address | : | Trident Chambers | Receipt No. | : | RCS00000003583704 |
| | | P.O. Box 146 | | | |
| | | Road Town | | | |
| | | Tortola | | | |
| | | VG1110 | | | |
| | | VIRGIN ISLANDS, BRITISH | | | |
| Agent Voice No. | : | 284-494-2434 | | | |
| Agent Email | : | bvi@tridenttrust.com | | | |

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**
**BVI BUSINESS COMPANIES ACT, 2004**

**CERTIFICATE OF DISAPPLICATION OF SCHEDULE 2, PART IV**
(Schedule 2, Part IV, Paragraph 12(8))

The REGISTRAR OF CORPORATE AFFAIRS of the British Virgin Islands HEREBY CERTIFIES that the election by

**VITERBI SERVICES LIMITED**

BVI COMPANY NUMBER 402637

to disapply Part IV of Schedule 2 of the BVI Business Companies Act takes effect this 21st day of July, 2020.

*for* **REGISTRAR OF CORPORATE AFFAIRS**
21st day of July, 2020

No. _____ 402637

British Virgin Islands
Business Companies Act, 2004

# Memorandum of Association & Articles of Association of

**Viterbi Services Limited**

Incorporated the **23rd** day of  August, **2000**

**As Amended  the 21st day of July, 2020**

TRIDENT TRUST COMPANY (B..V.I.) LTD.
PO Box 146, Road Town, Tortola British Virgin
Islands

# MEMORANDUM OF ASSOCIATION

## OF

### Viterbi Services Limited

## A COMPANY LIMITED BY SHARES

### INDEX

| CLAUSE | | PAGES |
|---|---|---|
| 1 | Name | 1 |
| 2 | Status | 1 |
| 3 | First Incorporation | 1 |
| 4 | Registered Office | 1 |
| 5 | Registered Agent | 1-2 |
| 6 | Capacity and Powers | 2 |
| 7 | Shares | 2-3 |
| 8 | Amendments | 3-4 |
| 9 | Definitions | 4 |

TERRITORY OF THE BRITISH VIRGIN ISLANDS

BVI BUSINESS COMPANIES ACT, 2004

MEMORANDUM OF ASSOCIATION

OF

Viterbi Services Limited

A COMPANY LIMITED BY SHARES

1.  **NAME**

The name of the company is Viterbi Services Limited.

2.  **STATUS**

The Company is a company limited by shares.

3.  **FIRST INCORPORATION**

The Company was first incorporated as an International Business Company on 23rd day of August, 2000 and immediately prior to its automatic re-registration under the BVI Business Companies Act, was governed by the International Business Companies Act (Cap 291).

4.  **REGISTERED OFFICE**

4.1   At the date of filing the Notice of Election to Disapply Part IV of Schedule 2 of the BVI Business Companies Act, the registered Office of the Company is located at  the offices of  Trident Trust Company (B.V.I.) Limited, Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands.

4.2   The Company may by a resolution of members or a resolution of directors change its registered office to take effect on the registration by the Registrar of a notice of the change.

5.  **REGISTERED AGENT**

5.1   At the date of filing the Notice of Election to Disapply Part IV of Schedule 2 of the BVI Business Companies Act, the Registered Agent of the Company

1

is Trident Trust Company (B.V.I.) Limited, Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands.

5.2    The Company may by a resolution of members or a resolution of directors change its registered agent to take effect on the registration by the Registrar of a notice of the change.

5.3    If at any time the Company does not have a registered agent, the Company shall by a resolution of members or a resolution of directors appoint a registered agent to take effect on the registration by the Registrar of a notice of the appointment.

## 6.    CAPACITY AND POWERS

6.1    Subject to the Act and any other British Virgin Islands legislation, the Company has, irrespective of corporate benefit:

6.1.1    full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

6.1.2    for the purposes of paragraph 6.1.1, full rights, powers and privileges.

6.2    For the purposes of section 9(4) of the Act, there are no limitations on the business that the Company may carry on.

## 7.    SHARES

### 7.1    NUMBER OF SHARES

7.1.1    The Company is authorised to issue a maximum of no more than 50,000 shares (the "Shares").  The Shares shall have a par value of US$1.00 each.

7.1.2    The Company may issue fractional Shares and a fractional Share shall have the corresponding fractional rights, obligations and liabilities of a whole share of the same class or series of shares.

### 7.2    CURRENCY

Shares in the Company shall be issued in the currency of The United States of America.

2

57

7.3 **CLASSES OF SHARES**

The Shares shall comprise one class and series, but this shall not prejudice the right of the Company to amend this Memorandum to provide for more than one class and series of Shares.

7.4 **RIGHTS, QUALIFICATIONS OF SHARES**

Unless otherwise herein provided, each Share in the Company confers upon the holder thereof:

7.4.1 the right to one vote at a meeting of members of the Company or on any resolution of members of the Company;

7.4.2 the right to an equal share in any dividend paid by the Company; and

7.4.3 the right to an equal share in the distribution of the surplus assets of the Company.

7.5 **REGISTERED SHARES**

The Shares shall only be issued in registered form. The issuance of bearer shares, the conversion of registered shares to bearer shares and the exchange of registered shares for bearer shares by the Company shall not be permitted.

7.6 **TRANSFER OF SHARES**

7.6.1 The Company shall, on receipt of an instrument of transfer complying with the Articles, enter the name of the transferee of a Share in the Company's register of members unless the directors resolve to refuse or delay the registration of the transfer for reasons that shall be specified in a resolution of directors.

7.6.2 The directors may refuse or delay registration of a transfer of Shares if the holder of those Shares has failed to pay an amount due in respect thereof.

8. **AMENDMENTS**

The Company may amend its Memorandum of Association and Articles of Association by a resolution of members or a resolution of directors, save that no amendment may be made by resolution of directors:

3

58

8.1    to restrict the rights or powers of the members to amend the Memorandum or the Articles;

8.2    to change the percentage of members required to pass a resolution of members to amend the Memorandum or the Articles;

8.3    in circumstances where the Memorandum or the Articles cannot be amended by the members; or

8.4    to Clause 7.5 and to this Clause 8 of the Memorandum.

9.    **DEFINITIONS**

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto.

We, TRIDENT TRUST COMPANY (B.V.I.) LIMITED Registered Agent of the Company of Trident Chambers, P.O. Box 146, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands for the purpose of disapplying Part IV of Schedule 2 of the BVI Business Companies Act in relation to the Company hereby sign this Memorandum of Association this 21st day of July, 2020.

Authorised Signatory
Linda Andrews
Trident Trust Company (B.V.I.) Limited

4

# ARTICLES OF ASSOCIATION

## OF

**Viterbi Services Limited**

### INDEX

| CLAUSE | | PAGES |
|---|---|---|
| 1 | Interpretation | 1-3 |
| 2 | Registered Shares | 3 |
| 3 | Shares | 3-4 |
| 4 | Redemption of Shares and Treasury Shares | 4-5 |
| 5 | Transfer and Transmission of Shares | 5 |
| 6 | Change in Number of Authorised Shares | 6 |
| 7 | Mortgages and Charges of Shares | 6 |
| 8 | Forfeiture | 7 |
| 9 | Meetings and Consents of Members | 7-10 |
| 10 | Directors | 10-12 |
| 11 | Powers of Directors | 12-13 |
| 12 | Proceedings of Directors | 13-15 |
| 13 | Alternate Director | 15-16 |
| 14 | Officers | 16 |
| 15 | Conflicts of Interest | 17 |
| 16 | Indemnification | 17-18 |
| 17 | Records | 18-19 |
| 18 | Seal | 19 |
| 19 | Register of Charges | 19-20 |
| 20 | Distributions By Way of Dividends | 20 |
| 21 | Accounts | 20 |
| 22 | Audit | 21 |
| 23 | Notices | 21-22 |
| 24 | Voluntary Winding Up and Dissolution | 22 |
| 25 | Continuation | 22 |

TERRITORY OF THE BRITISH VIRGIN ISLANDS

BVI BUSINESS COMPANIES ACT, 2004

ARTICLES OF ASSOCIATION OF

**Viterbi Services Limited**

## 1.   INTERPRETATION

In these Articles, if not inconsistent with the context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof.

| | **Expression:** | **Meaning:** |
|---|---|---|
| 1.1 | **distribution** | (i)  the direct or indirect transfer of an asset, other than Shares, to or for the benefit of a member in relation to Shares held by a member, or |
| | | (ii)  the incurring of a debt to or for the benefit of a member in relation to Shares held by a member, and whether by means of a purchase of an asset, the redemption or other acquisition of Shares, a distribution of indebtedness or otherwise, and includes a dividend. |
| 1.2 | **member** | A person who holds shares in the Company. |
| 1.3 | **person** | An individual, a corporation, a trust, the estate of a deceased individual, a partnership or an unincorporated association of persons. |
| 1.4 | **resolution of directors** | 1.4.1  A resolution approved at a duly constituted meeting of directors or of a committee of directors of the Company, by affirmative vote of a majority of the directors present at the meeting who voted and did not abstain;  or |
| | | 1.4.2  A resolution consented to in writing by all the directors or all the members of the committee, as the case may be; |
| | | 1.4.3  where a director is given more than one vote in any circumstances, he shall in the circumstances be counted for the purposes of establishing a majority by the number of votes he casts. |

1

| 1.5 | **resolution of members** | 1.5.1 | A resolution approved at a duly constituted meeting of the members of the company by the affirmative vote of |

1.5.1.1 a simple majority, of the votes of the shares that were present at the meeting and entitled to vote thereon and were voted and did not abstain, or

1.5.2 a resolution consented to in writing by

1.5.2.1 a majority, or such larger majority as may be specified in the Articles, of the votes of shares entitled to vote thereon.

| 1.6 | **securities** | Shares and debt obligations of every kind, and options, warrants and rights to acquire shares, or debt obligations. |

| 1.7 | **the Act** | The BVI Business Companies Act (No. 16 of 2004) including any modification, extension, re-enactment or renewal thereof and any regulations made thereunder. |

| 1.8 | **the Memorandum** | The Memorandum of Association of the Company as originally framed or as from time to time amended. |

| 1.9 | **the Registrar** | The Registrar of Corporate Affairs under section 229 of the Act. |

| 1.10 | **the Seal** | Any seal which has been adopted as the Seal of the Company. |

| 1.11 | **these Articles** | These Articles of Association as originally framed or as from time to time amended. |

| 1.12 | **treasury shares** | Shares in the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled. |

1.13 **"Written"** or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or re-presented or reproduced by any mode of representing or re-producing words in a visible form, including telex, telegram, facsimile, cable or other form of writing produced by electronic communication.

1.14 Save as aforesaid any words or expressions defined in the Act shall bear the same meaning in these Articles.

1.15 Whenever the singular or plural number, or the masculine, feminine or neuter gender is used in these Articles, it shall equally, where the context admits, include the others.

1.16 A reference in these Articles to voting in relation to Shares shall be construed as a reference to voting by members holding the Shares except that it is the votes allocated to the Shares that shall be counted and not the number of members who actually voted

2

and a reference to Shares being present at a meeting shall be given a corresponding construction.

1.17    A reference to money in these Articles is, unless otherwise stated, a reference to the currency in which Shares in the Company shall be issued according to the provisions of the Memorandum.

## 2.    REGISTERED SHARES

2.1    The Company shall issue to every member holding Shares in the Company a certificate signed by at least one director or officer of the Company or under the Seal specifying the Share or Shares held by him and the signature of the director or officer and the Seal may be a facsimile.

2.2    Any member receiving a certificate for Shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of the wrongful or fraudulent use or representation made by any person by virtue of the possession thereof.  If a certificate for Shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors.

2.3    If several persons are registered as joint holders of any shares, any one of such persons may be given receipt for any distribution.

## 3.    SHARES

3.1    Subject to the provisions of these Articles and any resolution of members , Shares may be issued and options to acquire Shares in the Company granted, at such times, to such persons, for such consideration and on such terms as the Company may by resolution of directors determine. The Company may issue fractional Shares.

3.2    The Shares of the Company shall not be subject to any pre-emptive rights. For the avoidance of doubt, section 46 of the Act shall not apply to the Company.

3.3    Shares in the Company may be issued for consideration in any form, including money, a promissory note or other written obligation to contribute money, real property, personal property (including goodwill and know-how), services rendered or a contract for future services, however, the consideration for a Share with par value shall not be less than the par value of the Share.

3.4    No Shares may be issued for a consideration other than money, unless a resolution of directors has been passed stating:

3.4.1    the amount to be credited for the issue of the Shares;

3.4.2    their determination of the reasonable present cash value of the non-money consideration for the issue; and

3

3.4.3   that, in their opinion, the present cash value of the non-money consideration for the issue is not less than the amount to be credited for the issue of the Shares.

3.5   The Company shall keep a register of members (the "register of members") containing:

3.5.1   the names and addresses of the persons who hold Shares;

3.5.2   the number of each class and series of Shares held by each holder of Shares in the Company;

3.5.3   the date on which the name of each holder of Shares in the Company was entered in the register of members; and

3.5.4   the date on which any person ceased to be a member.

3.6   The register of members may be in any such form as the directors may approve, but if it is magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.

3.7   A Share is deemed to be issued when the name of the holder of Shares in the Company is entered on the register of members.

## 4.   REDEMPTION OF SHARES AND TREASURY SHARES

4.1   The Company may, subject to these Articles, purchase, redeem or otherwise acquire its own Shares save that the Company may not purchase, redeem or otherwise acquire its own Shares without the consent of the member whose Shares are to be purchased, redeemed or otherwise acquired.

4.2   The Company may only offer to acquire Shares if the directors determine by resolution of directors that, immediately after the acquisition, the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

4.3   A determination by the directors under the preceding Regulation is not required where:

4.3.1   the Company redeems the Share or Shares under and in accordance with section 62 of the Act;

4.3.2   the Company purchases, redeems or otherwise acquires the Share or Shares pursuant to the right of the holder thereof to have his Shares redeemed or to have his Shares exchanged for money or other property of the Company; or

4.3.3   the Company purchases, redeems or otherwise acquires the Shares by virtue of the provisions of section 179 of the Act.

4.4   Sections 60 (Process for acquisition of own shares), 61 (Offer to one or more shareholders) and 62 (Shares redeemed otherwise than at the option of the company) of the Act shall not apply to the Company.

4

4.5 Treasury shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with these Articles) as the Company may by resolution of directors determine.

4.6 All the rights and obligations attaching to a treasury share are suspended and shall not be exercised by or against the Company while it holds the share as a treasury share.

5. **TRANSFER AND TRANSMISSION OF SHARES**

5.1 Shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee and the instrument of transfer shall be sent to the Company at the office of its registered agent for registration. The instrument of transfer shall also be signed by the transferee if registration as a holder of a share imposes a liability to the Company on the transferee.

5.2 The transfer of a Share is effective when the name of the transferee is entered on the Company's register of members.

5.3 If the directors of the Company are satisfied that an instrument of transfer relating to Shares has been signed but that the instrument has been lost or destroyed, they may resolve by resolution of directors:

5.3.1 to accept such evidence of the transfer of Shares as they consider appropriate; and

5.3.2 that the transferee's name should be entered in the register of members notwithstanding the absence of the instrument of transfer.

5.4 The personal representative of a deceased holder of shares in the Company may transfer a share even though the personal representative is not a holder of shares in the Company at the time of the transfer.

5.5 If the Company shall have only one member who is an individual and that member shall also be the sole director of the Company, that sole member/director may, by instrument in writing, nominate a person who is not disqualified from being a director of the Company under the Act as a reserve director of the Company to act in place of the sole director in the event of his death, PROVIDED THAT such person shall have consented in writing to be nominated as a reserve director.

6. **CHANGE IN NUMBER OF AUTHORISED SHARES**

6.1 The Company may by a resolution of members or a resolution of directors and in accordance with the Act amend the Memorandum to change the number of Shares that the Company is authorised to issue or to increase or reduce the par value of any shares or effect any combination of the foregoing.

6.2 The Company may by a resolution of members or a resolution of directors amend the Memorandum to

5

6.2.1   divide the shares, including issued shares, of a class or series into a larger number of shares of the same class or series; or

6.2.2   combine the shares, including issued shares, of a class or series into a smaller number of shares of the same class or series.

## 7.       MORTGAGES AND CHARGES OF SHARES

7.1   Members may mortgage or charge their Shares in the Company and upon satisfactory evidence thereof the Company shall give effect to the terms of any valid mortgage or charge except insofar as it may conflict with any requirements herein contained for consent to the transfer of shares.

7.2   In the case of the mortgage or charge of Shares there may be entered in the register of members of the Company at the request of the holder of such Shares

7.2.1   a statement that the Shares are mortgaged or charged;

7.2.2   the name of the mortgagee or chargee; and

7.2.3   the date on which the aforesaid particulars are entered in the register of members.

7.3   Where particulars of a mortgage or charge are registered, such particulars shall be cancelled

7.3.1   with the consent of the named mortgagee or chargee or anyone authorized to act on his behalf; or

7.3.2   upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

7.4   Whilst particulars of a mortgage or charge are registered, no transfer of any share comprised therein shall be effected without the written consent of the named mortgagee or chargee or anyone authorized to act on his behalf.

## 8.       FORFEITURE

8.1   Shares that are not fully paid on issue are subject to the forfeiture provisions set forth in this Regulation 8 and for this purpose shares issued for a promissory note or a contract for future services are deemed to be not fully paid.

8.2   Written notice of call specifying a date for payment to be made shall be served on the member who defaults in making payment in respect of the Shares.

8.3   The written notice specifying a date for payment shall

6

8.3.1    name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which payment required by the notice is to be made; and

8.3.2    contain a statement that in the event of non-payment at or before the time named in the notice the Shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

8.4    Where a written notice of call has been issued pursuant to Regulation 8.3 and the requirements of the notice have not been complied with the directors may at any time before tender of payment forfeit and cancel the Shares to which the notice relates.

8.5    The Company is under no obligation to refund any moneys to the member whose Shares have been cancelled pursuant to these provisions. Upon cancellation of the Shares the member is discharged from any further obligation to the Company with respect to the Shares forfeited and cancelled.

## 9.    MEETINGS AND CONSENTS OF MEMBERS

9.1    The directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the directors consider necessary or desirable.

9.2    Upon the written request of members holding 10 percent or more of the outstanding voting shares in the Company the directors shall convene a meeting of members.

9.3    The directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting. The directors may fix the date notice is given of a meeting of members as the record date for determining those shares that are entitled to vote at a meeting.

9.4    A meeting of members held in contravention of the requirement in Regulation 9.3 is valid if members holding not less than 90 percent of the total voting rights on all the matters to be considered at the meeting have waived notice of the meeting and, for this purpose, the presence of a member at the meeting shall be deemed to constitute waiver on his part.

9.5    The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting.

9.6    A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member.

9.7    The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

7

9.8    An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.

(Name of Company)

I/We _____

being a member of the above Company with _____

shares HEREBY APPOINT _____

of _____ or failing

him_____ of _____

to be my/our proxy to vote for me/us at the meeting of members to be held on the _____ day_____, 20_____ and at any

adjournment thereof.

(Any restrictions on voting to be inserted here)

Signed this day of _____, _____.

_____
Member

9.9    The following shall apply in respect of joint ownership of shares:

9.9.1    if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member;

9.9.2    if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and;

9.9.3    if two or more of the joint owners are present in person or by proxy they must vote as one.

9.10    A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

9.11    A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the shares or class or series of shares entitled to vote on resolutions of members to be considered at the meeting. If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person, then such person may resolve any

matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members.

9.12   If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

9.13   At every meeting of members, the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting, the members present shall choose someone of their number to be the chairman. If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair.

9.14   The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

9.15   At any meeting of the members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof. If the chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken. If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman.

9.16   Any person other than an individual shall be regarded as one member and subject to Regulation 9.17 the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence. In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any member.

9.17   Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of

9

members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise if it were an individual member of the Company.

9.18   The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

9.19   Directors of the Company may attend and speak at any meeting of members of the Company and at any separate meeting of the holders of any class or series of shares in the Company.

9.20   An action that may be taken by the members at a meeting may also be taken by a resolution of members consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication, without the need for any notice, but if any resolution of members is adopted otherwise than by the unanimous written consent of all members, a copy of such resolution shall forthwith be sent to all members not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more members.

10.

## DIRECTORS

10.1   The first directors of the Company shall be appointed by the first registered agent within six months of the incorporation of the Company and thereafter, the directors shall be elected

10.1.1  by resolution of members for such term as the members determine, or

10.1.2  by resolution of directors for such term as the directors may determine.

10.2   No person shall be appointed as a director of the Company or nominated as a reserve director unless he has consented in writing to act as a director or to be nominated as a reserve director.

10.3   The minimum number of directors shall be one and the maximum number shall be twenty.

10.4   Each director shall hold office for the term, if any, fixed upon his appointment. In the case of a director who is an individual the term of office of a director shall terminate on the director's death, bankruptcy, resignation or removal. The insolvency of a corporate director shall terminate the term of office of such director.

10.5   If, before the Company has any members, a sole director, or all the directors, appointed under Regulation 10.1 of these Articles, resign or die, or in the case of a director that is not an individual, ceases to exist, the registered agent may appoint one or more persons as directors of the Company.

10

10.6    A director may be removed from office:

   10.6.1  with or without cause, by a resolution of members at a meeting of the members called for the purpose of removing the director or for purposes including the removal of a director or, by written resolution of members passed by at least 75% of the votes of the Shares of the Company entitled to vote; or

   10.6.2  with cause, by a resolution of directors passed at a meeting of directors called for the purpose of removing the director or for purposes including the removal of the director, or by written resolution of directors.

10.7    A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice. A director shall resign as director if he is, or becomes disqualified to act as director under the Act.

10.8    The directors may at any time appoint any person to be a director to fill a vacancy in the board of directors. The term of the director appointed shall not exceed the term that remained when the person who has ceased to be a director ceased to hold office.

10.9    With or without the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

10.10   A director shall not require a share qualification, and may be an individual  or  a company.

10.11   The Company shall keep a register  of directors containing

   10.11.1  the  names and  addresses of the persons who are directors of the Company or who have been nominated as reserve directors of the Company;

   10.11.2  the date on which each person whose name is entered in the register was appointed as a director of the Company or nominated as a reserve director;

   10.11.3  the date on which each person named as a director ceased to be a director of  the Company;

   10.11.4  the date on which the nomination of any person nominated as a reserve director ceased to have effect; and

   10.11.5  such other information as may be prescribed by the Act.

10.12   The register of directors or a copy of the register of directors  shall be kept at the office of the Company's registered agent.

11

11.             **POWERS OF DIRECTORS**

11.1    The business and affairs of the Company shall be managed by or under the supervision of the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the members of the Company. The directors of the Company shall have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company.

11.2    The directors may, by a resolution of directors, appoint any person, including a person who is a director, to be an agent of the Company. Subject to the next Regulation, the resolution of directors appointing an agent may authorize the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

11.3    Every agent of the Company has such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the following:

11.3.1    to amend the Memorandum or these Articles;

11.3.2    to change the registered office or agent;

11.3.3    to designate committees of directors;

11.3.4    to delegate powers to a committee of directors;

11.3.5    to appoint or remove directors;

11.3.6    to appoint or remove an agent;

11.3.7    to fix emoluments of directors;

11.3.8    to approve a plan or merger, consolidation or arrangement;

11.3.9    to make a declaration of solvency for the purposes of section 198(1)(a) of the Act or to approve a liquidation plan;

11.3.10    to make a determination under section 57 (1) of the Act that the company will, immediately after a proposed distribution, satisfy the solvency test set out in Regulation 20; or

11.3.11    to authorise the Company to continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands.

11.4    Any director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the Board of Directors or with respect to unanimous written consents.

11.5    The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of directors, the continuing directors or director

12

may appoint directors  to fill any vacancy that has arisen or summon a meeting of members.

11.6     The directors may by resolution of directors exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings and property or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

11.7     All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of directors.

11.8     The directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons whether appointed directly or indirectly by the directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Regulations) and for such period and subject to such conditions as they may think fit and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with such attorney or attorneys as the directors may think fit and may also authorise any such attorney or attorneys to delegate all or any powers, authorities and discretions vested in them.

12.                         **PROCEEDINGS OF DIRECTORS**

12.1     The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

12.2     A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

12.3     A director shall be given not less than 3 days notice of meetings of directors, but a meeting of directors held without 3 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend, waive notice of the meeting; and for this purpose, the presence of a director at the meeting shall be deemed to constitute waiver on his part.  The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not  invalidate the meeting.

12.4     A  meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one half of the total number of directors, unless there are only two directors in which case the quorum shall be two.

13

12.5   If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of directors.  Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

12.6   At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting.  If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting the Vice Chairman of the Board of Directors shall preside. If there is no Vice Chairman of the Board of Directors or if the Vice Chairman of the Board of Directors is not present at the meeting the directors present shall choose someone of their number to be chairman of the meeting.

12.7   An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution of directors or a committee of directors consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication by all directors or all members of the committee, as the case may be, without the need for any notice.  The consent may be in the form of counterparts, each counterpart being signed by one or more directors.

12.8   The directors may, by a resolution of directors, designate one or more committees, each consisting of one or more directors and delegate one or more of their powers, including the power to affix the Seal to the committee.

12.9   Each committee of directors has such powers and authorities of the directors as are set forth in the resolution of directors establishing the committee, except that the directors have no power to delegate to a committee of directors any of the following powers:

12.9.1   to amend the Memorandum or these Articles;

12.9.2   to designate committees of directors;

12.9.3   to delegate powers to a committee of directors;

12.9.4   to appoint or remove directors;

12.9.5   to appoint or remove an agent;

12.9.6   to approve a plan of merger, consolidation or arrangement; or

12.9.7   to make a declaration of solvency for the purposes of section 198(1) (a) of the Act or to approve a liquidation plan; or

12.9.8   to make a determination under section 57(1) of the Act that the Company will, immediately after the proposed distribution, satisfy the solvency test set out in Regulation 20.

14

12.10 The preceding Regulations 12.9.2 and 12.9.3 do not prevent a committee of directors, where authorised by resolution of directors, from appointing a sub-committee and delegating powers exercisable by the committee to the sub-committee.

12.11 The meetings and proceedings of each committee of directors consisting of 2 or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution of directors establishing the committee.

12.12 Where the directors delegate their powers to a committee of directors they remain responsible for the exercise of that power by the committee, unless they believed on reasonable grounds at all times before the exercise of the power that the committee would exercise the power in conformity with the duties imposed on directors of the Company under the Act.

13. **ALTERNATE DIRECTOR**

13.1 A director of the Company may appoint as an alternate any director or other person who is not disqualified for the appointment as a director under the Act to exercise the appointing director's powers, and carry out the appointing director's responsibilities, in relation to the taking of decisions by the directors in the absence of the appointing director.

13.2 No person shall be appointed as an alternate director of the Company unless he has consented in writing to act as an alternate director.

13.3 The appointing director may, at any time, terminate the alternate's appointment.

13.4 The appointment of an alternate director and its termination shall be in writing and written notice of the appointment and termination shall be given by the appointing director to the Company within 14 days.

13.5 The termination of the appointment of an alternate director does not take effect until written notice of the termination has been given to the Company.

13.6 An alternate director has no power to appoint an alternate, whether of the appointing director or of the alternate director and does not act as an agent of or for the appointing director.

13.7 An alternate director has the same rights as the appointing director in relation to any directors' meeting and any written resolution circulated for written consent.

13.8 Any exercise by the alternate director of the appointing director's powers in relation to taking of decisions by the directors, is as effective as if the powers were exercised by the appointing director.

13.9 An alternate director is liable for his own acts and omissions as an alternate director

15

and is subject to the same duties and responsibilities as a director when acting as such.

13.10   The rights of an alternate director shall automatically terminate if the appointing director ceases to be a director of the Company for any reason whatsoever.

## 14   OFFICERS

14.1   The Company may by resolution of directors appoint officers of the Company at such times as shall be considered necessary or expedient.  Such officers may consist of a Chairman of the Board of Directors, a Vice Chairman of the Board of Directors, President and one or more Vice Presidents, Secretaries and Treasurers and such other officers as may from time to time be deemed desirable.  Any number of offices may be held by the same person.

14.2   The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of Directors to preside at meetings of directors and members, the Vice Chairman to act in the absence of the Chairman, the President to manage the day to day affairs of the Company, the Vice Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

14.3   The emoluments of all officers shall be fixed by resolution of directors.

14.4   The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors.  Any vacancy occurring in any office of the Company may be filled by resolution of directors.

## 15.   CONFLICTS OF INTEREST

15.1   A director of the Company shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose the interest to the board of directors of the Company.

15.2   For the purposes of Regulation 15.1, a disclosure to all other directors to the effect that a director is a member, director or officer of another named entity or has a fiduciary relationship with respect to the entity or a named individual and is to be regarded as interested in any transaction which may, after the date of the entry or disclosure, be entered into with that entity or individual, is a sufficient disclosure of interest in relation to that transaction.

16

15.3    A director of the Company who is interested in a transaction entered into or to be entered into by the Company may:

15.3.1  vote on a matter relating to the transaction;

15.3.2  attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of quorum; and

15.3.3  sign a document on behalf of the Company, or do any other thing in his capacity as a director, that relates to the transaction.

16.                          **INDEMNIFICATION**

16.1    Subject to the limitations hereinafter provided the Company may indemnify against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings, any person who

16.1.1  is or was a party or is threatened to be made a party to any threatened, pending or contemplated proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or

16.1.2  is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise.

16.2    The Company may only indemnify a person if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful. For the purposes of this Sub-Regulation, a director acts in the best interests of the Company if he acts in the best interests of:

16.2.1  the Company's holding company; or

16.2.2  a member or members of the Company;

in either case, in the circumstances specified in Section 120(2), (3) or (4) of the Act, as the case may be.

16.3    The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.

16.4    The termination of any proceedings by any judgement, order, settlement, conviction

17

or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

16.5   If a person to be indemnified has been successful in defence of any proceedings referred to in Regulation 16.1 the person is entitled to be indemnified against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

16.6   The Company may purchase and maintain insurance in relation to any person who is or was a director of the Company, or who at the request of the Company is or was serving as a director of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under Regulation 16.1.

17.                                    **RECORDS**

17.1   The Company shall keep the following documents at the office of its registered agent:

17.1.1   the Memorandum and these Articles;

17.1.2   the register of members, or a copy of the register of members;

17.1.3   the register of directors, or a copy of the register of directors; and

17.1.4   copies of all notices and other documents filed by the Company with the Registrar of Corporate Affairs in the previous 10 years.

17.2   Where the Company keeps a copy only of the register of members or the register of directors at the office of its registered agent, it shall:

17.2.1   within 15 days of any change in either register, notify the registered agent in writing of the change; and

17.2.2   provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

17.3   The Company shall keep the following records at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine:

17.3.1   minutes of meetings and resolutions of members and classes of members;

17.3.2   minutes of meetings and resolutions of directors and committees of directors;

18

and

17.3.3 an impression of the Seal.

17.4 Where the place at which the original register of members, the original register of directors or the original records mentioned at Regulation 17.3 above are maintained is changed, the Company shall provide the registered agent with the physical address of the new location of the records of the Company within 14 days of the change of location.

18. **SEAL**

18.1 The directors shall provide for the safe custody of the Seal. An imprint of the Seal shall be kept at the registered office of the company. The Seal when affixed to any written instrument shall be witnessed by a director or any other person so authorised from time to time by resolution of directors. The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

19. **REGISTER OF CHARGES**

19.1 The Company shall maintain at its registered office or at the office of its registered agent a register of charges showing the following particulars regarding each mortgage, charge and other encumbrance created by the Company:

19.1.1 the date of creation of the charge;

19.1.2 a short description of the liability secured by the charge;

19.1.3 a short description of the property charged;

19.1.4 the name and address of the trustee for the security, or, if there is no such trustee, the name and address of the chargee;

19.1.5 unless the charge is a security to bearer, the name and address of the holder of the charge; and

19.1.6 details of any prohibition or restriction contained in the instrument creating the charge on the power of the Company to create any future charge ranking in priority to or equally with the Charge.

20. **DISTRIBUTIONS BY WAY OF DIVIDENDS**

19

20.1    The directors of the Company may by a resolution of directors authorise a distribution by way of dividend at a time, and of an amount, and to any members it thinks fit if they are satisfied, on reasonable grounds, that, immediately after the distribution, the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

20.2    The resolution of directors authorising the distribution by way of dividend shall contain either a statement that, immediately after the distribution, in the opinion of the directors, the value of the Company's assets will exceed its liabilities and the Company will be able to pay its debts as they fall due.

20.3    In the event that a distribution by way of dividend is made in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorising the distribution, a fair and proper value for the assets to be so distributed.

20.4    The directors may from time to time make to the members such interim distributions by way of dividend as appear to the directors to be justified by the profits of the Company.

20.5    The directors may, before making any distribution by way of dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

20.6    Notice of any distribution by way of dividend or of any other distribution that has been authorised shall be given to each member in the manner hereinafter mentioned and all distributions by way of dividend unclaimed for 3 years after having been authorised may be forfeited by resolution of directors for the benefit of the Company.

20.7    No dividend shall bear interest as against the Company and no dividend shall be paid on treasury shares.

21.                                    **ACCOUNTS**

21.1    The Company shall keep such accounts and records that are sufficient to show and explain the Company's transactions and that will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

22.                                    **AUDIT**

22.1    The Company may by resolution of members call for the accounts to be examined by auditors in which event the remaining provisions of this Regulation 22 shall apply to the appointment and activities of the auditors.

22.2    The first auditors shall be appointed by resolution of directors; subsequent auditors shall be appointed by a resolution of members.

20

22.3   The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

22.4   The remuneration of the auditors of the Company

22.4.1   in the case of auditors appointed by the directors, may be fixed by resolution of directors;

22.4.2   subject to the foregoing, shall be fixed by resolution of members or in such manner as the Company may by resolution of members determine.

22.5   The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not

22.5.1   in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period;

22.5.2   all the information and explanations required by the auditors have been obtained.

22.6   The report of the auditors shall be annexed to the accounts and shall be read at the meeting of members at which the accounts are laid before the Company or shall be served on the members.

22.7   Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of his duties as an auditor.

22.8   The auditors of the Company shall be entitled to receive notice of and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

23.          **NOTICES**

23.1   Any notice, information or written statement to be given by the Company to members may be served in any way by which it can reasonably be expected to reach each member or by mail addressed to each member at the address shown in the share register.

23.2   Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail, to the office of the registered agent of the Company.

23.3   Service of any summons, notice, order, document, process, information or written

21

statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was delivered to the registered office or the office of the registered agent of the Company or that it was mailed in such time  as to admit to its being delivered to the office of the registered agent of  the Company in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage  was  prepaid.

24.              **VOLUNTARY WINDING UP AND DISSOLUTION**

24.1    The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares it may voluntarily  commence to wind up and dissolve by resolution of directors.

25.                     **CONTINUATION**

25.1    The Company may by resolution of members or by resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner  provided under those laws.

We, TRIDENT TRUST COMPANY (B.V.I.) LIMITED Registered Agent of the Company of Trident Chambers, P.O. Box 146, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands for the purpose of disapplying Part IV of Schedule 2 of the BVI Business Companies Act in relation to the Company hereby sign  these Articles of Association  this 21st day of July, 2020.

Authorised Signatory
Linda Andrews
Trident Trust Company (B.V.I.) Limited

22

**21 July, 2020**

**VITERBI SERVICES LIMITED**

**BC No. 402637**

We, Trident Trust Company (B.V.I.) Limited being the Registered Agent for the above Company, which was originally incorporated under the International Business Companies Act and was automatically re-registered under the BVI Business Companies Act on January 1, 2007, hereby confirm, in accordance with our records, that as at the date of submission of the extract amending the Memorandum of Association, the Company has no bearer shares in issue.

Yours faithfully
TRIDENT TRUST COMPANY (B.V.I.) LIMITED
Per:

Chantal Gumbs
Corporate Administrator
Post-Incorporations Department

Enc.

83

# VITERBI SERVICES LIMITED

INCORPORATED UNDER THE BRITISH VIRGIN ISLANDS INTERNATIONAL BUSINESS COMPANIES ACT (CAP. 291), ON THE 23RD DAY OF AUGUST 2000 AND AUTO – MATICALLY RE-REGISTERED AS A BVI BUSINESS COMPANY ON JANUARY 1, 2007.

IN ACCORDANCE WITH SECTION 13(1) OF THE BVI BUSINESS COMPANIES ACT, 2004, NOTICE IS HEREBY GIVEN THAT THE FOLLOWING RESOLUTION WAS DULY PASSED IN WRITING BY THE DIRECTORS OF THE COMPANY ON 15 JULY 2020.

-----------------------------------------------------------------------------------------------------------------

IT IS HEREBY RESOLVED

THAT Part IV of Schedule 2 of the BC Act be disapplied

THAT the attached New M&A containing amendments to the existing M&A of the Company as are deemed necessary or desirable, be and is hereby approved and adopted in all respects AND pursuant to the powers vested in the Sole Shareholder under Clause 7 of the Company's existing Memorandum of Association, the New M&A shall hereby amend, restate and replace the existing Memorandum and Articles of Association of the Company in its entirety upon the disapplication of the Part IV of Schedule 2 of the BC Act.

THAT the director of the Company be and is hereby authorized to take any and all actions which may be necessary or desirable to effect the resolutions herein, including but not limited to filing with the British Virgin Islands Registrar of Corporate Affairs all and any documents as may be required to effect the disapplication of Part IV of Schedule 2 of the BC Act as well and adoption of the New M&A as the applicable constitutional documents of the Company, as approved herein above.

THAT any director of the Company be and is hereby authorized to take any and all actions which may be necessary or desirable to effect the resolutions herein, including but not limited to:

1. Filing with the British Virgin Islands Registrar of Corporate Affairs all and any notices or other documents as may be required to effect the disapplication of Part IV of Schedule 2 of the BC Act and adoption of the New M&A as the applicable constitutional documents of the Company, as approved herein above; and

2. Updating the Company's corporate records where appropriate.

THAT the Registered Agent of the Company be and is hereby authorized to file notice with respect to the adoption of the new Memorandum and Articles of Association of the Company with the Registry of Corporate Affairs in the British Virgin Islands.

-----------------------------------------------------------------------------------------------------------------

ooo0ooo

Filed 21 July 2020

# VIRRGIN

Page 1 of 1

## POST-INCORPORATION TRANSACTIONS

### ANNUAL FEE SUBMISSION

| | | |
|---|---|---|
| Company Name | : | VITERBI SERVICES LIMITED |
| BVI Co. No. | : | 402637 |
| Previous Bearer Fee | : | 0.00 |
| Current Bearer Fee | : | 0.00 |
| Previous Renewal Fees | : | 495.00 |
| Current Renewal Fee | : | 0.00 |
| Restoration Charges | : | 0.00 |
| Total Amount | : | 495.00 |

**List of fees paid by year**

| Year | Licence Fee | Penalty Fee | Bearer Fee |
|---|---|---|---|
| 2020 | 450.00 | 45.00 | 0.00 |

I / We, Fredericks, Vivlyn, hereby confirm that information provided is true and correct to our knowledge.

Authorised Signatory Name: Fredericks, Vivlyn

| | | | | |
|---|---|---|---|---|
| Name | : Fredericks, Vivlyn | BVI Company No. | : | 402637 |
| Agent No. | : 26 | Date of Filing | : | 20/01/2021  11:27:52 |
| Agent Name | : TRIDENT TRUST COMPANY (B.V.I.) LIMITED | Transaction No. | : | T210039465 |
| Agent Address | : Trident Chambers | Receipt No. | : | RCS00000003724622 |
| | P.O. Box 146 | | | |
| | Road Town | | | |
| | Tortola | | | |
| | VG1110 | | | |
| | VIRGIN ISLANDS, BRITISH | | | |
| Agent Voice No. | : 284-494-2434 | | | |
| Agent Email | : bvi@tridenttrust.com | | | |

85

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

# *669 Westdeutsche Landesbank Girozentrale Respondent v Islington London Borough Council Appellant

 Positive/Neutral Judicial Consideration

**Court**
House of Lords

**Judgment Date**
22 May 1996

**Report Citation**
[1996] 2 W.L.R. 802
[1996] A.C. 669



House of Lords

Lord Goff of Chieveley , Lord Browne-Wilkinson , Lord Slynn of Hadley , Lord Woolf and Lord Lloyd of Berwick

1995 July 10, 11, 12, 13; 1996 May 22

*Restitution—Quasi—contract—Moneys had and received—Lump sum paid by bank to local authority under interest rate swap agreement—Local authority making payments pursuant to agreement—Agreement ultra vires local authority—Balance of lump sum recovered by bank—Whether compound interest recoverable from date sum paid—Whether local authority holding moneys on resulting trust—Whether equity to supplement bank's right to simple interest on common law claim*

The parties entered into a 10-year interest rate swap agreement starting on 18 June 1987 based on a notional principal sum of £25m. Additionally, the plaintiff bank as the fixed rate payer paid the defendant council as the floating rate payer a lump sum of £2.5m. Pursuant to the agreement, the council made "interest" payments in December 1987, June and December 1988 and June 1989 to the bank totalling £1,354,474.07. On 1 November 1989 the Divisional Court of the Queen's Bench Division held in an unrelated case that interest rate swap transactions by local authorities were ultra vires. Following that decision, the council made no more payments. The bank brought an action against the council claiming repayment of the balance of the £2.5m. amounting to £1,145,525.93 plus interest from 18 June 1987. The judge gave judgment for the bank for the principal sum plus compound interest from 1 April 1990. The Court of Appeal dismissed an appeal by the council and allowed a cross-appeal by the bank against the judge's rejection of 18 June 1987 as the date from which interest should run.

*670

On appeal by the council against the award of compound interest: -

Held:

(1) that on a claim at common law for recovery of moneys paid in pursuance of an ineffective contract the claimant was entitled under section 35A of the Supreme Court Act 1981 to simple interest only; that in the absence of fraud equity had never awarded compound interest except against a trustee or other person in a fiduciary position in respect of profits improperly made; that the recipient of moneys under a contract subsequently held void for mistake or as being ultra vires did not hold those moneys on a resulting trust and it would be undesirable so to develop the law of resulting trusts since to do so would give the claimant a proprietary interest in the moneys and produce injustice to third parties and commercial uncertainty; and

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

that the council was not otherwise in a fiduciary position vis-à-vis the bank (post, pp. 690C-F, 698C-D, 700H-701A, C, 702D-E, 703E-F, 705A-B, 708E, 709F, 716E-F, 720G-H, 738B-C).

(2) Allowing the appeal (Lord Goff of Chieveley and Lord Woolf dissenting), that it would be undesirable for equity to award compound interest in aid of the bank's common law claim for restitution having regard, inter alia, to the fact that Parliament had twice since 1934 considered what interest should be awarded on claims at common law and had expressly not authorised the award of compound interest; and that, accordingly, the bank should recover simple interest only as from 18 June 1987, the date of accrual of its cause of action (post, pp. 713H-714B, 717B, D-718B, D-E, 719A-C, 723D-E, 738A-E, 741F).

*President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* , H.L.(E.) applied.

*Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd. [1981] Ch. 105* considered.

*Sinclair v. Brougham [1914] A.C. 398* , H.L.(E.) departed from.

Decision of the Court of Appeal *[1994] 1 W.L.R. 938; [1994] 4 All E.R. 890* reversed.


The following cases are referred to in their Lordships' opinions:

*Afovos Shipping Co. S.A. v. R. Pagnan and Flli. [1980] 2 Lloyd's Rep. 469*
*Ames' Settlement, In Re; Dinwiddy v. Ames [1946] 1 Ch. 217; [1946] 1 All E.R. 689*
*Arnott v. Redfern (1826) 3 Bing. 353*
*Attorney-General v. Alford (1855) 4 De G.M. & G. 843*
*B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2) [1979] 1 W.L.R. 783* ; *[1982] 1 All E.R. 925*
*Bankers Trust Co. v. Shapira [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353, C.A.* .
*Barnes v. Addy (1874) L.R. 9 Ch.App. 244*
*Birch v. Blagrave (1755) 1 Amb. 264*
*Burdick v. Garrick (1870) L.R. 5 Ch.App. 233*
*Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd. [1981] Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025*
*Childers v. Childers (1857) 1 De G. & J. 482*
*Commissioner of Stamp Duties (Queensland) v. Livingston [1965] A.C. 694; [1964] 3 W.L.R. 963; [1964] 3 All E.R. 692, P.C.* .
*Cook, In Re; Beck v. Grant [1948] Ch. 212; [1948] 1 All E.R. 231*
*De Havilland v. Bowerbank (1807) 1 Camp. 50*
*Diplock, In Re; Diplock v. Wintle [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.* .
*Eddowes v. Hopkins (1780) 1 Doug. 376  \*671*
*Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd. [1943] A.C. 32; [1942] 2 All E.R. 122, H.L.(E.)* .
*Gittins v. Steele (1818) 1 Swan. 24; (1818) 1 Swan. 199*
*Goldcorp Exchange Ltd., In Re [1995] 1 A.C. 74; [1994] 3 W.L.R. 199; [1994] 2 All E.R. 806, P.C.* .
*Hadley v. Baxendale (1854) 9 Exch. 341*
*Hallett's Estate, In Re; Knatchbull v. Hallett (1880) 13 Ch.D. 696, C.A.* .
*Hazell v. Hammersmith and Fulham London Borough Council [1990] 2 Q.B. 697* ; *[1990] 2 W.L.R. 1038; [1990] 3 All E.R. 33, C.A.* ; *[1992] 2 A.C. 1; [1991] 2 W.L.R. 372; [1991] 1 All E.R. 545, H.L.(E.)* .
*Hungerfords v. Walker (1989) 171 C.L.R. 125*
*Johnson v. the King [1904] A.C. 817, P.C.* .
*Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council [1994] 4 All E.R. 972*
*Leslie (R.) Ltd. v. Sheill [1914] 3 K.B. 607, C.A.* .
*Lipkin Gorman v. Karpnale Ltd. [1987] 1 W.L.R. 987; [1992] 4 All E.R. 331* ; *[1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, H.L.(E.)* .
*London, Chatham and Dover Railway Co. v. South Eastern Railway Co. [1893] A.C. 429, H.L.(E.)* .
*McCormick v. Grogan (1869) L.R. 4 H.L. 82, H.L.(I.)*
*Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc. [1990] 1 Q.B. 391; [1989] 3 W.L.R. 563; [1989] 3 All E.R. 14, C.A.* .
*Montagu's Settlement Trusts, In Re [1987] Ch. 264; [1987] 2 W.L.R. 1192*

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

*Moses v. Macferlan (1760) 2 Burr. 1005*
*Muller, In Re; Cassin v. Mutual Cash Order Co. Ltd. [1953] N.Z.L.R. 879*
*Napier and Ettrick (Lord) v. Hunter [1993] A.C. 713; [1993] 2 W.L.R. 42; [1993] 1 All E.R. 385, H.L.(E.) .*
*National Bank of Greece S.A. v. Pinios Shipping Co. No. 1 [1990] 1 A.C. 637; [1989] 3 W.L.R. 1330; [1990] 1 All E.R. 78, H.L.(E.) .*
*O'Sullivan v. Management Agency and Music Ltd. [1985] Q.B. 428; [1984] 3 W.L.R. 448; [1985] 3 All E.R. 351, C.A. .*
*Page v. Newman (1829) 9 B. & C. 378*
*Pavey & Matthews Pty. Ltd. v. Paul (1987) 162 C.L.R. 221*
*Practice Statement (Judicial Precedent) [1966] 1 W.L.R. 1234; [1966] 3 All E.R. 77, H.L.(E.) .*
*President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104; [1984] 3 W.L.R. 10; [1984] 2 All E.R. 773, H.L.(E.) .*
*Quistclose Investments Ltd. v. Rolls Razor Ltd. [1970] A.C. 567; [1968] 3 W.L.R. 1097; [1968] 3 All E.R. 651, H.L.(E.) .*
*Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana [1983] 2 A.C. 694; [1983] 3 W.L.R. 203; [1983] 2 All E.R. 763, H.L.(E.) .*
*Sinclair v. Brougham [1914] A.C. 398, H.L.(E.) .*
*Stocks v. Wilson [1913] 2 K.B. 235*
*Vandervell v. Inland Revenue Commissioners [1967] 2 A.C. 291; [1967] 2 W.L.R. 87; [1967] 1 All E.R. 1, H.L.(E.) .*
*Vandervell's Trusts (No. 2), In Re [1974] Ch. 269; [1974] 3 W.L.R. 256; [1974] 3 All E.R. 205, C.A. .*
*Vinogradoff, In Re; Allen v. Jackson [1935] W.N. 68*
*Wadsworth v. Lydall [1981] 1 W.L.R. 598; [1981] 2 All E.R. 401, C.A. .*
*Wallersteiner v. Moir (No. 2) [1975] Q.B. 373; [1975] 2 W.L.R. 389; [1975] 1 All E.R. 849, C.A. .*
*West Sussex Constabulary's Widows, Children and Benevolent (1930) Fund Trusts, In Re [1971] Ch. 1; [1970] 2 W.L.R. 848; [1970] 1 All E.R. 544*
*Woolwich Equitable Building Society v. Inland Revenue Commissioners [1993] A.C. 70; [1992] 3 W.L.R. 366; [1992] 3 All E.R. 737, H.L.(E.) . *672*

The following additional cases were cited in argument:

*Alati v. Kruger (1955) 94 C.L.R. 216*
*Barclays Bank Ltd. v. W. J. Simms Son & Cooke (Southern) Ltd. [1980] Q.B. 677; [1980] 2 W.L.R. 218; [1979] 3 All E.R. 522*
*Bishopsgate Investment Management Ltd. v. Homan [1995] Ch. 211; [1994] 3 W.L.R. 1270; [1995] 1 All E.R. 347, C.A. .*
*Craven-Ellis v. Canons Ltd. [1936] 2 K.B. 403; [1936] 2 All E.R. 1066, C.A. .*
*Cundy v. Lindsay (1878) 3 App.Cas. 459, H.L.(E.) .*
*El Ajou v. Dollar Land Holdings Plc. [1993] 3 All E.R. 717 ; [1994] 2 All E.R. 685, C.A. .*
*General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd. [1975] 1 W.L.R. 819; [1975] 2 All E.R. 173, H.L.(E.) .*
*Guardian Ocean Cargoes Ltd. v. Banco do Brasil S.A. (No. 3) [1992] 2 Lloyd's Rep. 193*
*International Railway Co. v. Niagara Parks Commission [1941] A.C. 328; [1941] 2 All E.R. 456, P.C. .*
*Mathew v. T. M. Sutton Ltd. [1994] 1 W.L.R. 1455; [1994] 4 All E.R. 793*
*Norwich Union Fire Insurance Society Ltd. v. WM. H. Price Ltd. [1934] A.C. 455, P.C. .*
*Reg. v. Shadrokh-Cigari [1988] Crim.L.R. 465, C.A. .*
*Vyse v. Foster (1872) L.R. 8 Ch.App. 309; (1874) L.R. 7 H.L. 318, H.L.(E.) .*

Appeal from the Court of Appeal.

This was an appeal by the defendant, Islington London Borough Council, by leave of the House of Lords from the decision of the Court of Appeal (Dillon, Leggatt and Kennedy L.JJ.) on 17 December 1993 dismissing an appeal by the council and allowing a cross-appeal by the plaintiff bank, Westdeutsche Landesbank Girozentrale, from the order of Hobhouse J. on 12 February 1993 giving judgment for the bank in the sum of £1,145,525.93 with compound interest from 1 April 1990 totalling £446,368.81. The bank's cross-appeal related to the date from which compound interest should run; the Court of Appeal ordered that it should run from 18 June 1987, thus totalling £1,358,098.57 as at the date of the judge's judgment.

The Court of Appeal refused the council leave to appeal from its decision, but on 23 May 1994 the Appeal Committee of the House of Lords (Lord Goff of Chieveley, Lord Browne-Wilkinson and Lord Mustill) allowed a petition by it for leave.

The facts are stated in their Lordships' opinions.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

*Trevor Philipson Q.C.* and *Brian Doctor* for the council. Both parties accept that compound, as opposed to simple, interest is payable only if the council received the money under the void interest rate swaps agreement as fiduciary: see *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* , 116.

The bank contends that where the sole legal basis on which the property in money purportedly passed is non-existent (as where money is paid under an ultra vires contract or by mistake) there is a separation of the legal title in the money, which passes to the recipient, and the equitable title, which remains in the original owner. That contention would apply to the position of the revenue in *Woolwich Equitable Building Society v. Inland Revenue Commissioners [1993] A.C. 70* , the charities in *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* , the building society in *Sinclair v. Brougham [1914] A.C. 398* and the bank in *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd. [1981] Ch. 105* . But if the recipients were all fiduciaries simply because the legal basis for their receipt of money was non-existent there would never have been any doubt that they had to account for the money.

According to the analysis in *Sinclair v. Brougham* the council received the money as an innocent volunteer. If the analysis in *Sinclair v. Brougham* is not followed and/or applied to this case, the council received the money in circumstances where the bank did not retain equitable title in the money; alternatively, even if it did, the council was not constituted a "fiduciary" for the purposes of the question whether it is liable to pay compound interest. However, even if the council was in the position of a fiduciary, the fact that it was justifiably ignorant of that status would preclude it from having to account for profits or pay compound interest for any period before it could reasonably have been expected to have become aware of such status. Even if that is incorrect, there is a distinction to be made between accounting for profits and paying compound interest on the one hand and the saving of expenses that the council might otherwise have incurred if it had had to borrow the money elsewhere. No authority was cited in support of that extension of the obligation of a fiduciary to account by either Hobhouse J. or the Court of Appeal. The Court of Appeal relied on *Sinclair v. Brougham* for the proposition that the payment of money pursuant to an ultra vires contract made the recipient a fiduciary in respect of the money. However, in that case the building society was held to be not a fiduciary but an innocent volunteer: see pp. 422-423, 445-456, 452-453 and *In Re Diplock; Diplock v. Wintle* , at pp. 529-532, 544 and 547E. Like the council the building society was unaware at the time when the contracts were concluded that they were ultra vires. If, however, in *Sinclair v. Brougham* it was possible to construe the handing over of the money to the directors as being for a purpose (to invest in a lawful banking business) that failed, in the present case the bank can have had no purpose at all in handing over the money to the council other than to give it completely and irrevocably to the council to do with it what it wished. A finding that the council was a fiduciary might mean that the council would have to account for any profits made with the money, despite the fact that the money was given to it out-and-out and that before it issued its writ the bank did not seek the return of the money but instead sought the further performance of the contract. The bank would have been a preferred creditor in respect of the money if the council or a person in its position had become insolvent: *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd. [1981] Ch. 105* . A payer able to frame his claim in equity might be able to avoid a change of position defence and/or a defence of limitation. *Sinclair v. Brougham* is not authority for such startling propositions. Viscount Haldane L.C. does not say that the building society was in the position of a trustee. Nor does the case support the bank's proposition that the separation of the legal from the equitable interest necessarily imports a trust.

[Lord Goff of Chieveley. Their Lordships wish to hear argument as to whether *Sinclair v. Brougham* was correctly decided.]
    *674
If *Sinclair v. Brougham* is authority for the proposition that a person who receives money under an ultra vires transaction without knowledge of that fact does so as a fiduciary liable to pay compound interest, then it ought to be departed from.

Complex issues arise in relation to the position of a "fiduciary" on bankruptcy: however desirable it may be to fashion remedies in such a situation, the complexities cannot be avoided, nor can the problems be solved, by labelling the payee of money in a situation such as the present as a "fiduciary". This was a commercial contract that envisaged that on payment the money would become the property of the council, which could do with it as it pleased: see *In Re Goldcorp Exchange Ltd . [1995] 1 A.C. 74* , 98A-F, 100D-101E, 102G-103E and *Goff & Jones, The Law of Restitution* , 4th ed. (1993), pp. 94-96 and 541, n. 24b. If the council was a fiduciary, it was not in breach of its fiduciary duty by retaining and spending the money. It is irrelevant whether the bank can trace the property into the council's hands on the basis of ownership. The unwitting use of someone else's property does not give rise to a breach of trust.

The equitable jurisdiction to award compound interest is exercisable if money has been withheld or misapplied by a trustee or anyone else in a fiduciary position. If the council was not in a fiduciary position on receipt of the money, that removes the basis of the order for payment of compound interest. (No one suggested that it became a fiduciary when it failed to pay. If that were so, every overdue debtor would be a fiduciary liable to compound interest.) However, even if the council was a fiduciary

© 2021 Thomson Reuters.

4

89

the Court of Appeal applied the wrong test in determining whether the circumstances were such that compound interest was appropriate. The cases cited by Dillon L.J. *[1994] 1 W.L.R. 938* , 949-950 and Leggatt L.J., at pp. 953-954, show that the courts have consistently justified an award of compound (as opposed to simple) interest not by way of punishing the fiduciary for making use of the plaintiff's money but on the basis that it represents the profit that the fiduciary has made or is presumed to have made from use of the principal sum. Compound interest is given not to compensate for loss of profit but to ensure as far as possible that the defendant retains no profit for which he ought to account: see *Burdick v. Garrick (1870) L.R. 5 Ch.App. 233* , 241 and *Wallersteiner v. Moir (No. 2) [1975] Q.B. 373* , 406. It depends on the evidence as to what the accounting party has done or can be presumed to have done with the money (see *Wallersteiner v. Moir (No. 2)* , at p. 406 and *Burdick v. Garrick* , at pp. 241 and 243-244), but if it is established that he has used the money in ordinary trade the court will presume that the accounting party has made that amount of profit that persons ordinarily do make in trade: see *Burdick v. Garrick* , at p. 242, *Wallersteiner v. Moir (No. 2)* , at pp. 397E-F, 398F, 406F; *O'Sullivan v. Management Agency and Music Ltd. [1985] Q.B. 428* , 461F-G and *Guardian Ocean Cargoes Ltd. v. Banco do Brasil S.A. (No. 3) [1992] 2 Lloyd's Rep. 193* , 198. Whether his object is personal or proprietary is irrelevant. There is no evidence that the council earned compound interest *675* on the money or used it in a trade. The basis of the Court of Appeal's decision was that it had had a benefit from the money by being relieved of the obligation to pay compound interest on the money that it would otherwise have had to borrow. That in accordance with the test as laid down in the authorities.

As to the date from which interest should run, the prima facie rule in *B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2) [1979] 1 W.L.R. 783* , 846 was plainly applied by the Court of Appeal in the context of compound interest. The court took the view that, because the obligation to repay ran from the date of payment, the interest too ran from that date. That is unattractive. If simple interest is awarded the dictum of Lord Wilberforce in *General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd. [1975] 1 W.L.R. 819* , 836H is of some force. Until the decision in *Hazell v. Hammersmith and Fulham London Borough Council [1990] 2 Q.B. 697* ; *[1992] 2 A.C. 1* , both parties considered the agreement as binding and the bank neither demanded nor expected that it would be repaid its capital sum. There is no evidence that the bank would have agreed to the termination of the contract before the Divisional Court's decision in *Hazell's* case, and there is evidence that it went on demanding performance pursuant to the contract even after the House of Lords gave judgment in that case until it issued its writ in April 1991. The time at which persons acting honestly and reasonably would have paid is not earlier than the date of the Divisional Court's judgment, alternatively 1 April 1990 (the date chosen by Hobhouse J.), alternatively, a date just after the House of Lords had settled the law. No other recent case has sought to expand the old principles; they have simply been applied. [Reference was made to *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council [1994] 4 All E.R. 972* .]

*Jonathan Sumption Q.C.* and *George Leggatt* for the bank. Any civilised system of law is bound to provide remedies for "unjust enrichment or unjust benefit:" see *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd. [1943] A.C. 32* , 61 and *Woolwich Equitable Building Society v. Inland Revenue Commissioners [1993] A.C. 70* , 197, 202. The benefit that the council gained from the upfront payment is not limited to the net principal sum that it failed to repay to the bank. It includes the enrichment caused by having had the use of the money from the time of its receipt until it was paid back: see *per* Hobhouse J. *[1994] 4 All E.R. 890* , 954C-D. If the council had borrowed the money, it would in the commercial world have done so at compound and not merely simple interest: see *National Bank of Greece S.A. v. Pinios Shipping Co. No. 1 [1990] 1 A.C. 637* . It follows that to award no more than simple interest on the money received by the council or to award interest for only part of the period for which the council had the use of that money, would be to award less than full restitution. Such a result would be inconsistent with legal principle.

Where money is paid either pursuant to a contract which is void, or under a fundamental mistake of fact or law, the money is impressed in the hands of the payee with a trust in favour of the payer. The payee is then accountable to the payer not only for the principal but for the entire benefit which he has obtained from his possession of the principal in the intervening period. Compound interest may not be the measure of that benefit in all cases, but in the present case an award of compound interest was appropriate.

*676*

Where a payment is made under a contract which is void, no title to the money will pass: see *Cundy v. Lindsay (1878) 3 App.Cas. 459* . The position is the same where the contract is voidable and has been avoided ab initio: The property revests in the transferor as if it had never passed; if it cannot revest at law it will revest in equity: *Alati v. Kruger (1955) 94 C.L.R. 216* . Where, as here, the money is paid into a bank account in which it is mixed with the recipient's own money, the legal ownership of the money is lost by the payer: see *Lipkin Gorman v. Karpnale Ltd. [1991] 2 A.C. 548* , 572D and *In Re Hallett's Estate; Knatchbull v. Hallett (1880) 13 Ch.D. 696* , 717-718. In equity, however, it remains the property of the payer: see *Sinclair v. Brougham [1914] A.C. 398* , 418, 420, 423, 424, 441, 444 and *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* , 536-537.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

An analogy can be drawn with the case of a payment made for a limited purpose that becomes incapable of fulfilment. The money is then held on a resulting trust for the payer: *In Re Diplock* , pp. 540-541; *In Re Ames' Settlement; Dinwiddy v. Ames [1946] 1 Ch. 217* and *Quistclose Investments Ltd. v. Rolls Razor Ltd. [1970] A.C. 567* .

The separation of the legal from the equitable interest necessarily imports a trust: see *Sinclair v. Brougham* , at pp. 421, 441; *In Re Diplock* , at pp. 530-531 and *Birks, An Introduction to the Law of Restitution* (1985), pp. 381-382. In the case of money paid under an ultra vires contract, this is so whether or not the money is still traceable to specific assets in accordance with the rule in *In Re Hallett's Estate* . The application of this principle to a solvent defendant such as the council results in the bank recovering its property in full from the local authority's general assets. The rules of tracing were devised to work rough justice between the various victims of an insolvent fiduciary, not to enable the fiduciary himself to extinguish a claim against him in reliance on his own rearrangement of his assets: see *El Ajou v. Dollar Land Holdings Plc. [1993] 3 All E.R. 717* , 735J-736A and Hobhouse J. *[1994] 4 All E.R. 890* , 938F-J.

Quite apart from the proprietary claim, the bank also has a personal claim in equity to require the council to account for its property: Snell's Equity, 29th ed. (1990), pp. 284-287.

In *Sinclair v. Brougham* it was held that there was no personal claim in equity or at law, because to allow such a claim would be indirectly to enforce an invalid borrowing contract: see pp. 414, 418. This part of the decision has been subjected to powerful and justified criticism by Lord Wright *"Sinclair v. Brougham" (1938) 6 C.L.J. 305* . But even if correct it has no application to a restitutionary claim, whether at law or in equity, arising out of a void swap contract since such restitution would not be legally or financially equivalent to enforcement of the contract itself.

Hobhouse J. gave it as an alternative ground of his decision that, even if the invalidity of the swap contract had not given rise to an obligation to repay the money in equity, the mistake under which the premium was paid to the council by the bank was capable of doing so. This is correct. Where money (or other property) is transferred under a mistake as to a matter fundamental to the transferor's intention to pass ownership, the intention to transfer ownership is vitiated and title to the money does not pass to the recipient: *Norwich Union Fire Insurance Society Ltd. v. WM. H. Price Ltd. [1934] A.C. 455* , 462-463. As Hobhouse J. observed, at p. 432J, it would be hard to think of a more fundamental mistake than the belief of a person paying money that he was doing so pursuant to a binding agreement when there was in reality no such agreement. The result in equity is the same as it is in the case of payments under a void contract. The payer retains the equitable interest in the money: *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd. [1981] Ch. 105* ; *Reg. v. Shadrokh-Cigari [1988] Crim.L.R. 465* and *In Re Goldcorp Exchange Ltd. [1995] 1 A.C. 74* , 103. It follows that he has the same proprietary and personal claims arising out of that state of affairs. As the law is presently understood, it would be an answer to a claim at common law founded on mistake that the mistake was one of law. However, there is no authority that could require the House of Lords to hold that the distinction between mistakes of fact and law is relevant to a claim for equitable relief, and there is no justification in the generality of cases for the continued recognition of the distinction, even at common law.

The jurisdiction to award compound interest arises from the inherent powers of a court of equity. The award of compound interest can depend only on what measure of restitution the conscience of equity requires. The award of interest, whether simple or compound, is not punitive and does not depend on proof of misfeasance. The fundamental principle on which equity exercises its inherent jurisdiction to award interest is that the defendant should not profit personally from having had the use of assets to which he had no right. He is therefore accountable for the benefit that he has derived from them or may be presumed to have derived from them: see *Attorney-General v. Alford (1855) 4 De G.M & G. 843* , 851; *Burdick v. Garrick, L.R. 5 Ch.App. 233* , 241-242; *Vyse v. Foster (1872) L.R. 8 Ch. App. 309; (1874) L.R. 7 H.L. 318* ; *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* ; *Wallersteiner v. Moir (No. 2) [1975] Q.B. 373* , 388, 397; *Guardian Ocean Cargoes Ltd. v. Banco do Brasil S.A. (No. 3) [1992] 2 Lloyd's Rep. 193* and *Mathew v. T. M. Sutton Ltd. [1994] 1 W.L.R. 1455* , 1461.

The relationship of the parties is relevant to whether interest should be awarded in equity, but not to the measure of that interest. The relationship is very much wider than that of trust or analogous relationships: see *International Railway Co. v. Niagara Parks Commission [1941] A.C. 328* , 344-345 and *Halsbury's Laws of England* , 4th ed., vol. 32 (1980), p. 55, para. 109.

Reference was also made to the Report of the Law Commission, "Law of Contract: Report on Interest" (Law Com. No. 88) (1978) (Cmnd. 7229), paras. 8, 10, 21 and *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* .

© 2021 Thomson Reuters.

6

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

Every statutory intervention in the common law regarding interest has been not on general principle but to remedy some perceived defect. The exclusion of compound interest in section 35A of the Supreme Court Act 1981 is not relevant here even by analogy.

*Sinclair v. Brougham* reflected the received view in 1914 about money had and received. The basis of the law of restitution has changed significantly since then. The House of Lords would not imply a contract to repay; also, repayment would have been tantamount to performance. It is desirable that that part of the decision in *Sinclair v. Brougham* should *678 be brought into line with modern thinking. *Sinclair v. Brougham* would today be regarded as based on obsolete reasoning.

[Reference was made to *Goff & Jones, The Law of Restitution* , p. 5; Lord Wright, *"Sinclair v. Brougham," 6 C.L.J. 305* , 313 et seq.; *R. Leslie Ltd. v. Sheill [1914] 3 K.B. 607* ; *Craven-Ellis v. Canons Ltd. [1936] 2 K.B. 403* ; *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd. [1943] A.C. 32* ; *Pavey & Matthews Pty. Ltd. v. Paul (1987) 162 C.L.R. 221* ; *Lipkin Gorman v. Karpnale Ltd. [1991] 2 A.C. 548* and *Woolwich Equitable Building Society v. Inland Revenue Commissioners [1993] A.C. 70* .]

In considering whether to overrule *Sinclair v. Brougham* on the equity point, the House of Lords should take into consideration that there are more common law remedies today. However, it cannot be an objection to recognising an equitable remedy that there is a common law remedy for the same problem. One may assimilate the remedy. A wide range of equitable remedies serve the interests of justice: see Lord Wright, *"Sinclair v. Brougham," 6 C.L.J. 305* ; *Cundy v. Lindsay, 3 App.Cas. 459* ; *Norwich Union Fire Insurance Society Ltd. v. WM. H. Price Ltd. [1934] A.C. 455* and *Alati v. Kruger , 94 C.L.R. 216* .

Professor Birks's analysis in *An Introduction to the Law of Restitution* , pp. 396 et seq., is correct. The analogy with resulting trusts is helpful. There is no reason to distinguish between cases where the purpose fails afterwards and those where it was always non-existent. [Reference was made to *In Re Ames' Settlement, Dinwiddy v. Ames [1946] 1 Ch. 217* ; *Reg. v. Shadrokh-Cigari [1988] Crim.L.R. 465* and *Mathew v. T. M. Sutton Ltd. [1994] 1 W.L.R. 1455* .]

As to notice, the council says that a person cannot be a trustee where he does not know that he is one, but the only thing the council was ignorant of here was the true construction of the Local Government Act 1972 ; it was not ignorant of any facts. [Reference was made to Birks, "No Consideration: Restitution after Void Contracts" *(1993) 23 W.A.L.R. 195* and *El Ajou v. Dollar Land Holdings Plc. [1993] 3 All E.R. 717* .]

The case for awarding interest from the date when the sum of £2.5m. was received by the council, as the Court of Appeal held, was overwhelming. Since the principle on which equity awards interest is to prevent the defendant from profiting from the use of money to which it had no right, effect can be given to the principle only by awarding interest in respect of the whole period during which the defendant had the use of the money: *Woolwich Equitable Building Society v. Inland Revenue Commissioners [1993] A.C. 70* , 197D. This period ran from 18 June 1987, when the council received the premium. Hobhouse J. did not award interest from that date, on two grounds: (i) that both parties were conducting themselves at that time on the basis that their contract was valid; and (ii) that the bank was not in fact out of pocket at that time because it had received an equivalent sum under its swap with Morgan Grenfell & Co. Ltd. As to the first, it cannot be material that neither party was initially aware that the contract between them was void. As to the second ground, the bank's receipt of an equivalent sum of £2.5m. under a separate contract with Morgan Grenfell was irrelevant. The swap *679 with Morgan Grenfell was res inter alios acta: see *per* Hobhouse J., at p. 948J and *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council [1994] 4 All E.R. 972* , 985D.

The relevant period for the running of interest would be the same if it were to be awarded under section 35A of the Act of 1981: see *General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd. [1975] 1 W.L.R. 819* , 841; *B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2) [1979] 1 W.L.R. 783* , 845. No such reason for departing from the fundamental principle exists in this case.

*Philipson Q.C.* in reply. Having heard the bank's argument on the question of the correctness of *Sinclair v. Brougham [1914] A.C. 398* , and in view of the fact that only 26 minutes remain of the time allotted for the hearing of the appeal, the council does not wish to incur the cost of a further day's hearing on this question and is content to allow its submissions already made to stand as its argument. It will use the time remaining to address the bank's submissions on the jurisdiction of the court to award compound interest.

As Lord Brandon of Oakbrook said in *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* , 116, there is no general discretion to award compound interest in equity. There is no broad principle that the defendant should not benefit from assets to which he has no right. The principle underlying the equitable jurisdiction of the court is that equity will ensure

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

that the defendant will not make a profit from having the benefit of the money: see *Wallersteiner v. Moir (No. 2) [1975] Q.B. 373* . The bank failed to show that there was some such relationship as forbade the use of the money to the council's own purpose.

If the council was a volunteer, no claim can be made against it. There is no personal claim in equity in a case like this against a volunteer. That requires knowledge on the part of the volunteer that he has received trust property: see *Lipkin Gorman v. Karpnale Ltd. [1987] 1 W.L.R. 987* . There is no proprietary claim, because the money was paid into a bank account that became exhausted. [Reference was also made to *Bishopsgate Investment Management Ltd. v. Homan [1995] Ch. 211* .]

Alternatively, if there is some proprietary claim derived from *Sinclair v. Brougham* (a right to trace), that is no basis for an award of compound interest. (If the asset is traced and has increased in value, it may be that the increase is recoverable: see *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* and *Goff & Jones, The Law of Restitution*, p. 95.) The bank has to show that the council is a trustee or fiduciary in respect of these funds. It says that *Sinclair v. Brougham* shows that when money is paid under a void contract the equitable title is retained in the payer. That is wrong: see *Barclays Bank Ltd. v. W. J. Simms Son & Cooke (Southern) Ltd. [1980] Q.B. 677* . It is wrong to suggest that there was no intention to pass the property. That may perhaps be so in the case of an asset, but it is not so in the case of money: see Birks, "No Consideration: Restitution after Void Contracts," *23 W.A.L.R. 195* and W. J. Swadling, "Restitution for No Consideration" *[1994] R.L.R. 73* . There was no fundamental mistake here. The part of Lord Haldane's opinion in *Sinclair v. Brougham* that refers to tracing cannot be explained as if he thought that the building *\*680* society was a trustee. If it had been, it would have had to repay the money. In Lord Haldane's eyes it was an innocent volunteer.

Their Lordships took time for consideration.

22 May. LORD GOFF OF CHIEVELEY.

My Lords, this appeal is concerned with a transaction known as an interest rate swap. Under such a transaction, one party (the fixed rate payer) agrees to pay the other over a certain period interest at a fixed rate on a notional capital sum; and the other party (the floating rate payer) agrees to pay to the former over the same period interest on the same notional sum at a market rate determined in accordance with a certain formula. Interest rate swaps can fulfil many purposes, ranging from pure speculation to more useful purposes such as the hedging of liabilities. They are in law wagers, but they are not void as such because they are excluded from the regime of the Gaming Acts by section 63 of the Financial Services Act 1986 .

One form of interest rate swap involves what is called an upfront payment, i.e. a capital sum paid by one party to the other, which will be balanced by an adjustment of the parties' respective liabilities. Thus, as in the present case, the fixed rate payer may make an upfront payment to the floating rate payer, and in consequence the rate of interest payable by the fixed rate payer is reduced to a rate lower than the rate which would otherwise have been payable by him. The practical effect is to achieve a form of borrowing by, in this example, the floating rate payer through the medium of the interest rate swap transaction. It appears that it was this feature which, in particular, attracted local authorities to enter into transactions of this kind, since they enabled local authorities subject to rate-capping to obtain upfront payments uninhibited by the relevant statutory controls.

At all events, local authorities began to enter into transactions of this kind soon after they came into use in the early 1980s. At that time, there was thought to be no risk involved in entering into such transactions with local authorities. Financially, they were regarded as secure; and it was assumed that such transactions were within their powers. However, as is well known, in *Hazell v. Hammersmith and Fulham London Borough Council [1992] 2 A.C. 1* your Lordships' House, restoring the decision of the Divisional Court *[1990] 2 Q.B. 697* , held that such transactions were ultra vires the local authorities who had entered into them. It is unnecessary for present purposes to examine the basis of that decision; though I wish to record that it caused grave concern among financial institutions, and especially foreign banks, which had entered into such transactions with local authorities in good faith, with no idea that a rule as technical as the ultra vires doctrine might undermine what they saw as a perfectly legitimate commercial transaction. There then followed litigation in which banks and other financial institutions concerned sought to recover from the local authorities with which they had dealt the balance of the money paid by them, together with interest. Out of the many actions so commenced, two were selected as test cases. These were the present case, *Westdeutsche Landesbank Girozentrale v. Islington Borough Council* , and *Kleinwort Benson Ltd. v. Sandwell Borough Council* . Both *\*681* cases came on for hearing before Hobhouse J. *[1994] 4 All E.R. 890* . Your Lordships are concerned only with the former case. In a powerful judgment Hobhouse J. held that the plaintiffs ("the bank") were entitled to recover from the defendants ("the council") the net balance outstanding on the transaction between the parties, viz. the difference between the upfront payment of £2.5m. paid by the bank to the council on 18 June 1987, and the total of four semi-annual interest payments totalling £1,354,474.07 paid by the council to the bank between December 1987 and June 1989, leaving a net balance of £1,145,525.93 which the judge ordered the

© 2021 Thomson Reuters.

93

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

council to pay to the bank. He held the money to be recoverable by the bank either as money had and received by the council to the use of the bank, or as money which in equity the bank was entitled to trace into the hands of the council and have repaid out of the council's assets. He decided that the bank's right to restitution at common law arose from the fact that the payment made by the bank to the council was made under a purported contract which, unknown to both parties, was ultra vires the council and so void, no consideration having been given for the making of the payment. The decision by the judge, which was affirmed by the Court of Appeal *[1994] 1 W.L.R. 938* , raised important questions in the law of restitution, which are of great interest to lawyers specialising in this field. Yet it is an extraordinary feature of the present appeal to your Lordships' House that the judge's decision on the substantive right of recovery at common law does not fall for consideration by your Lordships' House. The appeal of the council is confined to one point only - the question of interest.

The judge ordered that the council should pay compound interest on the sum awarded against them, calculated at six-monthly rests from 1 April 1990 to the date of judgment. The Court of Appeal affirmed the judge's decision to award compound interest but, allowing a cross-appeal by the bank, ordered that interest should run from the date of receipt of the upfront payment. Both the judge and the Court of Appeal held that they were entitled to invoke against the council the equitable jurisdiction to award compound interest, on the basis that the bank was entitled to succeed against the council in an equitable proprietary claim. The foundation for the bank's equitable proprietary claim lay in the decision of this House in *Sinclair v. Brougham [1914] A.C. 398* . Since that decision has for long been controversial, the Appellate Committee invited argument on the question whether the House should depart from the decision despite the fact that it has stood for many years.

## The shape of the case

Once the character of an interest swap transaction has been identified and understood, and it is appreciated that, because the transaction was beyond the powers of the council, it was void ab initio, the basic question is whether the law can restore the parties to the position they were in before they entered into the transaction. That is, of course, the function of the law of restitution. I feel bound to say that, in the present case, there ought to be no difficulty about that at all. This is because the case is concerned solely with money. All that has to be done is to order that each party should pay back the money it has received - or, more sensibly, to *\*682* strike a balance, and order that the party who has received most should repay the balance; and then to make an appropriate order for interest in respect of that balance. It should be as simple as that. and yet we find ourselves faced with a mass of difficult problems, and struggling to reconcile a number of difficult cases.

I must confess that, like all the judges who have been involved in these cases, I too have found myself struggling in this way. But in the end I have come to realise the importance of keeping my eyes on the simple outline of the case which I have just described; and I have discovered that, if one does that - if one keeps one's eyes open above the thicket of case law in which we can so easily become enclosed - the solution of the problem in the present case becomes much more simple. In saying this, I do not wish in any way to criticise the judges who have been grappling with the case at first instance and in the Court of Appeal, within the confines of the doctrine of precedent by which they are bound. On the contrary, they are entitled to our gratitude and respect. The masterly judgment of Hobhouse J., in particular, has excited widespread admiration. But it is the great advantage of a supreme court that, not only does it have the great benefit of assistance from the judgments of the courts below, but also it has a greater freedom to mould, and remould, the authorities to ensure that practical justice is done within a framework of principle. The present case provides an excellent example of a case in which this House should take full advantage of that freedom.

## The three problems

There are three reasons why the present case has become so complicated. The first is that, in our law of restitution, there has developed an understanding that money can only be recovered on the ground of failure of consideration if that failure is total. The second is that because, in particular, of the well known but controversial decision of this House in *Sinclair v. Brougham* , it has come to be understood that a trust may be imposed in cases such as the present where the incapacity of one of the parties has the effect that the transaction is void. The third is that our law of interest has developed in a fragmentary and unsatisfactory manner, and in consequence insufficient attention has been given to the jurisdiction to award compound interest.

I propose at the outset to devote a little attention to each of these matters.

## (1) Total failure of consideration

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

There has long been a desire among restitution lawyers to escape from the unfortunate effects of the so-called rule that money is only recoverable at common law on the ground of consideration where the failure is total, by reformulating the rule upon a more principled basis; and signs that this will in due course be done are appearing in judgments throughout the common law world, as appropriate cases arise for decision. It is fortunate however that, in the present case, thanks (I have no doubt) to the admirable researches of counsel, a line of authority was discovered which had escaped the attention of the scholars who work in this field. *683 This line of authority was concerned with contracts for annuities which were void if certain statutory formalities were not complied with. They were not therefore concerned with contracts void by reason of the incapacity of one of the parties. Even so, they were concerned with cases in which payments had been made, so to speak, both ways; and the courts had to decide whether they could, in such circumstances, do justice by restoring the parties to their previous positions. They did not hesitate to do so, by ascertaining the balance of the account between the parties, and ordering the repayment of the balance. Moreover the form of action by which this was achieved was the old action for money had and received - what we nowadays call a personal claim in restitution at common law. With this precedent before him, Hobhouse J. felt free to make a similar order in the present case; and in this he was self-evidently right.

The most serious problem which has remained in this connection is the theoretical question whether recovery can here be said to rest upon the ground of *failure* of consideration. Hobhouse J. thought not. He considered that the true ground in these cases, where the contract is void, is to be found in the absence, rather than the failure, of consideration; and in this he was followed by the Court of Appeal. This had the effect that the courts below were not troubled by the question whether there had been a total failure of consideration.

The approach so adopted may have found its origin in the idea, to be derived from a well known passage in the speech of Viscount Simon L.C. in *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd. [1943] A.C. 32* , 48, that a failure of consideration only occurs where there has been a failure of performance by the other party of his obligation under a contract which was initially binding. But the concept of failure of consideration need not be so narrowly confined. In particular it appears from the annuity cases themselves that the courts regarded them as cases of failure of consideration; and concern has been expressed by a number of restitution lawyers that the approach of Hobhouse J. is contrary to principle and could, if accepted, lead to undesirable consequences: see Professor Birks, "No Consideration: Restitution after Void Contracts" *(1993) 23 W.A.L.R. 195* ; Mr. W. J. Swadling, "Restitution for No Consideration" *[1994] R.L.R. 73* and Professor Burrows, "Swaps and the Friction between Common Law and Equity" *[1995] R.L.R. 15* . However since there is before your Lordships no appeal from the decision that the bank was entitled to recover the balance of the payments so made in a personal claim in restitution, the precise identification of the ground of recovery was not explored in argument before the Appellate Committee. It would therefore be inappropriate to express any concluded view upon it. Even so, I think it right to record that there appears to me to be considerable force in the criticisms which have been expressed; and I shall, when considering the issues on this appeal, bear in mind the possibility that it may be right to regard the ground of recovery as failure of consideration.

(2) A proprietary claim in restitution

I have already stated that restitution in these cases can be achieved by means of a personal claim in restitution. The question has however arisen *684 whether the bank should also have the benefit of an equitable proprietary claim in the form of a resulting trust. The immediate reaction must be - why should it? Take the present case. The parties have entered into a commercial transaction. The transaction has, for technical reasons, been held to be void from the beginning. Each party is entitled to recover its money, with the result that the balance must be repaid. But why should the plaintiff bank be given the additional benefits which flow from a proprietary claim, for example the benefit of achieving priority in the event of the defendant's insolvency? After all, it has entered into a commercial transaction, and so taken the risk of the defendant's insolvency, just like the defendant's other creditors who have contracted with it, not to mention other creditors to whom the defendant may be liable to pay damages in tort.

I feel bound to say that I would not at first sight have thought that an equitable proprietary claim in the form of a trust should be made available to the bank in the present case, but for two things. The first is the decision of this House in *Sinclair v. Brougham [1914] A.C. 398* , which appears to provide authority that a resulting trust may indeed arise in a case such as the present. The second is that on the authorities there is an equitable jurisdiction to award the plaintiff compound interest in cases where the defendant is a trustee. It is the combination of these two factors which has provided the foundation for the principal arguments advanced on behalf of the bank in support of its submission that it was entitled to an award of compound interest. I shall have to consider the question of availability of an equitable proprietary claim, and the effect of *Sinclair v. Brougham* , in some depth in a moment. But first I wish to say a few words on the subject of interest.

© 2021 Thomson Reuters

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

(3) Interest

One would expect to find, in any developed system of law, a comprehensive and reasonably simple set of principles by virtue of which the courts have power to award interest. Since there are circumstances in which the interest awarded should take the form of compound interest, those principles should specify the circumstances in which compound interest, as well as simple interest, may be awarded; and the power to award compound interest should be available both at law and in equity. Nowadays, especially since it has been established (see *National Bank of Greece S.A. v. Pinios Shipping Co. No. 1 [1990] 1 A.C. 637* ) that banks may, by the custom of bankers, charge compound interest upon advances made by them to their customers, one would expect to find that the principal cases in which compound interest may be awarded would be commercial cases.

Sadly, however, that is not the position in English law. Unfortunately, the power to award compound interest is not available at common law. The power is available in equity; but at present that power is, for historical reasons, exercised only in relation to certain specific classes of claim, in particular proceedings against trustees for an account. An important - I believe the most important - question in the present case is whether that jurisdiction should be developed to apply in a commercial context, as in the present case.  *685

Equitable proprietary claims

I now turn to consider the question whether an equitable proprietary claim was available to the bank in the present case.

Ever since the law of restitution began, about the middle of this century, to be studied in depth, the role of equitable proprietary claims in the law of restitution has been found to be a matter of great difficulty. The legitimate ambition of restitution lawyers has been to establish a coherent law of restitution, founded upon the principle of unjust enrichment; and since certain equitable institutions, notably the constructive trust and the resulting trust, have been perceived to have the function of reversing unjust enrichment, they have sought to embrace those institutions within the law of restitution, if necessary moulding them to make them fit for that purpose. Equity lawyers, on the other hand, have displayed anxiety that in this process the equitable principles underlying these institutions may become illegitimately distorted; and though equity lawyers in this country are nowadays much more sympathetic than they have been in the past towards the need to develop a coherent law of restitution, and to identify the proper role of the trust within that rubric of the law, they remain concerned that the trust concept should not be distorted, and also that the practical consequences of its imposition should be fully appreciated. There is therefore some tension between the aims and perceptions of these two groups of lawyers, which has manifested itself in relation to the matters under consideration in the present case.

In the present case, however, it is not the function of your Lordships' House to rewrite the agenda for the law of restitution, nor even to identify the role of equitable proprietary claims in that part of the law. The judicial process is neither designed for, nor properly directed towards, such objectives. The function of your Lordships' House is simply to decide the questions at issue before it in the present case; and the particular question now under consideration is whether, where money has been paid by a party to a contract which is ultra vires the other party and so void ab initio, he has the benefit of an equitable proprietary claim in respect of the money so paid. Moreover the manner in which this question has arisen before this House renders it by no means easy to address. First of all, the point was not debated in any depth in the courts below, because they understood that they were bound by *Sinclair v. Brougham [1914] A.C. 398* to hold that such a claim was here available. But second, the point has arisen only indirectly in this case, since it is relevant only to the question whether the court here has power to make an award of compound interest. It is a truism that, in deciding a question of law in any particular case, the courts are much influenced by considerations of practical justice, and especially by the results which would flow from the recognition of a particular claim on the facts of the case before the court. Here, however, an award of compound interest provides no such guidance, because it is no more than a consequence which is said to flow, for no more than historical reasons, from the availability of an equitable proprietary claim. It therefore provides no guidance on the question whether such a claim should here be available.  *686

In these circumstances I regard it as particularly desirable that your Lordships should, so far as possible, restrict the inquiry to the actual questions at issue in this appeal, and not be tempted into formulating general principles of a broader nature. If restitution lawyers are hoping to find in your Lordships' speeches broad statements of principle which may definitively establish the future shape of this part of the law, I fear that they may be disappointed. I also regard it as important that your Lordships should, in the traditional manner, pay particular regard to the practical consequences which may flow from the decision of the House.

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

With these observations by way of preamble, I turn to the question of the availability of an equitable proprietary claim in a case such as the present. The argument advanced on behalf of the bank was that the money paid by it under the void contract was received by the council subject to a resulting trust. This approach was consistent with that of Dillon L.J. in the Court of Appeal: see *[1994] 1 W.L.R. 938* , 947. It is also consistent with the approach of Viscount Haldane L.C. (with whom Lord Atkinson agreed) in *Sinclair v. Brougham [1914] A.C. 398* , 420-421.

I have already expressed the opinion that, at first sight, it is surprising that an equitable proprietary claim should be available in a case such as the present. However, before I examine the question as a matter of principle, I propose first to consider whether *Sinclair v. Brougham* supports the argument now advanced on behalf of the bank.


Sinclair v. Brougham

The decision of this House in *Sinclair v. Brougham* has loomed very large in both the judgments in the courts below and in the admirable arguments addressed to the Appellate Committee of this House. It has long been regarded as a controversial decision, and has been the subject of much consideration by scholars, especially those working in the field of restitution. I have however reached the conclusion that it is basically irrelevant to the decision of the present appeal.

It is first necessary to establish what the case was about. The Birkbeck Permanent Benefit Building Society decided to set up a banking business, known as the Birkbeck Bank. The banking business was however held to be ultra vires the objects of the building society; and there followed a spate of litigation concerned with solving the problems consequent upon that decision. *Sinclair v. Brougham* was one of those cases.

The case has been analysed in lucid detail in the speech of my noble and learned friend, Lord Browne-Wilkinson, which I have read (in draft) with great respect. In its bare outline, it was concerned with the distribution of the assets of the society, which was insolvent. There were four classes of claimants. First, there were two classes of shareholders - the A shareholders (entitled to repayment of their investment on maturity) and the B shareholders (whose shares were permanent). Next, there was a numerous class of people who had deposited money at the bank, under contracts which were ultra vires and so void. Finally, there were the ordinary trade creditors of the society. By agreement, the A shareholders and the trade creditors were paid off first, leaving only the claims of the depositors and the B shareholders. There were sufficient assets to pay off the B shareholders, but not the depositors and certainly not both. The *\*687* question of how to reconcile their competing claims arose for consideration on a summons by the liquidator for directions.

The problem arose from the fact that the contracts under which the depositors deposited their money at the bank were ultra vires and so void. That prevented them from establishing a simple contractual right to be repaid, in which event they would have ranked with the ordinary trade creditors of the society in the liquidation. As it was, they claimed to be entitled to repayment in an action for money had and received - in the same way as the bank claimed repayment in the case now before your Lordships. But the House of Lords held that they were not entitled to claim on this ground. This was in substance because to allow such a claim would permit an indirect enforcement of the contract which the policy of the law had decreed should be void. In those days, of course, judges still spoke about the common law right to restitution in the language of implied contract, and so we find Lord Sumner saying in a much quoted passage, at p. 452:

"To hold otherwise would be indirectly to sanction an ultra vires borrowing. All these causes of action are common species of the genus assumpsit. All now rest, and long have rested, upon a notional or imputed promise to repay. The law cannot de jure impute promises to repay, whether for money had and received or otherwise, which, if made de facto, it would inexorably avoid."


This conclusion however created a serious problem because, if the depositors had no claim, then, in the words of Lord Dunedin, at p. 436:

"The appalling result in this very case would be that the society's shareholders, having got proceeds of the depositors' money in the form of investments, so that each individual depositor is utterly unable to trace his money, are enriched to the extent of some 500 per cent."

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

As a matter of practical justice, such a result was obviously unacceptable; and it was to achieve justice that the House had recourse to equity to provide the answer. It is, I think, apparent from the reasoning of the members of the Appellate Committee that they regarded themselves, not as laying down some broad general principle, but as solving a particular practical problem. In this connection it is, in my opinion, significant that there was a considerable variation in the way in which they approached the problem. Viscount Haldane L.C., with whom Lord Atkinson agreed, did so, at p. 421, on the basis that there arose in the circumstances "a resulting trust, not of an active character." Lord Dunedin based his decision upon a broad equity of restitution, drawn from Roman and French law. He asked himself the question, at p. 435: "Is English equity to retire defeated from the task which other systems of equity have conquered?" - a question which he answered in the negative. Lord Parker of Waddington, at pp. 441-442, attempted to reconcile his decision with the established principles of equity by holding that the depositors' money had been received by the directors of the society as fiduciaries, with the effect that the depositors could thereafter follow their money in equity into the assets of the society. Lord Sumner, at p. 458, considered that the *688 case should be decided on equitable principles on which there was no direct authority. He regarded the question as one of administration, in which "the most just distribution of the whole must be directed, so only that no recognised rule of law or equity be disregarded." Setting on one side the opinion of Lord Parker, whose approach I find very difficult to reconcile with the facts of the case, I do not discern in the speeches of the members of the Appellate Committee any intention to impose a trust carrying with it the personal duties of a trustee.

For present purposes, I approach this case in the following way. First, it is clear that the problem which arose in *Sinclair v. Brougham* , viz. that a personal remedy in restitution was excluded on grounds of public policy, does not arise in the present case, which is not of course concerned with a borrowing contract. Second, I regard the decision in *Sinclair v. Brougham* as being a response to that problem in the case of ultra vires borrowing contracts, and as not intended to create a principle of general application. From this it follows, in my opinion, that *Sinclair v. Brougham* is not relevant to the decision in the present case. In particular it cannot be relied upon as a precedent that a trust arises on the facts of the present case, justifying on that basis an award of compound interest against the council.

But I wish to add this. I do not in any event think that it would be right for your Lordships' House to exercise its power under the *Practice Statement (Judicial Precedent) [1966] 1 W.L.R. 1234* to depart from *Sinclair v. Brougham* . I say this first because, in my opinion, any decision to do so would not be material to the disposal of the present appeal, and would therefore be obiter. But there is a second reason of substance why, in my opinion, that course should not be taken. I recognise that nowadays cases of incapacity are relatively rare, though the swaps litigation shows that they can still occur. Even so, the question could still arise whether, in the case of a borrowing contract rendered void because it was ultra vires the borrower, it would be contrary to public policy to allow a personal claim in restitution. Such a question has arisen in the past not only in relation to associations such as the Birkbeck Permanent Benefit Building Society, but also in relation to infants' contracts. Moreover there is a respectable body of opinion that, if such a case arose today, it should still be held that public policy would preclude a personal claim in restitution, though not of course by reference to an implied contract. That was the opinion expressed by Leggatt L.J. in the Court of Appeal in the present case *[1994] 1 W.L.R. 938* , 952E-F, as it had been by Hobhouse J.; and the same view has been expressed by Professor Birks (see An Introduction to the Law of Restitution (1985), p. 374). I myself incline to the opinion that a personal claim in restitution would not indirectly enforce the ultra vires contract, for such an action would be unaffected by any of the contractual terms governing the borrowing, and moreover would be subject (where appropriate) to any available restitutionary defences. If my present opinion were to prove to be correct then *Sinclair v. Brougham* will fade into history. If not, then recourse can at least be had to *Sinclair v. Brougham* as authority for the proposition that, in such circumstances, the lender should not be without a remedy. Indeed, I cannot think that English law, or equity, is so impoverished as to be incapable of providing relief in such *689 circumstances. Lord Wright, who wrote in strong terms (" *Sinclair v. Brougham* " *(1938) 6 C.L.J. 305* ) endorsing the just result in *Sinclair v. Brougham* , would turn in his grave at any such suggestion. Of course, it may be necessary to reinterpret the decision in that case to provide a more satisfactory basis for it; indeed one possible suggestion has been proposed by Professor Birks (see *An Introduction to the Law of Restitution* , pp. 396 et seq.). But for the present the case should in my opinion stand, though confined in the manner I have indicated, as an assertion that those who are caught in the trap of advancing money under ultra vires borrowing contracts will not be denied appropriate relief.

The availability of an equitable proprietary claim in the present case

Having put *Sinclair v. Brougham* on one side as providing no authority that a resulting trust should be imposed in the facts of the present case, I turn to the question whether, as a matter of principle, such a trust should be imposed, the bank's submission being that such a trust arose at the time when the sum of £2.5m. was received by the council from the bank.

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

As my noble and learned friend, Lord Browne-Wilkinson, observes, it is plain that the present case falls within neither of the situations which are traditionally regarded as giving rise to a resulting trust, viz. (1) voluntary payments by A to B, or for the purchase of property in the name of B or in his and A's joint names, where there is no presumption of advancement or evidence of intention to make an out-and-out gift; or (2) property transferred to B on an express trust which does not exhaust the whole beneficial interest. The question therefore arises whether resulting trusts should be extended beyond such cases to apply in the present case, which I shall treat as a case where money has been paid for a consideration which fails.

In a most interesting and challenging paper, "Restitution and Resulting Trusts," published in *Equity: Contemporary Legal Developments* (1992) (ed. Goldstein), p. 335, Professor Birks has argued for a wider role for the resulting trust in the field of restitution, and specifically for its availability in cases of mistake and failure of consideration. His thesis is avowedly experimental, written to test the temperature of the water. I feel bound to respond that the temperature of the water must be regarded as decidedly cold: see, e.g., Professor Burrows, "Swaps and the Friction between Common Law and Equity" *[1995] R.L.R. 15* , and Mr. W. J. Swadling, "A new role for resulting trusts?" (1996) 16 Legal Studies 133.

In the first place, as Lord Browne-Wilkinson points out, to impose a resulting trust in such cases is inconsistent with the traditional principles of trust law. For on receipt of the money by the payee it is to be presumed that (as in the present case) the identity of the money is immediately lost by mixing with other assets of the payee, and at that time the payee has no knowledge of the facts giving rise to the failure of consideration. By the time that those facts come to light, and the conscience of the payee may thereby be affected, there will therefore be no identifiable fund to which a trust can attach. But there are other difficulties. First, there is no general rule that the property in money paid under a void contract does not pass to the payee; and it is difficult to escape the conclusion that, as a  *690  general rule, the beneficial interest in the money likewise passes to the payee.

This must certainly be the case where the consideration for the payment fails after the payment is made, as in cases of frustration or breach of contract; and there appears to be no good reason why the same should not apply in cases where, as in the present case, the contract under which the payment is made is void ab initio and the consideration for the payment therefore fails at the time of payment. It is true that the doctrine of mistake might be invoked where the mistake is fundamental in the orthodox sense of that word. But that is not the position in the present case; moreover the mistake in the present case must be classified as a mistake of law which, as the law at present stands, creates its own special problems. No doubt that much criticised doctrine will fall to be reconsidered when an appropriate case occurs; but I cannot think that the present is such a case, since not only has the point not been argued but (as will appear) it is my opinion that there is any event jurisdiction to award compound interest in the present case. For all of these reasons I conclude, in agreement with my noble and learned friend, that there is no basis for holding that a resulting trust arises in cases where money has been paid under a contract which is ultra vires and therefore void ab initio. This conclusion has the effect that all the practical problems which would flow from the imposition of a resulting trust in a case such as the present, in particular the imposition upon the recipient of the normal duties of trustee, do not arise. The dramatic consequences which would occur are detailed by Professor Burrows in his article on "Swaps and the Friction between Common Law and Equity" *[1995] R.L.R. 15* , 27: the duty to account for profits accruing from the trust property; the inability of the payee to rely upon the defence of change of position; the absence of any limitation period; and so on. Professor Burrows even goes so far as to conclude that the action for money had and received would be rendered otiose in such cases, and indeed in all cases where the payer seeks restitution of mistaken payments. However, if no resulting trust arises, it also follows that the payer in a case such as the present cannot achieve priority over the payee's general creditors in the event of his insolvency - a conclusion which appears to me to be just.

For all these reasons I conclude that there is no basis for imposing a resulting trust in the present case, and I therefore reject the bank's submission that it was here entitled to proceed by way of an equitable proprietary claim. I need only add that, in reaching that conclusion, I do not find it necessary to review the decision of Goulding J. in *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* *[1981] Ch. 105* .

Interest

It is against that background that I turn to consider the question of compound interest. Here there are three points which fall to be considered. These are (1) whether the court had jurisdiction to award compound interest; (2) if so, whether it should have exercised its jurisdiction to make such an award in the present case; and (3) from what date should such an award of compound interest run, if made.

It is common ground that in a case such as the present there is no jurisdiction to award compound interest at common law or by statute.  *691  The central question in the present case is therefore whether there is jurisdiction in equity to do so. It was held

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

below, on the basis that the bank was entitled to succeed not only in a personal claim at common law but also in a proprietary claim in equity, that there was jurisdiction in equity to make an order that the council should pay compound interest on the sum adjudged due. It was that jurisdiction which was exercised by Hobhouse J., whose decision on the point was not challenged before the Court of Appeal, on the basis that *Sinclair v. Brougham [1914] A.C. 398* provided binding authority that a proprietary claim was available to the bank in this case. However since, in my opinion, *Sinclair v. Brougham* provides no such authority, and no proprietary claim is available to the bank, the question now arises whether the equitable jurisdiction to award compound interest may nevertheless be exercised on the facts of the present case.

I wish however to record that Hobhouse J. was in no doubt that, if he had jurisdiction to do so, he should award compound interest in this case. He said *[1994] 4 All E.R. 890* , 955:

"Anyone who lends or borrows money on a commercial basis receives or pays interest periodically and if that interest is not paid it is compounded. . . . I see no reason why I should deny the plaintiff a complete remedy or allow the defendant arbitrarily to retain part of the enrichment which it has unjustly enjoyed."

With that reasoning I find myself to be in entire agreement. The council has had the use of the bank's money over a period of years. It is plain on the evidence that, if it had not had the use of the bank's money, it would (if free to do so) have borrowed the money elsewhere at compound interest. It has to that extent profited from the use of the bank's money. Moreover, if the bank had not advanced the money to the council, it would itself have employed the money on similar terms in its business. Full restitution requires that, on the facts of the present case, compound interest should be awarded, having regard to the commercial realities of the case. As the judge said, there is no reason why the bank should be denied a complete remedy.

It follows therefore that everything depends on the scope of the equitable jurisdiction. It also follows, in my opinion, that if that jurisdiction does not extend to apply in a case such as the present, English law will be revealed as incapable of doing full justice.

It is right that I should record that the scope of the equitable jurisdiction was not explored in depth in the course of argument before the Appellate Committee, in which attention was concentrated on the question whether a proprietary claim was available to the bank in the circumstances of the present case. In other circumstances, it might well have been appropriate to invite further argument on the point. However, since it was indicated to the Committee that the council was not prepared to spend further money on the appeal, whereupon it took no further part in the proceedings, and since the relevant authorities had been cited to the Committee, I am satisfied that it is appropriate that the point should now be decided by your Lordships' House.
*692

I wish also to record that I have had the opportunity of reading in draft the speech of my noble and learned friend, Lord Woolf, and that I find myself to be in agreement with his reasoning and conclusion on the point. Even so, I propose to set out in my own words my reasons for reaching the same conclusion.

I shall begin by expressing two preliminary thoughts. The first is that, where the jurisdiction of the court derives from common law or equity, and is designed to do justice in cases which come before the courts, it is startling to be faced by an argument that the jurisdiction is so restricted as to prevent the courts from doing justice. Jurisdiction of that kind should as a matter of principle be as broad as possible, to enable justice to be done wherever necessary; and the relevant limits should be found not in the scope of the jurisdiction but in the manner of its exercise as the principles are worked out from case to case. Second, I find it equally startling to find that the jurisdiction is said to be limited to certain specific categories of case. Where jurisdiction is founded on a principle of justice, I would expect that the categories of case where it is exercised should be regarded not as occupying the whole field but rather as emanations of the principle, so that the possibility of the jurisdiction being extended to other categories of case is not foreclosed.

It is with these thoughts in mind that I turn to the equitable jurisdiction to award interest. In *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* Lord Brandon of Oakbrook, delivering a speech with which the other members of the Appellate Committee agreed, described the equitable jurisdiction in the following words, at p. 116:

"Chancery courts had further regularly awarded interest, including not only simple interest but also compound interest, when they thought that justice so demanded, that is to say in cases where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position."

© 2021 Thomson Reuters.

15   100

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

Later however he said that Courts of Chancery only awarded compound, as distinct from simple, interest in two special classes of case.

With great respect I myself consider that, if the jurisdiction to award compound interest is available where justice so demands, it cannot be so confined as to exclude any class of case simply because that class of case has not previously been recognised as falling within it. I prefer therefore to read the passage quoted from Lord Brandon's speech as Mason C.J. and Wilson J. read it in *Hungerfords v. Walker (1989) 171 C.L.R. 125* , 148, as providing examples (i.e., not exclusive examples) of the application of the underlying principle of justice.

Now it is true that the reported cases on the exercise of the equitable jurisdiction, which are by no means numerous, are concerned with cases of breach of duty by trustees and other fiduciaries. In *Attorney-General v. Alford (1855) 4 De G.M. & G. 843* , for example, which came before Lord Cranworth L.C., the question arose whether an executor and trustee, who had for several years retained in his hands trust funds which he ought to have invested, should be chargeable with interest in excess of the ordinary rate of simple interest. It was held that he should not be chargeable at a  *\*693*  higher rate. Lord Cranworth L.C. recognised that the court might in such a case impose interest at a higher rate, or even compound interest. But he observed that if so the court does not impose a penalty on the trustee. He said, at p. 851:

"What the court ought to do, I think, is to charge him only with the interest which he has received, or which it is justly entitled to say he ought to have received, or which it is so fairly to be presumed that he did receive that he is estopped from saying that he did not receive it."

In cases of misconduct which benefits the executor, however, the court may fairly infer that he used the money in speculation, and may, on the principle "In odium spoliatoris omnia praesumuntur," assume that he made a higher rate, if that was a reasonable conclusion.

Likewise in *Burdick v. Garrick (1870) L.R. 5 Ch. App. 233* , where a fiduciary agent held money of his principal and simply paid it into his bank account, it was held that he should be charged with simple interest only. Lord Hatherley L.C., at pp. 241-242, applied the principle laid down in *Attorney-General v. Alford* , namely that:

"the court does not proceed against an accounting party by way of punishing him for making use of the plaintiff's money by directing rests, or payment of compound interest, but proceeds upon this principle, either that he has made, or has put himself in such a position that he is to be presumed to have made, 5 per cent., or compound interest, as the case may be. If the court finds . . . that the money received has been invested in an ordinary trade, the whole course of decision has tended to this, that the court presumes that the party against whom relief is sought has made that amount of profit which persons ordinarily do make in trade, and in those cases the court directs rests to be made."

For a more recent case in which the equitable jurisdiction was invoked, see *Wallersteiner v. Moir (No. 2) [1975] Q.B. 373* .

From these cases it can be seen that compound interest may be awarded in cases where the defendant has wrongfully profited, or may be presumed to have so profited, from having the use of another person's money. The power to award compound interest is therefore available to achieve justice in a limited area of what is now seen as the law of restitution, viz. where the defendant has acquired a benefit through his wrongful act (see *Goff & Jones, The Law of Restitution* , 4th ed. (1993), pp. 632 et seq.; *Birks, An Introduction to the Law of Restitution* , pp. 313 et seq.; *Burrows, The Law of Restitution* (1993), pp. 403 et seq.). The general question arises whether the jurisdiction must be kept constrained in this way, or whether it may be permitted to expand so that it can be exercised to ensure that full justice can be done elsewhere in that rubric of the law. The particular question is whether the jurisdiction can be exercised in a case such as the present in which the council has been ordered to repay the balance of the bank's money on the ground of unjust enrichment, in a personal claim at common law.

At this stage of the argument I wish to stress two things. The first is that it is plain that the jurisdiction may, in an appropriate case, be  *\*694*  exercised in the case of a personal claim in equity. In both *Alford's* case and *Burdick v. Garrick* , the cases were concerned with the taking of an account, and an order for payment of the sum found due. In each case the accounting party was a fiduciary, who held the relevant funds on trust. But the jurisdiction is not limited to cases in which a proprietary claim is being made and an award of interest is sought as representing the fruits of the property so claimed. On the contrary, the jurisdiction is in personam, and moreover an award of interest may be made not only where the trustee or fiduciary has made a profit, but also where it is held that he ought to have made a profit and has not done so. Furthermore in my opinion the decision of the Court of

Appeal in *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* provides no authority for the proposition that there is no *jurisdiction* to award compound interest where the claim is a personal claim. It is true that in that case the Court of Appeal decided not to award interest against a number of charities which had been held liable, in a personal claim in equity, to repay legacies which had been paid to them in error. But in so doing the court simply followed an old decision of Lord Eldon L.C. in *Gittins v. Steele (1818) 1 Swan. 199*, in which his judgment was as follows, at p. 200:

"Where the fund out of which the legacy ought to have been paid is in the hands of the court making interest, unquestionably interest is due. If a legacy has been erroneously paid to a legatee who has no farther property in the estate, in recalling that payment I apprehend that the rule of the court is not to charge interest; but if the legatee is entitled to another fund making interest in the hands of the court, justice must be done out of his share."

The Court of Appeal in *In Re Diplock* can have had no desire to make an award of interest against the charities in the personal claim against them in that case, and they must have been very content to follow uncritically this old "rule of court." But it does not follow that the rule of court went to the jurisdiction of the court. It is more likely that it represented an established practice which, as Lord Eldon L.C.'s brief judgment indicates, was subject to exceptions. In any event the Court of Appeal was there concerned only with simple interest; and in cases of the kind there under consideration, it seems unlikely that any question of an award of compound interest would ever have arisen.

I must confess that I find the reasoning which would restrict the equitable jurisdiction to award compound interest to cases where the claim is proprietary in nature to be both technical and unrealistic. This is shown by the reasoning and conclusion of Hobhouse J. in *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council [1994] 4 All E.R. 972*, another swap transaction case, in which the plaintiff bank had no proprietary claim. The judge upheld the submission of the defendant council that, although they were under a personal liability to make restitution both at law and in equity, nevertheless the court had no jurisdiction to award compound interest on the sum adjudged due. He said, at p. 994:

"If . . . the plaintiff is only entitled to a personal remedy which will be the case where, although there was initially a fiduciary relationship *695* and the payer was entitled in equity to treat the sum received by the payee as his, the payer's, money and to trace it, but because of subsequent developments he is no longer able to trace the sum in the hands of the payee, then there is no subject matter to which the rationale on which compound interest is awarded can be applied. The payee cannot be shown to have a fund belonging to the payer or to have used it to make profits for himself."

This reasoning is logical, assuming the restricted nature of the equitable jurisdiction to award compound interest. But if, as Lord Brandon in *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104*, 116 stated, the jurisdiction is founded upon the demands of justice, it is difficult to see the sense of the distinction which Hobhouse J. felt compelled to draw. It seems strange indeed that, just because the power to trace property has ceased, the court's jurisdiction to award compound interest should also come to an end. For where the claim is based upon the unjust enrichment of the defendant, it may be necessary to have power to award compound interest to achieve full restitution, i.e. to do full justice, as much where the plaintiff's claim is personal as where his claim is proprietary in nature. Furthermore, I know of no authority which compelled Hobhouse J. to hold that he had no jurisdiction to award compound interest in respect of the personal claim in equity in the case before him.

For these reasons I am satisfied that there is jurisdiction in equity to award compound interest in the case of personal claims as well as proprietary claims.

I turn next to the question whether the equitable jurisdiction can be exercised in aid of common law remedies such as, for example, a personal remedy in restitution, to repair the deficiencies of the common law. Here I turn at once to *Snell's Equity*, 29th ed. (1990), p. 28, where the first maxim of equity is stated to be that "Equity will not suffer a wrong to be without a remedy." The commentary on this maxim in the text reads:

"The idea expressed in this maxim is that no wrong should be allowed to go unredressed if it is capable of being remedied by courts of justice, and this really underlies the whole jurisdiction of equity. As already explained, the common law courts failed to remedy many undoubted wrongs, and this failure led to the establishment of the Court of Chancery. But it is must not be supposed that every *moral* wrong was redressed by the Court of Chancery. The maxim must be taken as referring to rights which are suitable for judicial enforcement, but were not enforced at common law owing to some technical defect."

© 2021 Thomson Reuters.

To this maxim is attributed the auxiliary jurisdiction of equity. The commentary reads:

"Again, to this maxim may be traced the origin of the auxiliary jurisdiction of the Court of Chancery, by virtue of which suitors at law were aided in the enforcement of their legal rights. Without such aid these rights would often have been 'wrongs without remedies.' For instance, it was often necessary for a plaintiff in a common law *696 action to obtain discovery of facts resting in the knowledge of the defendant, or of deeds, writings or other things in his possession or power. The common law courts, however, had no power to order such discovery, and recourse was therefore had to the Court of Chancery, which assumed jurisdiction to order the defendant to make discovery on his oath."

The question which arises in the present case is whether, in the exercise of equity's auxiliary jurisdiction, the equitable jurisdiction to award compound interest may be exercised to enable a plaintiff to obtain full justice in a personal action of restitution at common law.

I start with the position that the common law remedy is, in a case such as the present, plainly inadequate, in that there is no power to award compound interest at common law and that without that power the common law remedy is incomplete. The situation is therefore no different from that in which, in the absence of jurisdiction at common law to order discovery, equity stepped in to enable justice to be done in common law actions by ordering the defendant to make discovery on oath. The only difference between the two cases is that, whereas the equitable jurisdiction to order discovery in aid of common law actions was recognised many years ago, the possibility of the equitable jurisdiction to award compound interest being exercised in aid of common law actions was not addressed until the present case. Fortunately, however, judges of equity have always been ready to address new problems, and to create new doctrines, where justice so requires. As Sir George Jessel M.R. said, in a famous passage in his judgment in *In Re Hallett's Estate; Knatchbull v. Hallett (1880) 13 Ch.D. 696* , 710:

"I intentionally say modern rules, because it must not be forgotten that the rules of courts of equity are not, like the rules of the common law, supposed to have been established from time immemorial. It is perfectly well known that they have been established from time to time - altered, improved, and refined from time to time. In many cases we know the names of the Chancellors who invented them. No doubt they were invented for the purpose of securing the better administration of justice, but still they were invented."

I therefore ask myself whether there is any reason why the equitable jurisdiction to award compound interest should not be exercised in a case such as the present. I can see none. Take, for example, the case of fraud. It is well established that the equitable jurisdiction may be exercised in cases of fraud. Indeed it is plain that, on the same facts, there may be a remedy both at law and in equity to recover money obtained by fraud: see *Johnson v. the King [1904] A.C. 817* , 822, *per* Lord Macnaghten. Is it to be said that, if the plaintiff decides to proceed in equity, compound interest may be awarded; but that if he chooses to proceed in an action at law, no such auxiliary relief will be available to him? I find it difficult to believe that, at the end of the 20th century, our law should be so hidebound by forms of action as to be compelled to reach such a conclusion.

For these reasons I conclude that the equitable jurisdiction to award compound interest may be exercised in the case of personal claims at *697 common law, as it is in equity. Furthermore I am satisfied that, in particular, the equitable jurisdiction may, where appropriate, be exercised in the case of a personal claim in restitution. In reaching that conclusion, I am of the opinion that the decision of Hobhouse J. in *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council [1994] 4 All E.R. 972* that the court had no such jurisdiction should not be allowed to stand.

I recognise that, in so holding, the courts would be breaking new ground, and would be extending the equitable jurisdiction to a field where it has not hitherto been exercised. But that cannot of itself be enough to prevent what I see to be a thoroughly desirable extension of the jurisdiction, consistent with its underlying basis that it exists to meet the demands of justice. An action of restitution appears to me to provide an almost classic case in which the jurisdiction should be available to enable the courts to do full justice. Claims in restitution are founded upon a principle of justice, being designed to prevent the unjust enrichment of the defendant: see *Lipkin Gorman v. Karpnale Ltd. [1991] 2 A.C. 548* . Long ago, in *Moses v. Macferlan (1760) 2 Burr. 1005* , 1012, Lord Mansfield C.J. said that the gist of the action for money had and received is that "the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money." It would be strange indeed if the courts lacked jurisdiction in such a case to ensure that justice could be fully achieved by means of an award of compound interest, where it is appropriate to make such an award, despite the fact that the jurisdiction to award such interest is itself said to rest upon the demands of justice. I am glad not to be forced to hold that English law is so inadequate as to be

© 2021 Thomson Reuters.

103

incapable of achieving such a result. In my opinion the jurisdiction should now be made available, as justice requires, in cases of restitution, to ensure that full justice can be done. The seed is there, but the growth has hitherto been confined within a small area. That growth should now be permitted to spread naturally elsewhere within this newly recognised branch of the law. No genetic engineering is required, only that the warm sun of judicial creativity should exercise its benign influence rather than remain hidden behind the dark clouds of legal history.

I wish to add that I for my part do not consider that the statutory power to award interest, either under section 3 of the Law Reform (Miscellaneous Provisions) Act 1934 or under section 35A of the Supreme Court Act 1981 (which, pursuant to section 15 of the Administration of Justice Act 1982 , superseded section 3 of the Act of 1934), inhibits the course of action which I now propose. It is true that section 3(1) of the Act of 1934, when empowering courts of record to award interest in proceedings for the recovery of any debt or damages, did not authorise the giving of interest upon interest. But I cannot see that it would be inconsistent with the intention then expressed by Parliament later to extend the existing equitable jurisdiction to award compound interest to enable courts to ensure that full restitution is achieved in personal actions of restitution at common law. It is of course common knowledge that, until the latter part of this century, the existence of a systematic law of restitution, founded upon the principle of unjust enrichment, had not been recognised in English law. The question whether there should be a power *698 to award compound interest in such cases, in order to achieve full restitution, simply did not arise in 1934 and cannot therefore have been considered by Parliament in that year. To hold that, because Parliament did not then authorise an award of compound interest in proceedings the nature of which was not then recognised, the courts should now be precluded from exercising the ordinary judicial power to develop the law by extending an existing jurisdiction to meet a newly recognised need appears to me to constitute an unnecessary and undesirable fetter upon the judicial development of the law. It is not to be forgotten that there is jurisdiction in equity, as well as at common law, to order restitution on the ground of unjust enrichment; and I cannot see that section 3(1) of the 1934 Act would have precluded any extension of the existing equitable jurisdiction to award compound interest to enable full restitution to be achieved in such a case. Accordingly neither would section 3(1), which applied to all courts of record, have precluded a similar extension of the jurisdiction to enable full restitution to be achieved in actions at common law. Section 35A of the Act of 1981 no doubt perpetuated the position as established by section 3(1) of the Act of 1934, in that it, too, did not confer a power on the courts to award compound interest; but I cannot see that this affects the position. In so far as it is relevant to refer to the Report of the Law Commission "Law of Contract: Report on Interest" (Law Com. No. 88) (Cmnd. 7229) of 7 April 1978 which preceded that enactment, it appears from the Report that it was generally opposed to the introduction of any general power to award compound interest; but there was no intention of interfering with the equitable jurisdiction, and the problem which has arisen in the present case was not addressed. I wish to add that such an extension of the equitable jurisdiction as I propose would, in my opinion, be a case of equity acting in aid of the common law. There is in my opinion no need, and indeed no basis, for outlawing such a development as a case of equity acting in aid of the legislature simply because the legislature, in conferring upon courts the power to award simple interest, did not authorise the giving of compound interest.

It remains for me to say that I am satisfied, for the reasons given by Hobhouse J., that this is a case in which it was appropriate that compound interest should be awarded. In particular, since the council had the free use of the bank's money in circumstances in which, if it had borrowed the money from some other financial institution, it would have had to pay compound interest for it, the council can properly be said to have profited from the bank's money so as to make an award of compound interest appropriate. However, for the reasons given by Dillon L.J. *[1994] 1 W.L.R. 938* , 947-949, I agree with the Court of Appeal that the interest should run from the date of receipt of the money.


Conclusion

For these reasons I would dismiss the appeal.


LORD BROWNE-WILKINSON

My Lords, in the last decade many local authorities entered into interest rate swap agreements with banks and other finance houses. In *Hazell v. Hammersmith and Fulham London Borough Council [1992] 2 A.C. 1* your Lordships held that such contracts *699 were ultra vires local authorities and therefore void. Your Lordships left open the question whether payments made pursuant to such swap agreements were recoverable or not. The action which is the subject matter of this appeal is one of a number in which the court has had to consider the extent to which moneys paid under such an agreement are recoverable.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

An interest rate swap agreement is an agreement between two parties by which each agrees to pay the other on a specified date or dates an amount calculated by reference to the interest which would have accrued over a given period on a notional principal sum. The rate of interest payable by each party (on the same notional sum) is different. One rate of interest is usually fixed and does not change (and the payer is called "the fixed rate payer"); the other rate is a variable or floating rate based on a fluctuating interest rate such as the six-month London Inter-bank Offered Rate ("LIBOR") and the payer is known as "the floating rate payer." Normally the parties do not make the actual payments they have contracted for but the party owing the higher amount pays to the other party the difference between the two amounts.

In the present case the swap contract was concluded between the respondent bank, Westdeutsche Landesbank Girozentrale ("the bank"), and the appellant, the council of the London Borough of Islington ("the local authority"), on 16 June 1987. The interest sums were to be calculated on a notional principal arrangement was to run for 10 years starting on 18 June 1987. The interest sums were to be calculated on a notional principal sum of £25m. and were to be payable half-yearly. The bank was to be the fixed rate payer at a rate of 7.5 per cent. per annum and the local authority was to be the floating rate payer at the domestic sterling LIBOR rate. In addition, the bank was to pay to the local authority on 18 June 1987 a sum of £2.5m. ("the upfront payment") which payment was made. As a result of the provision of the upfront payment the rate of interest payable by the bank as the fixed rate payer was agreed to be lower than what would have been appropriate (9.43 per cent.) if the upfront payment had not been made.

Pursuant to the terms of the agreement, the following payments were made:

| Date | Payment by bank to council | Payment by council to bank |
|---|---|---|
| 18.06.87 | £2,500,000 | |
| 18.12.87 | | £172,345.89 |
| 20.06.88 | | £229,666.09 |
| 19.12.88 | | £259,054.56 |
| 19.06.89 | | £693,407.53 |
| Total | £ 2,500,000 | £1,354,474.07 |

Therefore the payments made by the bank to the local authority exceed those made by the local authority to the bank to the extent of £1,145,525.93.

On 1 November 1989 the Divisional Court gave judgment in *Hazell's* case declaring void swap transactions entered into by local authorities. *700 The decision applied to the contract between the parties in the present case.

As will appear it is of central importance to note the way in which the local authority dealt with the upfront payment of £2.5m. made to it on 18 June 1987. The money was credited to a bank account of the local authority in which there were other moneys of the local authority, i.e. into a mixed account. That account itself became overdrawn overnight on several dates in June and July 1987. There was an overall debit balance on the account on 16 November 1987. The moneys in the mixed account were used by the local authority for its general expenditure. If the upfront payment had not been received, the local authority would have had to borrow more money if it could. The local authority had been, and was likely to be in the future, rate-capped and one of the attractions to the local authority in the swap agreement was that it obtained the upfront payment in a form which did not attract statutory controls.

The bank in this action sought recovery of the amounts paid by it under the void agreement together with interest. On 12 February 1993 Hobhouse J. *[1994] 4 All E.R. 890* gave judgment in the Commercial Court for the bank ordering payment by the local authority to the bank of the balance together with compound interest on the balance as from 1 April 1990 with six-monthly rests.

The council appealed to the Court of Appeal against that order and the bank cross-appealed contending that compound interest should have been ordered as from the date of receipt of the principal sum, i.e. 18 June 1987.

On 17 December 1993 the Court of Appeal (Dillon, Leggatt and Kennedy L.JJ.) *[1994] 1 W.L.R. 938* dismissed the local authority's appeal and allowed the cross-appeal by the bank. It held that the bank was entitled to recover the balance at law as money had and received (Dillon L.J., at p. 946; Leggatt L.J., at p. 953E-F). It also held that the bank was entitled to recover

the balance in equity on the ground that the local authority held the upfront payment on a resulting trust and was there- fore personally liable, as trustee, to repay the bank (Dillon L.J., at p. 947A-E; Leggatt L.J., at p. 953G-H). The Court of Appeal further held the local authority liable to pay compound interest on the balance from time to time outstanding as from the date of receipt of the upfront payment. The ability of the court to award compound, as opposed to simple, interest was founded on the equitable jurisdiction to award compound interest as against a trustee or other person owing fiduciary duties who is personally accountable and who has made use of the plaintiff's money: Dillon L.J., at pp. 949-951; Leggatt L.J., at pp. 953-955.

The local authority now accepts that it is personally liable to repay the balance to the bank. The local authority appeals to your Lordships only against the award of compound interest. But, as will appear, notwithstanding the narrow scope of the appeal it raises profound questions for decision by your Lordships.


Compound interest in equity

It is common ground that in the absence of agreement or custom the court has no jurisdiction to award compound interest either at law or *701 under section 35A of the Supreme Court Act 1981 . It is also common ground that in certain limited circumstances courts of equity can award compound interest. Mr. Philipson, for the local authority, contends that compound interest can only be ordered on a claim against a trustee or other person owing fiduciary duties who in breach of such duty has used trust moneys in his own trade. He contends that compound interest cannot be awarded in this case since (a) the local authority never held the upfront payment as a trustee or in a fiduciary capacity and (b) in any event the local authority did not use the upfront payment in its trade. Mr. Sumption, for the bank, contends that compound interest can be awarded in equity whenever the defendant is liable to disgorge a benefit received whether or not he is a trustee or a fiduciary. Alternatively, Mr. Sumption contends that the local authority did receive the upfront payment as a trustee and as such is in equity accountable for the benefits it has received, including the benefit of not having to borrow £2.5m. on the market at compound interest.

In the absence of fraud courts of equity have never awarded compound interest except against a trustee or other person owing fiduciary duties who is accountable for profits made from his position. Equity awarded simple interest at a time when courts of law had no right under common law or statute to award any interest. The award of compound interest was restricted to cases where the award was in lieu of an account of profits improperly made by the trustee. We were not referred to any case where compound interest had been awarded in the absence of fiduciary accountability for a profit. The principle is clearly stated by Lord Hatherley L.C. in *Burdick v. Garrick* , L.R. 5 Ch.App. 233 , 241:

> "the court does not proceed against an accounting party by way of punishing him for making use of the plaintiff's money by directing rests, or payment of compound interest, but proceeds upon this principle, either that he has made, or has put himself into such a position as that he is to be presumed to have made, 5 per cent., or compound interest, as the case may be."


The principle was more fully stated by Buckley L.J. in *Wallersteiner v. Moir (No. 2) [1975] Q.B. 373* , 397:

> "Where a trustee has retained trust money in his own hands, he will be accountable for the profit which he has made or which he is assumed to have made from the use of the money. In *Attorney- General v. Alford* , 4 De G.M. & G. 843 , 851 Lord Cranworth L.C. said: 'What the court ought to do, I think, is to charge him only with the interest which he has received, or which it is justly entitled to say he ought to have received, or which it is so fairly to be presumed that he did receive that he is estopped from saying that he did not receive it.' This is an application of the doctrine that the court will not allow a trustee to make any profit from his trust. The defaulting trustee is normally charged with simple interest only, but if it is established that he has used the money in trade he may be charged compound interest. . . . The justification for charging compound interest normally lies in the fact that profits earned in trade would be likely to be used as working capital for earning further profits. Precisely similar equitable *702 principles apply to an agent who has retained moneys of his principal in his hands and used them for his own purposes: *Burdick v. Garrick* ."


In *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* , 116 Lord Brandon of Oakbrook (with whose speech the rest of their Lordships agreed) considered the law as to the award of interest as at that date in four separate areas. His third area was equity, as to which he said:

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

"Thirdly, the area of equity. The Chancery courts, again differing from the common law courts, had regularly awarded simple interest as ancillary relief in respect of equitable remedies, such as specific performance, rescission and the taking of an account. Chancery courts had further regularly awarded interest, including not only simple interest but also compound interest, when they thought that justice so demanded, that is to say in cases where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position. . . . Courts of Chancery only in two special classes of case, awarded compound, as distinct from simple, interest."

These authorities establish that in the absence of fraud equity only awards compound (as opposed to simple) interest against a defendant who is a trustee or otherwise in a fiduciary position by way of recouping from such a defendant an improper profit made by him. It is unnecessary to decide whether in such a case compound interest can only be paid where the defendant has used trust moneys in his own trade or (as I tend to think) extends to all cases where a fiduciary has improperly profited from his trust. Unless the local authority owed fiduciary duties to the bank in relation to the upfront payment, compound interest cannot be awarded.

Was there a trust? The argument for the bank in outline

The bank submitted that, since the contract was void, title did not pass at the date of payment either at law or in equity. The legal title of the bank was extinguished as soon as the money was paid into the mixed account, whereupon the legal title became vested in the local authority. But, it was argued, this did not affect the equitable interest, which remained vested in the bank ("the retention of title point"). It was submitted that whenever the legal interest in property is vested in one person and the equitable interest in another, the owner of the legal interest holds it on trust for the owner of the equitable title: "the separation of the legal from the equitable interest necessarily imports a trust." For this latter proposition ("the separation of title point") the bank, of course, relies on *Sinclair v. Brougham [1914] A.C. 398* and *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd. [1981] Ch. 105* .

The generality of these submissions was narrowed by submitting that the trust which arose in this case was a resulting trust "not of an active character:" see *per* Viscount Haldane L.C. in *Sinclair v. Brougham [1914] A.C. 398* , 421. This submission was reinforced, after completion of the oral argument, by sending to your Lordships Professor Peter Birks's paper "Restitution and Resulting Trusts:" see *Equity: Contemporary Legal* ***703*** *Developments* , p. 335. Unfortunately your Lordships have not had the advantage of any submissions from the local authority on this paper, but an article by William Swadling "A new role for resulting trusts?" 16 Legal Studies 133 puts forward counter-arguments which I have found persuasive.

It is to be noted that the bank did not found any argument on the basis that the local authority was liable to repay either as a constructive trustee or under the in personam liability of the wrongful recipient of the estate of a deceased person established by *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* . I therefore do not further consider those points.

The breadth of the submission

Although the actual question in issue on the appeal is a narrow one, on the arguments presented it is necessary to consider fundamental principles of trust law. Does the recipient of money under a contract subsequently found to be void for mistake or as being ultra vires hold the moneys received on trust even where he had no knowledge at any relevant time that the contract was void? If he does hold on trust, such trust must arise at the date of receipt or, at the latest, at the date the legal title of the payer is extinguished by mixing moneys in a bank account: in the present case it does not matter at which of those dates the legal title was extinguished. If there is a trust two consequences follow: (a) the recipient will be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, the "trustee" was still ignorant of the existence of any trust: see Burrows, "Swaps and the Friction between Common Law and Equity" *[1995] R.L.R. 15* ; (b) as from the date of the establishment of the trust (i.e. receipt or mixing of the moneys by the "trustee") the original payer will have an equitable proprietary interest in the moneys so long as they are traceable into whomsoever's hands they come other than a purchaser for value of the legal interest without notice. Therefore, although in the present case the only question directly in issue is the personal liability of the local authority as a trustee, it is not possible to hold the local authority liable without imposing a trust which, in other cases, will create property rights affecting third parties because moneys received under a void contract are "trust property."

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

The practical consequences of the bank's argument

Before considering the legal merits of the submission, it is important to appreciate the practical consequences which ensue if the bank's arguments are correct. Those who suggest that a resulting trust should arise in these circumstances accept that the creation of an equitable proprietary interest under the trust can have unfortunate, and adverse, effects if the original recipient of the moneys becomes insolvent: the moneys, if traceable in the hands of the recipient, are trust moneys and not available for the creditors of the recipient. However, the creation of an equitable proprietary interest in moneys received under a void contract is capable of having adverse effects quite apart from insolvency. The proprietary interest under the unknown trust will, quite apart from *704 insolvency, be enforceable against any recipient of the property other than the purchaser for value of a legal interest without notice.

Take the following example. T (the transferor) has entered into a commercial contract with R1 (the first recipient). Both parties believe the contract to be valid but it is in fact void. Pursuant to that contract: (i) T pays £1m. to R1 who pays it into a mixed bank account; (ii) T transfers 100 shares in X company to R1, who is registered as a shareholder. Thereafter R1 deals with the money and shares as follows: (iii) R1 pays £50,000 out of the mixed account to R2 otherwise than for value; R2 then becomes insolvent, having trade creditors who have paid for goods not delivered at the time of the insolvency; (iv) R1 charges the shares in X company to R3 by way of equitable security for a loan from R3.

If the bank's arguments are correct, R1 holds the £1m. on trust for T once the money has become mixed in R1's bank account. Similarly R1 becomes the legal owner of the shares in X company as from the date of his registration as a shareholder but holds such shares on a resulting trust for T. T therefore has an equitable proprietary interest in the moneys in the mixed account and in the shares.

T's equitable interest will enjoy absolute priority as against the creditors in the insolvency of R2 (who was not a purchaser for value) provided that the £50,000 can be traced in the assets of R2 at the date of its insolvency. Moreover, if the separation of title argument is correct, since the equitable interest is in T and the legal interest is vested in R2, R2 also holds as trustee for T. In tracing the £50,000 in the bank account of R2, R2 as trustee will be treated as having drawn out "his own" moneys first, thereby benefiting T at the expense of the secured and unsecured creditors of R2. Therefore in practice one may well reach the position where the moneys in the bank account of R2 in reality reflect the price paid by creditors for goods not delivered by R2: yet, under the tracing rules, those moneys are to be treated as belonging in equity to T.

So far as the shares in the X company are concerned, T can trace his equitable interest into the shares and will take in priority to R3, whose equitable charge to secure his loan even though granted for value will pro tanto be defeated.

All this will have occurred when no one was aware, or could have been aware, of the supposed trust because no one knew that the contract was void.

I can see no moral or legal justification for giving such priority to the right of T to obtain restitution over third parties who have themselves not been enriched, in any real sense, at T's expense and indeed have had no dealings with T. T paid over his money and transferred the shares under a supposed valid contract. If the contract had been valid, he would have had purely personal rights against R1. Why should he be better off because the contract is void?

My Lords, wise judges have often warned against the wholesale importation into commercial law of equitable principles inconsistent with the certainty and speed which are essential requirements for the orderly conduct of business affairs: see *Barnes v. Addy (1874) L.R. 9 Ch.App. 244* , 251 and 255; *Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana [1983] 2 A.C. 694* , 703-704. If the bank's arguments are *705 correct, a businessman who has entered into transactions relating to or dependent upon property rights could find that assets which apparently belong to one person in fact belong to another; that there are "off balance sheet" liabilities of which he cannot be aware; that these property rights and liabilities arise from circumstances unknown not only to himself but also to anyone else who has been involved in the transactions. A new area of unmanageable risk will be introduced into commercial dealings. If the due application of equitable principles forced a conclusion leading to these results, your Lordships would be presented with a formidable task in reconciling legal principle with commercial common sense. But in my judgment no such conflict occurs. The resulting trust for which the bank contends is inconsistent not only with the law as it stands but with any principled development of it.

23

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

The relevant principles of trust law

(i) Equity operates on the conscience of the owner of the legal interest. In the case of a trust, the conscience of the legal owner requires him to carry out the purposes for which the property was vested in him (express or implied trust) or which the law imposes on him by reason of his unconscionable conduct (constructive trust).

(ii) Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, i.e. until he is aware that he is intended to hold the property for the benefit of others in the case of an express or implied trust, or, in the case of a constructive trust, of the factors which are alleged to affect his conscience.

(iii) In order to establish a trust there must be identifiable trust property. The only apparent exception to this rule is a constructive trust imposed on a person who dishonestly assists in a breach of trust who may come under fiduciary duties even if he does not receive identifiable trust property.

(iv) Once a trust is established, as from the date of its establishment the beneficiary has, in equity, a proprietary interest in the trust property, which proprietary interest will be enforceable in equity against any subsequent holder of the property (whether the original property or substituted property into which it can be traced) other than a purchaser for value of the legal interest without notice.

These propositions are fundamental to the law of trusts and I would have thought uncontroversial. However, proposition (ii) may call for some expansion. There are cases where property has been put into the name of X without X's knowledge but in circumstances where no gift to X was intended. It has been held that such property is recoverable under a resulting trust: *Birch v. Blagrave (1755) 1 Amb. 264* ; *Childers v. Childers (1857) 1 De G. & J. 482* ; *In Re Vinogradoff; Allen v. Jackson [1935] W.N. 68* ; *In Re Muller; Cassin v. Mutual Cash Order Co. Ltd. [1953] N.Z.L.R. 879* . These cases are explicable on the ground that, by the time action was brought, X or his successors in title have become aware of the facts which gave rise to a resulting trust; his conscience was affected as from the time of such discovery and thereafter he held on a resulting trust under which *706 the property was recovered from him. There is, so far as I am aware, no authority which decides that X was a trustee, and therefore accountable for his deeds, at any time before he was aware of the circumstances which gave rise to a resulting trust.

Those basic principles are inconsistent with the case being advanced by the bank. The latest time at which there was any possibility of identifying the "trust property" was the date on which the moneys in the mixed bank account of the local authority ceased to be traceable when the local authority's account went into overdraft in June 1987. At that date, the local authority had no knowledge of the invalidity of the contract that regarded the moneys as its own to spend as it thought fit. There was therefore never a time at which both (a) there was defined trust property and (b) the conscience of the local authority in relation to such defined trust property was affected. The basic requirements of a trust were never satisfied.

I turn then to consider the bank's arguments in detail. They were based primarily on principle rather than on authority. I will deal first with the bank's argument from principle and then turn to the main authorities relied upon by the bank, *Sinclair v. Brougham [1914] A.C. 398* and *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd. [1981] Ch. 105* .

The retention of title point

It is said that, since the bank only intended to part with its beneficial ownership of the moneys in performance of a valid contract, neither the legal nor the equitable title passed to the local authority at the date of payment. The legal title vested in the local authority by operation of law when the moneys became mixed in the bank account but, it is said, the bank "retained" its equitable title.

I think this argument is fallacious. A person solely entitled to the full beneficial ownership of money or property, both at law and in equity, does not enjoy an equitable interest in that property. The legal title carries with it all rights. Unless and until there is a separation of the legal and equitable estates, there is no separate equitable title. Therefore to talk about the bank "retaining" its equitable interest is meaningless. The only question is whether the circumstances under which the money was paid were such as, in equity, to impose a trust on the local authority. If so, an equitable interest arose for the first time under that trust.

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

This proposition is supported by *In Re Cook; Beck v. Grant [1948] Ch. 212* ; *Vandervell v. Inland Revenue Commissioners [1967] 2 A.C. 291* , 311G, *per* Lord Upjohn, and 317F, *per* Lord Donovan; *Commissioner of Stamp Duties (Queensland) v. Livingston [1965] A.C. 694* , 712B-E; *Underhill and Hayton, Law of Trusts and Trustees* , 15th ed. (1995), p. 866.

The separation of title point

The bank's submission, at its widest, is that if the legal title is in A but the equitable interest in B, A holds as trustee for B.

Again I think this argument is fallacious. There are many cases where B enjoys rights which, in equity, are enforceable against the legal owner, A, without A being a trustee, e.g. an equitable right to redeem a mortgage,  *707*  equitable easements, restrictive covenants, the right to rectification, an insurer's right by subrogation to receive damages subsequently recovered by the assured: *Lord Napier and Ettrick v. Hunter [1993] A.C. 713* . Even in cases where the whole beneficial interest is vested in B and the bare legal interest in A, A is not necessarily a trustee, e.g. where title to land is acquired by estoppel as against the legal owner; a mortgagee who has fully discharged his indebtedness enforces his right to recover the mortgaged property in a redemption action, not an action for breach of trust.

The bank contended that where, *under a pre-existing trust,* B is entitled to an equitable interest in trust property, if the trust property comes into the hands of a third party, X (not being a purchaser for value of the legal interest without notice), B is entitled to enforce his equitable interest against the property in the hands of X because X is a trustee for B. In my view the third party, X, is not necessarily a trustee for B: B's equitable right is enforceable against the property in just the same way as any other specifically enforceable equitable right can be enforced against a third party. Even if the third party, X, is not aware that what he has received is trust property B is entitled to assert his title in that property. If X has the necessary degree of knowledge, X may himself become a constructive trustee for B on the basis of knowing receipt. But unless he has the requisite degree of knowledge he is not personally liable to account as trustee: *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* , 478; *In Re Montagu's Settlement Trusts [1987] Ch. 264* . Therefore, innocent receipt of property by X subject to an existing equitable interest does not by itself make X a trustee despite the severance of the legal and equitable titles. Underhill and Hayton, Law of Trusts and Trustees, pp. 369-370, whilst accepting that X is under no personal liability to account unless and until he becomes aware of B's rights, does describe X as being a constructive trustee. This may only be a question of semantics: on either footing, in the present case the local authority could not have become accountable for profits until it knew that the contract was void.

Resulting trust

This is not a case where the bank had any equitable interest which pre-dated receipt by the local authority of the upfront payment. Therefore, in order to show that the local authority became a trustee, the bank must demonstrate circumstances which raised a trust for the first time either at the date on which the local authority received the money or at the date on which payment into the mixed account was made. Counsel for the bank specifically disavowed any claim based on a constructive trust. This was plainly right because the local authority had no relevant knowledge sufficient to raise a constructive trust at any time before the moneys, upon the bank account going into overdraft, became untraceable. Once there ceased to be an identifiable trust fund, the local authority could not become a trustee: *In Re Goldcorp Exchange Ltd. [1995] 1 A.C. 74* . Therefore, as the argument for the bank recognised, the only possible trust which could be established was a resulting trust arising from the circumstances in which the local authority received the upfront payment.

  *708*

Under existing law a resulting trust arises in two sets of circumstances: (A) where A makes a voluntary payment to B or pays (wholly or in part) for the purchase of property which is vested either in B alone or in the joint names of A and B, there is a presumption that A did not intend to make a gift to B: the money or property is held on trust for A (if he is the sole provider of the money) or in the case of a joint purchase by A and B in shares proportionate to their contributions. It is important to stress that this is only a *presumption* , which presumption is easily rebutted either by the counter-presumption of advancement or by direct evidence of A's intention to make an outright transfer: see Underhill and Hayton, Law of Trusts and Trustees, pp. 317 et seq.; *Vandervell v. Inland Revenue Commissioners [1967] 2 A.C. 291* , 312 et seq.; *In Re Vandervell's Trusts (No. 2) [1974] Ch. 269* , 288 et seq. (B) Where A transfers property to B *on express trusts* , but the trusts declared do not exhaust the whole beneficial interest: ibid. and *Quistclose Investments Ltd. v. Rolls Razor Ltd (In Liquidation) [1970] A.C. 567* . Both types of resulting trust are traditionally regarded as examples of trusts giving effect to the common intention of the parties. A resulting trust is not imposed by law against the intentions of the trustee (as is a constructive trust) but gives effect to his presumed intention. Megarry J. in *In Re Vandervell's Trusts (No. 2)* suggests that a resulting trust of type (B) does not depend on intention but

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

operates automatically. I am not convinced that this is right. If the settlor has expressly, or by necessary implication, abandoned any beneficial interest in the trust property, there is in my view no resulting trust: the undisposed-of equitable interest vests in the Crown as bona vacantia: see *In Re West Sussex Constabulary's Widows, Children and Benevolent (1930) Fund Trusts [1971] Ch. 1* .

Applying these conventional principles of resulting trust to the present case, the bank's claim must fail. There was no transfer of money to the local authority on express trusts: therefore a resulting trust of type (B) above could not arise. As to type (A) above, any presumption of resulting trust is rebutted since it is demonstrated that the bank paid, and the local authority received, the upfront payment with the intention that the moneys so paid should become the absolute property of the local authority. It is true that the parties were under a misapprehension that the payment was made in pursuance of a valid contract. But that does not alter the actual intentions of the parties at the date the payment was made or the moneys were mixed in the bank account. As the article by William Swadling, "A new role for resulting trusts?" 16 Legal Studies 133 demonstrates the presumption of resulting trust is rebutted by evidence of any intention inconsistent with such a trust, not only by evidence of an intention to make a gift.

Professor Birks, "Restitution and Resulting Trusts" (see Equity: Contemporary Legal Developments, p. 335, at p. 360), whilst accepting that the principles I have stated represent "a very conservative form" of definition of a resulting trust, argues from restitutionary principles that the definition should be extended so as to cover a perceived gap in the law of "subtractive unjust enrichment" (at p. 368) so as to give a plaintiff a proprietary remedy when he has transferred value under a mistake or under a contract the consideration for which wholly fails. He suggests that *709 a resulting trust should arise wherever the money is paid under a mistake (because such mistake vitiates the actual intention) or when money is paid on a condition which is not subsequently satisfied.

As one would expect, the argument is tightly reasoned but I am not persuaded. The search for a perceived need to strengthen the remedies of a plaintiff claiming in restitution involves, to my mind, a distortion of trust principles. First, the argument elides rights in property (which is the only proper subject matter of a trust) into rights in "the value transferred:" see p. 361. A trust can only arise where there is defined trust property: it is therefore not consistent with trust principles to say that a person is a trustee of property which cannot be defined. Second, Professor Birks's approach appears to assume (for example in the case of a transfer of value made under a contract the consideration for which subsequently fails) that the recipient will be deemed to have been a trustee from the date of his original receipt of money, i.e. the trust arises at a time when the "trustee" does not, and cannot, know that there is going to be a total failure of consideration. This result is incompatible with the basic premise on which all trust law is built, viz. that the conscience of the trustee is affected. Unless and until the trustee is aware of the factors which give rise to the supposed trust, there is nothing which can affect his conscience. Thus neither in the case of a subsequent failure of consideration nor in the case of a payment under a contract subsequently found to be void for mistake or failure of condition will there be circumstances, at the date of receipt, which can impinge on the conscience of the recipient, thereby making him a trustee. Thirdly, Professor Birks has to impose on his wider view an arbitrary and admittedly unprincipled modification so as to ensure that a resulting trust does not arise when there has only been a failure to perform a contract, as opposed to total failure of consideration: see pp. 356-359 and 362. Such arbitrary exclusion is designed to preserve the rights of creditors in the insolvency of the recipient. The fact that it is necessary to exclude artificially one type of case which would logically fall within the wider concept casts doubt on the validity of the concept.

If adopted, Professor Birks's wider concepts would give rise to all the practical consequences and injustices to which I have referred. I do not think it right to make an unprincipled alteration to the law of property (i.e. the law of trusts) so as to produce in the law of unjust enrichment the injustices to third parties which I have mentioned and the consequential commercial uncertainty which any extension of proprietary interests in personal property is bound to produce.

The authorities

Three cases were principally relied upon in direct support of the proposition that a resulting trust arises where a payment is made under a void contract.

(A) Sinclair v. Brougham [1914] A.C. 398

The case concerned the distribution of the assets of the Birkbeck Permanent Benefit Building Society, an unincorporated body which was insolvent. The society had for many years been carrying on business as a *710 bank which, it was held, was ultra vires its objects. The bank had accepted deposits in the course of its ultra vires banking business and it was held that the debts

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

owed to such depositors were themselves void as being ultra vires. In addition to the banking depositors, there were ordinary trade creditors. The society had two classes of members, the A shareholders who were entitled to repayment of their investment on maturity and the B shareholders whose shares were permanent. By agreement, the claims of the ordinary trade creditors and of the A shareholders had been settled. Therefore the only claimants to the assets of the society before the court were the ultra vires depositors and the B shareholders, the latter of which could take no greater interest than the society itself.

The issues for decision arose on a summons taken out by the liquidator for directions as to how he should distribute the assets in the liquidation. In the judgments, it is not always clear whether this House was laying down general propositions of law or merely giving directions as to the proper mode in which the assets in that liquidation should be distributed. The depositors claimed, first, in quasi-contract for money had and received. They claimed secondly, as the result of an argument suggested for the first time in the course of argument in the House of Lords (at p. 404), to trace their deposits into the assets of the society.

Money had and received

The House of Lords was unanimous in rejecting the claim by the ultra vires depositors to recover in quasi-contract on the basis of moneys had and received. In their view, the claim in quasi-contract was based on an implied contract. To imply a contract to repay would be to imply a contract to exactly the same effect as the express ultra vires contract of loan. Any such implied contract would itself be void as being ultra vires.

Subsequent developments in the law of restitution demonstrate that this reasoning is no longer sound. The common law restitutionary claim is based not on implied contract but on unjust enrichment: in the circumstances the law imposes an obligation to repay rather than implying an entirely fictitious agreement to repay: *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd. [1943] A.C. 32* , 63-64, *per* Lord Wright; *Pavey & Matthews Pty. Ltd. v. Paul (1987) 162 C.L.R. 221* , 227, 255; *Lipkin Gorman v. Karpnale Ltd [1991] 2 A.C. 548* , 578C; *Woolwich Equitable Building Society v. Inland Revenue Commissioners [1993] A.C. 70* . In my judgment, your Lordships should now unequivocally and finally reject the concept that the claim for moneys had and received is based on an implied contract. I would overrule *Sinclair v. Brougham* on this point.

It follows that in *Sinclair v. Brougham* the depositors should have had a personal claim to recover the moneys at law based on a total failure of consideration. The failure of consideration was *not* partial: the depositors had paid over their money in consideration of a promise to repay. That promise was ultra vires and void; therefore the consideration for the payment of the money wholly failed. So in the present swaps case (though the point is not one under appeal) I think the Court of Appeal were right to hold that the swap moneys were paid on a consideration that wholly failed. The essence of the swap agreement is that, over the whole term of  *\*711* the agreement, each party thinks he will come out best: the consideration for one party making a payment is an obligation on the other party to make counter-payments over the whole term of the agreement.

If in *Sinclair v. Brougham* the depositors had been held entitled to recover at law, their personal claim would have ranked pari passu with other ordinary unsecured creditors, in priority to the members of the society who could take nothing in the liquidation until all creditors had been paid.

The claim in rem

The House of Lords held that, the ordinary trade creditors having been paid in full by agreement, the assets remaining were to be divided between the ultra vires depositors and the members of the society pro rata according to their respective payments to the society. The difficulty is to identify any single ratio decidendi for that decision. Viscount Haldane L.C. (with whom Lord Atkinson agreed) and Lord Parker of Waddington gave fully reasoned judgments (considered below). Lord Dunedin apparently based himself on some "super-eminent" equity (not a technical equity) in accordance with which the court could distribute the remaining assets of the society: see pp. 434 and 436. The members (by which presumably he means the society) were not in a fiduciary relationship with the depositors: it was the directors not the society which had mixed the moneys: p. 438. This indicates that he was adopting the approach of Lord Parker: yet he concurred in the judgment of Lord Haldane L.C.: p. 438. I can only understand his judgment as being based on some super-eminent jurisdiction in the court to do justice as between the remaining claimants in the course of a liquidation.

Lord Sumner plainly regarded the case as a matter of doing justice in administering the remaining assets in the liquidation, all other claims having been eliminated: p. 459. He said, at p. 458:

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

"The question is one of administration. The liquidator, an officer of the court, who has to discharge himself of the assets that have come to his hands, asks for directions, and, after hearing all parties concerned, the court has the right and the duty to direct him how to distribute all the assets. . . . In my opinion, if precedent fails, the most just distribution of the whole must be directed, so only that no recognised rule of law or equity be disregarded."

Lord Haldane L.C. treated the case as a tracing claim: could the depositors follow and recover property with which, in equity, they had "never really parted:" p. 418. After holding that the parties could not trace at law (pp. 418-420) he said that the moneys could be traced in equity "based upon trust:" p. 420. The only passage in which he identifies the trust is at p. 421:

"The property was never converted into a debt, in equity at all events, and there has been throughout a resulting trust, not of an active character, but sufficient, in my opinion, to bring the transaction within the general principle."

He treats the society itself (as opposed to its directors) as having mixed the depositors' money with its own money, but says, at pp. 422-423, that *712 such mixing was not a breach of fiduciary duty by the society but authorised by the depositors: it was intended that "the society should be entitled to deal with [the depositors' money] freely as its own." On that ground he distinguished In Re Hallett's Estate , 13 Ch.D. 696 (a trustee is taken to have drawn his own money first) and held that the mixed moneys therefore belonged to the depositors and members pro rata.

Like those before me, I find Lord Haldane L.C.'s reasoning difficult, if not impossible, to follow. The only equitable right which he identifies arises under "a resulting trust, not of an active character" which, as I understand it, existed from the moment when the society received the money. Applying the conventional approach, the resulting trust could only have arisen because either the depositors were treated as contributors to a fund (a resulting trust of type (A) above) or because the "trust" on which the moneys were paid to the society had failed (a resulting trust of type (B)). Yet the finding that the society was not in breach of fiduciary duty because it was the intention of the parties that the society should be free to deal with the money as its own (p. 423) is inconsistent with either type of resulting trust. Such an intention would rebut the presumption of resulting trust of type (A) and is inconsistent with a payment on express trusts which fail, i.e. with a type (B) resulting trust. Therefore the inactive resulting trust which Lord Haldane L.C. was referring to was, as Professor Birks points out ("Restitution and Resulting Trusts," Equity: Contemporary Legal Developments, at pp. 359-362), not a conventional one: indeed there is no trace of any such trust in earlier or later authority. The question is whether the recognition of such a trust accords with principle and the demands of certainty in commercial dealings.

As to the latter, Lord Haldane L.C.'s theory, if correct, gives rise to all the difficulties which I have noted above. Nor does the theory accord with principle. First, it postulates that the society became a trustee at a time when it was wholly ignorant of the circumstances giving rise to the trust. Second, since the depositors' money was intended to be mixed with that of the society, there was never any intention that there should be a separate identifiable trust fund, an essential feature of any trust. Third, and most important, if Lord Haldane L.C.'s approach were to be applicable in an ordinary liquidation it is quite incapable of accommodating the rights of ordinary creditors. Lord Haldane L.C.'s inactive resulting trust, if generally applicable, would give the depositors (and possibly the members) rights having priority not only to those of ordinary trade creditors but also to those of some secured creditors, e.g. the common form security for bank lending, a floating charge on the company's assets. The moneys of both depositors and members are, apparently, trust moneys and therefore form no part of the company's assets available to pay creditors, whether secured or unsecured. This seems to be an impossible conclusion. Lord Haldane L.C. appreciated the difficulty, but did not express any view as to what the position would be if there had been trade creditors in competition: see pp. 421-422 and 425-426.

Lord Parker analysed the matter differently. He held that the depositors had paid their money not to the society itself but to the directors, who apparently held the moneys on some form of Quistclose trust ( Quistclose Investments Ltd. v. Rolls Razor Ltd. (In Liquidation) [1970] A.C. 567 ): the *713 money had been paid by the depositors to the directors to be applied by them in making valid deposits with the society and, since such deposit was impossible, the directors held the moneys on a trust for the depositors: see pp. 441-442, 444. It is to be noted that Lord Parker does not at any time spell out the nature of this trust. However, he held that the directors owed fiduciary duties both to the depositors and to the members of the society. Therefore it was not a case in which a trustee had mixed trust moneys with his own moneys (to which In Re Hallett's Estate would apply) but of trustees (the directors) mixing the moneys of two innocent parties to both of whom they owed fiduciary duties: the depositors and members therefore ranked pari passu: p. 442.

© 2021 Thomson Reuters.

I find the approach of Lord Parker much more intelligible than that of Lord Haldane L.C.: it avoids finding that the society held the money on a resulting trust at the same time as being authorised to mix the depositors' money with its own. In *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* the Court of Appeal found the ratio of *Sinclair v. Brougham* to lie in Lord Parker's analysis. But, quite apart from the fact that no other member of the House founded himself on Lord Parker's analysis, it is in some respects very unsatisfactory. First, the finding that the depositors' moneys were received by the directors, as opposed to the society itself, is artificial. Although it was ultra vires the society to enter into a contract to repay the moneys, it was not ultra vires the society to receive moneys. Second, Lord Parker's approach gives depositors and members alike the same priority over trade creditors as does that of Lord Haldane L.C. The fact is that any analysis which confers an equitable proprietary interest as a result of a payment under a void contract necessarily gives priority in an insolvency to the recovery of the ultra vires payment. Lord Parker too was aware of this problem: but he left the problem to be solved in a case where the claims of trade creditors were still outstanding. Indeed he went further than Lord Haldane L.C. He appears to have thought that the court had power in some cases to postpone trade creditors to ultra vires depositors and in other cases to give the trade creditors priority: which course was appropriate he held depended on the facts of each individual case: pp. 444 and 445. There is much to be said for the view that Lord Parker, like Lord Haldane L.C. and Lord Sumner, was dealing only with the question of the due administration of assets of a company in liquidation. Thus he says, at p. 449:

"nor, indeed, am I satisfied that the equity to which effect is being given in this case is necessarily confined to a liquidation. It is, however, unnecessary for your Lordships to decide these points."

This makes it clear that he was not purporting to do more than decide how the assets of that society in that liquidation were to be dealt with.

As has been pointed out frequently over the 80 years since it was decided, *Sinclair v. Brougham* is a bewildering authority: no single ratio decidendi can be detected; all the reasoning is open to serious objection; it was only intended to deal with cases where there were no trade creditors in competition and the reasoning is incapable of application where there are such creditors. In my view the decision as to rights in rem in *Sinclair v. Brougham* should also be overruled. Although the case is one where *714* property rights are involved, such overruling should not in practice disturb long-settled titles. However, your Lordships should not be taken to be casting any doubt on the principles of tracing as established in *In Re Diplock* .

If *Sinclair v. Brougham* , in both its aspects, is overruled the law can be established in accordance with principle and commercial common sense: a claimant for restitution of moneys paid under an ultra vires, and therefore void, contract has a personal action at law to recover the moneys paid as on a total failure of consideration; he will not have an equitable proprietary claim which gives him either rights against third parties or priority in an insolvency; nor will he have a personal claim in equity, since the recipient is not a trustee.

(B) Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd. [1981] Ch. 105

In that case Chase Manhattan, a New York bank, had by mistake paid the same sum twice to the credit of the defendant, a London bank. Shortly thereafter, the defendant bank went into insolvent liquidation. The question was whether Chase Manhattan had a claim in rem against the assets of the defendant bank to recover the second payment.

Goulding J. was asked to assume that the moneys paid under a mistake were capable of being traced in the assets of the recipient bank: he was only concerned with the question whether there was a proprietary base on which the tracing remedy could be founded: p. 116B. He held that, where money was paid under a mistake, the receipt of such money without more constituted the recipient a trustee: he said that the payer "retains an equitable property in it and the conscience of [the recipient] is subjected to a fiduciary duty to respect his proprietary right:" p. 119.

It will be apparent from what I have already said that I cannot agree with this reasoning. First, it is based on a concept of retaining an equitable property in money where, prior to the payment to the recipient bank, there was no existing equitable interest. Further, I cannot understand how the recipient's "conscience" can be affected at a time when he is not aware of any mistake. Finally, the judge found that the law of England and that of New York were in substance the same. I find this a surprising conclusion since the New York law of constructive trusts has for a long time been influenced by the concept of a *remedial* constructive trust, whereas hitherto English law has for the most part only recognised an institutional constructive trust: see *Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc. [1990] 1 Q.B. 391* , 478-480. In the present context,

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

that distinction is of fundamental importance. Under an institutional constructive trust, the trust arises by operation of law as from the date of the circumstances which give rise to it: the function of the court is merely to declare that such trust has arisen in the past. The consequences that flow from such trust having arisen (including the possibly unfair consequences to third parties who in the interim have received the trust property) are also determined by rules of law, not under a discretion. A remedial constructive trust, as I understand it, is different. It is a judicial remedy giving rise to an enforceable equitable obligation: the extent to which it operates retrospectively to the prejudice of third parties lies in the *715 discretion of the court. Thus for the law of New York to hold that there is a remedial constructive trust where a payment has been made under a void contract gives rise to different consequences from holding that an institutional constructive trust arises in English law.

However, although I do not accept the reasoning of Goulding J., Chase Manhattan may well have been rightly decided. The defendant bank knew of the mistake made by the paying bank within two days of the receipt of the moneys: see at p. 115A. The judge treated this fact as irrelevant (p. 114F) but in my judgment it may well provide a proper foundation for the decision. Although the mere receipt of the moneys, in ignorance of the mistake, gives rise to no trust, the retention of the moneys after the recipient bank learned of the mistake may well have given rise to a constructive trust: see Snell's Equity , p. 193; Pettit, Equity and the Law of Trusts, 7th ed. (1993) p. 168; Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc. [1990] 1 Q.B. 391 , 473-474.

(C) In re Ames' Settlement; Dinwiddy v. Ames [1946] Ch. 217

In this case the father of the intended husband, in consideration of the son's intended marriage with Miss H., made a marriage settlement under which the income was payable to the husband for life and after his death to the wife for life or until her remarriage, with remainder to the issue of the intended marriage. There was an ultimate trust, introduced by the words "If there should not be any child of the said intended marriage who attains a vested interest . . ." for an artificial class of the husband's next of kin. The marriage took place. Many years later a decree of nullity on the grounds of non-consummation had the effect of rendering the marriage void ab initio. The income was paid to the husband until his death which occurred 19 years after the decree of nullity. The question was whether the trust capital was held under the ultimate trust for the husband's next-of-kin or was payable to the settlor's estate. It was held that the settlor's estate was entitled.

The judgment is very confused. It is not clear whether the judge was holding (as I think correctly) that in any event the ultimate trust failed because it was only expressed to take effect in the event of the failure of the issue of a non-existent marriage (an impossible condition precedent) or whether he held that all the trusts of the settlement failed because the beneficial interests were conferred in consideration of the intended marriage and that there had been a total failure of consideration. In either event, the decision has no bearing on the present case. On either view, the fund was vested in trustees on trusts which had failed. Therefore the moneys were held on a resulting trust of type (B) above. The decision casts no light on the question whether, there being no express trust, moneys paid on a consideration which wholly fails are held on a resulting trust.

The stolen bag of coins

The argument for a resulting trust was said to be supported by the case of a thief who steals a bag of coins. At law those coins remain traceable only so long as they are kept separate: as soon as they are mixed *716 with other coins or paid into a mixed bank account they cease to be traceable at law. Can it really be the case, it is asked, that in such circumstances the thief cannot be required to disgorge the property which, in equity, represents the stolen coins? Moneys can only be traced in equity if there has been at some stage a breach of fiduciary duty, i.e. if either before the theft there was an equitable proprietary interest (e.g. the coins were stolen trust moneys) or such interest arises under a resulting trust at the time of the theft or the mixing of the moneys. Therefore, it is said, a resulting trust must arise either at the time of the theft or when the moneys are subsequently mixed. Unless this is the law, there will be no right to recover the assets representing the stolen moneys once the moneys have become mixed.

I agree that the stolen moneys are traceable in equity. But the proprietary interest which equity is enforcing in such circumstances arises under a constructive, not a resulting, trust. Although it is difficult to find clear authority for the proposition, when property is obtained by fraud equity imposes a constructive trust on the fraudulent recipient: the property is recoverable and traceable in equity. Thus, an infant who has obtained property by fraud is bound in equity to restore it: Stocks v. Wilson [1913] 2 K.B. 235 , 244; R. Leslie Ltd. v. Sheill [1914] 3 K.B. 607 . Moneys stolen from a bank account can be traced in equity: Bankers Trust Co. v. Shapira [1980] 1 W.L.R. 1274 , 1282C-E: see also McCormick v. Grogan (1869) L.R. 4 H.L. 82 , 97.

© 2021 Thomson Reuters.

30    115

Restitution and equitable rights

Those concerned with developing the law of restitution are anxious to ensure that, in certain circumstances, the plaintiff should have the right to recover property which he has unjustly lost. For that purpose they have sought to develop the law of resulting trusts so as to give the plaintiff a proprietary interest. For the reasons that I have given in my view such development is not based on sound principle and in the name of unjust enrichment is capable of producing most unjust results. The law of resulting trusts would confer on the plaintiff a right to recover property from, or at the expense of, those who have not been unjustly enriched at his expense at all, e.g. the lender whose debt is secured by a floating charge and all other third parties who have purchased an equitable interest only, albeit in all innocence and for value.

Although the resulting trust is an unsuitable basis for developing proprietary restitutionary remedies, the remedial constructive trust, if introduced into English law, may provide a more satisfactory road forward. The court by way of remedy might impose a constructive trust on a defendant who knowingly retains property of which the plaintiff has been unjustly deprived. Since the remedy can be tailored to the circumstances of the particular case, innocent third parties would not be prejudiced and restitutionary defences, such as change of position, are capable of being given effect. However, whether English law should follow the United States and Canada by adopting the remedial constructive trust will have to be decided in some future case when the point is directly in issue.  *717*

The date from which interest is payable

The Court of Appeal held that compound interest was payable by the local authority on the balance for the time being outstanding, such interest to start from the date of the receipt by the local authority of the upfront payment of £2.5m. on 18 June 1987. Although, for the reasons I have given, I do not think the court should award compound interest in this case, I can see no reason why interest should not start to run as from the date of payment of the upfront payment. I agree with the judgment of Leggatt L.J. in the Court of Appeal *[1994] 1 W.L.R. 938* , 955 that there is no good ground for departing from the general rule that interest is payable as from the date of the accrual of the cause of action.

Equity acting in aid of the common law

Since drafting this speech I have seen, in draft, the speeches of my noble and learned friends, Lord Goff of Chieveley and Lord Woolf. Both consider that compound interest should be awarded in this case on the grounds that equity can act in aid of the common law and should exercise its jurisdiction to order compound interest in aid of the common law right to recover moneys paid under an ultra vires contract.

I fully appreciate the strength of the moral claim of the bank in this case to receive full restitution, including compound interest. But I am unable to accept that it would be right in the circumstances of this case for your Lordships to develop the law in the manner proposed. I take this view for two reasons.

First, Parliament has twice since 1934 considered what interest should be awarded on claims at common law. Both the Act of 1934, section 3(1) , and its successor, section 35A of the Act of 1981, make it clear that the Act does not authorise the award of compound interest. However both Acts equally make it clear that they do not impinge on the award of interest in equity. At the time those Acts were passed, and indeed at all times down to the present day, equity has only awarded compound interest in the limited circumstances which I have mentioned. In my judgment, your Lordships would be usurping the function of Parliament if, by expanding the equitable rules for the award of compound interest, this House were now to hold that the court exercising its equitable jurisdiction in aid of the common law can award compound interest which the statutes have expressly not authorised the court to award in exercise of its common law jurisdiction.

Secondly, the arguments relied upon by my noble and learned friends were not advanced by the bank at the hearing. The local authority would have a legitimate ground to feel aggrieved if the case were decided against them on a point which they had had no opportunity to address. Moreover, in my view it would be imprudent to introduce such an important change in the law without this House first having heard full argument upon it. Although I express no concluded view on the points raised, the proposed development of the law bristles with unresolved questions. For example, given that the right to interest is not a right which existed at common law but is solely the creation of statute, would equity in fact be acting in aid of the common law or would it be acting in aid of the legislature? Does the principle that equity acts in aid of the common law apply where there

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

*718* is no concurrent right of action in equity? If not, in the absence of any trust or fiduciary relationship what is the equitable cause of action in this case? What were the policy reasons which led Parliament to provide expressly that only the award of simple interest was authorised? In what circumstances should compound interest be awarded under the proposed expansion of the equitable rules? In the absence of argument on these points it would in my view be imprudent to change the law. Rather, the whole question of the award of compound interest should be looked at again by Parliament so that it can make such changes, if any, as are appropriate.

For these reasons, which are in substance the same as those advanced by my noble and learned friend, Lord Lloyd of Berwick, I am unable to agree with the views of Lord Goff of Chieveley and Lord Woolf.


Conclusion

I would allow the appeal and vary the judgment of the Court of Appeal so as to order the payment of simple interest only as from 18 June 1987 on the balance from time to time between the sums paid by the bank to the local authority and the sums paid by the local authority to the bank.


LORD SLYNN OF HADLEY.

My Lords, for the reasons given by my noble and learned friend, Lord Browne-Wilkinson, I agree that *Sinclair v. Brougham [1914] A.C. 398* should be departed from and that it should be held that in this case the local authority was neither a trustee of, nor in a fiduciary position in relation to, the moneys which it had received from the bank, nor had it improperly profited from the use of those moneys. For the reasons which he gives no resulting trust could arise on the present facts.

It follows that if, as I think, Lord Brandon of Oakbrook in *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* , 116, was right to say that in the Court of Chancery the award of compound interest was limited to situations "where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position," Courts of Chancery would not have awarded compound interest in a case like the present.

It is common ground that compound interest could not have been awarded at common law as presently formulated nor under the statutory provisions in section 3 of the Law Reform (Miscellaneous Provisions) Act 1934 nor under section 35A of the Supreme Court Act 1981 as inserted by the Administration of Justice Act 1982 .

But for the legislation I would have accepted that it was open to your lordships to hold that, in the light of the development of the law of restitution, the courts could award compound interest, either by modifying the common law rule or by resorting to equity to act in aid of the common law right to recover moneys paid under a void transaction. As to whether it would have been right to do so in general terms, or whether it would have been right to limit the cases in which compound interest should be awarded, or whether compound interest should be awarded at all I am *719* not, on the restricted arguments advanced in this case, prepared to comment.

I do not, however, consider that it would be right on this appeal to enlarge the cases in which compound interest can be awarded when Parliament has twice in relatively recent times limited statutory interest to simple interest. This is a matter which should be considered by Parliament when the merits or disadvantages of giving the courts power to award compound interest could be examined in a context wider than the present case.

Accordingly in agreement with my noble and learned friends, Lord Browne-Wilkinson and Lord Lloyd of Berwick, and despite the forceful reasoning of my noble and learned friends, Lord Goff of Chieveley and Lord Woolf, I would allow the appeal and vary the judgment of the Court of Appeal so as to award simple interest from 18 June 1987.


LORD WOOLF.

My Lords, this appeal raises directly only one issue of law. It is whether the courts have jurisdiction to make an order for the payment of compound interest ancillary to an order for restitution when a contract is ultra vires. All the judges in the courts below concluded that there was jurisdiction to do so.

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

In this case an order was made in favour of the respondent bank as against the appellant local authority which was the recipient of the ultra vires payment. There is no dispute that there was jurisdiction to make an order for the payment of *simple* interest. The dispute is limited to the order for compound interest.

It is accepted that if there is jurisdiction to make the order this is a case in which this achieves a just result. There is only one other issue raised by the appeal and that is as to the date from which the interest should be paid.

The transaction was a commercial transaction. The local authority in calculating the balance which it had to repay the bank was given credit for the sums which it had paid by way of notional interest under the contract prior to it being appreciated that the contract might be ultra vires. If the transaction had not taken place the local authority would have had to borrow (if it could find a way of lawfully doing so) the sum paid to it by the bank on terms which would be likely to involve compound interest being recoverable in proceedings for default. (Here see *National Bank of Greece S.A. v. Pinios Shipping Co. No. 1 [1990] 1 A.C. 637* as to commercial transactions with banks.) The bank could have lent that sum on the same basis.

Hobhouse J., the judge at first instance, reflected the commercial justice of the situation in the passage in his judgment in which he set out succinctly why he considered compound interest was payable *[1994] 4 All E.R. 890* , 955:

"[The local authority] has kept that sum and has not made any restitution. In this situation I see no reason why I should not exercise my equitable jurisdiction to award compound interest. Simple interest does not reflect the actual value of money. Anyone who lends or borrows money on a commercial basis receives or pays interest periodically and if that interest is not paid it is compounded **\*720** (e.g. *Wallersteiner v. Moir (No. 2) [1975] Q.B. 373* and *National Bank of Greece S.A. v. Pinios Shipping Co. No. 1, the Maira [1990] 1 A.C. 637* ). I see no reason why I should deny the plaintiff a complete remedy or allow the defendant arbitrarily to retain part of the enrichment which it has unjustly enjoyed. There are no special factors which have to be taken into account. No question of insolvency is involved nor is there any basis for any persuasive argument to the contrary."

This being the situation I am relieved that I am of the opinion that the judges in the courts below were correct in concluding that in the circumstances of this case they were entitled to award compound interest. Any other decision would be inconsistent with the court's ability to grant full restitution. It would be a further unhappy aspect, from a commercial standpoint, of the history of this case in particular and the swaps litigation as a whole. This commenced with the decision, to which I was a party at first instance, of *Hazell v. Hammersmith and Fulham London Borough Council [1992] 2 A.C. 1* . It is no secret that the decision at first instance in that case, which was approved by this House, caused dismay among some of those concerned with the standing abroad of the commercial law of this country. That concern is likely to be increased if the outcome of this litigation is that this appeal has to be allowed by this House because the courts have no jurisdiction to grant compound interest.

The position is not improved by the fact that such is the confused state of English law as to the extent of its jurisdiction to award interest that the hearing before their Lordships involved four days of argument. Argument that could have lasted even longer but for counsel for the local authority courteously informing their Lordships that because of the costs which the local authority was incurring on the appeal he was required by his clients to curtail his argument.

The argument had been extended by their Lordships themselves raising the issue as to the correctness of a decision of this House of some 80 years standing ( *Sinclair v. Brougham [1914] A.C. 398* ). That case does not directly involve the courts' equitable jurisdiction to award interest. Yet the issue as to whether the case was correctly decided still needed to be raised because the reasoning in that case was inconsistent with the submissions of the local authority. The fact that counsel was required to take the course of seeking to limit his argument does put in question whether the way appeals are managed before the House and the resources available to their Lordships are ideal for meeting both the contemporary needs of litigants and their Lordships' responsibilities for the proper development of the law.

I have had the considerable advantage of being able to read in draft the admirably reasoned speeches of Lord Goff of Chieveley and Lord Browne-Wilkinson. That reasoning convinces me that the bank is not entitled to proceed by way of an equitable proprietary claim and that the recipient of a sum of money paid under an ultra vires contract should not be regarded as owing the duty of a trustee or a fiduciary to the payer of that sum. Further than that it is not necessary for me to go. This avoids the dangers which Lord Browne-Wilkinson suggests could result from the **\*721** wholesale importation into commercial law of equitable principles. I am also in agreement with Lord Goff's reasoning as to compound interest being able to be awarded where one party is under a duty to make restitution to another, as a consequence of the development of the law of restitution.

33   118

The significance of the difference between equitable principles and remedies

Such a wholesale importation is not necessarily the consequence of a finding that the courts have the equitable jurisdiction to make an order for the payment of compound interest in conjunction with the grant of a remedy of restitution. We are concerned here primarily not with equitable principles of substantive law but with the possible existence of an equitable remedy. Compound interest, if it is recoverable, will be recoverable in the circumstances of this case in equity because of the absence of any statutory or common law remedy which will prevent the local authority being unjustly enriched at the expense of the bank if compound interest is not payable.

The situation is one in which compound interest would be awarded because it would be unconscionable to allow the local authority to make a profit out of a contract which was void because it had exceeded its own powers. This is very much an analogous situation to those where equity has traditionally provided remedies. Perhaps the best example is provided by specific performance. It is unnecessary to inquire whether the right which is being enforced by an order of specific performance is one recognised by the common law or equity. Yet what does matter is whether it is equitable to grant the remedy and whether an award of damages in lieu would be an adequate remedy.

In addition, if the contract had not been void and the local authority had failed to make the payments required the bank might well, as I will seek to show, have been fully protected by its remedy in damages at common law. Because there is no contract damages are not available. Here the situation is very much in accord with those where equity traditionally mitigates the inadequacy of a common law remedy without having to invoke substantive equitable law principles. This situation is described in Snell's Equity, p. 26:

> "Between them, equitable interests, mere equities, floating equities and the great doctrines of equity cover most of the field of equity; and they are all concerned to a greater or lesser degree with the rights of property. Yet although the existence of such rights has long been an important factor in deciding whether equity will intervene, it is not essential. Equitable remedies, though often used in aid of property rights, are also often used in other cases. The underlying principle is the inadequacy of the common law remedy of damages. Thus the equitable remedies of rescission and injunction may be employed in relation to contracts for personal services; and injunctions are sometimes granted in cases of tort which involve no rights of property. In this sense there may be equities unrelated to property."

In the same way there may be equities unrelated to a breach of trust or fiduciary duty. I would add that equity does not only come to the aid  *722  of a claimant where damages are an inadequate remedy. It can also do so when one of the other common law remedies is inadequate. I would take as an example the remedy of an account. The advantages of the equitable remedy over the common law remedy have resulted in the latter remedy being supplanted by the former. It may well be that the editors of Snell's Equity did not have in mind the power to award interest when writing the paragraph I have set out. The paragraph is nonetheless of general application and there is no reason why it should not apply to the equitable remedy of awarding interest in the same way as it applies to other equitable remedies. The award of interest is only distinct from other remedies in that it is usually awarded as an ancillary to some other remedy.

I therefore accept Mr. Sumption's submission on behalf of the bank that where there is a duty to make restitution equity can achieve full restitution by granting, when it is appropriate to do so, simple or compound interest in addition to requiring repayment of the principal sum. For this to be the position the defendant must have made an actual or presumed profit, a profit which he is presumed to have derived from his having been the recipient of a principal sum which he has not repaid. The compound interest will not be payable as of right. The remedy of awarding interest, like other equitable remedies, will be discretionary. Interest will only be awarded when it accords with equitable principles to make the award.

I appreciate that Mr. Sumption did not advance the argument in favour of the grant of compound interest on the basis that I have put forward. However, he came before your Lordships' House not expecting *Sinclair v. Brougham [1914] A.C. 398* to be challenged. He had no reason in his printed case to do other than base his argument on the fact that the local authority was a fiduciary. Before your Lordships he made clear that while he was arguing that the local authority was a fiduciary he was also contending that, if there was power to order restitution, equity could, as I have already indicated, achieve full restitution. This is also clear from the statements in the bank's case to which I will refer shortly.

© 2021 Thomson Reuters.

34

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

The absence of previous authority

There may be no clear previous authority to support this conclusion but this is not surprising where the relatively new jurisdiction of ordering restitution is involved. What is more important than the absence of clear support in the authorities for the grant of compound interest is the absence from the existing authorities of any statement of principle preventing the natural development of a salutary equitable jurisdiction enabling compound interest to be awarded. The jurisdiction is clearly desirable if full restitution in some cases is to be achieved. It is relevant here to repeat what is stated at the outset in the bank's case under the heading "The Position in Principle:"

"1. ' . . . any civilised system of law is bound to provide remedies for cases of what has been called unjust enrichment or unjust benefit, that is to prevent a man from retaining the money of or some benefit derived from another which it is against conscience that he should keep:' *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd. [1943] A.C. 32* , 61 (Lord Wright), approved in *Woolwich Equitable Building Society v. Inland Revenue Commissioners [1993] A.C. 70* , 197, 202."

Restitution is an area of the law which is still in the process of being evolved by the courts. In relation to restitution there are still questions remaining to be authoritatively decided. One question, which was still undecided until the decision on this appeal, is whether its legitimacy is derived from the common law or equity or both. In order to decide whether compound interest is payable in this case I do not consider it is necessary to decide which is the correct answer to that question, but I am content to assume that the cause of action is one at common law. If the principal sum is repayable as money had and received rather than under some trust or because of the existence of a fiduciary duty it is still unconscionable for the local authority to retain the benefit it made from having received payment under a contract it purported to make which was outside its powers. The fact that, until the law was clarified by the decision in this case, the local authority may reasonably not have appreciated that it should make restitution is not critical. What is critical is that the payment of compound interest is required to achieve restitution. A defendant may perfectly reasonably not regard himself as having been a trustee until the court so decides but this does not effect the remedies which the court has jurisdiction to grant. The jurisdiction of the court to grant remedies has to be judged in the light of what the court decides.

As to the date from which the interest should run I am in agreement with Lord Browne-Wilkinson that the decision of the Court of Appeal should not be disturbed.

Unjust enrichment creates the required relationship

There are a great many situations where interest as an equitable remedy has been awarded. Examples are conveniently set out in Halsbury's Laws of England, 4th ed., vol. 32 (1980), p. 55, para. 109. The principle which connects those examples is stated in the first sentence of the paragraph. It is the existence of a "particular relationship . . . between the creditor and debtor." The "particular relationship" in this case arises out of the right of the bank to restitution and the fact that the local authority would be unjustly enriched if it retained what it had received. That made the local authority an accounting party. The bank had to give credit for the sums it had received and the local authority had to pay the balance which was still due of what it had received. What it had received included the use of the money. The approach is precisely that indicated in the passage in the judgment of Lord Hatherley L.C. in *Burdick v. Garrick* , *L.R. 5 Ch.App. 233* , 241 already cited by Lord Browne-Wilkinson. It is the making of the award not as a punishment but to disgorge a profit made or presumed to have been made out of the payment of a sum of money which should not have been made. Here this was because the contract was void as being ultra vires. There would be no difference of principle if the contract was void for mistake. *\*724*

No distinction in principle between simple and compound interest

If the case is one where there is jurisdiction to award equitable interest then whether compound or simple interest is recoverable depends on the facts of the particular case. If it is not a situation where the defendant would have earned compound interest then as in *Burdick v. Garrick* there would be no profit of compound interest so it will not be awarded. Simple interest will awarded instead.

© 2021 Thomson Reuters.

120

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

The Law Commission's approach

In Law of Contract: Report on Interest (Law Com. No. 88) (1978) (Cmnd. 7229), the Law Commission decided not to make any recommendations for change as to the equitable jurisdiction. It is, however, interesting to note the following paragraphs of the report:

"10. Thirdly, there is the equitable jurisdiction. Interest may be awarded as ancillary relief in respect of equitable remedies such as specific performance, rescission or the taking of an account. Furthermore, the payment of interest may be ordered where money has been obtained and retained by fraud, or where it has been withheld or misapplied by an executor or a trustee or anyone else in a fiduciary position. . . ."

" *(a) The equitable jurisdiction*

"21. The equitable jurisdiction to award interest and to fix the rate at which it should be paid is extensive. It includes, for example, the power to order the payment of interest where money has been obtained or withheld by fraud or where it has been misapplied by someone in a fiduciary position. In such cases the court has an inherent power to order the payment of interest at whatever rate is equitable in the circumstances and may direct that such interest be compounded at appropriate intervals. Our view is that it would not be appropriate to impose statutory controls upon the exercise of the equitable jurisdiction to award interest, beyond those controls that are already in existence. We invited criticisms of this view in our working paper but no one disagreed with us. Accordingly, we make no recommendations for change in relation to the equitable jurisdiction."

From what I have said already it is clear that I agree with the statements in those paragraphs in so far as the equitable jurisdiction to award interest is regarded as "ancillary relief" but not in so far as they suggest that it is only equitable remedies in relation to which there can be the ancillary jurisdiction to award interest. The paragraphs are perfectly satisfactory as long as they are not regarded as exhaustive. It has to be remembered that the Law Commission were not intending to make any recommendations as to equitable interest.

The fact that the paragraphs accept that compound interest is payable in the case of fraud perhaps suggests that it is not intended to limit the relief to situations which only give an entitlement to an equitable remedy. In many cases of fraud the appropriate remedy will be common law damages. It is true in the first of the only two cases referred to by the Law   *725  Commission, *Johnson v. the King [1904] A.C. 817* , 821, the Privy Council appeared to think that interest was not payable in the case of an overpayment by mistake. However the authority relied on for this conclusion was *London, Chatham and Dover Railway Co. v. South Eastern Railway Co. [1893] A.C. 429* . Lord Macnaghten, at p. 821, regarded "the law as settled by the judgment" of this House in that case. It is a case to which I will refer later but it was not concerned with the equitable jurisdiction to grant interest, only the common law jurisdiction. What is of interest is what Lord Macnaghten said as to the power to award interest if there had been fraud. He said, at p. 822:

"In order to guard against any possible misapprehension of their Lordships' views, they desire to say that, in their opinion, there is no doubt whatever that money obtained by fraud and retained by fraud can be recovered with interest, whether the proceedings be taken in a court of equity or in a court of law, or in a court which has a jurisdiction both equitable and legal, as the Supreme Court of Sierra Leone possesses under the Ordinance of November 10, 1881." (Emphasis added.)

Lord Macnaghten did not consider that it mattered whether the proceedings were based on a common law or equitable cause of action.

The other case referred to in the Report is *Wallersteiner v. Moir (No. 2) [1975] Q.B. 373* . That case is a clear authority for the existence of an equitable jurisdiction and that it can be exercised where there is breach of a fiduciary duty but the court was not concerned with extent of that jurisdiction. It was accepted by all the members of the Court of Appeal that the jurisdiction was frequently exercised in the case of breach of trust and of a fiduciary duty but there is nothing in the judgments to suggest that the jurisdiction is limited to those situations. Indeed Lord Denning M.R. clearly did not regard it as being so limited. He said, at p. 388:

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

"The reason is because a person in a fiduciary position is not allowed to make a profit out of his trust: and, if he does, he is liable to account for that profit or interest in lieu thereof. In addition, in equity interest is awarded whenever a wrongdoer deprives a company of money which it needs for use in its business. It is plain that the company should be compensated for the loss thereby occasioned to it. Mere replacement of the money - years later - is by no means adequate compensation, especially in days of inflation. The company should be compensated by the award of interest. That was done by Sir William Page Wood V.-C. (afterwards Lord Hatherley) in one of the leading cases on the subject, *Atwool v. Merryweather (1867) L.R. 5 Eq. 464n*., 468-469. But the question arises: should it be simple interest or compound interest? On general principles I think it should be presumed that the company (had it not been deprived of the money) would have made the most beneficial use open to it: cf. *Armory v. Delamirie (1723) 1 Stra. 505* . It may be that the company would have used it in its own trading operations; or that it would have used it to help its subsidiaries. Alternatively, it should be presumed that the wrongdoer made the most beneficial use of it. But,  *726*  whichever it is, in order to give adequate compensation, the money should be replaced at interest with yearly rests, i.e. compound interest."

This was a broader approach than that adopted by Buckley L.J. or Scarman L.J.

There remains a further case to which I should make reference before leaving the authorities as to the equitable jurisdiction. It is *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* . This is the leading case as to the common law and statutory jurisdictions to which I will return later. I refer to it for the leading speech of Lord Brandon of Oakbrook with which the other members of the House agreed. Lord Brandon reviewed the different jurisdictions to award interest. While doing so he made the following dicta about the equitable jurisdiction, at p. 116 (Lord Brandon also referred to the equitable jurisdiction, at pp. 118-121, but he was then dealing with the position as to interest in the Admiralty Court and I do not consider those references are of any help here):

"Thirdly, the area of equity. The Chancery courts, again differing from the common law courts, had regularly awarded simple interest as ancillary relief in respect of equitable remedies, such as specific performance, rescission and the taking of an account. Chancery courts had further regularly awarded interest, including not only simple interest but also compound interest, when they thought that justice so demanded, that is to say in cases where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position. . . . The first point is that neither the Admiralty Court, nor Courts of Chancery, awarded interest, except in respect of moneys for which they were giving judgment. The second point is that the Admiralty Court never, and Courts of Chancery only in two special classes of case, awarded compound, as distinct from simple, interest."

The House had been referred in the course of argument to the report of the Law Commission and I suspect that Lord Brandon restricted the jurisdiction of the courts to award interest to equitable remedies following what was stated in that report. Likewise as to the distinction which he drew between the jurisdictions to award simple and compound interest. According to the report of argument, counsel did not address the House on the limits of the equitable jurisdiction. Therefore although any statement of Lord Brandon is entitled to the greatest respect I do not regard these two dicta as indicating that Lord Brandon held a considered opinion inconsistent with my views, which I have set out above. It may well be that he was doing no more than describing the situations where in the past the equitable jurisdiction had been exercised.

The position where the claim is based on a personal equity

Lord Browne-Wilkinson, in his speech, points out that two arguments were not advanced on behalf of the bank. The first is that the local authority should be liable to make the repayments as a constructive trustee. There is no need for me to make any comment about this  *727*  argument. The second argument which was not advanced is that the bank was entitled to repayment because of the existence of a personal equity based on the decision in *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* . This is a point which it is necessary for me to consider because of the decision of Hobhouse J. in *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council [1994] 4 All E.R. 972* , although the decision in *In Re Diplock* dealt with very different circumstances from those which exist here. The court in *In Re Diplock* was concerned with the personal equitable liability of a legatee to repay the executors of an estate of a deceased person a sum which was wrongly paid to them out of the estate. In the *Kleinwort Benson* case, Hobhouse J. decided that the existence of a personal equitable cause of action did not create a power to award compound interest. This conclusion is inconsistent with the view which I have expressed that there is a power to award compound interest in the circumstances of this case.

Personal equitable rights are not confined to the situation considered in *In Re Diplock* . For example, a personal equitable right to contribution can exist between co-sureties. This is regarded as being an application of an equitable approach to restitution to a situation where the remedy at law is not normally satisfactory. It exists without there having to be any proprietary right which could give rise to the difficulties to which Lord Browne-Wilkinson has referred.

The *Kleinwort Benson* case also involved a local authority which had entered into a swap transaction which was void. Hobhouse J. distinguished the *Kleinwort Benson* case from the present case because in that case there was no reliance on an equitable proprietary claim for repayment of the sum which had been paid under the void swap contract. In the *Kleinwort Benson* case, the local authority accepted that prima facie they were under a personal liability to make restitution in law and in equity to the bank but argued it was not open to a court to award compound interest where only remedies in personam were established.

Hobhouse J. decided that the local authority's submissions were correct. He said, at pp. 994-995:

"The position is therefore that if a plaintiff is entitled to a proprietary remedy against a defendant who has been unjustly enriched, the court may but is not bound to order the repayment of the sum with compound interest. If on the other hand the plaintiff is only entitled to a personal remedy which will be the case where, although there was initially a fiduciary relationship and the payer was entitled in equity to treat the sum received by the payee as his, the payer's, money and to trace it, but because of subsequent developments he is no longer able to trace the sum in the hands of the payee, then there is no subject matter to which the rationale on which compound interest is awarded can be applied. The payee cannot be shown to have a fund belonging to the payer or to have used it to make profits for himself. The legal analysis which is the basis of the award of compound interest is not applicable. (It is possible that in some cases there might be an intermediate position where it could be demonstrated that the fiduciary had, over part of the period, profited from holding a fund as a fiduciary even though  *728  he no longer held the fund at the date of trial and that in such a case the court might make some order equivalent to requiring him to account for those profits; but that is not the situation which I am asked to consider in the present case.) Although the original equitable right in both situations is the same at the outset, that is to say at the time when the payment was made and received, the two situations do not continue to be the same and are not the same at the time of trial when the remedy comes to be given. The payee no longer has property of the payer. The payer is confined to personal rights and remedies analogous to those recognised by the common law in the action for money had and received. In such a situation only simple interest can be awarded even though the plaintiff is relying upon a restitutionary remedy. Simple interest was awarded in *Woolwich Equitable Building Society v. Inland Revenue Commissioners [1993] A.C. 70* and in *B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2) [1979] 1 W.L.R. 783* and both those cases involved an application of restitutionary principles which carried with them remedies in personam (see also *O'Sullivan v. Management Agency and Music Ltd. [1985] Q.B. 428* .)."

The three cases cited by the judge to support his proposition that simple interest only could be awarded do not in fact assist to determine the question of principle which is at stake here. In both the *Woolwich* and the *B.P. Exploration* cases, the claim which was advanced was limited to statutory interest. The position as to compound interest was not considered. In the *O'Sullivan* case, it was conceded that in relation to part of the claim compound interest was payable and, in fact, it was awarded. Only simple interest was paid in relation to the balance of the claim, but this was not because of any lack of jurisdiction; it was because it was only appropriate to award simple interest in the circumstances of that case.

If Hobhouse J.'s reasoning is correct, then even if there had been an equitable claim in rem which would justify the award of compound interest, that would cease to be the situation if the right to trace were lost. That this would create an unsatisfactory state of affairs is demonstrated by the contrasting decisions to which the judge came in this case and in the *Kleinwort Benson* case. The power of the court to award compound interest would depend upon circumstances over which the claimant would have no control. This is inconsistent with the commercial realities to which the judge referred in the passage which I have cited from his judgment in this case.

Contrary to the view expressed by Hobhouse J., the rationale on which compound interest is awarded is independent of whether or not there is any property capable of being traced still in the payee's hands. The critical issue is whether, as has happened in this case, the authority was able to make a profit (which would include making a saving in the interest which it had to pay) from the fact it had received a sum of money to which it was not entitled. Even in the case of a claim in rem, the profit is distinct from the traceable property. If this were not the position the payee by returning the property to the payer prior to the proceedings could defeat the right which a claimant would otherwise have to compound interest.

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

*729*

Hobhouse J. refers, at p. 994, to *In Re Diplock; Diplock v. Wintle [1948] Ch. 465* in order to identify the distinction between personal and proprietary equitable remedies. He cites a passage from the very long judgment of the Court of Appeal in that case, at p. 521. However, although this is not clear, I would regard that passage as dealing only with equitable *proprietary* remedies. He also refers to a further passage in the judgment in *In Re Diplock*, at p. 517, which he does not cite. He presumably refers to the sentence in the judgment which indicates the view of the Court of Appeal that:

"upon their personal claims the appellants [plaintiffs] are not entitled to any interest. The same may not however be true as regards the claims in rem, at least where the appellants are able to 'trace' their proprietary interest into some specific investment."

It is therefore probable that Hobhouse J. was influenced in coming to his decision by the judgment of the Court of Appeal in *In Re Diplock*. However, that judgment provides a shaky foundation for Hobhouse J.'s decision. The passage to which he refers can, and should, in my judgment, be regarded as doing no more than indicating the decision on the merits of the situation which the Court of Appeal was considering in *In Re Diplock*, a situation which is very different from that which exists here. There was no commercial relationship between the parties. The overpaid legatees' liability was secondary and they were charities. In those circumstances if they had actually made a profit from the overpayment which could be traced it would have been reasonable to award interest but if they had not it would not have been reasonable to do so. I would draw attention here to the following passage of the judgment of the Court of Appeal in *In Re Diplock*, at p. 503, which indicates the Court of Appeal's general approach:

"Since the original wrong payment was attributable to the blunder of the personal representatives, the right of the unpaid beneficiary is in the first instance against the wrongdoing executor or administrator: and the beneficiary's direct claim in equity against those overpaid or wrongly paid should be limited to the amount which he cannot recover from the party responsible. In some cases the amount will be the whole amount of the payment wrongly made . . ."

I would also draw attention to the only passage in the Court of Appeal's judgment which gives any reason for their conclusion as to interest which is in these terms, at pp. 506-507:

"We should add that . . . in our judgment the respondents are liable under this head of their claim for the principal claimed only and not for any interest. This last result appears to follow from the case of *Gittins v. Steele (1818) 1 Swan. 199*, cited in *Roper on Legacies*, 4th ed. (1847), p. 461, where the language of Lord Eldon L.C. in the case, at p. 200, is cited: 'If a legacy has been erroneously paid to a legatee who has no farther property in the estate, in recalling that payment, I apprehend that the rule of the court is not to charge interest; but if the legatee is entitled to another fund making interest in the hands of the court, justice must be done out of his share.' "

*730*

The judgment of Lord Eldon L.C., at p. 200, in this case is extremely short. The Court of Appeal has cited the whole of the judgment except the opening sentence which reads: "Where the fund out of which the legacy ought to have been paid is in the hands of the court making interest, unquestionably interest is due."

In fact, interest was therefore ordered to be paid in that case at 4 per cent. The short judgment of Lord Eldon L.C. was in proceedings which followed an earlier judgment *(1818) 1 Swan. 24*. Having examined the case in both reports, I find they provide no support for a general proposition that equity could not in an appropriate case award interest in support of a personal equitable claim. The case supports the contrary view. In the circumstances which Lord Eldon L.C. is considering, the legatee had as far as one can tell benefited financially from the early payment and, that being so, the decision is merely an example of the fact that if a payee has benefited financially from his being unjustly enriched, an order for interest will be made. It is relevant that as interest had been earned (in the hands of the court), interest was payable.

Before leaving *In Re Diplock* it is important to note that *In Re Diplock* was not concerned with whether compound interest was payable; it was concerned with whether any interest, simple or compound, was payable. The view that no interest, not even simple, was payable was understandable on the facts but not otherwise.

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

While, therefore, it is not necessary on my approach to decide whether the sums paid by the bank are recoverable from the local authority in equity or in common law, it is necessary for me to indicate that Hobhouse J. was wrong in his judgment in *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council [1994] 4 All E.R. 972* in deciding that he would have no power to award compound interest if, as he thought was the case, the bank was entitled to a personal equitable remedy which would enable it to obtain judgment for the sums which had been paid.

There is one more aspect of Hobhouse J.'s judgment to which I should refer. In his review of the authorities, Hobhouse J. drew attention to two lines of authority, one where simple interest is being awarded, and the second where compound interest being awarded. In the former situation, the court, according to Hobhouse J., is concerned to compensate the party for what he has lost in consequence of not receiving the money to which he was entitled. In the latter situation the court is concerned with the benefit which the payee has derived as a result of the payment having been made. The distinction is a valid one if what is being considered is the right to interest on the one hand under the statute or common law and on the other in equity. The distinction is not valid if a different position is being considered, namely, whether simple or compound interest should be awarded in equity. Equity, in the case of both simple and compound interest, will look at the benefit which the payee has derived. If it is equitable so to do, the payee will be ordered to pay simple or compound interest depending upon the benefit which has resulted from the payment.

The position at common law and by statute

I should now deal shortly with the situation as to interest at common law and by statute. At common law the power to award interest was *731 linked to the power to award damages. While the equitable jurisdiction was concerned to prevent profit by the recipient of funds to which he was not entitled, the common law was concerned with the loss suffered by the payer of the funds. The statutory jurisdiction differed from the common law because initially there had to be a judgment for the payment of a debt or damages before interest could be awarded and the legislator was dealing with the generality of those situations.

As to the common law position a convenient starting-point is provided by the decision of this House in *London, Chatham and Dover Railway Co. v. South Eastern Railway Co. [1893] A.C. 429* which I have already cited. In that case the Lord Chancellor, Lord Herschell, and the other members of this House, came to the conclusion with considerable reluctance that at common law where there was no agreement or statutory provision which permitted the payment of interest a court had no power to award interest, whether simple or compound, by way of damages for the late payment of a debt. The view of the House was rather surprising because the members reluctantly followed a decision of Lord Tenterden C.J. in *Page v. Newman (1829) 9 B. & C. 378* which was based on convenience in preference to an earlier and more "liberal" line of authorities including a decision of Lord Mansfield C.J. in *Eddowes v. Hopkins (1780) 1 Doug. 376* and Lord Ellenborough C.J. in *De Havilland v. Bowerbank (1807) 1 Camp. 50*. Lord Mansfield C.J. stated the position in these terms:

> "that though by the common law, book debts do not of course carry interest, it may be payable in consequence of the usage of particular branches of trade; or of a special agreement; . . ."

(which of course is beyond question) or, in cases of long delay under vexatious and oppressive circumstances, if a jury in their discretion shall think fit to allow it. Lord Ellenborough C.J. included among four categories of situations where interest was payable that where the money had been actually used and interest made on it.

After the decision in the *London, Chatham and Dover Railway Co.* case it was generally accepted that at common law, apart from statute and some limited exceptions, there was no power to award simple or compound interest for the late payment of a sum of money.

This situation which was regarded as unsatisfactory by this House in 1893 was ameliorated in 1934 by the intervention of the legislature. Section 3(1) of the Law Reform (Miscellaneous Provisions) Act 1934 considerably extended the power which was contained in Lord Tenterden's Act, the Civil Procedure Act 1833 (3 & 4 Will. 4, c. 42). The Act of 1934 so far as relevant provided:

> "3(1) In any proceedings tried in any court of record for the recovery of any debt or damages, the court may, if it thinks fit, order that there shall be included in the sum for which judgment is given interest at such rate as it thinks fit on the whole or any part of the debt or damages for the whole or any part of the period between the date when the cause of action

arose and the date of the judgment: Provided that nothing in this section - (a) shall authorise the giving of interest upon interest; or (b) shall apply in relation to any debt *732 upon which interest is payable as of right whether by virtue of any agreement or otherwise; . . ."

It is to be noted that section 3 of the Act of 1934 makes it abundantly clear that it does not authorise the giving of compound interest and that it confines the power to award interest to situations where there is a "sum for which judgment is given." The latter point was a cause of considerable injustice. It enabled a debtor to prevent a court exercising the power under section 3 of the Act of 1934 by making a late payment but a payment prior to any judgment being given. To remedy that situation, the Supreme Court Act 1981 was amended by the Administration of Justice Act 1982 by adding a new section, section 35A. Section 35A is still the current relevant statutory provision. It makes clear: (a) that it is still only simple interest which is payable, that it only applies to the recovery of a debt or damages and that interest is to be paid at "such rate as the court thinks fit or as rules of court may provide" ( subsection (1) ); (b) that the section does not apply when for whatever reason interest on a debt already runs ( subsection (4) ); (c) that the section applies to payments made up to the date of the judgment ( subsection (1)(a) ).

The Act of 1982 followed the Report on Interest by the Law Commission (Law Com. No. 88) (Cmnd. 7229) of 7 April 1978 to which I have already referred. Parliament did not implement by the Act of 1982 all the recommendations of the Law Commission as to changes which should be made. In particular, it did not accede to the suggestion of the Law Commission that there should be a statutory standard rate of interest for reasons of administrative convenience. Instead, it retained the court's existing wide statutory discretion.

There are two more cases to which I need to refer. The first is *Wadsworth v. Lydall [1981] 1 W.L.R. 598* and the second is *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* , to which I have already referred. The decision in *Wadsworth v. Lydall* received express approval in *La Pintada* . I refer to *Wadsworth v. Lydall* for three reasons. The first is that it brings out clearly that despite the decision of this House in *London, Chatham and Dover Railway Co. v. South Eastern Railway Co. [1893] A.C. 429* , there is no inherent common law bias against the award of compound interest at common law. What is required for compound interest to be payable is that the contract either expressly or impliedly provides for the payment of compound interest or there is a breach of the contract and the breach is such that compound interest will be regarded as flowing from the breach in accordance with the second limb of the principle laid down in *Hadley v. Baxendale (1854) 9 Exch. 341* . The second reason is that while prior to the decision in *Wadsworth v. Lydall* it could legitimately be thought that the situations where compound interest would be awarded at common law were necessarily of a commercial nature, this is not an essential requirement. The situations where it was clearly established that compound interest was recoverable (as, for example, in the case of bills of exchange or banking transactions) should be regarded not so much as independent exceptions to a general rule but as examples of the application of a general rule where in accordance with ordinary contractual principles compound interest should *733 be recoverable. The third reason why I refer to *Wadsworth v. Lydall* is that it clearly demonstrates that notwithstanding the period which has elapsed since the decision in the *London, Chatham and Dover Railway Co.* case, in 1893, the courts will be prepared to limit the application of that decision where this can be done in accordance with principle and it is appropriate to do so.

*Wadsworth v. Lydall* was a decision of the Court of Appeal. The facts were straightforward. The defendant and the plaintiff had an informal partnership agreement under which the partnership held an agricultural tenancy of a farm and the plaintiff lived in the farmhouse. When the partnership was dissolved the plaintiff and the defendant agreed that the plaintiff would give up possession of the farm by a specified date when he would receive £10,000 from the defendant. On the strength of that agreement the plaintiff entered into a further agreement with a third party to purchase another property on terms which required him to pay the £10,000, which by then he should have received from the defendant, to the third party. Only part of the £10,000 was paid by the defendant to the plaintiff prior to his completing his transaction with the third party. The plaintiff therefore had to take out a mortgage from the third party for the balance. In an action which he brought against the defendant the plaintiff claimed as special damages the interest and costs he incurred due to his having to obtain the mortgage.

The trial judge disallowed those two items of special damage but the plaintiff succeeded in recovering them as a result of the decision of the Court of Appeal. In relation to the argument that the Court of Appeal were bound to conclude that the appeal failed because of the combined effect of the decision in the *London, Chatham and Dover Railway Co.* case and because of the provisions of the Law Reform (Miscellaneous) Provisions Act 1934, Brightman L.J. said, at p. 603:

"In my view the court is not so constrained by the decision of the House of Lords. In *London, Chatham and Dover Railway Co. v. South Eastern Railway Co. [1893] A.C. 429* the House of Lords was not concerned with a claim for special damages.

© 2021 Thomson Reuters.

The action was an action for an account. The House was concerned only with a claim for interest by way of general damages. If a plaintiff pleads and can prove that he has suffered special damage as a result of the defendant's failure to perform his obligation under a contract, and such damage is not too remote on the principle of *Hadley v. Baxendale (1854) 9 Exch. 341* , I can see no logical reason why such special damage should be irrecoverable merely because an obligation on which the defendant defaulted was an obligation to pay money and not some other type of obligation."

The facts of *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* are not important. Its significance is that the approach of this House was that Parliament had chosen to remedy some of the injustices caused by the common law rule as laid down in the decision in the *London, Chatham and Dover Railway Co.* case, and the restrictive language of section 3(1) of the Act of 1934. Due deference to the intention of Parliament therefore prevented any further departure from the House's *734 earlier decision in relation to interest. So the earlier decision would still apply to general damages.

In his speech, Lord Brandon of Oakbrook identified, at p. 122, "three cases in which the absence of any common law remedy for damage or loss caused by the late payment of a debt may arise . . ." For convenience he described these cases as case 1, case 2 and case 3. Case 1 is where a debt is paid late, before any proceedings for its recovery have been begun. Case 2 is where a debt is paid late, after proceedings for its recovery have begun, but before they have been concluded. Case 3 is where a debt remains unpaid until, as a result of proceedings for its recovery being brought and prosecuted to a conclusion, a money judgment is given in which the original debt becomes merged.

Having examined the history and origins of the common law rule and the interventions by the legislature, Lord Brandon described qualification of the common law rule made in *Wadsworth v. Lydall* as being important, and set out his conclusions as follows, at p. 129:

"First, an ideal system of justice would ensure that a creditor should be able to recover interest both on unpaid debts in case 1, and also in respect of debts paid late or remaining unpaid in cases 2 and 3. Secondly, if the legislature had not intervened twice in this field since the *London, Chatham and Dover Railway Co.* case, first by the Act of 1934 and more recently by the Act of 1982, and if the Court of Appeal had not limited the scope of that case by its decision in *Wadsworth v. Lydall [1981] 1 W.L.R. 598* , I should have thought that a strong, if not an overwhelming, case would have been made out for your Lordships' House, in order to do justice to creditors in all three cases 1, 2 and 3, to depart from the decision in the *London, Chatham and Dover Railway case [1893] A.C. 429* . But, thirdly, since the legislature has made the two interventions in this field to which I have referred, and since the scope of the *London, Chatham and Dover Railway* case has been qualified to a significant extent by *Wadsworth v. Lydall [1981] 1 W.L.R. 598* , I am of the opinion, for three main reasons, that the departure sought by the respondents would not now be justified."

The first of the reasons Lord Brandon gave for his conclusion was that the greater part of the injustice had already been remedied by the intervention of the legislature and judicial qualification of the scope of the decision in *London, Chatham and Dover Railway Co. v. South Eastern Railway Co. [1893] A.C. 429* . The second was that Parliament had given effect in legislation to some of the recommendations of the Law Commission (Law of Contract: Report on Interest (Law Com. No. 88) (1978) (Cmnd. 7229)) but had not given effect to further recommendations which meant that for the House to intervene would be to intervene in a manner which would conflict with the policy indicated by Parliament. The third reason was that the intervention would create for creditors a remedy as of right rather than a discretionary remedy which would be again contrary to the policy of Parliament as indicated in the Acts of 1934 and 1982.  *735

The reasoning in President of India v. La Pintada Compania Navigacion S.A. does not apply to equitable interest

In relation to that reasoning *[1985] A.C. 104* it is important to note that none of the three reasons directly apply to the issue at present before their Lordships. The first reason does not directly apply to the present case because neither the legislation nor the decision in *Wadsworth v. Lydall [1981] 1 W.L.R. 598* addresses the injustice demonstrated by the facts of this case. The injustice arises because, contrary to the intention of the parties, there is no contract. The inroads which have been made on the decision in the *London, Chatham and Dover Railway Co.* case by *Wadsworth v. Lydall* can only apply where there is a contract under which either interest is expressly payable or the situation is one where the second limb of the rule in *Hadley v. Baxendale , 9 Exch. 341* applies to a breach of contract. The second reason given by Lord Brandon, at p. 129, does not apply because the

Law Commission made no recommendation as to the equitable remedy of interest. The third reason does not apply because if the court has jurisdiction to award interest in equity, like other equitable remedies, the remedy will be discretionary.

I therefore do not find anything in Lord Brandon's reasoning which makes it inappropriate to extend the right in equity so that it extends to the recovery of compound interest ancillary to a restitutionary remedy. In this case this is particularly true because if there had been a contract and non-payment of the sums due under the contract by the local authority the bank may well, if proceedings resulted, have received compound interest as special damages.

The desirability of the equitable jurisdiction being extended

A decision in favour of the bank in this case will mark a further improvement in the powers of the English courts, an improvement the need for which has so frequently been recognised. While the improvement is consistent with the decision of this House in *La Pintada* , it should be noted that that decision has not been free from criticism. In a typically closely reasoned article, "On Interest, Compound Interest and Damages" *(1985) 101 L.Q.R. 30* the late Dr. F. A. Mann was not impressed by the reasoning of the House. Dr. Mann, at p. 34, found it difficult to understand, if interest, including compound interest, was recoverable under the second limb under the rule in *Hadley v. Baxendale* :

"why it should not also be recoverable under the first limb, where damages are such 'as may fairly and reasonably be considered arising naturally, i.e. according to the usual course of things' from the breach?"

As Dr. Mann pointed out, at pp. 34-35, to say that interest considered as damages is too remote is an argument which at the present time is no longer realistic or persuasive and which can only be described as an "empty phrase." The modern test should be whether the debtor could reasonably foresee that in the ordinary course of things the loss was likely to occur or was on the cards. Who would refuse to impute such knowledge to a debtor? Who would venture to suggest that a defaulting debtor could *\*736* not reasonably foresee interest as the creditor's loss flowing from the failure to pay?

Dr. Mann did not distinguish between simple and compound interest. However, if what he said with regard to simple interest is true then adopting the same approach it must equally apply to compound interest. Dr. Mann's final comment was, at p. 47:

"The history of interest, particularly in the field of Admiralty, displays a lack of legal analysis and a degree of positivism and inflexibility which show the common law of England at its worst."

In my judgment, their Lordships should avoid leaving the equitable jurisdiction of the English courts open to the same criticism.

Lord Browne-Wilkinson and Lord Lloyd of Berwick (whose speech I have also had the advantage of reading in draft) do not regard this as a case in which it would be appropriate to extend the law in the way I would wish. Their arguments, which are based on the legislative history as to interest and, in the case of Lord Lloyd, also based on *La Pintada,* I have dealt with already. However, as to the suggestion of usurpation of the role of Parliament I do remind myself of the approach of Lord Brandon of Oakbrook in the passage in his speech in *La Pintada* , at p. 129, which I have previously cited. Both Lord Browne-Wilkinson and Lord Lloyd also make the additional point that the local authority could feel aggrieved if this appeal were to be decided on the approach which Lord Goff and I would adopt. Here I take a different view. If their Lordships had not raised the issue of the correctness and scope of the decision in *Sinclair v. Brougham [1914] A.C. 398* , the bank would have succeeded. The local authority were only prepared to argue this point with reluctance. As I have indicated, the local authority also wanted the argument curtailed. In these circumstances they can hardly complain if they lacked the opportunity of dealing with the detail of your Lordships' reasoning.

In my recollection of his argument Mr. Sumption made it clear that his argument was not totally dependent on establishing that the local authority was a fiduciary. I have already set out how his case described the position in principle. I would also refer to paragraph 13 of his case and the footnote thereto, where he said:

"Quite apart from the proprietary claim, the bank also has a *personal* claim in equity to require the council to account for its property: Snell's Equity, 29th ed., pp. 284-287. [1] " (Emphasis added.)

© 2021 Thomson Reuters.

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

" [1] In *Sinclair v. Brougham* it was held that there was no personal claim in equity or at law, because to allow such a claim would be indirectly to enforce an invalid borrowing contract: see, in particular, pp. 414, 418 (Viscount Haldane L.C.). This part of the decision has been subjected to powerful and justified criticism by Lord Wright *(1938) 6 C.L.J. 805* . But even if correct it has no application to a restitutionary claim, whether at law or in equity, arising out of a void swap contract since such restitution would not be legally or financially equivalent to enforcement of the contract itself." (Emphasis added.)

The passage in *Snell's Equity* refers to a personal claim in equity where their is a breach of trust. However, the footnote makes reasonably clear   *737*  that Mr. Sumption was applying the same approach as I would to a restitutionary claim "whether at law or in equity."

For these reasons I would dismiss the appeal.

LORD LLOYD OF BERWICK.

My Lords, it was common ground before your Lordships that the bank is entitled to recover the principal sum of £1,145,526 in a common law action for money had and received. Judgment for that sum would carry simple interest at the appropriate rate under section 35A of the Supreme Court Act 1981 . Hobhouse J. *[1994] 4 All E.R. 890* and the Court of Appeal *[1994] 1 W.L.R. 938* have held (albeit for different reasons) that the bank has an alternative claim to recover the principal sum in equity, and that the equitable cause of action entitles the bank to claim a discretionary award of compound interest, depending on the facts of the particular case. The issue in the appeal as it came before your Lordships was whether the courts below were right in this respect. Thus the bank's argument is stated succinctly in paragraph 11 of its printed case as follows:

"The bank's submission in summary is that where money is paid either (i) pursuant to a contract which is void, or (ii) under a fundamental mistake of fact or law, the money is impressed in the hands of the payee with a trust in favour of the payer. The payee is then accountable to the payer not only for the principal but for the entire benefit which he has obtained from his possession of the principal in the intervening period."

A little later it is said, in paragraph 12(5): "The separation of the legal from the equitable interest necessarily imports a trust." In support of his argument Mr. Sumption relied, as he had in the courts below, on *Sinclair v. Brougham [1914] A.C. 398* . He also relied on the speech of Lord Brandon of Oakbrook in *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* , 116. It was not suggested in the bank's printed case that Lord Brandon's formulation of the equitable jurisdiction to award compound interest was incomplete, or insufficient for the bank's purposes. Nor was it suggested that the decision of Hobhouse J. in the parallel decision of *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council [1994] 4 All E.R. 972* (in which he declined to make an award of compound interest in favour of the bank, on the ground that the bank was in that case confined to its common law action for money had and received) was wrongly decided.

The local authority, in paragraph 5.1 of its case, stated the issue for decision in similar terms:

"Both parties accept that compound, as opposed to simple, interest is payable only if the council received the money under the void interest rate swaps agreement as fiduciary: *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* , 116."

The whole thrust of the local authority's case was directed to showing that it was not a fiduciary when it received the money and did not become a fiduciary thereafter. *Sinclair v. Brougham* could be distinguished. It had never been suggested that the mere failure to pay back the principal sum  *738*  rendered the local authority a fiduciary, otherwise "every overdue debtor would be a fiduciary liable to compound interest" (paragraph 6.12).

Both parties, therefore, came before your Lordships on the basis that *Sinclair v. Brougham* was correctly decided, for whatever it did decide. But in the course of the argument your Lordships indicated that the House would be willing to reconsider the correctness of that decision. For the reasons given by my noble and learned friend, Lord Browne-Wilkinson, I agree that *Sinclair v. Brougham* was wrongly decided on both the points discussed in his speech, and should be overruled. I understand that all

© 2021 Thomson Reuters.

your Lordships are agreed that the bank has failed to make good its claim that it has an equitable cause of action against the local authority for breach of duty as trustee or fiduciary. It follows that the ground on which the courts below awarded compound interest cannot be supported. The local authority has succeeded on the only issue on which the parties came before your Lordships. Accordingly, I would be content to allow the appeal, and leave it at that.

But my noble and learned friend, Lord Woolf, is of the view that, even though the bank has failed to prove any breach of trust or fiduciary duty, it may nevertheless be entitled to claim compound interest by way of a general equitable remedy ancillary to its common law claim for money had and received; and his views receive the powerful support of my noble and learned friend, Lord Goff of Chieveley.

I have naturally considered these views with the greatest care; for there is much force in the argument that the local authority ought, in justice, to pay compound interest, if it would have had to pay compound interest (as no doubt it would) on sums borrowed by way of more orthodox bank lending. But I regret that in my opinion the House cannot, or at any rate should not, hold that there is any such power in equity to make good the supposed defects of the common law remedy. I have come to that conclusion for three main reasons.

In the first place the point in question, which is one of great general importance, was scarcely argued. This was not the fault of counsel. The point only emerged from the background once it became apparent that *Sinclair v. Brougham* might fall to be reconsidered. By then there was no time to develop the argument. Thus the decision of Hobhouse J. in the *Kleinwort Benson* case, which would have to be overruled if the point is good, was only mentioned by Mr. Philipson at the very end of his argument, and then only in connection with the date from which interest should run. The decision was never mentioned by Mr. Sumption in oral argument at all.

Nor did Mr. Sumption seek to question the reasoning or conclusion of the House in *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* . On the contrary, he relied on Lord Brandon's speech as an accurate summary of the equitable jurisdiction to award compound interest in the two special classes of case to which Lord Brandon referred. I may be wrong, but I do not recall any reference to the comments expressed by Mason C.J. and Wilson J. in *Hungerfords v. Walker, 171 C.L.R. 125* . It is accepted that to decide the compound interest point in favour of the bank would mean breaking new ground, and would be  *739*  extending the equitable jurisdiction to a field where it has never before been exercised. I do not think it right to take so momentous a course involving such widespread ramifications, on the back of such inadequate argument. Above all I cannot regard it as fair to decide the case against the local authority on the alternative argument when through no fault of their own they have not had a proper opportunity to deal with the argument.

Secondly, I have difficulty in reconciling an award of compound interest as an equitable remedy available in support of the common law claim for money had and received with the ratio decidendi of the House in *La Pintada* . The facts of that case were that the charterers were between two and six years late in paying sums due to the owners by way of freight and demurrage. The owners claimed interest in respect of the late payment. The question was referred to arbitration, and the umpire awarded compound interest in favour of the owners for the whole period of the delay. One of the questions of law for the court was whether the umpire had jurisdiction to award interest in respect of the late payment. Mr. Saville Q.C. launched a frontal attack on *London, Chatham and Dover Railway Co. v. South Eastern Railway Co. [1893] A.C. 429* , in which it was held that a claim for interest by way of general damages will not lie at common law for late payment of a debt, in the absence of some custom binding on the parties, or some express or implied agreement. In giving the leading speech, Lord Brandon said, at p. 129, that other things being equal there was "a strong, if not an overwhelming, case" for departing from the decision in the *London, Chatham and Dover Railway Co.* case in order to do justice to creditors. But with regret he felt unable to take that course. I return to his reasons later. All the other noble Lords shared Lord Brandon's regret. Lord Roskill said, at p. 111:

"It has long been recognised that *London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* left creditors with a legitimate sense of grievance and an obvious injustice without remedy. I think the House in 1893 recognised those consequences of the decision, but then felt compelled for historical reasons to leave that injustice uncorrected."

Like Lord Brandon, he felt unable to depart from the *London, Chatham and Dover Railway* case, and called for the injustice to be remedied by further legislation.

I quote these passages in order to make the point that if Mr. Saville, for the owners, could have detected some way of supporting the umpire's award of compound interest, he would have found a ready ear. He pointed out in the course of his argument that the equitable jurisdiction to award compound interest had survived the passing of the Act of 1934, as had the Admiralty jurisdiction,

and he argued that these "exceptional" jurisdictions should be regarded as the rule, and not vice versa. But this argument did not prevail. When Lord Brandon said, at p. 116, that "the Admiralty Court never, and Courts of Chancery *only in two special classes of case*" awarded compound, as distinct from simple, interest (my emphasis), he meant, I think, exactly what he said. Moreover, he regarded it as a point of importance. I cannot, therefore, agree that he was only giving examples *\*740* of the application of a more general equitable jurisdiction to grant ancillary relief by way of compound interest. To my mind the immediate context, and the shape of the case as a whole, make quite clear that that was not his meaning.

It may be said that in *President of India v. la Pintada Compania Navigacion S.A. [1985] A.C. 104* the claim was for payment of a debt due under a contract, whereas in the present case the claim is for money had and received. But why should that make any difference? It is true that the common law action for money had and received can be given a restitutionary label; and that "restitution" may be said to be incomplete unless compound interest is included in the award. But the label cannot change the underlying reality. The cause of action remains a common law action for the return of money paid in pursuance of an ineffective contract. If compound interest cannot be recovered in a claim for debt due under a contract (in the absence of custom, or some express or implied agreement to that effect) I cannot see any reason in principle, or logic, why it should be recoverable in the case of money paid under a contract which turns out to be ineffective.

It is said, nevertheless, that the reasoning which led Lord Brandon to reject the owners' claim for compound interest does not apply to the different facts of the present case. Lord Brandon identified three main reasons for his conclusion. It is to the second reason, at p. 130, that I would draw attention. I will quote the reason in full:

> "My second main reason is that, when Parliament has given effect by legislation to some recommendations of the Law Commission in a particular field, but has taken what appears to be a policy decision not to give effect to a further such recommendation, any decision of your Lordships' House which would have the result of giving effect, by another route, to the very recommendation which Parliament appears to have taken that policy decision to reject, could well be regarded as an unjustifiable usurpation by your Lordships' House of the functions which belong properly to Parliament, rather than as a judicial exercise in departing from an earlier decision on the ground that it has become obsolete and could still, in a limited class of cases, continue to cause some degree of injustice."

It is true that the Law Commission (Law of Contract: Report on Interest (Law Com. No. 88) (1978) (Cmnd. 7229)) made no recommendation for changing the equitable jurisdiction to award interest, and so Parliament cannot be said to have taken a policy decision to reject any such recommendation. But the underlying objection remains. Parliament has on two occasions, first in 1934, and then in 1981, remedied injustices which had long been apparent in the power to award interest at common law. On the latter occasion it did so in the light of the view expressed by the Law Commission that the equitable jurisdiction to award interest was working satisfactorily, and called for no change. To extend the equitable jurisdiction for the first time to cover a residual injustice at common law, which Parliament chose not to remedy, would, I think, be as great a usurpation of the role of the legislature, and as clear an example of judicial law-making, as it would have been in *La Pintada* . If it is thought *\*741* desirable that the courts should have a power to award compound interest in common law claims for money had and received, then such a result can now only be brought about by Parliament.

My third reason for rejecting the bank's claim for compound interest is that I am by no means certain that the policy considerations all point in favour of change. It is presumably in commercial transactions that the discretionary power to award compound interest would most frequently be used, on the ground that the money received by the payee would otherwise have had to be borrowed at compound interest. But it is in just such transactions that the need for certainty is paramount. Disputes which would otherwise be settled on the basis of simple interest would be fought in the hope of persuading the court that an award of compound interest was appropriate. It is interesting to note that it was on this very ground that Lord Tenterden C.J. rejected the solution proposed by Best C.J. in *Arnott v. Redfern (1826) 3 Bing. 353* . In *Page v. Newman (1829) 9 B. & C. 378* , Lord Tenterden said, at pp. 380-381:

> "If we were to adopt as a general rule that which some of the expressions attributed to the Lord Chief Justice of the Common Pleas in *Arnott v. Redfern* which it seemed to warrant, viz. that interest is due wherever the debt has been wrongfully withheld after the plaintiff has endeavoured to obtain payment of it, it might frequently be made a question at nisi prius whether the proper means had been used to obtain payment of the debt, and such as the party ought to have used. That would be productive of great inconvenience."

Westdeutsche Landesbank Girozentrale v Islington LBC, [1996] A.C. 669 (1996)

As one who has in the past attempted to keep open the availability of equitable remedies in commercial disputes, I am now conscious of the strength of the arguments the other way: see *Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana [1983] 2 A.C. 694* , disapproving dicta of Lloyd J. in *Afovos Shipping Co. S.A. v. R. Pagnan and Flli. [1980] 2 Lloyd's Rep. 469* . It is, of course, true that even an award of simple interest lies in the discretion of the court, as does the rate of interest. But in the great majority of cases it is not difficult to predict the amount of simple interest which is likely to be awarded. Compound interest, on the other hand, is not so predictable. It presents wider room for disagreement. Disputes would be likely to end up in court, and this would, in the words of Lord Tenterden, "be productive of great inconvenience." Despite the weight which must attach to the views of my noble and learned friends, Lord Goff of Chieveley and Lord Woolf, I would allow the appeal.

### Representation

Solicitors: Nabarro Nathanson ; Travers Smith Braithwaite .

*Appeal allowed with costs. (M. G. )*

(c) Incorporated Council of Law Reporting for England & Wales

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)



*221  Banque Financiere de la Cité Appellants v. Parc (Battersea) Ltd. and Others Respondents

🖼 Image 1 within document in PDF format.

House of Lords
26 February 1998

[1998] 2 W.L.R. 475

[1999] 1 A.C. 221

Lord Steyn , Lord Griffiths , Lord Hoffmann , Lord Clyde and Lord Hutton
1997 Dec. 8, 9; 1998 Feb. 26

Analysis

Restitution—Unjust enrichment—Subrogation—Plaintiffs' loan used to reduce defendant company's debt to bank—Bank's debt secured by first charge on defendant's land—Intra—group creditor having second charge on land—Plaintiffs given letter from holding company postponing repayment of defendant's intra—group debts until repayment of plaintiffs' loan—Intra—group creditors unaware of letter—Whether plaintiffs having priority over secured intra—group creditors—Whether plaintiffs entitled to be subrogated to bank's security

In 1988 the first defendants obtained a bank loan from R. in order to purchase a development property. The loan was secured by a debenture containing a first legal charge over the property. The second defendants had a second legal charge over the property as security for another debt. Both defendants were companies within the same group. In 1990 H., the general manager of the group's holding company, negotiated a refinancing loan with the plaintiffs, a Swiss bank, for the purpose of enabling the first defendants to reduce the outstanding balance of the loan from R. In order to avoid the plaintiffs' obligations under Swiss federal banking regulations, the transaction was restructured by interposing H. as the immediate borrower, and he then paid the money to the first defendants, who used it to repay part of R.'s loan. The first defendants provided no security for the plaintiffs' loan, but the plaintiffs obtained an assignment from H. of a promissory note for the relevant sum given to him by the first defendants, and a "postponement letter," signed by H., stating that all companies in the group would not demand any repayment of loans made to the first defendants until the plaintiffs' loan to H. had been repaid in full. Both defendants were unaware of the existence of the letter. The group of companies collapsed in 1991, and the first defendants became insolvent. The plaintiffs obtained judgment against the first defendants for the sum due on the promissory note plus interest. The second defendants also obtained judgment against the first defendants and contended that their debt took priority by reason of the second charge. The plaintiffs relied on the postponement letter to claim priority over the second defendants. The judge ruled that, although the letter was not binding on the defendants because they did not know of it, they nevertheless knew enough to permit a presumption of the mutual intention which was necessary to activate the remedy of subrogation so as to prevent the second defendants from being unjustly enriched at the plaintiffs' expense. The Court of Appeal reversed that decision on the grounds, inter alia, that subrogation would give the plaintiffs rights for which they had never bargained, namely the rights of a first mortgagee, and would place them in a more favourable position than if the letter had been binding.  *222

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

On the plaintiffs' appeal:-

allowing the appeal, that the availability of subrogation as a restitutionary remedy, unlike contractual subrogation, did not depend on the intention of the parties, and the appropriate questions were whether the second defendants would be enriched at the plaintiffs' expense, whether such enrichment would be unjust, and whether there were nevertheless policy reasons for denying the remedy; that in the absence of subrogation the second defendants would prima facie be unjustly enriched by the discharge of R.'s security at the expense of the plaintiffs because the plaintiffs failed to obtain the priority over intra-group indebtedness which was an essential part of the transaction; that the interposing of H. was not a reason for denying the remedy since there was no evidence that that amounted to an illegality which would disqualify the plaintiffs from obtaining equitable relief and there was no difficulty in tracing the plaintiffs' money into the discharge of R.'s debt; that subrogation was not based on fault and neither the plaintiffs' failure to take precautions to safeguard their interest nor the lack of misrepresentation or sharp practice on the part of the second defendants were relevant considerations; that there was no conceptual problem about the plaintiffs and R. appearing to share the same security, since the plaintiffs did not seek to obtain priority over R.'s security but relied on it only for the purpose of obtaining priority over the second defendants; that R.'s security was "kept alive" for the benefit of the plaintiffs to prevent the second defendants from being unjustly enriched to the extent that the plaintiffs' money had paid off R.'s charge and therefore the plaintiffs did not obtain rights for which they had not bargained; and that, accordingly, in the absence of any other reasons for denying subrogation, the plaintiffs were entitled to be treated as against the second defendants as if they had the benefit of R.'s charge (post, pp. 226D-F, 227B-C, 228A-F, 231G-232B, 234A-C, 236C-D, 237A-C, 241D, 242F-G, 243B-C, 245D-F, 246C-D.

Chetwynd v. Allen [1899] 1 Ch. 353 and Boscawen v. Bajwa [1996] 1 W.L.R. 328 , C.A. considered.

Decision of the Court of Appeal reversed.

The following cases are referred to in their Lordships' opinions:

- Boodle, Hatfield & Co. v. British Films Ltd. , 1986 P.C.C. 176
- Boscawen v. Bajwa [1996] 1 W.L.R. 328; [1995] 4 All E.R. 769, C.A. .
- Burston Finance Ltd. v. Speirway Ltd. [1974] 1 W.L.R. 1648; [1974] 3 All E.R. 735
- Butler v. Rice [1910] 2 Ch. 277
- Chetwynd v. Allen [1899] 1 Ch. 353
- Ghana Commercial Bank v. Chandiram [1960] A.C. 732; [1960] 3 W.L.R. 328; [1960] 2 All E.R. 865, P.C. .
- Hobbs v. Marlowe [1978] A.C. 16; [1977] 2 W.L.R. 777; [1977] 2 All E.R. 241 , C.A. and H.L.(E.) .
- Lipkin Gorman v. Karpnale Ltd. [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, H.L.(E.) .
- Napier and Ettrick (Lord) v. Hunter [1993] A.C. 713; [1993] 2 W.L.R. 42; [1993] 1 All E.R. 385, H.L.(E.) .
- Orakpo v. Manson Investments Ltd. [1978] A.C. 95; [1977] 3 W.L.R. 229; [1977] 3 All E.R. 1, H.L.(E.) .
- Paul v. Speirway Ltd. [1976] Ch. 220; [1976] 2 W.L.R. 715; [1976] 2 All E.R. 587

The following additional cases were cited in argument:

- Downsview Nominees Ltd. v. First City Corporation Ltd. [1993] A.C. 295; [1993] 2 W.L.R. 86; [1993] 3 All E.R. 626, P.C. .
- T.H. Knitwear (Wholesale) Ltd., In re [1987] 1 W.L.R. 371 ; [1988] 1 Ch. 275; [1988] 2 W.L.R. 276; [1988] 1 All E.R. 860, C.A. .
- Wylie v. Carlyon [1922] 1 Ch. 51

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords (Lord Browne-Wilkinson, Lord Nolan and Lord Steyn) granted on 25 June 1997, by the plaintiffs, Banque Financière de la Cité, from a decision of the Court of Appeal (Beldam, Morritt and Mummery L.JJ.) on 29 November 1996, allowing an appeal by the second defendants, Omnicorp Overseas Ltd., from a decision dated 1 December 1994 of Robert Walker J. granting a declaration that the plaintiffs were entitled to the benefit of the first charge over the property of the first defendants, Parc (Battersea) Ltd.

The facts are stated in the opinions of Lord Steyn and Lord Hoffmann.

*David Oliver Q. C.* and *Mark Cunningham* for the plaintiffs. It is clear, both from its terms and from the context in which it was provided to the plaintiffs, that the postponement letter was intended to be legally binding, as the trial judge and the Court of Appeal both held. In that context the letter constituted an offer of a form of "negative security" in that the repayment of the plaintiffs' loan was given priority over intra-group indebtedness. It would be perverse to attribute to the letter a meaning that gave the plaintiffs something less than that.

This case falls within a category of cases in which subrogation has been successfully invoked by a lender who expects under the agreement to obtain security for his loan but is disappointed in his expectation, and where the loan has been advanced and used for the purpose of discharging the borrower's liability to some other secured lender.

There is an inevitable link between unjust enrichment and subrogation, but the two are not co-extensive. [Reference was made to Ghana Commercial Bank v. Chandiram [1960] A.C. 732 ; Butler v. Rice [1910] 2 Ch. 277 ; Wylie v. Carlyon [1922] 1 Ch. 51 ; Paul v. Speirway [1976] Ch. 220 and Chetwynd v. Allen [1899] 1 Ch. 353 .]

Unless the steps taken by the plaintiffs were sufficient to give them priority over intra-group indebtedness, the second defendants would be unjustly enriched in that they would get a windfall where there had been an expectation of security for the plaintiffs.

The Court of Appeal's decision was wrong on the authorities and as a matter of principle. Morritt L.J. suggested that subrogation was fault-based and that the party enriched had to be at fault. There is no basis for that in the authorities. The unjust enrichment aspect of the doctrine of subrogation is not wholly equitable in origin. Historically there is no justification for the deployment of the concept of "clean hands." However, there is nothing which comes near to suggesting that the plaintiffs had "unclean hands."

The Court of Appeal relied on In re T. H. Knitwear (Wholesale) Ltd. [1987] 1 W.L.R. 371 , but it had no bearing on the present case since it turned entirely upon a question of statutory interpretation. *224

The approach adopted by the trial judge was correct in its reasoning and result.

**Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)**

*Leslie Kosmin Q.C.* and *Andrew Thompson* for the defendants. Unless the second defendants were unjustly enriched at the plaintiffs' expense the plaintiffs cannot claim subrogation. The plaintiffs lent the money, not to the first defendants, but to H., who then lent an equivalent sum to the first defendants, who used it to discharge the loan from R. Therefore the money paid to R. was not the plaintiffs' money but was H.'s money. The plaintiffs' loan to H. was a genuine loan and it was made on entirely different terms from H.'s loan to the first defendants. Accordingly the second defendants were enriched at H.'s expense and not at the plaintiffs' expense.

Alternatively, if enrichment was at the plaintiffs' expense, it was not unjust. The remedy of subrogation will not be granted to a new lender who has got all that he bargained for. In particular, a new lender who lends on an unsecured basis will not be entitled to be subrogated to the security of a prior lender: see Paul v. Speirway Ltd. [1976] Ch. 220 ; Orakpo v. Manson Investments Ltd. [1978] A.C. 95 and Boscawen v. Bajwa [1996] 1 W.L.R. 328 .

Equally, the new lender will not be subrogated to the security of the existing lender merely because his security turns out to be commercially inadequate. The plaintiffs bargained for and obtained an assignment of the promissory note, the pledge of shares and the postponement letter. It cannot be said that they did not get what they bargained for because the letter turned out to be ineffective. As construed by the Court of Appeal the letter was effective in accordance with its terms and the plaintiffs got all they bargained for.

The plaintiffs' real complaint is that the security for which they bargained has proved commercially inadequate because of the unforeseen collapse of the group of companies, which rendered the security valueless.

On its true construction the postponement letter did not bind other companies in the group. There was no indication, and no express statement, that the holding company was acting as agent of its subsidiaries. The letter was simply a promise by the holding company and no more. If the letter was defective in that it purported to, but did not in fact bind the defendants, the defect arose as a result of the plaintiffs' own neglect. On the other hand, the defendants' conduct was beyond reproach.

The remedy of subrogation would give the plaintiffs more than they bargained for. It would not remedy an unjust enrichment but would provide the plaintiffs with a windfall gain in a manner that would be unjust to the defendants. In particular the plaintiffs would gain the proprietary rights of a chargee rather than the merely contractual rights that they had bargained for. [Reference was made to Downsview Nominees Ltd. v. First City Corporation Ltd. [1993] A.C. 295 .] There was no mutual intention that the plaintiffs should have priority.

Mutual intention as to postponement is an insufficient foundation for subrogation. If the actual intentions of the new lender and the borrower are inconsistent with the subrogation of the new lender to the existing security, subrogation will not be granted.

[Lord Clyde.Is there a requirement that there should be no remedy available other than subrogation?] **\*225**

That seems to be the case. Subrogation is a last ditch remedy. That is borne out by the authorities: see Ghana Commercial Bank v. Chandiram [1960] A.C. 732 and Butler v. Rice [1910] 2 Ch. 277 .

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

*Oliver Q.C.* replied.

Their Lordships took time for consideration.

26 February 1998. Lord Steyn.

My Lords, the present dispute arose out of the short term refinancing by the appellant ("B.F.C."), a Swiss bank, of part of an existing bank loan made available by Royal Trust Bank (Switzerland) ("R.T.B.") to Parc (Battersea) Ltd. ("Parc") for the purpose of buying development land at Battersea Wharf, London, S.W.11. Parc was part of the Omni Group of companies which was controlled by Mr. Werner Rey, a Swiss national. The ultimate holding company was Omni Holding A.G. ("Holding"). Mr. Markus Herzig was the General Manager of Holding. The refinancing transaction was concluded and completed at the end of September and the beginning of October 1990. The relevant events and circumstances were as follows. (1) The transaction was negotiated by Mr. Rey and Mr. Herzig with officers of B.F.C. Originally, the parties intended a loan directly from B.F.C. to Parc. That would have brought into operation a disclosure obligation on B.F.C. under Swiss Federal Banking Regulations . In order to avoid this requirement the transaction was restructured by interposing Mr. Herzig as the immediate borrower. (2) B.F.C. lent DM30m. to Mr. Herzig and Mr. Herzig took steps to ensure that the sterling equivalent of this sum was paid directly by B.F.C. to Parc in reduction of the existing loan granted to Parc by R.T.B. (3) At the request of B.F.C. Mr. Herzig handed a signed letter on the letterhead of Holding to B.F.C. This letter read as follows:

> "This is to confirm that we and all companies of our group will not demand any repayment of loans granted to Parc (Battersea) Ltd., London, until the full repayment of your loan of DM30m. granted to Mr. M. Herzig, which is secured by a deep discount promissory note amounting to £10m. issued by Parc (Battersea) Ltd."

I will call this letter the postponement letter. (4) On 1 October Parc issued to Mr. Herzig a promissory note for the relevant sum and soon afterwards Mr. Herzig assigned the note to B.F.C.

In April 1991 the Omni Group collapsed. Parc is insolvent. B.F.C. obtained a judgment for £12m. against Parc representing the sum due on the note, with interest. R.T.B. and Omnicorp Overseas Ltd. ("O.O.L."), a company incorporated in the British Virgin Islands, respectively had first and second charges over the Battersea Wharf Property. O.O.L. was a company in the Omni Group and the second charge related to an intra-group debt as it has been described. O.O.L. obtained a judgment for £30m. against Parc. Parc and O.O.L. contended that the debt owed to O.O.L. took priority over the debt owed by B.F.C. by reason of O.O.L.'s second charge. B.F.C. asserted that by reason of the letter of postponement and its utilisation to obtain the refinancing the rights of B.F.C. took priority over the rights of O.O.L. Parc and O.O.L. had been unaware of the letter   *226  of postponement. The judge upheld B.F.C.'s contention. The Court of Appeal disagreed and allowed the appeal.

137

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

The starting point is the letter of postponement, Robert Walker J. found that it was not binding on Parc or O.O.L. Although they were "companies of our group" within the meaning of the letter Parc and O.O.L. were not bound by its terms either by agency or estoppel. But Robert Walker J. concluded that properly construed the letter of postponement was intended to be directly binding on all companies in the Omni Group. The Court of Appeal came to the opposite conclusion. Morritt L.J. held that the agreement expressed in the postponement letter was intended to be that of Holding alone. This interpretation does not involve an undertaking on the part of Holding to procure the consent of companies in the group: it takes effect as a warranty by Holding. Morritt L.J. relied strongly on the fact that companies in the group were neither consulted nor informed of the letter. Given Mr. Rey's dominance and control of the Omni Group I do not attach much weight to this factor. The letter was badly drafted, and it is certainly capable of more than one interpretation. But ultimately I take the same view as the judge. The context is important. The letter was requested by B.F.C., and tendered by Mr. Herzig, as a form of security albeit not security involving rights in rem. Moreover, the letter shows that B.F.C. wanted security not from Parc but in respect of intra-group indebtedness. The letter was the result of a negotiation between commercial men. In my view the commercial construction is one that treats the letter as intended to give effective protection in respect of all companies in the group, i.e. it was intended to be directly binding on all companies in the group. and I am reinforced in this view by the fact that Robert Walker J., who was steeped in the realities of the context of the letter, ultimately favoured it. From this conclusion it follows that the expectation of B.F.C. was that the letter of postponement effectively protected B.F.C. against loans granted by group companies to Parc. In the result that expectation has not been fulfilled. In any event, the important point is that B.F.C. would not have lent had it not mistakenly believed that its priority in respect of intra-group indebtedness was secured effectively against subsidiaries of the group.

My Lords, both the judge and Morritt L.J. invoked the vocabulary of unjust enrichment or restitution. Nevertheless both courts ultimately treated the question at stake as being whether B.F.C. is entitled to be subrogated to the rights of R.T.B. On the present appeal counsel adopted a similar approach. That position may have seemed natural at a stage when B.F.C. apparently claimed to be entitled to step in the shoes of R.T.B. as chargee with the usual proprietary remedies. On appeal to your Lordships' House counsel for B.F.C. attenuated his submission by making clear that B.F.C. only seeks a restitutionary remedy against O.O.L. In these circumstances it seems sensible to consider directly whether the grant of the remedy would be consistent with established principles of unjust enrichment. O.O.L. committed no wrong: it cannot therefore be a case of unjust enrichment by wrongdoing. If it is a case of unjust enrichment, it must in the vivid terminology of Professor Peter Birks, *An Introduction to the Law of Restitution* (1985), be unjust enrichment by subtraction. If the case is approached in this way it follows that B.F.C. is either entitled to a **\*227** restitutionary remedy or it is not so entitled. After all, unjust enrichment ranks next to contract and tort as part of the law of obligations. It is an independent source of rights and obligations.

Four questions arise. (1) Has O.O.L. benefited or been enriched? (2) Was the enrichment at the expense of B.F.C.? (3) Was the enrichment unjust? (4) Are there any defences? The first requirement is satisfied: the repayment of £10m. of the loan pro tanto improved O.O.L.'s position as chargee. That is conceded. The second requirement was in dispute. Stripped to its essentials the argument of counsel for O.O.L. was that the interposition of the loan to Mr. Herzig meant that the enrichment of O.O.L. was at the expense of Mr. Herzig. The loan to Mr. Herzig was a genuine one spurred on by the motive of avoiding Swiss regulatory requirements. But it was nevertheless no more than a formal act designed to allow the transaction to proceed. It does not alter the reality that O.O.L. was enriched by the money advanced by B.F.C. via Mr. Herzig to Parc. To allow the interposition of Mr. Herzig to alter the substance of the transaction would be pure formalism.

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

That brings me to the third requirement, which was the ground upon which the Court of Appeal decided against B.F.C. Since no special defences were relied on, this was also the major terrain of debate on the present appeal. It is not seriously disputed that by asking for a letter of postponement B.F.C. expected that they would obtain a form of security sufficient to postpone repayment of loans by all companies in the Omni Group until repayment of the B.F.C. loan. In any event, that fact is clearly established. But for B.F.C.'s mistaken belief that it was protected in respect of intra-group indebtedness B.F.C. would not have proceeded with the refinancing. In these circumstances there is in my judgment a principled ground for granting a restitutionary remedy.

Counsel for O.O.L. challenged the view that restitutionary liability is prima facie established by submitting that there was no mutual intention that B.F.C. should have priority as against O.O.L. Restitutionary liability is triggered by a range of unjust factors or grounds of restitution. Defeated bilateral expectations are a prime source of such liability. But sometimes unilateral defeated expectations may be sufficient, e.g. payments made under a unilateral mistake of fact where the ground of liability is the mistake of one party. I would reject the idea that in a case such as the present a test of mutuality must be satisfied.

It is now necessary to mention the other factors which the Court of Appeal relied on in concluding that B.F.C. was not entitled to succeed. Perhaps in passing Morritt L.J. commented that neither Parc nor O.O.L. was guilty of any misrepresentation. It is sufficient to say that restitution is not a fault-based remedy. Morritt L.J. then pointed out that B.F.C. failed to take elementary precautions to safeguard their interests. Counsel for O.O.L. conceded that this feature is not a self-sufficient answer to the claim. At one stage he argued that this feature is relevant to the exercise of a discretion but I understood him ultimately to concede that the relief sought is not discretionary. In any event, the neglect of B.F.C. is akin to the carelessness of a mistaken payor: it does not by itself undermine the ground of restitution. *228

On the arguments as presented in the Court of Appeal Morritt L.J. concluded that B.F.C., if subrogated, would be in competition with R.T.B. Factually this is incorrect. B.F.C. knew that R.T.B. had a first charge over the property. The letter of postponement, and the circumstances of the case, show that B.F.C. merely expected to receive priority over loans by other companies in the Omni Group. This particular obstacle is not a real one.

The Court of Appeal considered that subrogation if allowed would place B.F.C. in a better position than if the postponement letter had been binding on Parc and O.O.L. The Court of Appeal considered the matter from the point of view of B.F.C. seeking to step into the shoes of R.T.B. as chargee. But it has now been made clear that B.F.C. merely seeks reversal of O.O.L.'s unjust enrichment at the expense of B.F.C. B.F.C. merely asserts restitutionary rights against O.O.L. In the circumstances conceptual difficulties about the remedy sought by B.F.C. disappear.

In my view, on an application of established principles of unjust enrichment B.F.C. are entitled to succeed against O.O.L. But, if it were necessary to do so, I would reach the same conclusion in terms of the principles of subrogation. It would admittedly not be the usual case of subrogation to security rights in rem and in personam. The purpose of the relief would be dictated by the particular form of security, involving rights in personam against companies in the group, which B.F.C. mistakenly thought it was obtaining. It is true that no decided case directly in point has been found. But distinguished writers have shown that the place of subrogation on the map of the law of obligations is by and large within the now sizeable corner marked out for restitution: see *Goff & Jones, The Law of Restitution* , 4th ed. (1993), pp. 526, 531; Birks, An Introduction to the Law of Restitution, p. 93 et seq.; Burrows, The Law of Restitution (1993), p. 92; Mitchell, The Law of Subrogation (1994), p. 4. and there can be no conceptual impediment to the remedy of subrogation being allowed not in respect of both rights in rem and rights in personam but only in respect of rights in personam.

139

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

For these reasons, as well as the reasons contained in the speech of my noble and learned friend, Lord Hoffmann, I would allow the appeal.

Lord Griffiths.

My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Hoffmann. For the reasons which he gives I, too, would allow the appeal.

Lord Hoffmann.

My Lords, this appeal raises, in unusual circumstances, a question on the scope of the equitable remedy of subrogation. The appellant, the Banque Financière de la Cité, made an advance of DM30m. for the purpose of enabling Parc (Battersea) Ltd. to repay part of a loan from another bank secured by a first charge upon its property. The transaction did not contemplate that Parc would provide any security. It was however an express condition of the advance that other companies in the group to which Parc belonged would not demand repayment of their loans until B.F.C. had been repaid. One such company was Omnicorp Overseas Ltd. which was owed £26.25m. secured by a second charge over the property. Unfortunately the persons who negotiated the transaction *229 had no authority to commit O.O.L. to such an undertaking and it was not binding upon it. Parc is insolvent and if B.F.C. has no priority over O.O.L.'s second charge, it is unlikely to be repaid. The question is whether, as against O.O.L., B.F.C. is entitled to be subrogated to the first charge to the extent that its money was used to repay the debt which it secured. The judge, Robert Walker J., decided that the remedy was available. The Court of Appeal, in a judgment delivered by Morritt L.J., decided that it was not. Against that decision B.F.C. appeals to your Lordships' House.

The striking feature of this case, which distinguishes it from familiar cases on subrogation to which it bears a partial resemblance such as Butler v. Rice [1910] 2 Ch. 277 and Ghana Commercial Bank v. Chandiram [1960] A.C. 732 is that B.F.C. did not contemplate that Parc would provide it with any security at all. As against Parc, it was content to be an unsecured creditor. What was contemplated was a negative form of protection from certain of Parc's other creditors, namely the other companies in the group, in the form of an undertaking that they would not enforce any claims they might have against Parc in priority to B.F.C. It is this distinction which is principally relied upon by the respondents for their submission, which found favour in the Court of Appeal, that subrogation is not available. To allow B.F.C. to be subrogated to the first charge would mean, it is said, giving it far greater security than it ever bargained for. But there are also other distinctions and for this purpose it is necessary to set out the facts in rather more detail.

Parc is an English company owning development land in Battersea and O.O.L. is registered in the British Virgin Islands. They belonged to the Omni Group, based in Switzerland, where the ultimate holding company, Omni Holding A.G., was incorporated. The principal officers of Holding were its founder and principal shareholder Mr. Werner Rey and its chief financial officer Mr. Markus Herzig.

Parc acquired the Battersea land in 1988 with the aid of a £30m. bridging loan from Royal Trust Bank (Switzerland) ("R.T.B."), secured by a first charge, and additional finance from O.O.L., in respect of which it subsequently obtained

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

a second charge. The R.T.B. loan was partially repaid in 1989 but £20m. was extended until 28 September 1990. Parc was unable to refinance its borrowing on the London market and turned to Mr. Herzig for help. He approached B.F.C. which had previously lent to the Omni Group. On 14 September 1990 it agreed in principle to advance DM30m. for two months and the necessary arrangements were concluded in haste. A difficulty was that a further loan to a member of the Omni Group would have had to be reported to the Swiss banking authorities. To avoid this, B.F.C. agreed to make the loan to Mr. Herzig personally on the basis that he would pass it on to Parc, which would issue him with a promissory note which he would assign to B.F.C. as security. The principal security was to be the pledge of 35,000 bearer shares in Holding, which B.F.C. valued at DM40m. and, in addition, B.F.C. required the "postponement letter" in respect of the claims of other group companies. This read as follows:

> "This is to confirm that we and all companies of our group will not demand any repayment of loans granted to Parc (Battersea) Ltd., London, until the full repayment of your loan of DM30m. granted
> **\*230** to Mr. M. Herzig, which is secured by a deep discount promissory note amounting to £10m. issued by Parc (Battersea) Ltd."

Completion took place on 28 September 1990, when Mr. Herzig handed over the pledged shares and postponement letter, signed by himself and another officer of Holdings, and B.F.C., at the direction of Mr. Herzig, paid DM30m. to R.T.B. for the account of Parc, which was credited with £10,097,000. The promissory note was issued by Parc to Mr. Herzig on 8 November 1990 and duly assigned by him to B.F.C. Its terms were quite different from those of B.F.C.'s loan to Mr. Herzig: it was for £11,775,000 payable on 28 September 1991, representing an advance of £10m. and interest at a fixed rate of 17.75 per cent., and unsecured. B.F.C.'s loan was DM30m. for two months, secured as I have described and bearing interest at 1.25 per cent. over two months LIBOR from time to time.

Mr. Herzig defaulted on repayment of the loan and in April 1991 the Omni Group collapsed. B.F.C. had realised some of the pledged shares before they became worthless and repaid itself about DM5m. but the rest of the advance remains unpaid. Parc still owns the land in Battersea but is in receivership and has no other assets. Mr. Herzig is unable personally to repay.

The first issue at the trial before Robert Walker J. concerned the purported effect of the postponement letter. He rejected a submission that it was not intended to have legal effect and this point has not been pursued. He also dealt with a point of construction: were Holdings purporting to contract on behalf of the other group companies or were they merely warranting on their own behalf that they would take whatever steps were necessary to ensure that the other group companies did not make claims in priority to B.F.C.? He declared himself "narrowly persuaded" that the former construction was correct. The main question at the trial then became whether O.O.L. was bound by the postponement letter, either because Holding (or Mr. Herzig) had authority to contract on its behalf or because it was estopped from denying this. The judge held that O.O.L. (which, like Parc, was administered from London) had not given the necessary authority and had no knowledge of the postponement letter at any time which could have raised an estoppel. There was no appeal against these findings of fact.

On the question of subrogation, the judge held that although Parc, like O.O.L., knew nothing of the postponement letter, it knew enough to permit the presumption of whatever mutual intention was needed to activate the remedy of

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

subrogation. Your Lordships may think this summary of his reasoning somewhat cryptic but I shall in due course expand upon the issues which it raises. He went on to say that B.F.C. did not get all it expected to get in the way of a binding postponement letter and the effect of its failure to bind O.O.L. would, in the absence of subrogation, result in O.O.L. being enriched at B.F.C.'s expense. This, he held, would "in the technical sense" be unjust and therefore brought subrogation into play.

In the Court of Appeal, Morritt L.J. (with whom Mummery and Beldam L.JJ. agreed) disagreed. He accepted that O.O.L. would be enriched  **231** at the expense of B.F.C. but said that such enrichment would not be unjust or unconscionable. His reasons were as follows.

(1) The loan was structured to avoid disclosure under Swiss banking regulations. As a result, the loan by B.F.C. was to Mr. Herzig on different terms from the loan by Mr. Herzig to Parc and the idea of a second charge in favour of the bank over the Battersea property had been considered and for similar reasons rejected.

(2) The reason why B.F.C. did not get a binding postponement letter was its own failure to take the elementary precaution of checking that Holdings had the necessary authority.

(3) There had been no misrepresentation or sharp practice on the part of the recipient of the enrichment, O.O.L.

(4) There was a conceptual problem about the subrogation of B.F.C. to part of the debt secured by the charge in favour of R.T.B., which would have prejudiced the security of R.T.B. in respect of the rest of its debt. It was also said to be contrary to a priority agreement executed on 13 February 1990 which had confirmed R.T.B. 's priority over O.O.L.'s second charge.

(5) Subrogation would give B.F.C. the rights of a first mortgagee over the Battersea land. This would give it rights for which it had never bargained - indeed, the possibility of even a second charge had been considered and rejected - and would place it in a more favourable position than if the postponement letter had been binding.

My Lords, the subject of subrogation is bedevilled by problems of terminology and classification which are calculated to cause confusion. For example, it is often said that subrogation may arise either from the express or implied agreement of the parties or by operation of law in a number of different situations: see, for example, Lord Keith of Kinkel in Orakpo v. Manson Investments Ltd. [1978] A.C. 95 , 119. As a matter of current terminology, this is true. Lord Diplock, for example, was of the view that the doctrine of subrogation in contracts of insurance operated entirely by virtue of an implied term of the contract of insurance ( Hobbs v. Marlowe [1978] A.C. 16 , 39) and although in Lord Napier and Ettrick v. Hunter [1993] A.C. 713 your Lordships rejected the exclusivity of this claim for the common law and assigned a larger role to equitable principles, there was no dispute that the doctrine of subrogation in insurance rests upon the common intention of the parties and gives effect to the principle of indemnity embodied in the contract. Furthermore, your Lordships drew attention to the fact that it is customary for the assured, on payment of the loss, to provide the insurer with a letter of subrogation, being no more nor less than an express assignment of his rights of recovery against any third party. Subrogation in this sense is a contractual arrangement for the transfer of rights against third parties and is founded upon the common intention of the parties. But the term is also used to describe an equitable remedy to reverse or prevent unjust enrichment which is not based upon any agreement or common intention of the party enriched and

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

the party deprived. The fact that contractual subrogation and subrogation to prevent unjust enrichment both involve transfers of rights or something resembling transfers of rights should not be allowed to obscure the fact that one is dealing with radically different institutions. One is part of the law of **\*232** contract and the other part of the law of restitution. Unless this distinction is borne clearly in mind, there is a danger that the contractual requirement of mutual consent will be imported into the conditions for the grant of the restitutionary remedy or that the absence of such a requirement will be disguised by references to a presumed intention which is wholly fictitious. There is an obvious parallel with the confusion caused by classifying certain restitutionary remedies as quasi-contractual and importing into them features of the law of contract.

In this case there was plainly no common intention as between O.O.L., the party enriched, and B.F.C., the party deprived. O.O.L. had no knowledge of the postponement letter or reason to believe that the advance to Parc of the money provided by B.F.C. was otherwise than unsecured. But why should this necessarily exclude subrogation as a restitutionary remedy? I shall refer to five authorities which in my view demonstrate the contrary.

In Chetwynd v. Allen [1899] 1 Ch. 353 one Terrell had in 1891 lent Mr. Chetwynd £2,000 secured upon mortgages over two properties: a house called Cedars, which belonged to his wife, and a riding school, which was his own. Mrs. Chetwynd had consented to the mortgage over her property. In 1892 Mr. Chetwynd borrowed £1,200 from one Mynors, saying that it was to pay off Terrell's mortgage on Cedars and promising him a transfer of that mortgage. He did not disclose that Cedars belonged to his wife or that Terrell's mortgage was for a larger sum and was over the riding school as well. Mr. Chetwynd applied £1,000 of Mynor's money in part repayment to Terrell. Mrs. Chetwynd, who had known nothing of the transaction with Mynors, claimed that she was entitled to Cedars with the benefit of the part repayment to Terrell but free of any claim by Mynors. Romer J. held, at p. 357, that the charge over Cedars and the riding school was, to the extent of £1,000, "kept alive in equity in favour of Mynors." I shall have to return to the question of what that expression means, but the case shows that the remedy of subrogation does not depend upon any common intention between the plaintiff and the party enriched.

In Butler v. Rice [1910] 2 Ch. 277 , Mrs. Rice owned properties in Bristol and Cardiff which were equitably mortgaged to a bank (by deposit of title deeds) to secure a loan of £450. Mr. Rice asked Mr. Butler to lend him £450 to pay off the mortgage on the Bristol property, not mentioning the Cardiff property or the fact that both belonged to his wife. Mr. Butler agreed to lend on a mortgage for £300 over the Bristol property and a guarantee for the rest from Mr. Rice's solicitor. The money was used to pay off the bank but Mrs. Rice refused to execute a mortgage over the Bristol property. She too had known nothing about the transaction before the bank's mortgage was paid off. Warrington J. said, at p. 282 that the question was whether the bank's charge had been "paid off or kept alive" and on that question "the concurrence of the mortgagor is immaterial." He followed Chetwynd v. Allen [1899] 1 Ch. 353 in holding that Mr. Butler was entitled to the benefit of the mortgage over the Bristol property to secure the £450 he had advanced.

In Ghana Commercial Bank v. Chandiram [1960] A.C. 732 the bank made an advance to the owner of property in Accra which was used to pay off his indebtedness to Barclays (D.C. & O.) Ltd., secured by an **\*233** equitable mortgage. The owner executed a legal mortgage in favour of the Ghana Bank, but this was invalidated by a previous attachment of the property by a creditor. The Privy Council, following Butler v. Rice and Chetwynd v. Allen held that the Ghana Bank was entitled to be subrogated to the equitable mortgage which had been paid off. Lord Jenkins said, at p. 745:

> "It is not open to doubt that where a third party pays off a mortgage he is presumed, unless the contrary appears, to intend that the mortgage shall be kept alive for his own benefit . . ."

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

In Paul v. Speirway Ltd. [1976] Ch. 220 the plaintiff made a loan to a company in which he had a joint interest in order to enable it to pay the price due under a contract for the purchase of development land. When the company failed, he claimed to be a secured creditor by subrogation to the vendor's lien. Oliver J. found on the facts that the advance to the company was intended to be an unsecured loan and held that this excluded any remedy by way of subrogation, which would give the plaintiff more than he had bargained for. The learned judge rejected the proposition, advanced by counsel for the company, that the remedy of subrogation was available only when the common intention of the parties was (as in the three earlier cases to which I have referred) that the plaintiff should have some security which, for one reason or another, he did not get. He confined himself to the much narrower proposition, at p. 232 that:

> "where on all the facts the court is satisfied that the true nature of the transaction between the payer
> of the money and the person at whose instigation it is paid is simply the creation of an unsecured loan,
> this in itself will be sufficient to dispose of any question of subrogation."

In formulating this proposition, the judge was clearly confining himself to cases in which the claim was to subrogation to security and not referring to subrogation to a mere debt, as in cases of ultra vires borrowings.

The wisdom of the caution shown by Oliver J. was demonstrated by the facts in Boscawen v. Bajwa [1996] 1 W.L.R. 328 , which contains a valuable and illuminating analysis of the remedy of subrogation by Millett L.J. The Abbey National Building Society agreed to make an advance on mortgage to a purchaser of property and paid the money to the solicitors acting for them and the purchaser to hold on behalf of the Abbey National until paid over against a first legal charge on the property. The solicitors paid it over to the vendor's solicitors to hold to their order pending completion but the latter used the money in advance of completion to pay off the vendor's mortgage to the Halifax Building Society. In fact completion never took place: the vendor failed to convey to the purchaser and the Abbey National accordingly obtained no legal charge or other security. It claimed to be subrogated to the Halifax mortgage. It will be seen at once that there was no common intention that the vendor, whose mortgage had been paid off, should grant any security to the Abbey National. As Millett L.J. pointed out, at p. 339, the Abbey National expected to obtain a charge from the purchaser as legal owner after completion of the sale, and, in the event which happened of there being **\*234** no such completion, did not intend its money to be used at all. This meant that:

> "The factual context in which the claim to subrogation arises is a novel one which does not appear to
> have arisen before but the justice of its claim cannot be denied."

144

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

These cases seem to me to show that it is a mistake to regard the availability of subrogation as a remedy to prevent unjust enrichment as turning entirely upon the question of intention, whether common or unilateral. Such an analysis has inevitably to be propped up by presumptions which can verge upon outright fictions, more appropriate to a less developed legal system than we now have. I would venture to suggest that the reason why intention has played so prominent a part in the earlier cases is because of the influence of cases on contractual subrogation. But I think it should be recognised that one is here concerned with a restitutionary remedy and that the appropriate questions are therefore, first, whether the defendant would be enriched at the plaintiff's expense; secondly, whether such enrichment would be unjust; and thirdly, whether there are nevertheless reasons of policy for denying a remedy. An example of a case which failed on the third ground is Orakpo v. Manson Investments Ltd. [1978] A.C. 95 , in which it was considered that restitution would be contrary to the terms and policy of the Moneylenders Acts.

This does not of course mean that questions of intention may not be highly relevant to the question of whether or not enrichment has been unjust. I would certainly not wish to question the proposition of Oliver J. in Paul v. Speirway Ltd. [1976] Ch. 220 that, as against a borrower, subrogation to security will not be available where the transaction was intended merely to create an unsecured loan. I do not express a view on the question of where the burden of proof lies in these matters. Oliver J., following the dictum of Lord Jenkins in Ghana Commercial Bank v. Chandiram [1960] A.C. 732 , 745 which I have quoted, held that if the plaintiff's money was used to discharge a secured liability, he was presumed to "intend that the mortgage shall be kept alive for his own benefit" and this presumption was applied by Nicholls J. in Boodle, Hatfield & Co. v. British Films Ltd., 1986 P.C.C. 176 . However, if it is recognised that the use of the plaintiff's money to pay off a secured debt and the intentions of the parties about whether or not the plaintiff should have security are only materials upon which a court may decide that the defendant's enrichment would be unjust, it could be argued that on general principles it is for the plaintiff to make out a case of unjust enrichment.

In this case, I think that in the absence of subrogation, O.O.L. would be enriched at B.F.C.'s expense and that prima facie such enrichment would be unjust. The bank advanced the DM30m. upon the mistaken assumption that it was obtaining a postponement letter which would be effective to give it priority over any intra-group indebtedness. It would not otherwise have done so. On the construction of the letter adopted by Robert Walker J., namely that Holdings was purporting to contract on behalf of all companies in the Omni Group, the payment was made under a mistake as to Holdings's authority. On the construction adopted by the Court of Appeal the mistake was as to the power of Holdings to ensure *235 that other group companies would postpone their claims. For my part, I prefer the construction adopted by the judge. But I do not think that for present purposes it matters which view one takes. In either case, B.F.C. failed to obtain that priority over intra-group indebtedness which was an essential part of the transaction under which it paid the money. It may have attached more importance to the pledge of the shares but the provision of the postponement letter was a condition of completion. The result of the transaction is that B.F.C.'s DM30m. has been used to reduce the debt secured by R.T.B.'s first charge and that this reduction will, by reason of O.O.L.'s second charge, enure wholly to the latter's advantage.

I turn, therefore, to the grounds upon which the Court of Appeal decided that the enrichment of O.O.L. would not be unjust. The first four seem to me to carry little weight. It is true that the transaction was structured to pass the money through the hands of Mr. Herzig in order to avoid disclosure under Swiss banking law. But there is no difficulty in tracing B.F.C.'s money into the discharge of the debt due to R.T.B.: the payment to R.T.B. was direct. In this respect, the case is stronger than in Boscawen v. Bajwa [1996] 1 W.L.R. 328 . Since the money can be traced, the differences in the terms of the loans by B.F.C. to Mr. Herzig and by Mr. Herzig to Parc do not seem to me to matter, although of course on the principle of Paul v. Speirway Ltd. [1976] Ch. 220 , B.F.C. could not, on the basis of any terms agreed between Mr. Herzig and Parc, assert by way of subrogation greater rights than they bargained for. As for the avoidance of Swiss banking

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

law, it seems to me that there was no evidence that this amounted to an illegality which would disqualify B.F.C. from obtaining equitable relief and I do not think that Morritt L.J. suggested this to be the case.

The second ground was that B.F.C. did not take proper precautions to ensure that Mr. Herzig had authority to execute the postponement letter. But there is, so far as I know, no case in which it has been held that carelessness is a ground for holding that a consequent enrichment is not unjust. No doubt Mr. Mynors (in Chetwynd v. Allen [1899] 1 Ch. 353 ) and Mr. Butler (in Butler v. Rice [1910] 2 Ch. 277 ) were careless in parting with their money without bothering to inspect the borrower's title deeds. They relied upon Mr. Chetwynd and Mr. Rice as B.F.C. relied upon Mr. Herzig. But that did not entitle Mrs. Chetwynd or Mrs. Rice to be enriched as a result of their mistakes. As a third ground, Morritt L.J. said that there had been no misrepresentation or sharp practice on the part of the recipient of the enrichment. But neither had there been on the part of Mrs. Chetwynd or Mrs. Rice. Both were found to have known nothing about the transactions which resulted in their indebtedness being paid off. All that could be said against them was that they, in common with O.O.L., wanted to retain the benefit of their enrichment.

Fourthly, there is the "conceptual problem" about B.F.C. and R.T.B. appearing to share the same security. In my view this is not a real problem. B.F.C. does not claim any priority over R.T.B. It accepts that R.T.B. was entitled to rely upon its first charge, in priority to B.F.C., in respect of the whole of its outstanding indebtedness. B.F.C. claims only to be able to rely upon that security against O.O.L. after R.T.B. has been paid. In this respect the case is in my view no different from Chetwynd v. Allen [1899] 1 Ch. 353 , 357 in which Romer J. said that the unpaid balance of Terrell's debt would take priority over Mynors's claim by way of subrogation to his security. Morritt L.J. regarded this authority as of no assistance because "Romer J. made it plain that his decision was not based on any principle of subrogation." It is true that Romer J., following the submissions of counsel, appeared to distinguish between "keeping the charge alive," or what would now be called subrogation to the security, and "subrogation," by which he seems to have meant subrogation to the debt (and, presumably, the security). But subrogation to the security is precisely the remedy sought in this case and Chetwynd v. Allen therefore seems to me very much in point. In any case, the priority of R.T.B. over B.F.C. can be explained on a wider ground which I shall in due course discuss.

This brings me to the fifth reason relied upon by the Court of Appeal and what I regard as the main question in the case, namely the fact that "keeping the charge alive" for the benefit of B.F.C. would give it more than it was entitled to expect. The transaction contemplated that B.F.C. would be an unsecured creditor of Parc; "keeping the charge alive" would give it the benefit of a first charge. This makes it necessary, as I earlier foreshadowed, to examine more closely what is involved in subrogation to a security.

In my view, the phrase "keeping the charge alive" needs to be handled with some care. It is not a literal truth but rather a metaphor or analogy: see Birks, *An Introduction to the Law of Restitution* , pp. 93-97. In a case in which the whole of the secured debt is repaid, the charge is not kept alive at all. It is discharged and ceases to exist. In a case like the present, in which part of the secured debt is repaid, the charge remains alive only to secure the remainder of the debt for the benefit of the original chargee. Nothing can affect his rights and there is no question of competition between him and the party claiming subrogation. It is important to remember that, as Millett L.J. pointed out in Boscawen v. Bajwa [1996] 1 W.L.R. 328 , 335, subrogation is not a right or a cause of action but an equitable remedy against a party who would otherwise be unjustly enriched. It is a means by which the court regulates the legal relationships between a plaintiff and a defendant or defendants in order to prevent unjust enrichment. When judges say that the charge is "kept alive" for the benefit of the plaintiff, what they mean is that his legal relations with a defendant who would otherwise be unjustly enriched are regulated *as if* the benefit of the charge had been assigned to him. It does not by any means follow

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

that the plaintiff must for all purposes be treated as an actual assignee of the benefit of the charge and, in particular, that he would be so treated in relation to someone who would not be unjustly enriched.

This, I interpose, is the real reason why there is no "conceptual problem" about treating B.F.C. as subrogated to part of the R.T.B. secured debt. The equitable remedy is available only against O.O.L., which is the only party which would be unjustly enriched. As between R.T.B. and B.F.C., subrogation has no part to play. R.T.B. is entitled to its security and B.F.C. is no more than an unsecured creditor. The same is true as between B.F.C. and any secured or unsecured creditor of Parc other than the members of the Omni Group. The transaction contemplated that as against non-group creditors, B.F.C. would incur no more than an unsecured *237 liability, evidenced by the promissory note issued to Mr. Herzig and assigned by him to B.F.C. As against such creditors, therefore, the remedy of subrogation is not available. Nor is it available against Parc itself, so as to give B.F.C. the rights of sale, foreclosure etc. which would normally follow from B.F.C. being treated as if it were an assignee of the R.T.B. charge.

It follows that subrogation *as against* O.O.L., which is all that B.F.C. claims in the action, would not give it greater rights than it bargained for. All that would happen is that O.O.L. would be prevented from being able to enrich itself to the extent that B.F.C.'s money paid off the R.T.B. charge. This is fully within the scope of the equitable remedy. I would therefore allow the appeal. Robert Walker J. made a declaration that B.F.C. "is and has since 28 September 1990 been entitled to the benefit of" the R.T.B. charge and the priority agreement of 13 February 1990. I think that this declaration goes further than is justified. As against Parc, B.F.C. is not entitled to such a declaration. I would therefore insert after the words "entitled to" the words "be treated as against O.O.L. as if it had." Subject to that amendment, I would restore the declaration made by the judge.

Lord Clyde.

My Lords, the basis for the appellants' claim is to be found in the principle of unjust enrichment, a principle more fully expressed in the Latin formulation, nemo debet locupletari aliena jactura. The principle is equitable in the sense that it seeks to secure a fair and just determination of the rights of the parties concerned in the case. But it is not a principle which is entirely discretionary in its application so as to enable a court in any case to withhold a remedy where all the necessary elements for its satisfaction have been established, although there may be circumstances where on grounds which may be described as grounds of public policy a remedy may be refused. Without attempting any comprehensive analysis, it seems to me that the principle requires at least that the plaintiff should have sustained a loss through the provision of something for the benefit of some other person with no intention of making a gift, that the defendant should have received some form of enrichment, and that the enrichment has come about because of the loss. The loss may be an expenditure which has not met with the expected return. The remedy may vary with the circumstances of the case, the object being to effect a fair and just balance between the rights and interests of the parties concerned. The obligation to provide the remedy does not rest on any contractual basis but on the general principle of the common law and it may find its expression in a variety of circumstances.

The claim which the appellants have eventually come to make is not for a share in the charge which had been effected over the Battersea Wharf in favour of R.T.B., so as to give them a preference over all creditors of Parc, but only a personal right to rank in priority to O.O.L., effective only as between R.T.B. and O.O.L. and open to be defeated by any further transactions by Parc, which in the event have not occurred. I would have had difficulty in accepting that the appellants would be entitled to have even a pro tanto right to the charge in circumstances where they did not intend to obtain any such security, indeed such a *238 provision had been deliberately considered and deleted from the documentation. The

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

more modest claim which they now make, however, seems to me to have been made out. The difference between these two positions, which to my mind is critical in the case, can be readily obscured by the use of the term "subrogation."

It is agreed that O.O.L. was enriched by the repayment of some £10m. of the R.T.B. loan. The structural arrangements made with Mr. Herzig in order to avoid a breach of the Swiss banking regulations do not seem to me to prevent recognition of the reality of the granting of the funds by the appellants to R.T.B. for Parc's account. Indeed the money was transmitted by them through the Deutsche-Schweizische Bank A.G. to R.T.B. for the account of Parc. The appellants were well aware that the money was required for a partial reduction of an existing bank loan. The enrichment which is agreed to have occurred seems to me to have come about through the expenditure which the appellants made. Parc then incurred a direct liability to the appellants through the promissory note which Parc supplied and, ill-drafted as it was, the appellants certainly must have come to expect through the letter of postponement that they would in any question with O.O.L. enjoy a priority to O.O.L. in the enforcing of their own claim against Parc. It does not in my view matter that neither Parc nor O.O.L. knew anything about the letter nor that the letter was ineffective to achieve what the appellants expected. In the circumstances it seems to me to in accordance with principle that they should be accorded the priority which they now claim.

For these reasons and for the reasons more fully set out by my noble and learned friend, Lord Hoffmann, I would allow the appeal.

Lord Hutton.

My Lords, the case made on this appeal by the appellant, the Banque Financière de la Cité, is that there is an equitable principle that where a lender advances a sum of money to another person intended to be a secured loan, and the money is used by that person to discharge a debt owed by him to a secured creditor, the lender is entitled to be subrogated to the charge of that creditor if his security proves to be defective. The appellant further contends that its claim comes within the ambit of this principle.

In some circumstances such a principle is applied by equity. It was applied in Ghana Commercial Bank v. Chandiram [1960] A.C. 732 where, in the context of that case, the lender's security having proved to be defective, Lord Jenkins said, at p. 745:

> "It is not open to doubt that where a third party pays off a mortgage he is presumed, unless the contrary appears, to intend that the mortgage shall be kept alive for his own benefit: see Butler v. Rice ."

The issue on this appeal is whether, in the unusual circumstances of this case, the appellant can rely on this principle. The facts giving rise to the appellant's claim have been set out by my noble and learned friend, Lord Hoffmann, and I need not repeat them. It is clear that one of the elements which gives rise to the right to subrogation is the unjust

148

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

enrichment of the **\*239** defendant at the expense of the plaintiff. In Orakpo v. Manson Investments Ltd. [1978] A.C. 95 , 104 Lord Diplock stated:

> "My Lords, there is no general doctrine of unjust enrichment recognised in English law. What it does is to provide specific remedies in particular cases of what might be classified as unjust enrichment in a legal system that is based upon the civil law. There are some circumstances in which the remedy takes the form of 'subrogation,' but this expression embraces more than a single concept in English law."

It is not disputed by the respondent, Omnicorp Overseas Ltd., that it had been enriched by the reduction of the debt owing to Royal Trust Bank (Switzerland) secured by a first charge held by R.T.B. on the freehold property of Parc (Battersea) Ltd. in Battersea, London ("the Battersea property") so that O.O.L.'s second charge over the Battersea property was made more valuable. But the argument advanced on behalf of O.O.L., which was rejected by Robert Walker J. but was largely accepted by the Court of Appeal, was that there were a number of features of the transaction involving B.F.C., Mr. Herzig, Omni Holdings A.G. and Parc which resulted in the payment of about £10m. to R.T.B. on 28 September 1990, which took the case outside the ambit of the doctrine of subrogation and which defeated B.F.C.'s claim against O.O.L.

One of the submissions advanced to the House by Mr. Kosmin on behalf of O.O.L. was that O.O.L. had not been enriched at B.F.C.'s expense. A claim based on unjust enrichment cannot succeed unless the plaintiff can establish that the defendant was unjustly enriched at its expense: see per Lord Goff of Chieveley in Lipkin Gorman v. Karpnale Ltd. [1991] 2 A.C. 548 , 578c. Mr. Kosmin submitted that O.O.L. had not been enriched at the expense of B.F.C. but at the expense of Mr. Herzig. B.F.C. did not lend to Parc but deliberately lent to Mr. Herzig who then lent an equivalent sum to Parc. Moreover Mr. Herzig lent to Parc on different terms in that, whereas B.F.C.'s loan to Mr. Herzig was for a short period of two months and was secured by a pledge of shares, Mr. Herzig's loan to Parc was for a period of 12 months and was unsecured. Accordingly it was argued that having chosen to lend to Mr. Herzig, B.F.C. could not subsequently claim that O.O.L. had been enriched at its expense. Both Robert Walker J. and the Court of Appeal rejected this submission. The findings of Robert Walker J. at pp. 23 and 24 of his judgment made it clear that the understanding and intention of B.F.C. was that the loan to be made by it was a loan to enable Parc to make partial repayment of a debt owing by it to a bank. Therefore I consider that Robert Walker J. and the Court of Appeal were right to hold that the reality was that O.O.L. was enriched at the expense of B.F.C.

Before considering Mr. Kosmin's further submissions it is necessary to refer to the terms of the letter of 28 September 1990 sent to B.F.C. by Omni Holding A.G. ("the postponement letter"):

> "This is to confirm that we and all companies of our group will not demand any repayment of loans granted to Parc (Battersea) Ltd., London, until the full repayment of your loan of DM30m. granted **\*240** to Mr. M. Herzig, which is secured by a deep discount promissory note amounting to £10m. issued by Parc (Battersea) Ltd."

149

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

I agree with Robert Walker J. and the Court of Appeal that the postponement letter was intended to have legal effect, and I did not understand Mr. Kosmin to dispute this conclusion. Robert Walker J. held that the intended effect of the postponement letter was an agreement by Omni Holding A.G. on its own behalf and as agent for all the other companies in the Omni Group that all of those companies would not demand any repayment of loans granted to Parc until the full repayment of B.F.C.'s loan to Mr. Kosmin, but the judge further held that Holding did not have authority to contract as agent on behalf of O.O.L. and the other companies in the group. The Court of Appeal held that the only undertaking contained in the letter was an undertaking by Holding on its own behalf which did not bind O.O.L.

The letter was drafted in terms which are imprecise and lacking in clarity, but for the reasons stated by Robert Walker J. I incline, on balance, to the view that the letter was intended to constitute an undertaking by Holding both on its own behalf and as agent for the other companies. But even if the letter constituted only an undertaking by Holding on its own behalf, I consider that its terms were such and the relationship, as known to B.F.C., between Holding and the other companies in its group (all of which were controlled by Mr. Rey) was such that the letter gave rise to the expectation by B.F.C. that all the members of the Omni Group would postpone their claims against Parc until the loan made by B.F.C. had been repaid to it.

The claim made by B.F.C. that it is entitled to subrogation to R.T.B.'s charge on Parc's Battersea property is advanced on the basis that it expected the letter of postponement to give it security for its loan, but this expectation was disappointed because it transpired that O.O.L. was not bound by the letter. Therefore the question arises whether, if the letter had been enforceable against O.O.L., the letter would have given the bank a "security," so that the letter can now be regarded as a "defective security." In my opinion it can, because B.F.C. expected that by reason of the letter its loan would be repaid in priority to the debts owing by Parc to the companies in the Omni Group, and I consider that if the letter had operated in that way, it would have given B.F.C. protection which can be regarded as a form of security.

Another principal argument advanced on behalf of O.O.L. was that any enrichment of O.O.L. at the expense of B.F.C. was not unjust. A number of reasons were advanced in support of this contention. One reason related to the security which B.F.C. did receive in respect of its loan and to a security which it decided not to require. In the discussions prior to the making of the loan to Mr. Herzig B.F.C. stipulated for, and obtained, security in the form of a pledge of 35,000 bearer shares in Holding (with an initial margin of cover of about 160 per cent.), and this pledge of shares would have constituted ample security for the loan if the Omni Group had not become insolvent. Moreover, whereas the bank had originally required a second charge to be granted to it over Parc's Battersea property, it subsequently agreed not to require such a charge. Therefore it *241 was submitted that the remedy of subrogation should not be granted to a lender who had got all that it bargained for in lending to the borrower. In particular, a new lender who lends on an unsecured basis will not be entitled to be subrogated to the security of an earlier lender. In support of this submission Mr. Kosmin relied on the judgment of Oliver J. in Paul v. Speirway Ltd. [1976] 1 Ch. 220 , 233:

> "As it seems to me, where a court, upon a review of the facts, comes to the conclusion that what was intended between the parties was really an unsecured borrowing, there is no room for the doctrine of subrogation. That really is analogous to the situation envisaged in the judgment which I have just read, because to apply the doctrine of subrogation in such a case would in fact be putting the lender in a better position than he is bargaining to be put in when he advances money."

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

It was submitted that, equally, a new lender who bargains for and gets his own security should not be subrogated to the security of an earlier lender merely because its security turned out to be inadequate.

Linked to this submission was the further submission that there was no mutual intention on the part of B.F.C. and Parc that B.F.C. should be subrogated to the rights of R.T.B. My Lords, I agree with the view of my noble and learned friend, Lord Hoffmann, that the concept of mutual intention, whether actual or presumed, can be artificial in a case such as the present one, where the claim to subrogation arises because the security intended by the lender has proved to be defective. In my opinion in such circumstances the doctrine of subrogation is to be applied unless its application will produce an unjust result. This view finds strong support in the judgment of Nicholls J. in Boodle, Hatfield & Co. v. British Films Ltd., 1986 P.C.C. 176 , where, after referring to the judgments in the Orakpo case, he stated, at pp. 182-183:

> "First, one of the ways (because I do not think that Lord Diplock meant that this was the only way) in which the implication of subrogation to the existing security rights of the vendor may be displaced is by the express terms in the contract made between the lender and the borrower being inconsistent with the acquisition by the lender of the security rights. Secondly, the failure of the lender and the borrower to address themselves to the question whether the lender will acquire the security rights of the vendor will not of itself negative the application of the doctrine of subrogation. A lender who advances money to enable a borrower to complete and who stipulates for a legal charge to be given when his loan is made is unlikely to consider what his security position will be if the legal charge produced is invalid; that is, whether in that event he will acquire a lien by subrogation. But the view of both Lord Diplock and Lord Keith was that such a lender may acquire the pre-existing security rights by subrogation. Thirdly, and of overriding importance, the equitable doctrine of subrogation will not be applied when its application would produce an unjust result. One of the circumstances in which subrogation may lead to an unjust result is if, without the implication of subrogation, the lender obtained all that he bargained for."

**\*242**  And, at pp. 183-184:

> "Moreover, I do not think that the absence of any agreement or even discussion regarding security leads to the conclusion that there was by implication a common intention that the lender should have no security. The explanation for the absence of any discussion on this subject is the simple one, that neither party considered what the plaintiffs' position would be if the cheque was not met. Mr. Smith did not consider this, because he was relying on the assurance of a person who was well known to his firm. Obviously he was taking a risk that the cheque might not be met after all. But I do not think that from this I should infer that he was agreeing to waive or release any rights which the plaintiffs

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

otherwise would have had in respect of the financial assistance they were providing to their client. As to the argument that the plaintiffs obtained all they bargained for, it is important to remember that subrogation applied in this case unless excluded. Accordingly, the question is not: did the plaintiffs bargain for the transfer to them of the vendor's security rights? Rather it is: did the bargain made by the plaintiffs with the defendant exclude that transfer, either expressly or impliedly? Unless this is kept in mind, consideration of whether the plaintiffs obtained what they bargain for is likely to mislead rather than assist in a case where, at the time, in the course of one short conversation neither party directed his mind to the crucial question."

This view is also supported by the judgment of Oliver J. in Paul v. Speirway Ltd. [1976] Ch. 220 , 232:

"I think respectfully that the wide general formulation in Coote on Mortgages, 9th ed. (1927), vol. 2, p. 1377 and in Ghana Commercial Bank v. Chandiram [1960] A.C. 732 is the right one, and that where the given circumstances exist subrogation applies unless the contrary appears. The real divergence here, as it seems to me, is on the strength of the evidence which is required to demonstrate a contrary intention."

A further submission was that as B.F.C. had not maintained its original requirement to have a charge on Parc's Battersea property, and had obtained the security it required, which was the pledge of shares in Holding, B.F.C. would receive more than it had bargained for if it were granted subrogation. I do not accept this submission because, in the events which have happened, there are competing claims by B.F.C. and O.O.L. to priority in receiving payment from Parc's remaining asset, the Battersea property. Therefore, as Robert Walker J. observed, at p. 65 of his judgment, to permit B.F.C. to be subrogated to the R.T.B. security, to the extent of its loan to Mr. Herzig, would give rise to a result not dissimilar to that which would have occurred if the postponement letter had operated as B.F.C. had expected.

It was also submitted on behalf of O.O.L. that B.F.C. should not be subrogated to R.T.B.'s security because it had neglected to take simple steps to ensure that the letter of postponement would operate effectively to bind the other companies of the Omni Group. In my opinion this submission is invalid because there is no requirement that before a lender *243 can claim the benefit of subrogation he must show that he took reasonable precautions to ensure that the security for which he stipulated would be effective. It is because the intended security proved to be defective that the need for subrogation arises.

It was further submitted that there was no misrepresentation or sharp practice on the part of O.O.L. or Parc, and that this was a consideration which pointed to the conclusion that there was no unjust enrichment of O.O.L. But in my opinion a remedy for unjust enrichment is granted where the defendant has been enriched at the expense of the plaintiff, and it would be unjust to allow the defendant to retain the enrichment. I consider that for a plaintiff to establish that it would be unjust for the defendant to keep the benefit which he had gained at the expense of the plaintiff, the plaintiff does not need to prove that the defendant was guilty of misconduct. In order for a claim for unjust enrichment to succeed at

152

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

common law the plaintiff does not have to prove a wrong committed by the defendant against him. In Lipkin Gorman v. Karpnale Ltd. [1991] 2 A.C. 548 , 572 Lord Goff of Chieveley stated:

> "Furthermore, it appears that in these cases the action for money had and received is not usually founded upon any wrong by the third party, such as conversion; nor is it said to be a case of waiver of tort. It is founded simply on the fact that, as Lord Mansfield said, the third party cannot in conscience retain the money - or, as we say nowadays, for the third party to retain the money would result in his unjust enrichment at the expense of the owner of the money."

A separate submission advanced by Mr. Kosmin was that where the creditor who held a charge over the property of the debtor received payment by reason of a subsequent loan made to the debtor by a new lender, the essence of the subrogation granted to the new lender was the acquisition by him of the benefit of the charge held by the creditor who had been paid off: that, as stated by Lord Diplock in the Orakpo case [1978] A.C. 95 , 104d, there is "a transfer of rights from one person to another, without assignment or assent of the person from whom the rights are transferred and which takes place by operation of law. . ." But in the present case there were two closely linked and interrelated reasons why subrogation should not be granted to B.F.C. One reason was that the payment of about £10m. which R.T.B. received from Mr. Herzig did not discharge the entire debt owing to it by Parc. A balance of more than £10m. remained owing, and the charge held by R.T.B. remained in being as security for that balance (although it was subsequently repaid to R.T.B. at the end of October 1990 with money advanced by O.O.L.). Therefore it was not conceptually possible for B.F.C. to be subrogated to R.T.B.'s charge. Before the Court of Appeal B.F.C. relied upon the decision of Romer J. in Chetwynd v. Allen [1899] 1 Ch. 353 in answer to this submission. In his judgment Morritt L.J. referred to the passage in the judgment of Romer J., at p. 359, where he made it clear that his decision in that case was not based on the principle of subrogation, and accordingly Morritt L.J. stated that he did not regard the decision as being of any assistance to B.F.C. *244

My Lords, I consider that the decision does materially assist B.F.C., as it establishes that a lender, whose loan is used to discharge part of a sum owing on a mortgage, will be treated by equity as having a charge on the mortgaged property to secure his loan without prejudice to the security given by the mortgage to the first lender. In Chetwynd v. Allen [1899] 1 Ch. 353 there was a mortgage to Terrell of two properties, the Cedars, of which Chetwynd's wife, the plaintiff, was the beneficial owner, and the "riding school" owned by Chetwynd, to secure £2,000 lent to him by Terrell. Mynors subsequently lent £1,200 to Chetwynd on a promise by Chetwynd that he should have a transfer of the earlier mortgage to Terrell, and Chetwynd applied £1,000 of the sum of £1,200 advanced by Mynors in partial repayment of the loan of £2,000 made by Terrell. Romer J. stated, at p. 357:

> "On these facts I have to consider what Mynors' rights are. Now, in my opinion, when Mynors advanced the £1,200 on the representations and promise above mentioned, and the £1,000 was applied in part payment to Terrell, the charge on the Cedars and school to the extent of the £1,000 was kept alive in equity in favour of Mynors, so far as that could be done without prejudicing Terrell or the plaintiff. So far as Chetwynd was concerned, he could not complain that the charge was kept alive also on the school, seeing that it was by his fraud that the true facts as to Terrell's charge were kept hidden from Mynors. As regards Terrell, he clearly was not prejudiced, for the balance of his mortgage debt

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

had priority over Mynors' charge; and as regards the plaintiff she was not prejudiced, so long as no extra costs were thrown on the Cedars by reason of the original mortgage debt of £2,000 being divided as between Terrell and Mynors (and this I can provide for), and provided that as between the school and the Cedars the former remained primarily liable for the debt as between her and her husband."

It is somewhat puzzling to read, at the present day, the statement relating to subrogation at the end of Romer J.'s judgment, to which Morritt L.J. referred, and which clearly influenced him to hold, erroneously in my respectful opinion, that the decision was not of assistance to B.F.C. The report of Chetwynd v. Allen [1899] 1 Ch. 353 , 355 states that after having ruled in favour of the plaintiff, Chetwynd's wife, on a number of points which had been raised, Romer J. reserved for further consideration "the question which had been raised as to the right of the defendant Mynors to be subrogated to the rights of Terrell under the mortgage of 4 June 1891 so far as concerned the £1,000 paid off to Terrell out of the £1,200 advanced by Mynors to Chetwynd." and it is reported, at p. 356, that in the subsequent argument on the reserved question counsel for "Mynors submitted that Mynors is entitled on the principle of subrogation to stand in the shoes of Terrell to the extent of the £1,000 paid off to him out of the £1,200." I consider that the decision of Romer J. in favour of Mynors was a decision which today would be described as one that Mynors was entitled to the extent of £1,000 to a charge upon the "Cedars" under the doctrine of subrogation, and it appears that the decision was treated as an application of that doctrine by Lord Jenkins in the Ghana Commercial Bank case [1960] A.C. 732 , 745. It may be that Romer J. considered at the time of his decision, 100 years ago, that a case should not be regarded as one to which the principle of subrogation applied unless the debt of the first lender was completely discharged and the new lender succeeded to the entirety of the charge held by the first lender. Whilst that is the usual situation where the new lender is entitled to subrogation, it is not the only situation, because as Goff & Jones, The Law of Restitution, states at p. 593:

"subrogation is essentially a remedy, which is fashioned to the facts of the particular case and which is granted in order to prevent the defendant's unjust enrichment."

and in Burston Finance Ltd. v. Speirway Ltd. [1974] 1 W.L.R. 1648 , 1652 Walton J., referring to subrogation, stated:

"It finds one of its chief uses in the situation where one person advances money on the understanding that he is to have certain security for the money he has advanced, and, for one reason or another, he does not receive the promised security. In such a case he is nevertheless to be subrogated to the rights of any other person who at the relevant time had any security over the same property and whose debts have been discharged, in whole *or in part* , by the money so provided by him, but of course only to the extent to which his money has, in fact, discharged their claims." (Emphasis added.)

The second related reason relied on by Mr. Kosmin as to why B.F.C. could not be subrogated in part to R.T.B.'s charge, ranking behind the balance of the charge held by R.T.B., was because this would not, in reality, have constituted

subrogation to R.T.B.'s rights but a grant to B.F.C. by the court of new rights created specially for the purpose. Mr. Kosmin's submission was that the court had no jurisdiction to confer such new rights.

In my opinion this submission is invalid because it fails to take account of the consideration that the doctrine of subrogation applies in a variety of different circumstances where the defendant has been unjustly enriched at the expense of the plaintiff, and where equity considers that it would be unconscionable for the defendant to retain that enrichment. In such a case, as Goff and Jones say, the remedy is fashioned to the facts of the particular case. In the Orakpo case [1978] A.C. 95 , 104e Lord Diplock stated that some rights by subrogation "appear to defeat classification except as an empirical remedy to prevent a particular kind of unjust enrichment."

And in Boscawen v. Bajwa [1996] 1 W.L.R. 328 , 335 Millett L.J. referring to subrogation, said:

> "It is available in a wide variety of different factual situations in which it is required in order to reverse the defendants' unjust enrichment."

Therefore, in the present case, where O.O.L. was enriched at the expense of B.F.C., where it would be unconscionable to permit O.O.L. to retain that enrichment, and where B.F.C. had expected to receive the form of security constituted by the postponement of the demands of O.O.L. and the other companies in the group, I consider that B.F.C. is entitled in the *246 circumstances to the order made by Robert Walker J. (subject to the amendment proposed by my noble and learned friend, Lord Hoffmann), the effect of which is that its loan will be repaid in priority to the payment claimed by O.O.L.

As I have observed, the submissions advanced by Mr. Kosmin to this House were largely accepted by the Court of Appeal, and the grounds upon which Morritt L.J. held in favour of O.O.L. can be summarised as follows (in a different order to that stated by Morritt L.J.). First, the failure of B.F.C. to obtain the security for which it stipulated, which was an agreement binding on all the companies of the Omni Group that they would postpone their demands against Parc, was due entirely to the failure of B.F.C. to take the normal and elementary precautions. Secondly, there had been no misrepresentation or sharp practice on the part of O.O.L. Thirdly, there was the conceptual difficulty that B.F.C. could not be subrogated to the rights given by R.T.B.'s charge when that charge remained vested in R.T.B. to secure the balance of the debt owing to it, and the decision of Romer J. in Chetwynd v. Allen [1899] 1 Ch. 353 did not assist B.F.C. For the reasons which I have stated in considering the submissions advanced by Mr. Kosmin I am unable to agree with these grounds given by Morritt L.J. for dismissing B.F.C.'s claim.

In addition there was a further reason for dismissing the bank's action given by Morritt L.J., which was a reason advanced to Robert Walker J. and the Court of Appeal by Mr. Kosmin, but which he did not rely upon as a separate ground before the House. This was that the loan was made by the bank to Mr. Herzig, and not to Parc, in order to avoid the impact of the Swiss Federal Banking regulations. The decision of Robert Walker J. at p. 63 of his judgment on this aspect of the case was as follows:

Banque Financiere de la Cite SA v Parc (Battersea) Ltd, [1999] 1 A.C. 221 (1998)

"It is clear that the Swiss regulatory authorities took the view that the loan to Mr. Herzig was a breach of the reporting requirement. That breach carried criminal sanctions, though in fact the plaintiff received only a reprimand. The breach did not invalidate the loan. I do not consider that those circumstances are a reason for refusing subrogation, either by themselves or in conjunction with the plaintiff's failure, in its apparent eagerness to oblige Mr. Rey, to make inquiries about intra-group indebtedness."

I consider that the conclusion of Robert Walker J. on this point was correct and I agree with his view that the breach of the reporting requirement should not prevent the court from remedying the unjust enrichment of O.O.L. at the expense of B.F.C.

Accordingly I would allow this appeal and restore the order of Robert Walker J. with the proposed amendment.

**Representation**
Solicitors: Forsyte Saunders Kerman; Cameron McKenna.

Appeal allowed. [Reported by Shiranikha Herbert, Barrister]

(c) Incorporated Council of Law Reporting for England & Wales

[1999] 1 A.C. 221

End of Document                                                              © 2019 Thomson Reuters.



All England Law Reports/2017/Volume 3 /Investment Trust Companies (in liquidation) v Revenue and Customs Commissioners - [2017] 3 All ER 113

[2017] 3 All ER 113

# Investment Trust Companies (in liquidation) v Revenue and Customs Commissioners

[2017] UKSC 29

SUPREME COURT

LORD NEUBERGER P, LORD MANCE, LORD REED, LORD CARNWATH AND LORD HODGE SCJJ

17–19 MAY 2016, 11 APRIL 2017

*Value added tax – Overpayment of tax – Repayment – Claim by end consumers of VAT on services subsequently held to be exempt – Whether claimants having right to restitution against HMRC of amounts wrongly paid – Whether any restitutionary claim barred by statute – Whether lack of claim contrary to EU law – Value Added Tax Act 1994, s 80.*

The claimants were investment trust companies ('ITCs'), three of which had been chosen as lead claimants. Between 1992 and 2002, the lead claimants received supplies of services from investment managers ('the managers'). The services were supplied under contracts which provided for the managers to be paid fees plus value added tax ('VAT') if applicable. Under the provisions of United Kingdom VAT legislation then in force, those services did not qualify for exemption from VAT. The managers therefore charged VAT on the supplies of their services, and the lead claimants paid the amounts charged. The managers were obliged to account to Revenue and Customs ('HMRC') (or their statutory predecessors) for the VAT due in respect of their chargeable supplies during each accounting period. The managers were understood to be entitled to pay HMRC only the surplus of their output tax over their input tax, and to retain the balance of the output tax in their own hands. Thus if a manager made taxable supplies to an ITC, and the VAT chargeable on those supplies was £100 and the manager had purchased taxable supplies during the relevant period on which the VAT was £25, the manager was entitled to credit for that £25, and was required to pay HMRC the balance of £75. It was subsequently established (in *JP Morgan Fleming Claverhouse Investment Trust plc v Revenue and Customs Comrs* (Case C-363/05) [2008] STC 1180) that supplies of investment management services were exempt from VAT under art 13B(d)(6) of Council Directive 77/388/EEC ('the Sixth Directive'). Although the UK failed to transpose art 13B(d)(6) correctly into national legislation until October 2008, it had direct effect at all material times. In early 2004, when the *Claverhouse* litigation was begun, certain managers made claims to HMRC under s 80[a] of the Value Added Tax Act 1994 for refunds of VAT in respect of accounting periods from 2001 to 2004. Claims were not made in relation to earlier accounting periods because of the three-year limitation period imposed by s 80(4). HMRC allowed the claims and repaid the relevant amounts to the managers, with interest. The managers were required to reimburse the refunded VAT and interest to the lead claimants, and did so. It was

ª    Section 80, so far as material, is set out at [75], below.

114

subsequently established (in *Fleming (t/a Bodycraft) v Revenue and Customs Comrs, Condé Nast Publications Ltd v Revenue and Customs Comrs* [2008] 1 All ER 1061) that the retrospective manner in which the three-year limitation period had been introduced was incompatible with EU law, and that the time bar had to be disapplied in respect of rights which had accrued before it came into effect on 4 December 1996. The managers made further claims in respect of accounting periods ending before that date. Those claims were allowed, and the refunds passed on to the lead claimants under the same reimbursement conditions as applied to the initial refunds. As a result, there were two periods in respect of which the lead claimants had not been refunded the VAT they had paid to the managers. First, the managers were unable to make claims in respect of accounting periods ending on or after 4 December 1996 which were time-barred under s 80(4). Secondly, the amounts repaid to the managers were calculated on the basis that, under s 80(2A), it was necessary to set against the output tax for which they had accounted, the amount of input tax for which they had deducted, ie the managers were repaid the £75 which they had paid to HMRC, but not the £25 which they had retained in their own hands, and only the £75 was repaid to the lead claimants under the reimbursement arrangements. The ITCs brought proceedings against HMRC in which they sought repayment of the amounts which had been paid by them to the managers, to the extent that they had not been recovered under the statutory scheme established by s 80 or otherwise. Those claims were based on unjust enrichment, or alternatively on EU law. Two first instance judgments were given, against which both the lead claimants and HMRC appealed. The Court of Appeal allowed both parties' appeals and held: (i) that the lead claimants had a direct cause of action in unjust enrichment against HMRC for VAT paid under a mistake of law; (ii) the judge had been wrong to treat that cause of action as excluded by s 80(7); (iii) any domestic claim in unjust enrichment for the notional £25 lay against the managers alone; and (iv) that the lead claimants had no direct claim against HMRC for the notional £25 under EU law, given the claim they had in that amount against the managers. Section 80(7) provided that, except as provided by s 80, HMRC were not liable to credit or repay any amount accounted for or paid to them by way of VAT that was not VAT due to them. HMRC appealed and the lead claimants cross-appealed. The issues before the Supreme Court were: (1) whether the lead claimants had a common law claim against HMRC in principle, subject to any statutory exclusion of such a claim; (2) if so, whether s 80 barred such a claim; and (3) if the lead claimants had no claim against HMRC, either because no such claim was recognised at common law or because a common law claim was barred by s 80, whether that was compatible with EU law.

**Held** – (1) HMRC were not enriched by the managers' retention of the notional £25, and the managers had, in principle, no defence to a claim by the lead claimants for the restitution of that amount. HMRC's enrichment was only to the extent of the notional £75. Further, there had been no transfer of value from the lead claimants to HMRC. There had been a transfer of value, comprising the notional £100, from the lead claimants to the managers, under the contract between them. That was defective, because it was made in performance of a contractual obligation which it was mistakenly believed to be owed. There was a subsequent transfer of value, comprising the notional £75, from the managers to HMRC. That was also defective, because it was made in compliance with a statutory obligation that was inapplicable because it was

115

incompatible with EU law. The two transfers could not be collapsed into a single transfer of value from the lead claimants to HMRC. The lead claimants did not in principle have any right to restitution against HMRC. They did, however, have a right to restitution against the managers. That right was to restitution of the entire notional £100 paid in respect of VAT. The managers did not in principle have a change of position defence in respect of the notional £75 which they paid to HMRC, since that change of position was reversible under s

80; nor did they have a change of position defence in respect of the £25 they had retained (see [30], [39]–[43], [46]–[48], [52], [59], [70]–[74], below); *Banque Financière de la Citeî v Parc (Battersea) Ltd* [1998] 1 All ER 737 considered.

(2) Under s 80(3), HMRC had a statutory defence to a claim under s 80—a claim which could only be made by a supplier—where crediting the supplier would unjustly enrich him. The possibility of unjust enrichment arose because the supplier normally recovered from his customers the output tax for which he accounted to HMRC. The subsection created a statutory defence of passing on. That defence was disapplied where re-imbursement arrangements were made with the purpose of ensuring that the payment to the supplier was used to reimburse the consumers who had borne the economic burden of the tax. That scheme enabled consumers to recover VAT they had been wrongly charged, to the extent that it was remitted by the supplier to HMRC, via the supplier's claim under s 80. Such a claim was subject to the limitation period in s 80(4). Although that remedy was indirect, it could generally be expected to be effective. In light of s 80(3) and (4), Parliament could not sensibly be taken to have intended, when it created the scheme for reimbursement of suppliers (with provision in turn for them to reimburse their customers), subject to strict time limits, that it should exist concurrently with non-statutory liabilities towards suppliers and their customers which were po-tentially wider in scope and were subject to a longer and less certain limitation period. Section 80(7) had to be construed as excluding such claims. It followed that s 80 barred claims by consumers who ultimately bore the burden of VAT. It nevertheless enabled them to be reimbursed, subject to a limitation period designed to avoid the disruption of public finances (see [80]–[84], [86]–[88], below).

(3) The lead claimants had a common law right to restitution against the managers of the amounts mistaken-ly paid to the managers, whose enforcement was neither impossible nor excessively difficult. The managers had a statutory right to recover the notional £75 from HMRC. The managers retained the remaining £25, and were in a position to refund it to the lead claimants. The only amounts the lead claimants could not recover was the notional £75 whose recovery from HMRC was time-barred under s 80(4). Although a claim by the lead claimants against the managers for that amount would not be time-barred, the managers would have a change of defence position, since the amounts they had paid to HMRC during those periods were irrecover-able. The inability of the lead claimants to recover those sums was not, however, incompatible with EU law. In those circumstances, the inability of the lead claimants to pursue a direct claim for restitution against HMRC was not incompatible with EU law (see [93], [94], below).

Decision of the Court of Appeal [2015] STC 1280 reversed in part.

**Notes**

For the recovery of overpaid value added tax by credit or repayment, see 99 *Halsbury's Laws* (5th edn) (2012) para 391.

*116*

For the Value Added Tax Act 1994, s 80, see 44 *Halsbury's Statutes* (4th edn) (2010 reissue) 171.

**Cases referred to**

*123 East Fifty-Fourth Street Inc v US* (1946) 157 F 2d 68, US Ct of Apps.

*Abbey National Building Society v Cann* [1990] 1 All ER 1085, [1991] 1 AC 56, [1990] 2 WLR 832, HL.

159

*Amministrazione delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) EU:C:1983:318, [1983] ECR 3595, ECJ.

*Banque Financière de la Citeì v Parc (Battersea) Ltd* [1998] 1 All ER 737, [1999] AC 221, [1998] 2 WLR 475, HL.

*Barclays Bank v Quistclose Investments Ltd* [1968] 3 All ER 651, [1970] AC 567, [1968] 3 WLR 1097, HL.

*Becker v Finanzamt Münster-Innenstadt* (Case 8/81) EU:C:1982:7, [1982] ECR 53, ECJ.

*British Columbia v Canadian Forest Products Ltd* 2004 SCC 38, [2004] 2 SCR 74, Can SC.

*Burston Finance Ltd v Speirway Ltd* [1974] 3 All ER 735, [1974] 1 WLR 1648.

*Child Poverty Action Group v Secretary of State for Work and Pensions* [2010] UKSC 54, [2011] 1 All ER 729, [2011] 2 AC 15, [2011] 2 WLR 1.

*Comr of State Revenue v Royal Insurance Australia Ltd* [1994] 4 LRC 511, (1994) 182 CLR 51, Aus HC.

*Danfoss A/S v Skatteministeriet* (Case C-94/10) EU:C:2011:674, [2013] STC 1651, [2011] ECR I-9963, ECJ.

*Edinburgh and District Tramways Co Ltd v Courtenay* 1909 SC 99.

*Elida Gibbs Ltd v Customs and Excise Comrs* (Case C-317/94) EU:C:1996:400, [1997] All ER (EC) 53, [1997] QB 499, [1996] ECR I-5339, ECJ.

*Equuscorp Pty Ltd v Haxton* [2012] HCA 7, [2012] 3 LRC 716, (2012) 246 CLR 498, Aus HC.

*European Commission v Italy* (Case C-129/00) EU:C:2003:656, [2003] ECR I-14637, ECJ.

*Ferguson v Smyth,* 18 November 1802, SC Old Sess Pap, vol 437, No 30, Ct of Sess.

*Fleming (t/a Bodycraft) v Revenue and Customs Comrs, Condeì Nast Publications Ltd v Revenue and Customs Comrs* [2008] UKHL 2, [2008] 1 All ER 1061, [2008] 1 WLR 195.

*Hanover Shoe Inc v United Shoe Machinery Corp* (1968) 392 US 481, US SC.

*Holt v Markham* [1923] 1 KB 504, [1922] All ER Rep 134, CA.

*JP Morgan Fleming Claverhouse Investment Trust plc v Revenue and Customs Comrs* (Case C-363/05) EU:C:2007:391, [2008] STC 1180, [2007] ECR I-5517, ECJ.

*Kingstreet Investments Ltd v New Brunswick (Dept of Finance)* 2007 SCC 1, [2007] 1 SCR 3, Can SC.

*Kleinwort Benson Ltd v Birmingham City Council* [1996] 4 All ER 733, [1997] QB 380, [1996] 3 WLR 1139, CA.

*Kleinwort Benson Ltd v Lincoln City Council* [1998] 4 All ER 513, [1999] 2 AC 349, [1998] 3 WLR 1095, HL.

*Lipkin Gorman (a firm) v Karpnale Ltd* [1992] 4 All ER 512, [1991] 2 AC 548, [1991] 3 WLR 10, HL.

*Littlewoods Retail Ltd v Revenue and Customs Comrs* (Case C-591/10) EU:C:2012:478, [2012] STC 1714, ECJ.

*117*

*Macdonald v Costello* [2011] EWCA Civ 930, [2012] 1 All ER (Comm) 357, [2012] QB 244, [2011] 3 WLR 1341.

*Marks and Spencer plc v Customs and Excise Comrs* (Case C-62/00) EU:C:2002:435, [2002] STC 1036, [2003] QB 866, [2003] 2 WLR 665, [2002] ECR I-6325, ECJ.

*Menelaou v Bank of Cyprus UK Ltd* [2013] EWCA Civ 1960, [2014] 1 WLR 854; *affd* [2015] UKSC 66, [2016] 2 All ER 913, [2016] AC 176, [2015] 3 WLR 1334.

*Ministero delle Finanze v IN CO GE '90 Srl* (Joined cases C-10/97 to C-22/97) EU:C:1998:498, [1998] ECR I-6307, ECJ.

*Monro v Revenue and Customs Comrs* [2008] EWCA Civ 306, [2008] STC 1815, [2009] Ch 69, [2008] 3 WLR 734.

*Moses v Macferlan* (1760) 2 Burr 1005, (1760) 97 ER 676, [1558–1774] All ER Rep 581.

*Peter v Beblow* [1993] 1 SCR 980, Can SC.

*Reemtsma Cigarettenfabriken GmbH v Finance Minister* (Case C-35/05) EU:C:2007:167, [2008] STC 3448, [2007] ECR I-2425, ECJ.

*Relfo Ltd (in liq) v Varsani* [2014] EWCA Civ 360, [2015] 1 BCLC 14.

*Ruabon Steamship Co Ltd v London Assurance Co* [1900] AC 6, [1895–9] All ER Rep 677, HL.

*Taylor v Laird* (1856) 25 LJ Ex 329.

*Test Claimants in the FII Group Litigation v Revenue and Customs Comrs* [2012] UKSC 19, [2012] 3 All ER 909, [2012] 2 AC 337, [2012] 2 WLR 1149.

*TFL Management Services Ltd v Lloyds Bank plc* [2013] EWCA Civ 1415, [2014] 1 WLR 2006.

*VDP Dental Laboratory NV v Staatssecretaris van Financiën, Staatssecretaris van Financiën v X BV* (Joined cases C-144/13, C-154/13 and C-160/13) EU:C:2015:116, [2015] STC 1133, ECJ.

*Wayne County Produce Co v Duffy-Mott Co* (1927) 244 NY 351, NY Ct of Apps.

*Westdeutsche Landesbank Girozentrale v Islington London BC* [1996] 2 All ER 961, [1996] AC 669, [1996] 2 WLR 802, HL.

*Woolwich Equitable Building Society v IRC* [1992] 3 All ER 737, [1993] AC 70, [1992] 3 WLR 366, HL.

**Additional cases referred to in list of authorities**

*Autologic Holdings plc v IRC* [2005] UKHL 54, [2005] 4 All ER 1141, [2006] 1 AC 118, [2005] 3 WLR 339.

*Benedetti v Sawiris* [2013] UKSC 50, [2013] 4 All ER 253, [2014] AC 938, [2013] 3 WLR 351.

*Birmingham Hippodrome Theatre Trust Ltd v Revenue and Customs Comrs* [2014] EWCA Civ 684, [2014] STC 2222, [2014] 1 WLR 3867.

*British Telecommunications plc v Revenue and Customs Comrs* [2014] EWCA Civ 433, [2014] STC 1926.

*Customs and Excise Comrs v Fine Art Developments plc* [1989] 1 All ER 502, [1989] AC 914, [1989] 2 WLR 369, HL.

*Deutsche Morgan Grenfell Group plc v IRC* [2006] UKHL 49, [2007] 1 All ER 449, [2007] 1 AC 558, [2006] 3 WLR 781.

*Federal Republic of Brazil v Durant International Corporation* [2015] UKPC 35, [2016] 1 All ER (Comm) 722, [2016] AC 297, [2015] 3 WLR 599.

*Filby v Mortgage Express (No 2) Ltd* [2004] EWCA Civ 759, [2004] All ER (D) 198 (Jun), [2004] 29 LS Gaz R 30.

*Gibb v Maidstone & Tunbridge Wells NHS Trust* [2010] EWCA Civ 678, [2010] IRLR 786.

*118*

*Iaia v Ministero dell'Istruzione, dell'Università e della Ricerca* (Case C-452/09) EU:C:2011:323, [2011] ECR I-4043, ECJ.

*Lady & Kid A/S v Skatteministeriet* (Case C-398/09) EU:C:2011:540, [2012] All ER (EC) 410, [2011] ECR I-7375, ECJ.

*Littlewoods Ltd v Revenue and Customs Comrs* [2015] EWCA Civ 515, [2015] STC 2014, [2016] Ch 373, [2015] 3 WLR 1748.

*Minister Finansów v MDDP sp z oo Akademia Biznesu, sp komandytowa* (Case C-319/12) EU:C:2013:778, [2014] STC 699, ECJ.

*Prudential Assurance Co Ltd v Revenue and Customs Comrs* [2013] EWHC 3249 (Ch), [2014] STC 1236.

*R v Harvey* [2015] UKSC 73, [2016] 4 All ER 521, [2017] AC 105, [2016] 2 WLR 37.

*R (on the application of Quintavalle) v Secretary of State for Health* [2003] UKHL 13, [2003] 2 All ER 113, [2003] 2 AC 687, [2003] 2 WLR 692.

*R (on the application of the Child Poverty Action Group) v Secretary of State for Work and Pensions* [2010] UKSC 54, [2011] 1 All ER 729, [2011] 2 AC 15, [2011] 2 WLR 1.

*Rewe-Zentralfinanz eG v Landwirtschaftskammer für das Saarland* (Case 33/76) EU:C:1976:188, [1976] ECR 1989, ECJ.

*Schmeink & Cofreth AG & Co KG v Finanzamt Borken; Manfred Strobel v Finanzamt Esslingen* (Case C-454/98) EU:C:2000:469, [2000] STC 810, [2000] ECR I-6973, ECJ.

*Staatssecretaris van Financien v Stadeco BV* (Case C-566/07) EU:C:2009:149, [2009] STC 1622, [2009] ECR I-5295, ECJ.

*Test Claimants in the FII Group Litigation v Revenue and Customs Comrs* [2014] EWHC 4302 (Ch), [2015] STC 1471.

*Total Network SL v Revenue and Customs Comrs* [2008] UKHL 19, [2008] 2 All ER 413, [2008] 1 AC 1174, [2008] 2 WLR 711.

*University of Sussex v Customs and Excise Comrs* [2001] STC 1495.

*Ze Fu Fleischhandel GmbH and Vion Trading GmbH v Hauptzollamt Hamburg-Jonas* (Joined cases C-201/10 and C-202/10) EU:C:2011:282, [2011] 3 CMLR 11, ECJ.

### Appeal and cross-appeal

The Revenue and Customs Commissioners ('HMRC') appealed and the Investment Trust Companies (in liquidation) cross-appealed against a judgment of the Court of Appeal (Moore-Bick VP, Patten and Beatson LJJ) given on 12 February 2015 ([2015] EWCA Civ 82, [2015] STC 1280) allowing appeals by both parties against judgments of Henderson J given on 2 March 2012 ([2012] EWHC 458 (Ch), [2012] STC 1150) on the claimants' restitutionary claims for unrecovered value added tax, and on 26 March 2013 ([2013] EWHC 665 (Ch), [2013] STC 1129) on certain issues that had been adjourned pending the judgment of the Supreme Court in *Test Claimants in the FII Group Litigation v Revenue and Customs Comrs* [2012] UKSC 19, [2012] 3 All ER 909. The facts are set out in the judgment of Lord Reed.

*Stephen Moriarty QC* and *Andrew Macnab* (instructed by the *Solicitor for Revenue and Customs*) for HMRC.

*119*

*Laurence Rabinowitz QC, Andrew Hitchmough QC* and *Michael Jones* (instructed by *PricewaterhouseCoopers Legal LLP*) for the Investment Trust Companies as lead claimants.

*Judgment was reserved.*

**11 April 2017. The following judgment was delivered.**

**LORD REED**

(with whom Lord Neuberger P, Lord Mance, Lord Carnwath and Lord Hodge agree).

[1] This appeal arises out of the payment of value added tax ('VAT') which was not due, because the supplies in question were exempt from VAT under the relevant EU directive. At the time of the payment, however, the supplies were treated as taxable by the United Kingdom's VAT legislation, which had incorrectly transposed the directive, and were mistakenly believed to be taxable by the customer who paid an amount charged in respect of the tax, the supplier who received that amount, and the Commissioners to whom the supplier accounted for the tax. As the corollary of the supplies being believed to be taxable, the supplier and the Commissioners also believed that the supplier was entitled to deduct from the tax chargeable on its supplies to customers the tax which it had itself paid on taxable supplies received for the purposes of its business. It therefore accounted to the Commissioners for the tax chargeable on its supplies during each accounting period on the basis that it could deduct and retain the amount of the tax which it had paid to its own suppliers, and it paid the Commissioners only the remaining surplus, if any.

[2] In that situation, does the customer have a common law claim against the Commissioners for restitution, or is he confined to a claim against the supplier? If he has a claim against the Commissioners, is it for the entire amount which he paid to the supplier, or only for the amount, if any, which the Commissioners received from the supplier? Does it make a difference if any claim for restitution by the supplier against the Commissioners is time-barred? Does it make a difference if there is a statutory scheme under which the customer can obtain reimbursement of the amount which the supplier paid to the Commissioners, but not of any amount which was retained by the supplier? Furthermore, if the statutory scheme has the effect of excluding a common law claim by the customer against the Commissioners, is that compatible with EU law? These are the principal issues which the court has to decide.

**The factual background**

**[3]** The claimants are investment trust companies ('ITCs'). They are 'closed-ended' investment funds constituted as limited companies: that is to say, the companies were established with a fixed number of issued shares and a term date when the company would be wound up and the assets distributed to the shareholders. They have now reached their term dates and are in winding up. The claims of three of the ITCs ('the Lead Claimants') have been taken forward as lead claims while the others are stayed to await the outcome of these proceedings. The Lead Claimants are Kleinwort Overseas Investment Trust plc, F&C Income Growth Investment Trust plc, and M&G Recovery Investment Trust plc. They will be referred to respectively as the Kleinwort Trust, the F&C Trust and the M&G Trust.

*120*

**[4]** Between 1992 and 2002 the Lead Claimants received supplies of investment management services from their investment managers ('the Managers'). Those were respectively Kleinwort Benson Investment Management Ltd, F&C Asset Management Ltd and M&G Investment Management Ltd. Their services were rendered under contracts which provided for the Managers to be paid fees plus VAT 'if applicable' (or words to similar effect). Under the provisions of the UK VAT legislation then in force, those services, unlike the other investment management services provided by the Managers, did not qualify for exemption. The Managers therefore charged VAT on the supplies of their services. The VAT charges were separately identified on the VAT invoices issued to the Lead Claimants, and the Lead Claimants paid the amounts charged.

**[5]** The Managers were obliged to account to the Commissioners for the VAT due in respect of their chargeable supplies during each accounting period. It is relevant to note that the obligation to account for tax arises whether or not tax is charged on the supply or paid by the customer: it is the supplier, rather than the customer, who is under a liability to the Commissioners, and it is the supply, rather than payment by the customer, which triggers the supplier's liability. The customer's liability to pay an amount in respect of the tax rests upon contract. The Managers' obligation to account for the tax due did not, however, mean that they were obliged to pay the Commissioners the whole of, or indeed any part of, the sums they received from the Lead Claimants. Under general principles of VAT law, they were entitled to deduct from the tax chargeable in respect of any taxable supplies they had made, known as output tax, the tax chargeable in respect of any taxable supplies which they had received for the purpose of their business of making taxable supplies, known as input tax.

**[6]** It therefore followed from the legislative treatment of the services supplied to the Lead Claimants as taxable, that the Managers were understood to be entitled to pay to the Commissioners only the surplus of their output tax over their input tax, and to retain the balance of the output tax in their own hands. If the input tax exceeded the output tax, they were entitled to a credit, which could be paid by the Commissioners or carried forward to later accounting periods. Thus, for example, if a Manager made taxable supplies to an ITC, and the VAT chargeable on those supplies was £100, then the Manager was bound to account to the Commissioners for £100. If the Manager had purchased taxable supplies during the relevant period on which the VAT was £25, the Manager was entitled to credit for that £25, and was required to pay the Commissioners only the balance of £75.

**[7]** It was also possible for an ITC to be registered for VAT (if it invested in securities outside the EU), and in that event to recover, as input tax, some of the VAT which it had paid to its Manager. The F&C Trust and the M&G Trust made no such supplies, but the Kleinwort Trust did, and recovered 58.4% of the VAT charged by its Manager (that being the percentage of its portfolio which was invested outside the EU). Its claim against the Commissioners has therefore been adjusted to take account of the sums which it has already recovered as input tax: rather than claiming every £100 which it paid to its Manager in respect of VAT, it claims £41.60, being the difference between the £100 and the £58.40 which it recovered as input tax.

**[8]** The essential pattern was therefore as follows:

*121*

(1)    The Managers supplied investment management services to the Lead Claimants under contracts providing for the payment of fees plus VAT if applicable.

(2)    The Managers charged the Lead Claimants VAT on the supply of those services, and included the VAT charges on the invoices which they issued to the Lead Claimants.

(3)    The Lead Claimants paid the invoices. They might or might not be able to recover some of the VAT as input tax.

(4)    The Managers made periodic VAT returns in which they:

(i)    accounted for the VAT chargeable on their supplies of investment management services as output tax;

(ii)    deducted as input tax the VAT which they had paid to third parties for supplies received in the course of their business; and

(iii)    paid the difference between their output tax and input tax to the Commissioners.

**[9]** It transpired that the supplies of the investment management services were exempt from VAT under art 13B(d)(6) of the Sixth VAT Directive (Council Directive 77/388/EEC (on the harmonisation of the laws of the member states relating to turnover taxes—common system of value added tax: uniform basis of assessment) (OJ 1977 L145 p 1)). That was established by the Court of Justice of the European Communities in *JP Morgan Fleming Claverhouse Investment Trust plc v Revenue and Customs Comrs* (Case C-363/05) EU:C:2007:391, [2008] STC 1180, [2007] ECR I-5517. Although the UK failed to transpose art 13B(d)(6) correctly into national legislation until 1 October 2008, it had direct effect at all material times. It is therefore common ground between the parties that the Lead Claimants paid the Managers the amounts they did in respect of VAT, and that the Managers accounted for VAT to the Commissioners, under a mistake of law.

## The Managers' claims against the Commissioners

**[10]** In early 2004, when the *Claverhouse* litigation began and was publicised, the Managers of the F&C Trust and the M&G Trust made claims to the Commissioners under s 80 of the Value Added Tax Act 1994 for refunds in respect of VAT accounting periods from 2001 to 2004. It will be necessary to return to s 80, the material provisions of which are set out in para [75], below. Claims were not made in relation to earlier accounting periods because of the three-year limitation period imposed by s 80(4). For the same reason, no claim was made by the Managers of the Kleinwort Trust, which had gone into winding up in 1998. Following the *Claverhouse* judgment, the Commissioners allowed the claims and repaid the relevant amounts (as will be explained shortly) to the Managers, with interest. In accordance with s 80, and regulations made pursuant to s 80A, the Commissioners required the Managers to enter into approved 'reimbursement arrangements' with the Lead Claimants, so that the refunded VAT and interest were passed on by the Managers to them.

**[11]** Subsequently, the decision of the House of Lords in *Fleming (t/a Bodycraft) v Revenue and Customs Comrs, Condei Nast Publications Ltd v Revenue and Customs Comrs* [2008] UKHL 2, [2008] 1 All ER 1061, [2008] 1 WLR 195 established that the retrospective manner in which the three-year limitation period had been introduced (by an amendment to the 1994 Act, effected by the Finance Act 1997, which reduced the previous period) was incompatible with EU law, and that the time bar had to be disapplied in respect of rights which

*122*

had accrued before it came into effect on 4 December 1996. The Managers then made further claims in respect of accounting periods ending before that date. These claims were again allowed, with interest, and the appropriate repayments were made to the Managers, who in turn passed them on to the Lead Claimants.

[12] As a result of these arrangements, the Lead Claimants were refunded the VAT which they had paid to the Managers, subject to two exceptions. First, the Managers were unable to make claims in respect of accounting periods ending on or after 4 December 1996 which were time-barred under s 80(4). In practice, that meant that claims could not be made by the Managers of the Kleinwort Trust in relation to accounting periods ending between 4 December 1996 and 20 March 1998, when the Kleinwort Trust went into liquidation. The corresponding periods in relation to the F&C Trust and the M&G Trust ended on 6 April 2001 and 1 April 2001 respectively. Those periods have been referred to in these proceedings as the 'dead periods'. It is common ground that the limitation period in s 80(4) is compatible with EU law.

[13] Secondly, the amounts repaid to the Managers were calculated on the basis that, under s 80(2A), it was necessary to set against the output tax for which they had accounted, the amount of the input tax which they had deducted. It is a matter of agreement that that was the correct approach to the application of s 80. In the illustrative example given in para [6], above, that means that the Managers were entitled to repayment of the £75 which they had paid to the Commissioners, but not of the £25 which they had retained in their own hands.

[14] It is a matter of agreement that, although the Managers were only entitled under s 80 to reimbursement of the notional £75, the Commissioners could have made the refunds conditional on the Managers' undertaking to repay to the Lead Claimants the full amount which they had mistakenly charged (ie the notional £100). It is agreed that the Commissioners did not do so because they accepted the Managers' assertion that, if they had known that the input tax was non-deductible, they would have passed on that cost to the Lead Claimants by charging a higher price for their services. In the present proceedings, however, it is accepted that that assertion was erroneous: had the true position been known, the Managers would not have sought to increase the price of their services to the Lead Claimants. Instead, as Henderson J found after trial, they would have absorbed the input tax as a business expense. In the event, the notional £25 was later refunded to the Kleinwort Trust and the F&C Trust by their respective Managers, but it was not refunded to the M&G Trust.

**The proceedings below**

[15] The ITCs brought proceedings against the Commissioners in which they sought payment of the amounts which had been paid by them to their managers, to the extent that they had not been recovered under the statutory scheme established by s 80 or otherwise: in other words, the amounts which the managers could not claim because any claim would be time-barred, and the amounts which the managers had not paid to the Commissioners but had retained and set against input tax (unless those amounts had been refunded to the ITC in question by its manager). The ITCs' claims were based on unjust enrichment, or alternatively on EU law.

[16] The claims of the Lead Claimants proceeded to a trial on liability. After trial, the judge held ([2012] EWHC 458 (Ch), [2012] STC 1150):

123

    (1)    That, using the notional figures referred to above, the Commissioners had been enriched in the full amount of £100, even if only £75 was paid to them by a Manager after deducting £25 in respect of input tax paid to its own suppliers. In the judge's view, although the £25 was not paid to the Commissioners, it was nevertheless used by the Commissioners to give the Managers a credit for that input tax.

    (2)    That the Commissioners were enriched at the expense of the Lead Claimants because, in economic terms, the person at whose expense the VAT was paid was the customer. The enrichment was also unjust.

(3)    That a cause of action in unjust enrichment was, however, excluded under domestic law by s 80(7) of the 1994 Act, which protects the Commissioners from liability other than as provided in that section.

(4)    That the Lead Claimants had a directly effective right to repayment against the Commissioners under EU law, which required a remedy to be made available in respect of the full notional £100, not merely the £75.

(5)    That EU law did not, on the other hand, require national law to give the Lead Claimants any remedy in respect of amounts falling within the scope of the time bar imposed by s 80(4). Any EU-based claims would be subject (in effect) to the same limitation period.

**[17]** In a subsequent judgment ([2013] EWHC 665 (Ch), [2013] STC 1129) which had been deferred pending the decision of this court in *Test Claimants in the FII Group Litigation v Revenue and Customs Comrs* [2012] UKSC 19, [2012] 3 All ER 909, [2012] 2 AC 337, and the judgment of the Court of Justice in *Littlewoods Retail Ltd v Revenue and Customs Comrs* (Case C-591/10) EU:C:2012:478, [2012] STC 1714, the judge further held that the Lead Claimants had no *Woolwich* claim under English law for unlawfully levied tax (ie a claim based on the principle established in *Woolwich Equitable Building Society v IRC* [1992] 3 All ER 737, [1993] AC 70), and that EU law required s 80(7) to be disapplied, so as to permit a mistake-based restitutionary claim. It is unnecessary to consider the *Woolwich* issue further, as the point has not been pursued in the present appeal.

**[18]** In the light of these conclusions, the judge gave judgment for the M&G Trust in respect of the notional £25 (defined as the difference between the amounts paid by the M&G Trust to its Manager as VAT and the amount of the refunds it received from its Manager, and also as equalling the input tax brought into account by its Manager) for periods outside the dead period, and dismissed the claims in relation to the dead periods (the dead period in relation to each claimant being the period for which its Manager was unable, for reasons of limitation, to make a claim under s 80).

**[19]** The Lead Claimants appealed against the first judgment on the grounds that the judge was wrong to conclude (i) that a cause of action in unjust enrichment against the Commissioners was excluded by s 80(7) of the 1994 Act, and (ii) that the Lead Claimants had no claim under EU law to VAT paid in respect of the dead periods. The Commissioners also appealed against the first judgment on the ground that the judge was wrong to conclude that the M&G Trust had a directly effective EU law right to recover from the Commissioners the £25 element of its claim for accounting periods outside the dead period, and they appealed against the second judgment on the ground that the judge had erred in holding that s 80(7) was to be disapplied.

**[20]** The Court of Appeal (Moore-Bick, Patten and Beatson LJJ) ([2015] EWCA Civ 82, [2015] STC 1280) allowed both parties' appeals. It held:

*124*

(1)    That the judge had been right to conclude that the Lead Claimants had a direct cause of action in unjust enrichment against the Commissioners for VAT paid under a mistake of law.

(2)    That he had been wrong to treat this cause of action as excluded by s 80(7).

(3)    That he had been wrong to conclude that the notional £25 retained by the Managers represented the discharge of any subsisting obligation to refund that amount on the part of the Commissioners, and that, accordingly, the Commissioners could not have been enriched by more than the notional £75 for any of the accounting periods in question. Any domestic claim in unjust enrichment for the notional £25 lay against the Managers alone.

(4)    That the Lead Claimants had no direct claim against the Commissioners for the notional £25 under EU law, given the claim they had in that amount against the Managers.

[21] The Court of Appeal therefore allowed the Lead Claimants' appeal, to the extent of the notional £75 paid in respect of dead periods, and allowed the Commissioners' appeal in respect of the notional £25.

[22] In this appeal by the Commissioners against the decision of the Court of Appeal (in respect of the notional £75 paid in respect of dead periods), and cross-appeal by the Lead Claimants (in respect of the notional £25), there are three key questions. First, did the Lead Claimants have a common law claim against the Commissioners in principle, subject to any statutory exclusion of such a claim? Secondly, if so, did s 80 of the 1994 Act bar such a claim? Thirdly, if the Lead Claimants have no claim against the Commissioners, either because no such claim is recognised at common law or because a common law claim is barred by s 80, is that compatible with EU law?

**The common law claim**

[23] The Lead Claimants argue that customers who pay undue VAT charged by their supplier have a claim against the Commissioners based on unjust enrichment, unless such a claim is excluded by statute. The first question is whether that is correct. If not, that in itself provides an answer to the claims made in these proceedings, subject to any issue arising under EU law.

[24] In answering the question, both parties followed the approach adopted by Lord Steyn in *Banque Financière de la Citeì v Parc (Battersea) Ltd* [1998] 1 All ER 737 at 740, [1999] AC 221 at 227, and asked:

(a)    Has the defendant been benefited, in the sense of being enriched?

(b)    Was the enrichment at the claimant's expense?

(c)    Was the enrichment unjust?

(d)    Are there any defences?

**Were the Commissioners enriched?**

[25] There is no dispute that the Commissioners were enriched to the extent of the notional £75. What is in dispute is whether they were also enriched to the extent of the notional £25 which they did not receive. The judge held that they were. Although the £25 was not paid to the Commissioners by the Managers, it enriched the Commissioners, in his view, by being set against the input tax which the Commissioners would otherwise have been obliged to pay or credit to the Managers: that is to say, the tax which the Managers had paid on the goods and services supplied to them for the purposes of their business of supplying investment services.
*125*

[26] The Court of Appeal considered this reasoning to be fallacious on the basis that if the supply of services by the Managers was not taxable, then the Managers had no right to deduct as input tax the VAT which they had paid to their own suppliers. The Managers retained the notional £25 in satisfaction of what the court regarded as a purported obligation, on the part of the Commissioners, which never existed. The Commissioners did not, therefore, benefit from the Lead Claimants' payment of the notional £25. An order compelling them to pay that amount to the Lead Claimants would not reverse an enrichment but leave them worse off, having received £75 and made 'restitution' of £100. Any claim to restitution of the £25 should therefore have been directed against the Managers.

**[27]** In this appeal, counsel for the Lead Claimants argued that when the £25 was paid to the Managers, the position under the applicable UK legislation was that the Managers were entitled to deduct their input tax in satisfaction of an obligation owed to them by the Commissioners. They continued to be entitled to account to the Commissioners for VAT, notwithstanding that it was not lawfully due under EU law, and therefore remained entitled to claim reimbursement in respect of input tax, until the position under UK law was changed: *Becker v Finanzamt Münster-Innenstadt* (Case 8/81) EU:C:1982:7, [1982] ECR 53; *VDP Dental Laboratory NV v Staatssecretaris van Financiën, Staatssecretaris van Financiën v X BV* (Joined cases C-144/13, C-154/13 and C-160/13) EU:C:2015:116, [2015] STC 1133. The Court of Justice had rejected the argument that a domestic levy which was incompatible with EU law was to be treated as having never existed: *Ministero delle Finanze v IN CO GE '90 Srl* (Joined cases C-10/97 to C-22/97) EU:C:1998:498, [1998] ECR I-6307.

**[28]** I am unable to accept this argument. The case of *Ministero delle Finanze v IN CO GE '90 Srl* merely establishes that national legislation which is incompatible with EU law, although inapplicable in so far as it is incompatible, is not a nullity for all purposes. The case concerned claims for the repayment of a charge which had been levied under Italian legislation which was inconsistent with EU law. A preliminary issue before the national court was whether the claims fell within its jurisdiction: an issue which turned on whether they were of a fiscal or a civil nature. The question which troubled the national court was whether, in deciding that issue, it should treat the national legislation as set aside in its entirety, or whether it could have regard to the legislation for the purpose of characterising the nature of the relationship between the parties at the time when the contested amounts were paid. The Court of Justice held that, subject to compliance with the principles of non-discrimination and effectiveness, the detailed rules which applied for the repayment of a charge, and the classification for that purpose of the legal relationship established when the charge was levied, were matters to be determined under national law (para 26).

**[29]** The cases of *Becker* and *VDP Dental Laboratory* are more directly in point. In the former case, VAT had been levied under domestic law in respect of services which were exempt under the relevant directive, and an issue was raised as to the consequences of granting the exemption retrospectively after the mistake was discovered. In the course of its judgment, the Court of Justice stated that, by availing themselves of an exemption from VAT, persons entitled to the exemption necessarily waived the right to claim a deduction in respect of input tax (para 44). An analogous conclusion was reached in the *VDP Dental Laboratory* case, where an exemption provided for under national law was incompatible with the relevant VAT directive. The court held that the taxable

*126*

person was not entitled both to benefit from the exemption and to exercise the right to deduct input tax (para 40). It follows from these authorities that the Managers could not both claim reimbursement of the output tax which they had paid to the Commissioners, under s 80 of the 1994 Act, on the basis that their supplies were exempt from VAT, and simultaneously assert an entitlement to retain the amounts which they had deducted as input tax, on the basis that their supplies were taxable.

**[30]** The Commissioners were not, therefore, enriched by the Managers' retention of the notional £25, and the Managers have, in principle, no defence to a claim by the Lead Claimants for the restitution of that amount. That conclusion is as one would expect. The Lead Claimants' claim to restitution against the Commissioners proceeds on the basis that the supplies which they received from the Managers were exempt from VAT. That being so, it would be surprising if they could present that claim, in relation to the measure of restitution, on a basis which was predicated on the supplies being taxable.

**[31]** It follows that the Commissioners' enrichment was only to the extent of the notional £75.

**Was the enrichment at the Lead Claimants' expense?**

**[32]** There is no doubt that, in economic terms, the Commissioners were enriched at the expense of the Lead Claimants. On the mistaken premise that the supplies were taxable, the Lead Claimants were charged tax by the Managers, and paid it to them in accordance with their contract. On the same premise, the Managers were obliged to account to the Commissioners for the tax chargeable on their supplies, and to pay them the output tax in respect of each accounting period, after deducting their input tax. The net result of the mistake was that the Lead Claimants were worse off by the amount of the Managers' output tax, and the Commissioners were better off to the extent that that amount exceeded the Managers' input tax.

**[33]** As the judge noted, however, no payment was made by the Lead Claimants to the Commissioners. Nor were the Managers simply a conduit or, in legal terms, an agent for payment by the Lead Claimants to the Commissioners. The Lead Claimants owed no money to the Commissioners. Furthermore, the payment of the tax element of the invoices submitted by the Managers to the Lead Claimants was not the cause of the payment of tax by the Managers to the Commissioners: as explained earlier, the Managers were liable to account for tax to the Commissioners once they had supplied the relevant services. As the judge found, it could not be said that the tax would not have been paid but for the payments by the Lead Claimants to the Managers. In these circumstances, it was argued, the Lead Claimants' remedy lay against the Managers, as the recipients of the mistaken payments which they had made, leaving it to the Managers to recover from the Commissioners any amount which they had mistakenly paid to them in accordance with the legislation.

**[34]** After considering the limited guidance provided by the modern English authorities, and English academic opinion, the judge concluded that, as a general rule, a defendant was legally enriched at the expense of the person from whom the benefit in question was directly received. There were, however, exceptions to that general rule. Without attempting to be exhaustive, he listed a number of relevant criteria for identifying such exceptions, which he derived from the authorities: put shortly, the need for a close causal connection between the payment (or other provision of a benefit) by the claimant and the

*127*

enrichment of the defendant, the need to avoid the risk of double recovery, the need to avoid conflict with contracts between the parties, and the need to distinguish between unjust enrichment and compensation or damages.

**[35]** Applying that approach, he regarded the present case as exceptional. First, to allow the Lead Claimants to recover from the Commissioners would not, in his view, involve any risk of double recovery, as any claim against the Managers would face a cast iron defence of change of position, since they had accounted to the Commissioners for the entirety of the tax and retained no benefit for themselves (this reasoning mistakenly presumed that the Managers were entitled to retain the notional £25, as deductible input tax, and that the notional £75 was irrecoverable by the Managers from the Commissioners). Secondly, it would not undermine or conflict with the contract between the Lead Claimants and the Managers, which had provided for the payment of VAT 'if applicable'. Thirdly, notwithstanding the absence of a strict causal connection between the payments by the Lead Claimants and the enrichment of the Commissioners, the nexus created by the VAT system between the consumer and the Commissioners could, in his view, hardly be closer or stronger as a matter of commercial reality. In that regard, the judge referred at para 49 to the statements of the Court of Justice in *Elida Gibbs Ltd v Customs and Excise Comrs* (Case C-317/94) EU:C:1996:400, [1997] All ER (EC) 53, [1997] QB 499, that 'the basic principle of the VAT system is that it is intended to tax only the final consumer' (para 19), and that the taxable persons 'collect the tax on behalf of the tax authorities and account for it to them' (para 22). In his view, cases concerned with subrogation showed that the 'at the expense of' requirement could be satisfied by reference to 'the underlying commercial reality of a transaction' (para 72).

**[36]** By the time this case came before the Court of Appeal, the approach adopted by the judge had already been approved by that court in three decisions: *Menelaou v Bank of Cyprus UK Ltd* [2013] EWCA Civ 1960, [2014] 1 WLR 854; *TFL Management Services Ltd v Lloyds Bank plc* [2013] EWCA Civ 1415, [2014] 1 WLR 2006; and *Relfo Ltd (in liq) v Varsani* [2014] EWCA Civ 360, [2015] 1 BCLC 14. It was also endorsed by the Court of Appeal in the present case. The court noted that the judge had been mistaken in thinking that the

Managers would have a defence to a direct claim by the Lead Claimants, so far as the notional £25 was concerned. It nevertheless agreed with his conclusion that, in the context of VAT, the final consumer who paid the tax had a sufficient economic connection with the Commissioners to be able to say that they had been enriched at his expense when the tax ought never to have been imposed on the services which were supplied.

## General discussion

[37] Decisions concerning the question whether an enrichment was 'at the expense of' the claimant demonstrate uncertainty as to the approach which should be adopted. Such tests as have been suggested have been too vague to provide clarity. For example, in *Menelaou v Bank of Cyprus UK Ltd* [2015] UKSC 66, [2016] 2 All ER 913, [2016] AC 176 (at [27]), Lord Clarke of Stone-cum-Ebony said, with the agreement of Lord Neuberger of Abbotsbury, Lord Kerr of Tonaghmore and Lord Wilson, that 'the question in each case is whether there is a sufficient causal connection, in the sense of a sufficient nexus or link, between the loss to the bank and the benefit received by the defendant'. This leaves unanswered the critical question, namely, what connection, nexus or link is sufficient? The same can be said of Arden LJ's

*128*

statement in *Relfo* that there must be a 'sufficient link' (para [95]), Floyd LJ's reference in the same case to 'proximity' (para [110]), and the Court of Appeal's finding in the present case that there was 'a sufficient economic connection' (para [67]).

[38] It would be unwise to attempt in this appeal to arrive at a definitive statement of the circumstances in which the enrichment of a defendant can be said to be at the expense of the claimant. Nevertheless, in view of the uncertainty which has resulted from the use of vague and generalised language, this court has a responsibility to establish more precise criteria. Some observations of a general nature should therefore be made, before turning to the specific context in which the issue arises in the present case. It should be said at the outset that these observations are concerned only with personal claims, and not with proprietary claims.

[39] First, it is important, when dealing with personal claims based on unjust enrichment, to bear in mind what was said by Lord Goff of Chieveley in *Lipkin Gorman (a firm) v Karpnale Ltd* [1992] 4 All ER 512 at 532, [1991] 2 AC 548 at 578, when rejecting a submission that, when dealing with a claim to restitution based on unjust enrichment, it was for the court to consider the question of injustice or unfairness on broad grounds, and that it should deny recovery if it thought that it would be unjust or unfair to hold the defendant liable:

'The recovery of money in restitution is not, as a general rule, a matter of discretion for the court. A claim to recover money at common law is made as a matter of right; and, even though the underlying principle of recovery is the principle of unjust enrichment, nevertheless, where recovery is denied, it is denied on the basis of legal principle.'

As Lord Steyn remarked in *Banque Financière,* unjust enrichment ranks next to contract and tort as part of the law of obligations ([1998] 1 All ER 737 at 740, [1999] AC 221 at 227). A claim based on unjust enrichment does not create a judicial licence to meet the perceived requirements of fairness on a case-by-case basis: legal rights arising from unjust enrichment should be determined by rules of law which are ascertainable and consistently applied. Without going as far as Scrutton LJ, who described the legacy of *Moses v Macferlan* (1760) 2 Burr 1005, (1760) 97 ER 676 as 'a history of well-meaning sloppiness of thought' (*Holt v Markham* [1923] 1 KB 504 at 513, [1922] All ER Rep 134 at 141), McLachlin J rightly cautioned against the 'tendency ... to view the action for unjust enrichment as a device for doing whatever may seem fair between the parties': *Peter v Beblow* [1993] 1 SCR 980 at 988.

**[40]** Secondly, the adoption of the concept of unjust enrichment in the modern law, as a unifying principle underlying a number of different types of claim, does not provide the courts with a tabula rasa, entitling them to disregard or distinguish all authorities pre-dating *Lipkin Gorman*. The point is illustrated by the judgment of Floyd LJ in *TFL*, where the decision in *Ruabon Steamship Co Ltd v London Assurance Co* [1900] AC 6, [1895–9] All ER Rep 677 was put to one side on the basis that 'the House of Lords … was not looking at the case through the eyes of the modern law of unjust enrichment' (para [39]). Although judicial reasoning based on modern theories of unjust enrichment is in some respects relatively novel, there are centuries' worth of relevant authorities, whose value should not be underestimated. The wisdom of our predecessors is a valuable resource, and the doctrine of precedent continues to apply. The courts should not be reinventing the wheel.

*129*

**[41]** Thirdly, as the judge observed in the present case, in remarks with which Lord Clarke expressed agreement in *Menelaou* (para [19]), Lord Steyn's four questions are no more than broad headings for ease of exposition. They are intended to ensure a structured approach to the analysis of unjust enrichment, by identifying the essential elements in broad terms. If they are not separately considered and answered, there is a risk that courts will resort to an unstructured approach driven by perceptions of fairness, with consequent uncertainty and unpredictability. At the same time, the questions are not themselves legal tests, but are signposts towards areas of inquiry involving a number of distinct legal requirements. In particular, the words 'at the expense of' do not express a legal test; and a test cannot be derived by exegesis of those words, as if they were the words of a statute.

**[42]** The structured approach provided by the four questions does not, therefore, dispense with the necessity for a careful legal analysis of individual cases. In carrying out that analysis, it is important to have at the forefront of one's mind the purpose of the law of unjust enrichment. As was recognised in *Menelaou* (para [23]), it is designed to correct normatively defective transfers of value, usually by restoring the parties to their pre-transfer positions. It reflects an Aristotelian conception of justice as the restoration of a balance or equilibrium which has been disrupted. That is why restitution is usually the appropriate remedy.

**[43]** The nature of the various legal requirements indicated by the 'at the expense of' question follows from that principle of corrective justice. They are designed to ensure that there has been a transfer of value, of a kind which may have been normatively defective: that is to say, defective in a way which is recognised by the law of unjust enrichment (for example, because of a failure of the basis on which the benefit was conferred). The expression 'transfer of value' is, however, also too general to serve as a legal test. More precisely, it means in the first place that the defendant has received a benefit from the claimant. But that is not in itself enough. The reversal of unjust enrichment, usually by a restitutionary remedy, is premised on the claimant's also having suffered a loss through his provision of the benefit.

**[44]** This was recognised in *Menelaou,* as was noted in para [37], above. It was explained more fully by Lord Clyde in *Banque Financière* [1998] 1 All ER 737 at 750, [1999] AC 221 at 237, citing a maxim of Pomponius:

'My Lords, the basis for the appellants' claim is to be found in the principle of unjust enrichment, a principle more fully expressed in the Latin formulation, nemo debet locupletari aliena jactura [no one should be enriched by another's loss] … Without attempting any comprehensive analysis, it seems to me that the principle requires at least that the plaintiff should have sustained a loss through the provision of something for the benefit of some other person with no intention of making a gift, that the defendant should have received some form of enrichment, and that the enrichment has come about because of the loss.'

**[45]** It should be emphasised that there need not be a loss in the same sense as in the law of damages: restitution is not a compensatory remedy. For that reason, some commentators have preferred to use different terms, referring for example to a subtraction from, or diminution in, the claimant's wealth, or simply to a

transfer of value. But the word 'loss' is used in the authorities, and it is perfectly apposite, provided it is understood that it does not bear the same meaning as in the law of damages. The loss to the claimant may, for example,

130

be incurred through the gratuitous provision of services which could otherwise have been provided for reward, where there was no intention of donation. In such a situation, the claimant has given up something of economic value through the provision of the benefit, and has in that sense incurred a loss.

### Direct and indirect provision of a benefit

**[46]** Situations in which the defendant has received a benefit from the claimant, and the claimant has incurred a loss through the provision of that benefit, usually arise where the parties have dealt directly with one another, or with one another's property. Common examples are the gratuitous payment of money, or provision of goods or services, by the claimant to the defendant, where there was no intention of donation. In such a situation, if the enrichment of the defendant is unjust—if, in other words, the transfer of value is defective in a sense recognised by the law of unjust enrichment—then the claimant is prima facie entitled to have the enrichment reversed.

**[47]** There are, however, situations in which the parties have not dealt directly with one another, or with one another's property, but in which the defendant has nevertheless received a benefit from the claimant, and the claimant has incurred a loss through the provision of that benefit. These are generally situations in which the difference from the direct provision of a benefit by the claimant to the defendant is more apparent than real.

**[48]** One such situation is where the agent of one of the parties is interposed between them. In that situation, the agent is the proxy of his principal, by virtue of the law of agency. The series of transactions between the claimant and the agent, and between the agent and the defendant, is therefore legally equivalent to a transaction directly between the claimant and the defendant. Similarly, where the right to restitution is assigned, as in *Equuscorp Pty Ltd v Haxton* [2012] HCA 7, [2012] 3 LRC 716, (2012) 246 CLR 498, the claimant stands in the shoes of the assignor, and is therefore treated as if he had been a party to the relevant transaction, and the defendant's enrichment had been directly at his expense. Another situation is where, as in *Relfo,* an intervening transaction is found to be a sham (para [121]). Since the sham is created precisely in order to conceal the connection between the claimant and the defendant, it is disregarded when deciding whether the latter was enriched at the former's expense. So, in *Relfo,* Gloster and Floyd LJJ described the arrangements in question as being 'equivalent to a direct payment' (paras [103] and [115]). There have also been cases, discussed below, in which a set of co-ordinated transactions has been treated as forming a single scheme or transaction for the purpose of the 'at the expense of' inquiry, on the basis that to consider each individual transaction separately would be unrealistic. There are also situations where the defendant receives property from a third party into which the claimant can trace an interest. Since the property is, in law, the equivalent of the claimant's property, the defendant is therefore treated as if he had received the claimant's property.

**[49]** A different type of situation is typified by the case where the claimant discharges a debt owed by the defendant to a third party. Although it is the third party creditor who receives the payment from the claimant, the defendant is directly enriched, since the payment discharges his debt: the enrichment is not the payment which the third party receives, but the discharge which the defendant receives. Where the transfer of value is defective, and the enrichment is consequently unjust, the law reverses it, as far as possible, by subrogating the claimant to the rights formerly held by the third party (as was

131

explained, for example, by Walton J in *Burston Finance Ltd v Speirway Ltd* [1974] 3 All ER 735 at 738, [1974] 1 WLR 1648 at 1652). There are many variations on the type of situation where equitable subrogation

is an appropriate remedy to reverse or prevent unjust enrichment. The remedy differs from restitution, in that it does not have the effect of restoring the parties to their pre-transfer positions, but it is the most practicable means of reversing or preventing unjust enrichment in the types of situation where it is appropriate.

[50] It has often been suggested that there is a general rule, possibly subject to exceptions, that the claimant must have directly provided a benefit to the defendant. The situations discussed in the two preceding paragraphs can be reconciled with such a rule, if it is understood as encompassing a number of situations which, for the purposes of the rule, the law treats as equivalent to a direct transfer, in the sense that there is no substantive or real difference. So understood, the suggested rule is helpful. It may nevertheless require refinement to accommodate other apparent exceptions, and it would be unwise at this stage of the law's development to exclude the possibility of genuine exceptions, or to rule out other possible approaches.

[51] Where, on the other hand, the defendant has not received a benefit directly from the claimant, no question of agency arises, and the benefit does not consist of property in which the claimant has or can trace an interest, it is generally difficult to maintain that the defendant has been enriched at the claimant's expense. The point is illustrated by the case of *Macdonald v Costello* [2011] EWCA Civ 930, [2012] 1 All ER (Comm) 357, [2012] QB 244, where the provision of services to a company was held not to enrich its directors and shareholders. It is also illustrated by the example, discussed in *Relfo*, of a claimant who makes a mistaken payment to a third party, who in consequence makes a gift to the defendant out of property in which the claimant has no interest, and into which he is unable to trace. As Arden and Floyd LJJ recognised (paras [78] and [114]), the claimant does not have a claim in unjust enrichment against the defendant. The claimant suffers a loss through making the payment to the third party, who is unjustly enriched at his expense. A claim in unjust enrichment therefore lies against the third party (subject to any defences available). But no claim of a personal nature lies at the instance of the claimant against the defendant: the claimant has not incurred any loss through the making of the gift.

**Incidental benefits**

[52] As explained earlier, the 'at the expense of' requirement is not satisfied merely by the direct receipt of a benefit. The claimant must also incur a loss through the provision of the benefit. As Lord Clyde put it in *Banque Financière,* in the passage cited at para [44], above, 'the plaintiff should have sustained a loss through the provision of something for the benefit of some other person'. That requirement will not normally be satisfied where the provision of the benefit was merely an incidental or collateral result of his expenditure. (In practice, situations where the defendant has received a benefit merely as an incidental consequence of the claimant's pursuit of some other objective are also often situations in which the enrichment of the defendant is not in any event unjust.) In such a situation, the claimant may have received the consideration for which he bargained as the counterpart of his own expenditure, and in that event will not usually have suffered any loss. Even if he has incurred a loss, it will not normally have arisen through his provision of something for the benefit of the defendant, since the benefit received by the

*132*

defendant will have been merely incidental or collateral to the reason why the expenditure was incurred. A 'but for' causal connection between the claimant's being worse off and the defendant's being better off is not, therefore, sufficient in itself to constitute a transfer of value.

[53] The need for the claimant to suffer a loss through the provision of something for the benefit of the defendant is illustrated by the *Ruabon* case, which concerned a ship which had been damaged during a voyage covered by a policy of marine insurance. She was put into dry dock for repairs at the expense of the insurers. The owners took advantage of her being in dry dock to have her surveyed for the purpose of renewing her Lloyds classification. There was no consequent increase in dock expenses. Even if the insurers might be regarded as having provided a benefit to the owners (by enabling them to have the vessel surveyed without themselves incurring the expense of putting her into dry dock), the insurers incurred no loss through the provision of that benefit: their expenses were not increased, and they received the consideration for which they

had paid. The insurers' claim for a contribution towards their expenses, on the basis that the owners had benefited from it, was rejected. Lord Macnaghten put the point in a nutshell: '[T]here is no principle of law which requires that a person should contribute to an outlay merely because he has derived a material benefit from it' ([1900] AC 6 at 15, [1895–9] All ER Rep 677 at 681).

**[54]** The Earl of Halsbury LC, in a speech with which the other members of the Committee agreed, emphasised the fact that the owners were strangers to the exercise undertaken by the insurers, and the absence in those circumstances of any reason why, in justice, they should contribute towards its cost ([1900] AC 6 at 12, [1895–9] All ER Rep 677 at 680):

'[T]his is the first time in which it has been sought to advance that principle [of contribution] where there is nothing in common between the two persons, except that one person has taken advantage of something that another person has done, there being no contract between them, there being no obligation by which each of them is bound, and the duty to contribute is alleged to arise only on some general principle of justice, that a man ought not to get an advantage unless he pays for it. So that if a man were to cut down a wood which obscured his neighbour's prospect and gave him a better view, he ought upon this principle to be compelled to contribute to cutting down the wood.'

The Lord Chancellor's example did not involve anything which might have been argued to be an unjust factor, but the position would scarcely be different if it had: if, for example, the man had cut down the wood in the mistaken belief that the trees were diseased.

**[55]** Another illustration of the need for a loss to be incurred through the provision of the benefit, also cited to the Court of Appeal in the *TFL* case, is the case of *Edinburgh and District Tramways Co Ltd v Courtenay* 1909 SC 99. It concerned a contract between a tramway company and an advertising firm, under which the firm paid a rental for the right to display advertising on the tramcars. It was up to the firm to provide the boards around the upper deck of the tramcars, on which the advertisements were displayed. The tramway company subsequently constructed new tramcars with 'decency boards' already supplied, saving the advertising firm the expense of fitting its own. The tramway company's claim against the advertising firm for the cost of fitting the decency boards was rejected, on the ground that the tramway company had

133

not incurred any loss through the provision of the benefit. Lord President Dunedin observed that 'there are certain marks or notes of the situation in which recompense is due, and I think that one mark or note is that the person who claims recompense must have lost something' (at 105–106). The Lord President also emphasised that the company had been acting for its own purposes. Referring to earlier authorities, he remarked that in the case at hand 'you have the same element that went to the decision of some of these cases, that the thing done was as much for the benefit of the man who did it as for that of the other person' (at 106). The Lord President illustrated his opinion with an illuminating example (at 105):

'One man heats his house, and his neighbour gets a great deal of benefit. It is absurd to suppose that the person who has heated his house can go to his neighbour and say—"Give me so much for my coal bill, because you have been warmed by what I have done, and I did not intend to give you a present of it." '

**[56]** The importance of identifying a loss arising through the provision of a benefit is also illustrated by the case of *TFL,* where a claim based on unjust enrichment was brought by a company, A, against a defendant, B, in order to recover the costs which A had incurred in earlier legal proceedings. Those proceedings had been brought by A in order to recover a debt from a third party, C, and had been successfully defended on the ground that the debt was due, not to A, but to B. After B recovered the debt, A brought proceedings against B on the basis that A had conferred a benefit on it by bringing the earlier proceedings and thereby

clarifying B's right to recover the debt. Since A had done so under an erroneous understanding of its rights, it argued that B had therefore been unjustly enriched at its expense. The Court of Appeal, by a majority (Sir Stanley Burnton dissenting), held that the claim could not be summarily dismissed. The court had understandable difficulty in identifying the benefit which had supposedly been conferred by A on B (para [50]), and accepted that the benefit, 'whatever it consists of', had not been directly provided by A to B (para [54]). It appears to have considered that a causal link between A's payment of the costs of the proceedings and an indirect benefit to B was nevertheless arguably sufficient (para [64]). The fact that A had been acting in its own interests was considered to be no answer (para [67]).

**[57]** The court could hardly have reached the same conclusion if, when considering the 'at the expense of' question, it had focused on the need to identify a transfer of value from the claimant to the defendant. A had not provided any benefit directly to B. At best, B had received an incidental benefit as the result of A's pursuit of its own interests. The facts of the case, so far as the 'at the expense of' question is concerned, were not materially distinguishable from those of Lord Dunedin's example of the householder whose heating warms his neighbour's house. Furthermore, A's erroneous understanding of its legal rights did not in any event bear on the justice of B's incidentally benefiting from the clarification of the legal position: one might cite Pollock CB's rhetorical question in *Taylor v Laird* (1856) 25 LJ Ex 329 at 332, 'One cleans another's shoes; what can the other do but put them on?' A had received the legal services it had bargained for when it incurred the expense (and, if it also had to meet its opponent's costs, that was a risk inherent in litigation, which it voluntarily assumed). Even bearing in mind that the Court of Appeal was dealing with a strike-out application, the majority of the court were wrong in not summarily dismissing the claim.

*134*

**[58]** It is interesting to note that similar claims were rejected long ago in Scotland, on the basis that the litigant had been pursuing his own interests. More, in his *Notes to Stair's Institutions* (1832) p liv, states:

'[A] person who, for his own benefit, carries on an expensive law-suit, which, in the result, establishes some point as beneficial to other neighbouring proprietors as to himself, can make no claim against them for any part of the expense incurred by him. And Lord Stair, in the text, states the case of a person who reduces [sets aside] a right as void, and thereby lets in the claims of third parties, which are ultimately preferred to his own, yet he says, that "as he was doing his own business, not theirs, he can claim no share from them of his expenses." '

Hume's *Lectures* (1786–1822) are to the same effect, stating in relation to the person who brings an action:

'Now, though it should so happen, (as very often it must,) that he settles some point of law, in the decision of this lawsuit of his, and thus does a service to a number of other persons, whose property, or concerns, are in the like situation; yet still the cost of this lawsuit is his peculiar and exclusive concern. He can recover no part of it from his neighbours, or any of them, for whose benefit he probably never would have stirred in the matter.' (Vol III, p 167, citing the unreported case of *Ferguson v Smyth*, 18 November 1802, SC Old Sess Pap, vol 437, No 30.)

### Economic reality

**[59]** Nor is the 'at the expense of' requirement satisfied by a connection between the parties' respective benefit and loss merely as a matter of economic or commercial reality. Economic reality is not only a 'somewhat fuzzy concept', as Moses LJ described it in *Menelaou* [2014] 1 WLR 854 at [62], but one which is difficult to apply with any rigour or certainty in this context, or consistently with the purpose of restitution on the ground of unjust enrichment. An inquiry into where the economic burden of an unjust enrichment has fallen is liable to be a very complex undertaking, especially where there is a chain of suppliers and consumers. The supplier who passes on a tax or other charge by increasing the price of his goods or services might be thought to have shifted the economic burden, but his increased prices may have an adverse impact upon his sales, and

accordingly upon the profitability of his operations. Furthermore, in a situation where numerous factors affect the prices which he charges, it may be far from easy to decide to what extent the economic burden of the tax has been reflected in the price charged. Deciding whether the economic burden of an unjust enrichment has been passed on has been described as virtually unascertainable (*Hanover Shoe Inc v United Shoe Machinery Corp* (1968) 392 US 481 at 493) and a near impossibility (*British Columbia v Canadian Forest Products Ltd* 2004 SCC 38, [2004] 2 SCR 74 (at [205])). These points have been made repeatedly in other jurisdictions, when considering a defence of passing on: that is to say, a defence based on the proposition that the economic burden of an unjustified enrichment was borne not by the claimant but by a third party: see, for example, *Comr of State Revenue v Royal Insurance Australia Ltd* [1994] 4 LRC 511, (1994) 182 CLR 51; *Kingstreet Investments Ltd v New Brunswick (Dept of Finance)* 2007 SCC 1, [2007] 1 SCR 3; and the opinions of Advocate General Mancini in *Amministrazione delle Finanze*

135

*dello Stato v SpA San Giorgio* (Case 199/82) EU:C:1983:318, [1983] ECR 3595 ('*San Giorgio*') and of Advocate General Geelhoed in *European Commission v Italy* (Case C-129/00) EU:C:2003:656, [2003] ECR I-14637.

**[60]** A more fundamental difficulty with an approach based on economic reality arises from the fact that the purpose of restitution is not to compensate for loss, but to reverse the defective transfer. Looking to see who has suffered an economic loss is therefore not, in principle, the correct way of identifying the appropriate claimant. Indeed, even in tort law, which *is* concerned with compensation for loss, the court is not concerned with where the economic burden of the tort may ultimately have fallen as a matter of economic reality.

### Co-ordinated transactions

**[61]** There are, on the other hand, cases in which the court has referred to 'reality' in a different sense. These are cases in which, for the purpose of answering the 'at the expense of' question, the court has treated a set of related transactions, operating in a co-ordinated way, as forming a single scheme or transaction, on the basis that to answer the question by considering each of the individual transactions separately would be unrealistic. The case of *Banque Financière*, as explained in some of the judgments, is an example. The claimant had entered into a refinancing arrangement involving the loan of a sum of money to the manager of a holding company, which he in turn lent to a subsidiary of that company so that it could discharge a debt secured by a first-ranking security. The purpose of interposing the manager between the claimant and the first subsidiary was to avoid a requirement to make a public disclosure of the loan, which would have applied if the claimant had lent the money directly to the first subsidiary. The claimant paid the money directly to the subsidiary's creditor, so discharging the debt. It was conceded that this enriched the defendant, which was another subsidiary of the holding company, since it promoted the ranking of its own security, with the consequence that it was the only creditor of the first subsidiary which was likely to be repaid. This was contrary to the understanding on which the claimant had advanced the loan, namely that it would be repaid in priority to all intra-group debts. The House of Lords held that this would unjustly enrich the defendant, and therefore subrogated the claimant to the discharged security, as against the defendant, so as to prevent the unjust enrichment.

**[62]** One of the questions considered by the House of Lords was whether the enrichment was at the expense of the claimant, when the claimant had made the loan to the manager of the holding company, who had then made a further loan to the first subsidiary, rather than the claimant lending directly to the first subsidiary. Two different analyses were put forward. Lord Steyn proceeded on the basis that the interposition of the loan to the manager was 'no more than a formal act designed to allow the transaction to proceed … To allow [it] to alter the substance of the transaction would be pure formalism' ([1998] 1 All ER 737 at 740, [1999] AC 221 at 227). Lord Clyde similarly stated that the arrangement with the manager did not 'prevent recognition of the reality of the granting of the funds by [the claimant] to [the holder of the first-ranking security]' ([1998] 1 All ER 737 at 750, [1999] AC 221 at 238). That was also the view of Lord Hutton ('the reality was that the [defendant] was enriched at the expense of [the claimant]': ([1998] 1 All ER 737 at 752, [1999] AC 221 at 239).

Lord Hoffmann, with whom Lord Steyn, Lord Griffiths and Lord Clyde agreed, put forward another analysis, namely that the claimant's money could be traced into the discharge of the debt secured by the first-ranking security

*136*

([1998] 1 All ER 737 at 748, [1999] AC 221 at 235). On both analyses, the House of Lords treated the situation as one where the defendant had directly received a benefit from the claimant, since on one analysis it was in reality the claimant which had discharged the first-ranking security and thereby promoted the defendant's security, and on the other analysis it was the claimant's money which had done so.

**[63]** The case of *Menelaou* provides another illustration. The case concerned the sale of a property owned by the defendant's parents, and the use of part of the proceeds to purchase another property in her name, as a gift. The claimant bank held a charge over the first property to secure the parents' borrowings, and agreed to the discharge of the security in return for a fresh charge over the second property. It instructed solicitors to deal with the discharge of the security over the first property and to obtain a charge over the second property. The solicitors sent the bank a charge over the second property, purportedly executed by the defendant, and the bank authorised the discharge of the security over the first property. In the event, the second charge was defective, as a result of the solicitors' negligence. The defendant had agreed to the purchase of the second property in her name, but was unaware of her parents' agreement with the bank that there should be a charge. The solicitors admitted liability to the bank for its losses, subject to credit being given for any sums which the bank might recover from the defendant.

**[64]** Lord Carnwath analysed the case in terms of the law of equity rather than unjust enrichment. He considered that the moneys held by the solicitors following the sale of the first property, and used to purchase the second property, were held on a *Quistclose*-type trust for the bank (*Barclays Bank v Quistclose Investments Ltd* [1968] 3 All ER 651, [1970] AC 567). On that footing, it followed that the bank was subrogated to the lien of the unpaid vendor of the second property, so as to give it an equitable interest in the property. In other words, the vendor had a lien over the property, to secure his right to payment of the purchase price, as long as he remained unpaid. The bank, on discharging the parents' obligation to pay the vendor, became entitled in equity to the benefit of that lien (or, strictly analysed, to a new lien to secure its own right to repayment) by subrogation.

**[65]** The other members of the court held that the bank should be subrogated to the unpaid vendor's lien on the basis of unjust enrichment, since it had mistakenly authorised the use of the proceeds of sale of the first property (which it could otherwise have required to be applied to discharge the debt owed to itself) to purchase the second property, thereby providing the defendant with a benefit at its expense. Lord Clarke proceeded on the basis that 'the two arrangements, namely the sale of [the first property] and the purchase of [the second property], were not separate but part of one scheme, which involved the bank throughout' ([2016] 2 All ER 913, [2016] AC 176 (at [25])). Lord Neuberger agreed, observing that 'it is appropriate not merely to consider the purchase of, and charge over, [the second property] as a single composite transaction', applying the approach to property purchases involving a charge which was adopted in *Abbey National Building Society v Cann* [1990] 1 All ER 1085, [1991] 1 AC 56, but that it was 'also appropriate in the present case to treat the sale of [the first property] and the purchase of [the second property] as one scheme, at least for present purposes' (at [67]). Lord Kerr and Lord Wilson agreed with both judgments in relation to this issue.

**[66]** On that basis, Lord Clarke considered that the conclusion that there had been a transfer of value between the bank and the defendant gave effect to 'the

*137*

reality of the transaction', notwithstanding the absence of a direct payment by the former to the latter (at [33]). Lord Neuberger agreed, stating (at [73]):

'[T]here was in reality a single transaction, and it was from that transaction that [the defendant] directly benefitted, even though the benefit was effected at the direction of the Menelaou parents. The benefit to [the defendant] was direct because it arose as the immediate and inevitable result of the very transaction to which she was party and which gave rise to the unjust enrichment.'

## 'At the expense of' in the present case

[67] Turning to the issue raised in the present case, the only English authority cited in argument which contains a discussion of the 'at the expense of' question in relation to taxation is the decision of the Court of Appeal in *Kleinwort Benson Ltd v Birmingham City Council* [1996] 4 All ER 733, [1997] QB 380. The case concerned a claim by a bank for restitution of money which it had paid to a local authority under a void swap transaction. The bank had also entered into hedging arrangements with a third party which protected it against loss. In considering whether English law recognised a defence of passing on, the Court of Appeal discussed the requirement that the defendant's enrichment should be at the expense of the claimant. Evans LJ, delivering the leading judgment with which Saville LJ agreed, referred to a range of authority and academic writing from other jurisdictions, including two authorities concerned with taxes paid under a mistake: the decision of the United States Federal Court of Appeals for the Second Circuit in *123 East Fifty-Fourth Street Inc v US* (1946) 157 F 2d 68, and the decision of the High Court of Australia in *Comr of State Revenue (Victoria) v Royal Insurance Australia Ltd*. He noted that the cases raised a 'question, akin to agency, which is whether the taxpayer should be regarded as having collected tax from his customers on behalf of the taxing authority', and that it had been said by Learned Hand J in the *123 East Fifty-Fourth Street* case that any tax recovered by the taxpayer would be held by him as a fiduciary for his customers. Similarly, in the *Royal Insurance* case it had been said that if it was established that the plaintiff had charged its policy-holders the tax as a separate item, it would be entitled to recover the money from the tax authority but would then hold it as a constructive trustee. In the event, however, Evans LJ found the taxation cases of little assistance, since on the facts of the case no question of a constructive trust or of any obligation to account to customers could arise ([1996] 4 All ER 733 at 741, [1997] QB 380 at 391). Morritt LJ, with whose judgment Saville LJ also agreed, emphasised that the plaintiff was legally and beneficially entitled to the money it paid to the authority, and that the case was not one in which the claimant held the money claimed as a bare trustee or tax collector such as, arguably, in the *123 East Fifty-Fourth Street* case ([1996] 4 All ER 733 at 749, [1997] QB 380 at 400).

[68] It has not been argued in the present appeal that the Managers held the amounts paid to them by the Lead Claimants in respect of VAT as agents or trustees or in any other fiduciary capacity. In the circumstances, it is unnecessary to consider the American and Australian authorities in any detail. The dissenting opinion of Learned Hand J in the *123 East Fifty-Fourth Street* case was concerned with a simpler situation than the present case, where the supplier of services collected sales tax from his customers, as a separately identifiable amount paid for the purpose of meeting the tax, and then remitted

138

the whole of that amount to the tax authority. The same was true in the case of *Wayne County Produce Co v Duffy-Mott Co* (1927) 244 NY 351, where Cardozo CJ adopted a similar approach. The reasoning in these cases was approved by Mason CJ in the *Royal Insurance* case, in an opinion in which the other members of the court did not join, but he distinguished the case before him on the basis that the amount collected was not paid separately from the price of the services supplied.

[69] In considering these authorities, it is necessary not only to bear in mind the differences from the facts of the present case, but also to remember that American and Australian law adopt a broader approach to constructive trusts than English law. In particular, one of the essential requisites for a trust in English law is that there must be identifiable trust property (or its traceable proceeds) in the hands of the recipient which is not

available to him as part of his general assets: see *Westdeutsche Landesbank Girozentrale v Islington London BC* [1996] 2 All ER 961 at 987, [1996] AC 669 at 705.

[70] In the present case, the contracts between the Managers and the Lead Claimants provided for the Managers to be paid fees plus VAT 'if applicable' (or words to similar effect). The contractual obligation of the Lead Claimants was therefore to pay the fees plus whatever sum, if any, was necessary in order to meet the VAT chargeable on the supply in question. This was reflected in the invoices issued by the Managers, which drew a distinction between their fees, on the one hand, and the VAT due on their fees, on the other hand. There is, however, no evidence that the Managers were expected to keep the amounts paid to them by the Lead Claimants in respect of VAT separate from their other funds: on the face of things, they were entitled to treat them as part of their general assets. It follows that in paying those amounts to the Managers, the Lead Claimants must be taken to have intended to part with any interest in the money, rather than to have impressed it with a special purpose trust. Furthermore, since the Managers were not aware of any mistake prior to making payment to the Commissioners, their conscience cannot have been affected so as to render them trustees: see *Westdeutsche* [1996] 2 All ER 961 at 990–991, [1996] AC 669 at 709. In these circumstances, the right to the restitution of money paid under the contract as the result of a mistake gives rise, like the contract itself, to purely personal obligations.

[71] Returning, then, to the question whether the unjust enrichment of the Commissioners was at the expense of the Lead Claimants, and focusing on whether there was a transfer of value from the Lead Claimants to the Commissioners, the answer is in the negative. There was a transfer of value, comprising the notional £100, from the Lead Claimants to the Managers, under the contract between them. It was defective, because it was made in performance of a contractual obligation which was mistakenly believed to be owed. There was a subsequent transfer of value, comprising the notional £75, from the Managers to the Commissioners. It was also defective, because it was made in compliance with a statutory obligation which was inapplicable because it was incompatible with EU law. These two transfers cannot be collapsed into a single transfer of value from the Lead Claimants to the Commissioners.

[72] That follows from a number of considerations. First, the Lead Claimants do not challenge the judge's rejection of a connection between the payments made by the Lead Claimants and the payments received by the Commissioners based on agency. The intervention of the Managers cannot therefore be disregarded on the basis that they were in law the proxy of one of the other

139

parties. Secondly, since the payments made by the Lead Claimants formed part of the Managers' general assets, to do with as they pleased, it is impossible to trace those payments into the payments subsequently made by the Managers to the Commissioners, and so to regard the Commissioners as having benefited from the receipt of property in which the Lead Claimants had an interest. Thirdly, the fact that there were two separate transactions—first, between the Claimants and the Managers, and secondly between the Managers and the Commissioners—is not in this context something which can be disregarded. In particular, there is no question of the transactions being a sham or involving an artificial step, or of their comprising a single scheme. The first transfer did not even bring about the second transfer as a matter of causation: the judge's rejection of a 'but for' causal connection between the two transfers is not challenged. The Lead Claimants rely on a connection established by commercial or economic reality. But, for the reasons already explained, the fact that, as a matter of economic or commercial reality, the Lead Claimants bore the cost of the undue tax paid by the Managers to the Commissioners does not in itself entitle them to restitution from the Commissioners.

[73] It follows that the Lead Claimants did not in principle have any right to restitution against the Commissioners. They did, on the other hand, have a right to restitution against the Managers. That right was to restitution of the entire amount paid in respect of VAT, ie the notional £100. The Managers did not in principle have a change of position defence in respect of the notional £75 which they paid to the Commissioners,

since that change of position was reversible under s 80 of the 1994 Act, as I shall shortly explain. Nor did they have a change of position defence in respect of the notional £25 which they retained.

**[74]** In the circumstances, it is unnecessary to consider the remainder of Lord Steyn's questions.

**Section 80 of the 1994 Act**

**[75]** In order to determine the issues arising in relation to EU law, it is necessary next to consider the effect of s 80 of the 1994 Act. The section has undergone amendment on a number of occasions. The version in force at the time when the Managers made their claims, and also applicable at the time when the present actions were brought by the Lead Claimants, was in the following terms, so far as material:

'Credit for, or repayment of, overstated or overpaid VAT

(1) Where a person—

(a)    has accounted to the Commissioners for VAT for a prescribed accounting period (whenever ended), and

(b)    in doing so, has brought into account as output tax an amount that was not output tax due,

the Commissioners shall be liable to credit the person with that amount.

(1A) Where the Commissioners—

(a)    have assessed a person to VAT for a prescribed accounting period (whenever ended), and

(b)    in doing so, have brought into account as output tax an amount that was not output tax due,

they shall be liable to credit the person with that amount.

(1B) Where a person has for a prescribed accounting period (whenever ended) paid to the Commissioners an amount by way of VAT that was not VAT due to them, otherwise than as a result of—

*140*

(a)    an amount that was not output tax due being brought into account as output tax, or

(b)    an amount of input tax allowable under section 26 not being brought into account,

the Commissioners shall be liable to repay to that person the amount so paid.

(2) The Commissioners shall only be liable to credit or repay an amount under this section on a claim being made for the purpose.

(2A) Where—

(a)     as a result of a claim under this section by virtue of subsection (1) or (1A) above an amount falls to be credited to a person, and

(b)     after setting any sums against it under or by virtue of this Act, some or all of that amount remains to his credit,

the Commissioners shall be liable to pay (or repay) to him so much of that amount as so remains.

(3) It shall be a defence, in relation to a claim under this section by virtue of subsection (1) or (1A) above, that the crediting of an amount would unjustly enrich the claimant ...

(4) The Commissioners shall not be liable on a claim under this section—

(a)     to credit an amount to a person under subsection (1) or (1A) above, or

(b)     to repay an amount to a person under subsection (1B) above,

if the claim is made more than three years after the relevant date [ie the end of the prescribed accounting period] ...

(7) Except as provided by this section, the Commissioners shall not be liable to credit or repay any amount accounted for or paid to them by way of VAT that was not VAT due to them.'

**[76]** Section 80 is supplemented by s 80A, introduced by s 46(2) of the Finance Act 1997 and subsequently amended, which enables the Commissioners to make regulations providing for reimbursement arrangements to be disregarded for the purposes of s 80(3) except where they contain such provision, and are supported by such undertakings, as may be required by the regulations. The relevant regulations are contained in Pt VA of the Value Added Tax Regulations 1995, SI 1995/2518, as amended. They provide for 'reimbursement arrangements', defined by reg 43A as arrangements for the purposes of a claim under s 80 which '(a) are made by a claimant for the purpose of securing that he is not unjustly enriched by the crediting of any amount in pursuance of the claim, and (b) provide for the reimbursement of persons (consumers) who have, for practical purposes, borne the whole or any part of the original amount brought into account as output tax that was not output tax due'. The regulations go on to require the claimant under s 80 to give undertakings to the Commissioners that he will apply the whole of the amount credited, and any interest on that amount, to the reimbursement of identified consumers whom he has reimbursed or intends to reimburse.

**[77]** It is common ground that, for persons who have accounted to the Commissioners for VAT that was not due, s 80 and the associated regulations provide a code for the recovery of VAT which is exhaustive and excludes other remedies such as a common law claim based on unjust enrichment. It is also common ground that the ITCs could never have made a claim under s 80, since they did not pay or account for any of the VAT in question to the

*141*

Commissioners. The first issue in dispute is whether the effect of s 80 is to exclude a common law claim by the ITCs, assuming, contrary to my earlier conclusion, that such a claim might otherwise be brought.

**[78]** The argument for the Lead Claimants is based primarily on the structure and wording of s 80. They point out that sub-ss (1)–(6) are concerned with the crediting or repayment of undue VAT to the supplier, not the consumer. In sub-s (7), the words 'credit or repay' echo the language of earlier subsections, where they can plainly refer only to the repayment or crediting of the supplier. They submit that sub-s (7) is similarly concerned with the supplier. Only a supplier of goods or services can 'account' for an amount to the Commissioners, and only a supplier can be 'credited' with an amount by them. Similarly, only a supplier can be 're-paid' by the Commissioners, since only he has paid them in the first place. Section 80(7) is thus designed only to exclude claims, otherwise than under the section, by persons who have a claim under the section. That argument was accepted by the Court of Appeal.

**[79]** On behalf of the Commissioners, it is argued that the word 'repay' is capable of applying to any payment back by the Commissioners of VAT which they have received. From their perspective, there is a repayment if the VAT is refunded, whether to the supplier or to someone else. Furthermore, it is argued, it would be strange if s 80(7) barred a restitutionary claim by the supplier, but left the supplier's customer in a better position. Moreover, it is argued, s 80 establishes a statutory scheme for the restitution of VAT which was not due, which by necessary implication excludes non-statutory restitutionary claims. The argument seeks to draw support from the decision of the Court of Appeal in *Monro v Revenue and Customs Comrs* [2008] EWCA Civ 306, [2008] STC 1815, [2009] Ch 69, where a common law claim was held to be excluded by a statutory scheme for the recovery of tax, since it would be inconsistent with the purpose of the scheme.

**[80]** In agreement with the judge, I find the textual arguments inconclusive, when considered by themselves. The word 'repay' is capable of bearing a wider meaning than the one for which the claimants contend, but could also be construed more narrowly. A purposive construction of the provision points more clearly to the correct conclusion. In that regard, s 80(3) and (4) are particularly important.

**[81]** Under s 80(3), the Commissioners have a statutory defence to a claim under s 80—a claim which, it is agreed, can only be made by a supplier—where crediting the supplier would unjustly enrich him. The possibility of unjust enrichment (in a non-technical sense) arises because the supplier normally recovers from his customers the output tax for which he accounts to the Commissioners. The subsection therefore creates a statutory defence of passing on. Section 80A, and the 1995 Regulations, then create a scheme under which the defence is disapplied where 'reimbursement arrangements' are made with the purpose of ensuring that the payment to the supplier is used to reimburse the consumers who have borne the economic burden of the tax. Sections 80 and 80A, together with the 1995 Regulations, thus create a scheme which enables consumers who have been wrongly charged VAT to obtain reimbursement. The consumers are able to recover the VAT which they were wrongly charged, to the extent that it was remitted by the supplier to the Commissioners, through the medium of the supplier's claim under s 80.

**[82]** Although the consumers' remedy is indirect, it can generally be expected to be effective: if the supplier is otherwise reluctant to make a claim, the consumers have a direct claim against him, as explained below. Subject to the

*142*

question of time bar, these arrangements therefore remove any need there might otherwise be, in most circumstances, for the consumer to have a direct remedy against the Commissioners. It will be necessary at a later point to return to the question whether there may nevertheless be some circumstances in which a direct remedy is required by EU law.

**[83]** Section 80(4) lays down a limitation period for claims under the section which is shorter than the period of six years, with extensions in the event of mistake, which would apply to a common law claim in unjust enrichment under s 32(1)(c) of the Limitation Act 1980 (and which also applied under s 80(4) until its amendment by the Finance Act 1997). A statutory claim by the supplier must therefore be brought within a shorter

and more certain period of time. The evident aim is to protect public finances against the risk of a liability to repay tax emerging more than three years after the tax was received. It would be inconsistent with that intention for there to be a potentially far longer period within which non-statutory claims might be brought against the Commissioners by the supplier's customers.

**[84]** In the light, therefore, of s 80(3) and (4) in particular, Parliament cannot sensibly be taken to have intended, when it created this scheme for the reimbursement of suppliers (with provision for them in turn to reimburse their customers), subject to strict time limits, that it should exist concurrently with non-statutory liabilities towards suppliers and their customers which were potentially wider in scope and were subject to a longer and less certain limitation period. Such an intention would be inconsistent with the rationale of the statutory scheme. In these circumstances, on the hypothesis that non-statutory claims by consumers might otherwise lie against the Commissioners in circumstances falling within the scope of s 80, sub-s (7) must be construed as excluding such claims.

**[85]** The Court of Appeal considered that that approach, which the judge accepted, presupposed that Parliament had in mind that restitutionary claims might be brought by consumers, and legislated with the intention of excluding such claims. As they pointed out, however, *Kleinwort Benson Ltd v Lincoln City Council* [1998] 4 All ER 513, [1999] 2 AC 349, which established that money paid under a mistake of law might be recoverable, had not been decided when the 1994 Act was enacted. In their view, that background pointed away from a legislative intent to restrict claims for the recovery of overpaid VAT to the machinery provided by s 80.

**[86]** I find this reasoning unpersuasive. The fact that Parliament will not have had in mind a particular common law right to payment when enacting a legislative scheme for recovery does not preclude the common law right being excluded by that scheme: *Child Poverty Action Group v Secretary of State for Work and Pensions* [2010] UKSC 54, [2011] 1 All ER 729, [2011] 2 AC 15. The absence of a recognised right to recover money paid under a mistake of law, at the time when s 80 was enacted, did not exclude the possibility of restitutionary claims by consumers, since there were other established grounds on which restitution might be sought, including payment under a mistake of fact. Moreover, the Lead Claimants' argument proves too much: if s 80(7) was not intended to exclude common law claims based on mistake of law, because no such cause of action was recognised when the legislation was enacted, then a common law claim by the Managers would not be excluded either; but it is common ground that s 80(7) is effective to exclude any common law claim by the Managers.

**[87]** More fundamentally, the determining factor in the present case is that the scheme created by s 80 is inconsistent with the existence of a concurrent

*143*

non-statutory liability on the part of the Commissioners to make restitution to consumers. In the absence of s 80(7), one would therefore conclude that s 80 impliedly excluded such liability (assuming that it might otherwise exist). Given the existence of an express exclusion in s 80(7) which is capable of covering such liability, it is unnecessary to rely on implication: one can construe s 80(7) as having the same exclusionary effect.

**[88]** It follows that s 80 bars claims by the consumers who ultimately bear the burden of VAT. It nevertheless enables them to be reimbursed, subject to a limitation period designed to avoid the disruption of public finances.

**Compatibility with EU law**

**[89]** Section 80 must have been intended to be compliant with EU law, since it is concerned with the recovery of VAT, which is a tax imposed by EU law. Indeed, a report by the Law Commission indicates that s 80 was framed to accord closely with European Community law: *Restitution: Mistakes of Law and Ultra Vires*

*Public Authority Receipts and Payments* (Law Com No 227) (1994) para 14.19. The present case raises the question whether the system of reimbursement established by s 80 has achieved that objective.

[90] There is a well-established principle of EU law that a member state is in principle required to repay taxes levied in breach of EU law, and an equally well-established exception whereby repayment can be refused where it would entail unjust enrichment of the taxable person because the burden of the tax has been passed on: see *San Giorgio* [1983] ECR 3595, paras 12–13. In the latter situation, however, the Court of Justice has held that the person to whom the tax was passed on should have a right to recover the sums unduly paid, so as to offset the consequences of the tax's incompatibility with EU law by neutralising the economic burden which the tax has imposed on the operator who has actually borne it: *Danfoss A/S v Skatteministeriet* (Case C-94/10) EU:C:2011:674, [2013] STC 1651, [2011] ECR I-9963, paras 23 and 25. It is for the domestic legal system of each member state to lay down the conditions under which claims may be made, subject to observance of the principles of equivalence and effectiveness: *Danfoss,* para 24. These general principles apply to the reimbursement of improperly invoiced VAT: *Reemtsma Cigarettenfabriken GmbH v Finance Minister* (Case C-35/05) EU:C:2007:167, [2008] STC 3448, [2007] ECR I-2425. Reasonable limitation periods are compatible with the principle of effectiveness, and the limitation period applicable to claims under s 80 of the 1994 Act has specifically been held to be reasonable: *Marks and Spencer plc v Customs and Excise Comrs* (Case C-62/00) EU:C:2002:435, [2002] STC 1036, [2003] QB 866, para 35.

[91] The court has accepted that, in principle, a system under which only the supplier is entitled to seek reimbursement of VAT from the tax authorities, and the consumer can seek restitution from the supplier, meets the requirements of EU law: *Reemtsma* [2008] STC 3448, [2007] ECR I-2425, para 39. The court added one caveat (para 41): '[I]f reimbursement of the VAT becomes impossible or excessively difficult, in particular in the case of the insolvency of the supplier, those principles may require that the recipient of the services to be able to address his application for reimbursement to the tax authorities directly.'

[92] This approach has been applied and restated in later cases. In the *Danfoss* case, the Court of Justice put the matter in this way:

'27. It follows that a member state may, in principle, oppose a claim for the reimbursement of a duty unduly paid made by the final consumer to

*144*

whom that duty has been passed on, on the ground that it is not that consumer who has paid the duty to the tax authorities, provided that the consumer—who, in the final analysis, bears the burden of that duty—is able, on the basis of national law, to bring a civil action against the taxable person for recovery of the sums unduly paid.

28. However, if reimbursement by the taxable person were to prove impossible or excessively difficult—in particular, in the case of the insolvency of that person—the principle of effectiveness requires that the purchaser be able to bring his claim for reimbursement against the tax authorities directly and that, to that end, the member state must provide the necessary instruments and detailed procedural rules.'

In these passages, the insolvency of the taxable person is given as an example of circumstances where reimbursement by that person might prove impossible or excessively difficult, and where the principle of effectiveness would therefore be infringed. It is the most likely example to arise in practice, but it cannot be treated as necessarily exhaustive. The governing principle of effectiveness means that the purchaser must, in principle (and subject to procedural rules which are compatible with the principle of effectiveness, such as reasonable limitation periods), be able to recover from the member state where reimbursement by the taxable person would be impossible or excessively difficult.

**[93]** In the present case, the Lead Claimants had a common law right to restitution of the amounts mistakenly paid to the Managers, whose enforcement was neither impossible nor excessively difficult. The Managers had a statutory right to recover the notional £75 from the Commissioners, under arrangements which ensured that it was passed on to the Lead Claimants. The Managers retained the remaining £25 and were not insolvent. They were therefore in a position to refund it to the Lead Claimants. The only amounts which the Lead Claimants could not recover were the amounts which they had paid during the 'dead periods', to the extent that those amounts had been paid by the Managers to the Commissioners: that is to say, the notional £75 whose recovery from the Commissioners was time-barred under s 80(4) of the 1994 Act. Although a claim by the Lead Claimants against the Managers in respect of the dead periods would not have been time-barred, because of the more generous limitation period allowed by s 32(1)(c) of the Limitation Act 1980, the Managers would have a defence of change of position, since the amounts which they paid to the Commissioners during those periods were irrecoverable. The inability of the Lead Claimants to recover those sums is not, however, incompatible with EU law: as explained earlier, it is conceded that the three-year limitation period imposed by s 80(4) of the 1994 Act is compatible with EU law.

**[94]** In these circumstances, the inability of the Lead Claimants to pursue a direct claim for restitution against the Commissioners is not incompatible with EU law. That follows from the application of well-established principles of EU law. There is therefore no need for any reference to the Court of Justice. Nor is it necessary or appropriate to consider what the position would be in a hypothetical case where the supplier was insolvent: the court has heard no submissions, and has no information before it, as to how reimbursement arrangements under s 80 might operate in that situation.

*145*

## Conclusion

**[95]** For these reasons I would allow the Commissioners' appeal and dismiss the Lead Claimants' cross-appeal.

*Appeal allowed. Cross-appeal dismissed.*

Katie Green    Barrister.

ICLR: Appeal Cases/1991/Volume 2/LIPKIN GORMAN (A FIRM) APPELLANTS AND CROSS-RESPONDENTS  AND  KARPNALE LTD. RESPONDENTS AND CROSS-APPELLANTS - [1991] 2 A.C. 548

[1991] 2 A.C. 548

## LIPKIN GORMAN (A FIRM) APPELLANTS AND CROSS-RESPONDENTS  AND KARPNALE LTD. RESPONDENTS AND CROSS-APPELLANTS

**[HOUSE OF LORDS]**

**1991 Jan. 21, 22, 24, 28, 29, 30, 31; Feb. 4, 5; June 6**

**Lord Bridge of Harwich, Lord Templeman, Lord Griffiths, Lord Ackner and Lord Goff of Chieveley**

*Gaming - Club - Stolen money - Bank draft and cash - Purchase of gaming chips with stolen money - Gaming club unaware money stolen - Thief gambling in club casino and losing heavily - Whether claim for money had and received under void contract - Whether chips valuable consideration for money - Whether club taking money for value - <u>Gaming Act 1845</u> (8 & 9 Vict. c. 109), s. 18*

*Banking - Banker's draft - Conversion - Draft made out to true owner - Bank giving draft to owner's agent - No ratification of agent's authority to obtain draft - Draft dishonestly endorsed to gambling club - Whether true owner having title to draft - Whether club holder in due course - Whether liable to true owner in conversion - <u>Bills of Exchange Act 1882</u> (45 & 46 Vict. c. 61), s. 29(1)(b)*

C. was a partner in the plaintiff firm of solicitors and had authority to operate the firm's client account at the bank. Unbeknown to the other partners, he was a compulsive gambler and without their knowledge he withdrew cash from that account by making out cheques for cash and sending the firm's cashier to cash them. The cashier, despite knowing C.'s motive, handed the money to him. C. used that money to fund his gambling at the defendant club. There the cash was exchanged for chips which were used for gambling at the casino and also for payment for refreshments. Although they were used as currency within the club they were worthless and remained the property of the club. Bets were placed by using chips. If a bet was lost chips were retained by the casino. Winnings were paid by chips. Unused chips and chips representing winnings could be exchanged for cash or a cheque drawn on the club's bank. On one occasion C., acting within his authority, procured, through the firm's cashier, a banker's draft for £3,735 drawn in favour of the solicitors, paying for it by a cheque from the client account. He then endorsed it and proffered it to the club which, after some hesitation on the part of the employees, accepted it in exchange for chips. C. was convicted on a number of counts of theft. The solicitors brought an action against the club and their bank, seeking to recover the moneys which C. had stolen. The judge held, inter alia, that although the contracts for the exchange of money for chips were void under section 18 of the <u>Gaming Act 1845</u>[1] the moneys so passed were not recoverable by the solicitors from the club as money had and received; that the club had not become the holder

Page 2

1   Gaming Act 1845, s. 18: post, p. 560G-H.

*[1991] 2 A.C. 548 Page   549*

of the draft in due course under section 29(1)(*b*) of the Bills of Exchange Act 18822 and was liable to the so-licitors for its conversion and that the bank had been in breach of its duty to the solicitors and was liable as constructive trustee of certain moneys stolen. The solicitors appealed. The club and the bank cross-appealed. The Court of Appeal, by a majority, dismissed the appeal and the club's cross-appeal but allowed the bank's cross-appeal.

On appeal by the solicitors and cross-appeal by the club:-

*Held*, (1) allowing the appeal, that an innocent recipient of stolen money was obliged to pay an equivalent sum to the true owner where he had not given full consideration for it and had thus been unjustly enriched at the expense of the true owner; that although the solicitors had no proprietary rights in the money in their bank account, at common law they were owners of the chose in action constituted by the indebtedness of the bank to them and could trace their property into its direct product, namely the money drawn from the account by C., and follow it into the hands of the club; that since the use of the chips was merely a convenient mech-anism for facilitating gambling and the gamblers did not buy them, no valuable consideration was given by the club for the money it received in exchange for chips; that with each bet at the casino a separate contract came into existence but that since gaming and wagering contracts were rendered void by section 18 of the Gaming Act 1845 the club gave no valuable consideration when bets were accepted and it came under no legal obligation to honour the bets but was bound only in honour to pay the winning gamblers; that even if in restitution claims a defence of change of position in good faith was available so that where the defendant had changed his position in such a manner that he would suffer an injustice if called upon to repay the mon-eys to the extent that he had changed his position, the solicitors were entitled to recover their money to the extent of the club's winnings from C. since, although the club changed its position each time a gambler placed a bet at the casino in that it exposed itself to the risk that on the gambler winning it would have to pay a substantially larger sum than the amount of the bet, it was the totality of the bets which had to be borne in mind and both losing and winning bets had to be brought into account (post, pp. **558D-F, 559E, 561F, 562C-E, 563B-C, 566E, 567B-F, H-568A, B, 573H-574B, F-G, 575F-H, 577B-F, 579E-F, 580E-G, 582F-583A).**

*Marsh v. Keating* (1834) 1 Bing. (N.C.) 198 and *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, H.L.(E.) applied.

*Miller v. Race* (1758) 1 Burr. 452; *Clarke v. Shee and Johnson* (1774) 1 Cowp. 197 and *Banque Belge pour l'Etranger v. Hambrouck* [1921] 1 K.B. 321, C.A. considered.

(2) Dismissing the cross-appeal, that since the club never gave value for the banker's draft, it did not become holder in due course of the draft within section 29(1)(*b*) of the Act of

2   Bills of Exchange Act 1882, s. 29(1): "A holder in due course is a holder who has taken a bill, complete and regular on the face of it, under the following conditions: namely . . . (*b*) That he took the bill in good faith and for value, and that at the time the bill was negotiated to him he had no notice of any defect in the title of the person who negotiated it."

*[1991] 2 A.C. 548 Page   550*

1882; that, furthermore, the draft was made payable to the solicitors, thus the immediate right to its possession vested in them against any other person, including C., and they had sufficient title to bring an action for damages for its conversion; and that, accordingly, the solicitors were entitled to recover (post, pp. **559A-B, 568A, C, 583F-G, 587C-D, 588A-B**).

*Bute (Marquess) v. Barclays Bank Ltd.* [1955] 1 Q.B. 202 applied.

*Commercial Banking Co. of Sydney Ltd. v. Mann* [1961] A.C. 1, P.C. considered.

*Per curiam.* It is right for English law to recognise that the defence of change of position in good faith is available against restitution claims, based on the unjust enrichment of the defendant, but nothing should be said at this stage to define its scope so as to inhibit its development on a case by case basis in the usual way (post, pp. **558G-H, 568B-C, 580B-C**).

*Per Lord Templeman.* The banker's draft represented money derived from the solicitors and had unjustly enriched the club and thus the solicitors were entitled to recover that money (post, p. **567G**).

Decision of the Court of Appeal [1989] 1 W.L.R. 1340 reversed in part.

The following cases are referred to in the opinions of their Lordships:

*Aubert v. Walsh* (1810) 3 Taunt. 277

*Australia and New Zealand Banking Group Ltd. v. Westpac Banking Corporation* (1988) 78 A.L.R. 157

*Avon County Council v. Howlett* [1983] 1 W.L.R. 605; [1983] 1 All E.R. 1073, C.A.

*Bainbrigge v. Browne* (1881) 18 Ch.D. 188

*Bank of New South Wales v. Murphett* [1983] 1 V.R. 489

*Banque Belge pour l'Etranger v. Hambrouck* [1921] 1 K.B. 321, C.A.

*Baylis v. Bishop of London* [1913] 1 Ch. 127, C.A.

*Black v. S. Freedman & Co.* (1910) 12 C.L.R. 105

*Bolton Partners v. Lambert* (1889) 41 Ch.D. 295, C.A.

*Bute (Marquess) v. Barclays Bank Ltd.* [1955] 1 Q.B. 202; [1954] 3 W.L.R. 741; [1954] 3 All E.R. 365

*C.H.T. Ltd. v. Ward* [1963] 1 W.L.R. 922; [1963] 3 All E.R. 226; [1965] 2 Q.B. 63; [1963] 3 W.L.R. 1071; [1963] 3 All E.R. 835, C.A.

*Clarke v. Shee and Johnson* (1774) 1 Cowp. 197; Lofft 756

*Commercial Banking Co. of Sydney Ltd. v. Mann* [1961] A.C. 1; [1960] 3 W.L.R. 726; [1960] 3 All E.R. 482, P.C.

*Durrant v. Ecclesiastical Commissioners for England and Wales* (1880) 6 Q.B.D. 234

*Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32; [1942] 2 All E.R. 122, H.L.(E.)

*Foster v. Green* (1862) 7 H. & N. 881

*Hudson v. Robinson* (1816) 4 M. & S. 475

*Jones (R.E.) Ltd. v. Waring and Gillow Ltd.* [1926] A.C. 670, H.L.(E.)

*London and River Plate Bank Ltd. v. Bank of Liverpool Ltd.* [1896] 1 Q.B. 7

*Marsh v. Keating* (1834) 1 Bing. (N.C.) 198

*Miller v. Race* (1758) 1 Burr. 452

*Ministry of Health v. Simpson* [1951] A.C. 251; [1950] 2 All E.R. 1137, H.L.(E.)

*Moses v. Macferlan* (1760) 2 Burr. 1005

*[1991] 2 A.C. 548 Page   551*

*Orton v. Butler* (1822) 5 B. & Ald. 652

*Price v. Neal* (1762) 3 Burr. 1355

*Rural Municipality of Storthoaks v. Mobil Oil Canada Ltd.* (1975) 55 D.L.R. (3d) 1

*Shoolbred v. Roberts* [1899] 2 Q.B. 560

*Taylor v. Plumer* (1815) 3 M. & S. 562

*Transvaal & Delagoa Bay Investment Co. Ltd. v. Atkinson* [1944] 1 All E.R. 579

*Union Bank of Australia Ltd. v. McClintock* [1922] 1 A.C. 240, P.C.

The following additional cases were cited in argument:

*Abbotts v. Barry* (1820) 2 Brod. & B. 369

*Agip (Africa) Ltd. v. Jackson* [1990] Ch. 265; [1989] 3 W.L.R. 1367; [1991] Ch. 547; [1991] 3 W.L.R. 116, C.A.

*Armstrong v. Strain* [1952] 1 K.B. 232; [1952] 1 All E.R. 139, C.A.

*Becker v. Fitch* (1917) 2 A.L.R. 340

*Bridger v. Savage* (1885) 15 Q.B.D. 363, C.A.

*Canadian Laboratory Supplies Ltd. v. Engelhard Industries of Canada Ltd.* (1977) 78 D.L.R. (3d) 232; (1979) 97 D.L.R. (3d) 1

*Corking v. Jarrard* (1807) 1 Camp. 36

*Diggle v. Higgs* (1877) 2 Ex.D. 422, C.A.

*Diplock, In re, Diplock v. Wintle* [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.

*Draycot v. Piot* (1601) Cro. Eliz. 818

*Ellesmere (Earl of) v. Wallace* [1929] 2 Ch. 1, C.A.

*Follett v. Hoppe* (1847) 5 C.B. 226

*Golightly v. Reynolds* (1772) Lofft 88

*Greer v. Downs Supply Co.* [1927] 2 K.B. 28, C.A.

*Hall v. Dean* (1600) Cro. Eliz. 841

*Hill v. William Hill (Park Lane) Ltd.* [1949] A.C. 530; [1949] 2 All E.R. 452, H.L.(E.)

*Holiday v. Sigil* (1826) 2 Carr. & P. 176

*John v. Dodwell & Co. Ltd.* [1918] A.C. 563, P.C.

*Jones v. Gordon* (1877) 2 App.Cas. 616, H.L.(E.)

*Leslie (J.) Engineers Co. Ltd., In re* [1976] 1 W.L.R. 292; [1976] 2 All E.R. 85

*London Joint Stock Bank v. Simmons* [1892] A.C. 201, H.L.(E.)

*McCollom v. Wrightson* [1968] A.C. 522; [1968] 2 W.L.R. 578; [1968] 1 All E.R. 514, H.L.(E.)

*MacDonald v. Green* [1951] 1 K.B. 594; [1950] 2 All E.R. 1240, C.A.

*Midland Bank Ltd. v. Reckitt* [1933] A.C. 1, H.L.(E.)

*Morgan v. Ashcroft* [1938] 1 K.B. 49; [1937] 3 All E.R. 92, C.A.

*Morison v. London County and Westminster Bank Ltd.* [1914] 3 K.B. 356, C.A.

*Morley v. Loughnan* [1893] 1 Ch. 736

*Moss v. Hancock* [1899] 2 Q.B. 111

*Nelson v. Larholt* [1948] 1 K.B. 339; [1947] 2 All E.R. 751

*Pearce v. Brain* [1929] 2 K.B. 310, D.C.

*Petranker v. Brown* [1984] 2 N.S.W.L.R. 177

*Raphael v. Bank of England* (1855) 17 C.B. 161

*Reckitt v. Barnett, Pembroke and Slater Ltd.* [1929] A.C. 176, H.L.(E.)

*Reg. v. Knightsbridge Crown Court, Ex parte Marcrest Properties Ltd.* [1983] 1 W.L.R. 300; [1983] 1 All E.R. 1148, C.A.

*Reid v. Rigby & Co.* [1894] 2 Q.B. 40, D.C.

*Saffery v. Mayer* [1901] 1 Q.B. 11, C.A.

*[1991] 2 A.C. 548 Page   552*

*Sheffield (Earl of) v. London Joint Stock Bank Ltd.* (1888) 13 App.Cas. 333, H.L.(E.)

*Sinclair Houston Federal Credit Union v. Hendricks* (1954) 268 S.W. 2d 290

*Strachan v. Universal Stock Exchange Ltd. (No. 2)* [1895] 2 Q.B. 697, C.A.

*Stuart v. Stephen* (1940) 56 T.L.R. 571

*Tote Investors Ltd. v. Smoker* [1968] 1 Q.B. 509; [1967] 3 W.L.R. 1239; [1967] 3 All E.R. 242, C.A.

*United Australia Ltd. v. Barclays Bank Ltd.* [1941] A.C. 1; [1940] 4 All E.R. 20, H.L.(E.)

*Valentini v. Canali* (1889) 24 Q.B.D. 166, D.C.

*Varney v. Hickman* (1847) 5 C.B. 271

*Wilton v. Commonwealth Trading Bank of Australia* [1973] 2 N.S.W.L.R. 644

*Woolf v. Freeman* [1937] 1 All E.R. 178

APPEAL AND CROSS-APPEAL from the Court of Appeal.

This was an appeal by the plaintiffs, Lipkin Gorman, a firm of solicitors ("the solicitors"), by leave of the House of Lords (Lord Bridge of Harwich, Lord Templeman and Lord Oliver of Aylmerton) granted on 6 February 1989 from an order dated 13 October 1988 (subsequently amended and re-amended) of the Court of Appeal by a majority (May and Parker L.JJ., Nicholls L.J. dissenting) [1989] 1 W.L.R. 1340, dismissing an appeal by the solicitors against the judgment dated 8 April 1986 of Alliott J. [1987] 1 W.L.R. 987. The judge had dismissed the solicitors' claim against the first defendant, Karpnale Ltd. (formerly known as Playboy Club of London Ltd.) ("the club"), for £222,908 as money had and received but decided, inter alia, that the solicitors were only entitled to recover £6,400, including interest, in respect of a banker's draft received by the club.

There was also a cross-appeal, by leave of the House of Lords, from the order the Court of Appeal dismissing the cross-appeal of the club from Alliott J.'s order in respect of the banker's draft.

The second defendant in the action, Lloyds Bank Plc., took no part in the appeal.

The facts are stated in the opinion of Lord Goff of Chieveley.

*Dermod O'Brien Q.C.* and *Thomas Putnam* for the solicitors. Where money is stolen the victim is entitled to recover it from a third party even though the third party has no knowledge of the theft and the thief has lost the money by entering into gaming contracts which are rendered void by section 18 of the Gaming Act 1845. The third party has no right to retain such money: *Clarke v. Shee and Johnson* (1774) 1 Cowp. 197, 200-201 and *Corking v. Jarrard* (1807) 1 Camp. 36. That principle was applied in *Abbots v. Barry* (1820) 2 Brod. & B. 369; *Aubert v. Walsh* (1810) 3 Taunt. 277; *Becker v. Fitch* (1917) 2 A.L.R. 340; *Sinclair Houston Federal Credit Union v. Hendricks* (1954) 268 S.W. 2d 290 and *Black v. S. Freedman & Co.* (1910) 12 C.L.R. 105. In the absence of valuable consideration a thief cannot pass a good title to the stolen money by losing it under a gaming contract: *Shoolbred v. Roberts* [1899] 2 Q.B. 560 and *Morgan v. Ashcroft* [1938] 1 K.B. 49. It makes no difference that the thief intended to steal the money before it was withdrawn by the victim's servant from the victim's bank account.

*[1991] 2 A.C. 548 Page   553*

The position remains the same where the thief passes the money to the owners of a proprietary club of which he is a member, and to enable him to place bets at gambling tables the money is ex-changed for gaming chips representing money. There is no material difference between the giving of credit to the club member by the casino and the giving of credit to the casino by the member: *Woolf v. Freeman* [1937] 1 All E.R. 178; *Stuart v. Stephen* (1940) 56 T.L.R. 571 and *C.H.T. Ltd. v. Ward* [1963] 1 W.L.R. 922; [1965] 2 Q.B. 63. The acquisition of the casino's chips in exchange for cash is not a contract but is a preliminary to gaming. But if it is a contract it is a void gaming con-tract: see section 18 of the Act of 1845; Alliott J.'s judgment [1987] 1 W.L.R. 987, 991G-992F; *C.H.T. Ltd. v. Ward* [1965] 2 Q.B. 63, 79-80 and *Earl of Ellesmere v. Wallace* [1929] 2 Ch. 1. The

nature of the chips is unaltered by the casino's willingness to accept them as payment for the provision of refreshments.

If the victim is entitled to recover the stolen money he can make the claim either in conversion or for money had and received or he can do both. In circumstances of delictual receipt those remedies are alternative remedies on the same facts: *United Australia Ltd. v. Barclays Bank Ltd.* [1941] A.C. 1, 18-19, 34-35 and *Hudson v. Robinson* (1816) 4 M. & S. 475, 478. Even if there is no identifiable fund remaining in the recipient's hands because the stolen money, together with other money, has been put into a bank account the victim is entitled to recover: *Taylor v. Plumer* (1815) 3 M. & S. 562. The victim has a right to follow his money because the recipient, albeit innocent, acquires no better title than the thief: *Banque Belge pour l'Etranger v. Hambrouck* [1921] 1 K.B. 321. The victim only has to show the receipt and no more: *Agip (Africa) Ltd. v. Jackson* [1990] Ch. 265; [1991] Ch. 547. [Reference was made to *Saffery v. Mayer* [1901] 1 Q.B. 11.]

***Gavin Lightman Q.C.*** and ***Alan Boyle*** for the club. The claim for money had and received does not lie because (1) the club gave valuable consideration for the money it received; (2) even assuming that there was no consideration, the club was an innocent recipient and had no knowledge that the money was stolen; and (3) even if the claim lies the money received from C. has been mixed with other money and is unidentifiable.

That valuable consideration was given by the club is shown by examining the terms of the transaction between the club and its members. The holder of chips exchanged for cash is entitled to use them as currency at the casino for gambling at the tables and also for buying food and drinks. The holder is entitled to have any original chips redeemed. He can retain them until redeemed and the club gives him the right to redeem the winning chips: *Moss v. Hancock* [1899] 2 Q.B. 111, 118; *Tote Investors Ltd. v. Smoker* [1968] 1 Q.B. 509, 515, 518, and *Petranker v. Brown* [1984] 2 N.S.W.L.R. 177. The transaction under which chips are exchanged for cash is not a gaming contract. It is not transformed into such a contract in its entirety if some gaming takes place. Every gaming transaction is a separate contract: *Cheshire, Fifoot & Furmston's Law of Contract*, 11th ed. (1986), p. 314; *Hill v. William Hill (Park Lane) Ltd.* [1949] A.C. 530.

*[1991] 2 A.C. 548 Page 554*

The chips are not I.O.U.s. The club was not a party to the gaming. It was only responsible for calculating winnings and losses. The looser was under no legal obligation to pay to the club and vice versa. The arrangement here was, therefore, much different from that in *C.H.T. Ltd. v. Ward* [1965] 2 Q.B. 63, 79-80. The nature of the chips is a matter of evidence: *Reg. v. Knightsbridge Crown Court, Ex parte Marcrest Properties Ltd.* [1983] 1 W.L.R. 300, 308-310; *MacDonald v. Green* [1951] 1 K.B. 594, 600, 605 and *Hill v. William Hill (Park Lane) Ltd.* [1949] A.C. 530, 577. Thus, one must look at the contracts under which cash has been exchanged and see if there is an element of gaming. Here, there was no obligation that the chips can only be used for gaming. The fact that there may or may not be a gaming transaction does not affect the initial transaction. Even if the transaction was a gaming transaction the club gave valuable consideration: *Bridger v. Savage* (1885) 15 Q.B.D. 363, 367. Even under a void contract the money cannot be recovered where there is consideration: *Valentini v. Canali* (1889) 24 Q.B.D. 166. The money paid under a void contract cannot be recovered unless there is a total failure of consideration: *Pearce v. Brain* [1929] 2 K.B. 310. Gaming only takes place where there is a change winning or loosing: *McCollom v. Wrightson* [1968] A.C. 522, 528.

An innocent volunteer who receives stolen or fraudulently obtained money is not liable to reimburse it to the true owner. Where A pays money to an agent of B, A can get it from the agent before he parts with it and pays it over to the principal B. If the money has been paid over to the principal then the principal has to be sued: *Transvaal & Delagoa Bay Investment Co. Ltd. v. Atkinson* [1944] 1 All E.R. 579, 586. An innocent person is not liable if trust money has passed through his hands without

his knowing that there has been a breach of trust and he received it in good faith. In this respect the position is the same at common law and in equity: *In re J. Leslie Engineers Co. Ltd.* [1976] 1 W.L.R. 292. [Reference was made to *Nelson v. Larholt* [1948] 1 K.B. 339.] *Clarke v. Shee and Johnson*, 1 Cowp. 197; *Corking v. Jarrard*, 1 Camp. 36, *Becker v. Fitch*, 2 A.L.R. 340 and *Sinclair Houston Federal Credit Union v. Hendricks*, 268 S.W. 2d 290 are distinguishable in that the recipients were not innocent parties.

It would be unjust to allow the claim because this is not a case where a new category of relationship founding an action for money had and received should be created, or where it could be found that the club was unjustly enriched. When chips are given and gambling takes place the club comes under an obligation to pay the winner. The club had no knowledge or notice that the cash introduced by C. was fraudulently extracted from the solicitors' client account. The club dealt with C. in the bona fide belief that he had a good title to the money. For the purposes of section 18 of the Gaming Act 1845 the club would be a bona fide purchaser for value without notice of the solicitors' claim. The gaming contracts were merely void, not illegal, and the gaming took place at an establishment duly licensed under Part II of the Gaming Act 1968 and carried on in accordance with those provisions. The solicitors' claim is no different in principle from a claim to recover against an
*[1991] 2 A.C. 548 Page   555*

innocent third party to whom the money was given and who no longer retains it. It would be contrary to principle to allow the victim of theft to sue the innocent recipient of the stolen money where that recipient has dissipated the money. He should only be liable to be sued where he retains the money or its traceable proceeds, i.e. in the circumstances permitted by the rules of tracing.

The solicitors do not have title to the moneys they are claiming. The title passed to C. when the bank paid the money out to him. C.'s title is liable to be displaced by the solicitors' claim but any title obtained by the solicitors does not entitle them to make any claim against any innocent third party through whose hands the money may have passed in the interim, unless the solicitor ratified the transaction: *Union Bank of Australia Ltd. v. McClintock* [1922] 1 A.C. 240 and *Commercial Banking Co. of Sydney Ltd. v. Mann* [1961] A.C. 1.

Those cases exemplify the rule of common law tracing. If a partner or an agent acquires property within the scope of his authority using partnership money, the acquisition is partnership property both in law and equity. If a partner acquires property using partnership money but outside the scope of his authority, the title vests in that partner although in equity he will hold as a trustee. At common law the partnership will have a right to trace through that acquisition. But tracing is not automatic. The partnership has a choice. It may decide that it does not want to acquire the property. It may be that the partnership would claim under equity. In the meantime the right remains in the individual partner free from any right of the partnership. Only when the partnership decides to acquire the property does the right of possession vest in it. [Reference was made to *Wilton v. Commonwealth Trading Bank of Australia* [1973] 2 N.S.W.L.R. 644; *Strachan v. Universal Stock Exchange Ltd. (No. 2)* [1895] 2 Q.B. 697 and *In re Diplock, Diplock v. Wintle* [1948] Ch. 465.]

*Boyle* following. The proper analysis of the contract under which chips are issued for cash shows the following. First, it is intended that the gambler should attain rights at the club for cash. Secondly, he can use the chips not only for gambling but for buying food and drinks and the club makes a promise, under its rules, to redeem those chips or any chips that the gambler presents after he has finished his game. Thirdly, when a gambler makes his bet at the gambling table a further contract is made; if the gambler looses, the contract is completed when the stake is removed from the table, and if the gambler wins, the contract is completed when the chips are redeemed by the gambler. Fourthly, the buying of chips in exchange for cash or cheque, although a contract itself, is preparatory to entering into a gaming contract when the member gambles in the casino. But it is not

a gaming contract within section 18 of the Act of 1845: *Tote Investors Ltd. v. Smoker* [1968] 1 Q.B. 509.

On the cross-appeal, two issues arise: (a) whether the solicitors had title to the banker's draft at the time that it was passed to the club, and (b) whether the club had a defence to the claim under section 29(1)(*b*) of the Bills of Exchange Act 1882.

*[1991] 2 A.C. 548 Page   556*

The solicitors did not plead or prove (1) that the draft was originally obtained for the proper purposes of the partnership, delivered for those purposes to C. and then diverted by him for his own fraudulent purposes; or (2) that the draft was delivered to the solicitors' employee acting within the scope of his authority, and thereby became the property of the partners. They pleaded, and contended at the trial, that C. obtained the draft as part of his fraudulent scheme to loot the client account. The only case open to the solicitors is that which was pleaded and put at the trial: *Union Bank of Australia Ltd. v. McClintock* [1922] 1 A.C. 240 and *Commercial Banking Co. of Sydney Ltd. v. Mann* [1961] A.C. 1. Thus, without delivery of the draft to the partners or their duly authorised agent, title to the draft passed to C., albeit that his title was voidable. The club was a "holder in due course" of the draft, having taken it "complete and regular" on its face and in good faith and for value: sections 29(1)(*b*) and 30(2) of the Act of 1882. The club, thus, took free from prior title: section 38(2).

The solicitors' case against the club is that C. obtained the draft by fraud. But since the draft was prima facie a good one and the club had no reason to doubt C.'s bona fides the club was entitled to accept the draft as good: *Jones v. Gordon* (1877) 2 App.Cas. 616. The test is subjective, namely, whether the club believed C. acted properly: *London Joint Stock Bank v. Simmons* [1892] A.C. 201. [Reference was made to *Armstrong v. Strain* [1952] 1 K.B. 232.]

*Greer v. Downs Supply Co.* [1927] 2 K.B. 28 decided that the equitable doctrine of constructive notice is not to be extended to commercial transactions. The court should not take constructive notice as a substitute for actual notice. In commercial transactions possession is everything: see [1927] 2 K.B. 28, 32, 36-37. Where in a commercial transaction a negotiable security is accepted by a party who gives value for it and has no notice that the party from whom he has taken the security has no title to it, the former is entitled to sue on the security even if he has had the means to discover the facts but has neglected to do so: *Raphael v. Bank of England* (1855) 17 C.B. 161.

Section 16(4) of the Gaming Act 1968 enables the recipient of a cheque to enforce obligations under the Bills of Exchange Act 1882 which otherwise might be unenforceable.

*O'Brien Q.C.* in reply. On a true analysis there is no contract when chips are exchanged for cash. If there is a contract it is void as being of a gaming nature. The exchange of chips for cash gives rise to a liability to repay binding in honour only. [Reference was made to *Bridger v. Savage*, 15 Q.B.D. 363.] Assuming that exchange of chips for cash is a contract whereby it only amounts to a deposit of money with the casino to enable the gambler to gamble and it is part of a contract in contemplation of gaming and is void. If the gambler changes his mind and does not gamble that does not alter its nature: *Saffery v. Mayer* [1901] 1 Q.B. 11; *Diggle v. Higgs* (1877) 2 Ex.D. 422 and *Varney v. Hickman* (1847) 5 C.B. 271. Even if there is a valid and enforceable right to repayment on presentation of chips for redemption, the club's case is not advanced because, in relation to chips acquired with money stolen from them, the solicitors are entitled to the redemption moneys

*[1991] 2 A.C. 548 Page   557*

and the club's only pretext for extinguishing such right of redemption is winning the chips in gaming which cannot be valuable consideration for such extinguishment.

An innocent recipient is liable to pay back stolen moneys received from a thief because it is the receipt from which the victim's cause of action arises and the extent of the liability depends on the amount received. The fact the recipient has not retained the asset is irrelevant: *Agip (Africa) Ltd. v. Jackson* [1991] Ch. 547; *Baylis v. Bishop of London* [1913] 1 Ch. 127; *Bainbrigge v. Browne* (1881) 18 Ch.D. 188 and *Morley v. Loughnan* [1893] 1 Ch. 736.

Trover lies for the conversion by the defendant of any corporeal personal property. It therefore lies for chattels, i.e. money which is identifiable as the plaintiff's personal property, although it need not be in a bag: *Hall v. Dean* (1600) Cro. Eliz. 841; *Draycot v. Piot* (1601) Cro. Eliz. 818; *Miller v. Race* (1758) 1 Burr. 452 and *Morison v. London County and Westminster Bank Ltd.* [1914] 3 K.B. 356. The plaintiff's title to property, and therefore his right to sue for conversion thereof, is not lost simply by virtue of its exchange (by contract or otherwise) for other money or chattels or a combination of both, provided that the one is identifiable as the product of the other. The plaintiff's title continues in the replaced item: *Golightly v. Reynolds* (1772) Lofft 88; *Taylor v. Plumer*, 3 M. & S. 562 and *In re J. Leslie Engineers Co. Ltd.* [1976] 1 W.L.R. 292. The plaintiff's title necessary to support an action in trover may be ownership, but an immediate right to possession is sufficient: *Midland Bank Ltd. v. Reckitt* [1933] A.C. 1 and *Bute (Marquess) v. Barclays Bank Ltd.* [1955] 1 Q.B. 202.

Action for money had and received to the plaintiff's use lies (a) for money converted even where trover would have lain on the same facts, e.g., against the original converter of an identified bank note which he has passed on to another, and no waiver of tort or ratification was necessary (*Holiday v. Sigil* (1826) 2 Carr. & P. 176); (b) whenever the defendant has acquired the benefit of the plaintiff's money otherwise than as a bona fide purchaser for value without notice (*Hudson v. Robinson*, 4 M. & S. 475; *Reid v. Rigby & Co.* [1894] 2 Q.B. 40; *Nelson v. Larholt* [1948] 1 K.B. 339 and *Clarke v. Shee and Johnson*, 1 Cowp. 197); (c) where conversion would have lain in respect of money or the value of the plaintiff's goods (*United Australia Ltd. v. Barclays Bank Ltd.* [1941] A.C. 1); and (d) where there was no conversion in the first place: *Reid v. Rigby & Co.*; *Nelson v. Larholt* and *Hudson v. Robinson*.

Even if conversion does not lie for money taken and received as money, there is an obligation under the law on the recipient of stolen money to pay an equivalent of that money to the victim: *Orton v. Butler* (1822) 5 B. & Ald. 652; *Foster v. Green* (1862) 7 H. & N. 881 and *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32. [Reference was made to *Marsh v. Keating* (1834) 1 Bing. (N.C.) 198.]

The banker's draft was issued pursuant to instructions from the solicitors and on its face payable to themselves. Thus the draft must belong to them. The solicitors do not need to have an unimpeachable title in order to sue. It is sufficient that they have a right to possession:

*[1991] 2 A.C. 548 Page   558*

*Bute (Marquess) v. Barclays Bank Ltd.* [1955] 1 Q.B. 202; *Midland Bank Ltd. v. Reckitt* [1933] A.C. 1; *Reckitt v. Barnett, Pembroke and Slater Ltd.* [1929] A.C. 176; *John v. Dodwell & Co. Ltd.* [1918] A.C. 563 and *Earl of Sheffield v. London Joint Stock Bank Ltd.* (1888) 13 App.Cas. 333. Accordingly, *Union Bank of Australia v. McClintock* [1922] 1 A.C. 240 and *Commercial Banking Co. of Sydney Ltd. v. Mann* [1961] A.C. 1 can be said to have been wrongly decided and should be overruled. Since the banker's cheques in *Mann's case* were made payable to a third party, that case is distinguishable and should not be followed.

A banker's draft is drawn by a bank on itself. It cannot be a bill of exchange within section 3(1) of the Bills of Exchange Act 1882 and therefore does not fall within the definition of a cheque in

section 73 of that Act. It cannot come within the Gaming Acts: see section 16(2) of the <u>Gaming Act 1968</u>.

**Lightman Q.C.** referred to *Follett v. Hoppe* (1847) 5 C.B. 226 and *Canadian Laboratory Supplies Ltd. v. Engelhard Industries of Canada Ltd.* (1977) 78 D.L.R. (3d) 232; (1979) 97 D.L.R. (3d) 1 in reply to the solicitors' reply.

**Boyle** replied to the cross-appeal.

Their Lordships took time for consideration.

6 June. LORD BRIDGE OF HARWICH. My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Templeman and Lord Goff of Chieveley. I agree with their conclusion that the appeal should be allowed and the cross-appeal dismissed with the consequence that the appellants ("the solicitors") become entitled to judgment for the principal sum of £154,695 inclusive of the sum to which the cross-appeal relates. All questions with respect to the amount of interest to be awarded on this principal sum and with respect to the costs of the proceedings must, unless the parties are able to agree, be deferred to enable counsel to make further submissions.

With respect to the view that prevailed in the Court of Appeal I cannot see that the respondents ("the club") are in any better position to resist the solicitors' claim to recover the money which Cass stole from them and gambled away in the casino by reason of the fact that cash was exchanged for gaming chips before being wagered at the gaming tables. The club was nevertheless a mere volunteer who gave no consideration for the stolen money. This was the common sense view expressed in the dissenting judgment of Nicholls L.J. Both my noble and learned friends have thoroughly analysed this issue and I agree with the reasoning in both their speeches.

I agree with my noble and learned friend, Lord Goff of Chieveley, that it is right for English law to recognise that a claim to restitution, based on the unjust enrichment of the defendant, may be met by the defence that the defendant has changed his position in good faith. I equally agree that in expressly acknowledging the availability of this defence for the first time it would be unwise to attempt to define its scope in abstract terms, but better to allow the law on the subject to develop on a case by case basis. In the circumstances of this case I

*[1991] 2 A.C. 548 Page   559*

would adopt the reasoning of my noble and learned friend, Lord Templeman for the conclusion that the club can only rely on the defence to the extent that it limits the club's liability to the solicitors to the amount of their net winnings from Cass which must have been derived from the stolen money.

The club submitted that the solicitors' claims failed on the ground that they had no title to the money which was the subject of the appeal or to the banker's draft which was the subject of the cross-appeal. The arguments in support of this submission are examined in the speech of my noble and learned friend, Lord Goff of Chieveley. I agree with his reasons for rejecting them.

LORD TEMPLEMAN. My Lords, Cass was a partner in the appellant firm of solicitors, Lipkin Gorman ("the solicitors"). Cass withdrew £323,222.14 from the solicitors' bank account. The sum of £100,313.16 was replaced, recovered or accounted for, but the balance of £222,908.48 was money which Cass stole from the solicitors and proved to be irrecoverable from him. Cass staked £561,014.06 at the gaming tables of the Playboy Club, a licensed casino owned and operated by the respondent, Karpnale Ltd. ("the club"). Cass won £378,294.06. After making adjustments for certain cheques, the club agreed that the club won and Cass lost overall, in a matter of months, the sum of £174,745. The parties also agreed that the maximum gross personal resources of Cass amounted to £20,050 and that at least the sum of £154,695 won by the club and lost by Cass was derived from money stolen from the solicitors. The club acted innocently throughout and was not aware that the club had received £154,695 derived from the solicitors until the solicitors claimed restitution. Conversion does not lie for money, taken and received as currency: see *Orton v. Butler* (1822) 5 B. & Ald. 652 and *Foster v. Green* (1862) 7 H. & N. 881. But the law imposes an obligation on the recipient of stolen money to pay an equivalent sum to the victim if the recipient has been "unjustly enriched" at the expense of the true owner. In *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, 61, Lord Wright said:

> "It is clear that any civilised system of law is bound to provide remedies for cases of what has been called unjust enrichment or unjust benefit, that is to prevent a man from retaining the money of or some benefit derived from another which it is against conscience that he should keep."

The club was enriched as and when Cass staked and lost to the club money stolen from the solicitors amounting in the aggregate to £300,000 or more. But the club paid Cass when he won and in the final reckoning the club only retained £154,695 which was admittedly derived from the solicitors' money. The solicitors can recover the sum of £154,695 which was retained by the club if they show that in the circumstances the club was unjustly enriched at the expense of the solicitors.

In the course of argument there was a good deal of discussion concerning tracing in law and in equity. In my opinion in a claim for

[1991] 2 A.C. 548 Page   560

money had and received by a thief, the plaintiff victim must show that money belonging to him was paid by the thief to the defendant and that the defendant was unjustly enriched and remained unjustly enriched. An innocent recipient of stolen money may not be enriched at all; if Cass had paid £20,000 derived from the solicitors to a car dealer for a motor car priced at £20,000, the car dealer would not have been enriched. The car dealer would have received £20,000 for a car worth £20,000. But an innocent recipient of stolen money will be enriched if the recipient has not given full consideration. If Cass had given £20,000 of the solicitors' money to a friend as a gift, the friend would have been enriched and unjustly enriched because a donee of stolen money cannot in good conscience rely on the bounty of the thief to deny restitution to the victim of the theft. Complications arise if the donee innocently expends the stolen money in reliance on the validity of the gift before the donee receives notice of the victim's claim for restitution. Thus if the donee spent £20,000 in the purchase of a motor car which he would not have purchased but for the gift, it seems to me that the donee has altered his position on the faith of the gift and has only been unjustly enriched to the extent of the secondhand value of the motor car at the date when the victim of the theft seeks restitution. If the donee

spends the £20,000 in a trip round the world, which he would not have undertaken without the gift, it seems to me that the donee has altered his position on the faith of the gift and that he is not unjustly enriched when the victim of the theft seeks restitution. In the present case Cass stole and the club received £229,908.48 of the solicitors' money. If the club was in the same position as a donee, the club nevertheless in good faith allowed Cass to gamble with the solicitors' money and paid his winnings from time to time so that when the solicitors' sought restitution, the club only retained £154,695 derived from the solicitors. The question is whether the club which was enriched by £154,695 at the date when the solicitors sought restitution was unjustly enriched.

The club claims that the club gave consideration for the sum of £154,695 by allowing Cass to gamble and agreeing to pay his winnings and therefore the club was not enriched or, alternatively, was not unjustly enriched. The solicitors claim that the club acquired £154,695 under void contracts and that as between the club and the solicitors from whom the money was derived, the club is in no better position than an innocent donee from the thief, Cass. The resolution of this dispute depends on the true construction of section 18 of the Gaming Act 1845, an analysis of the relationship between the club and Cass and the consideration of the authorities dealing with gaming and the authorities dealing with unjust enrichment.

Section 18 of the Gaming Act 1845, so far as material, provides:

"all contracts or agreements, whether by parole or in writing, by way of gaming or wagering, shall be null and void; and that no suit shall be brought or maintained in any court of law or equity for recovering any sum of money or valuable thing alleged to be won upon any wager, or which shall have been deposited in the hands of any person to abide the event on which any wager shall have been made ..."

*[1991] 2 A.C. 548 Page 561*

The club contends that the club received money from Cass under a contract with him which was not a contract "by way of gaming or wagering" and is not rendered null and void by section 18 of the Act of 1845. Alternatively, even if the club received the money under a contract by way of gaming nevertheless, it is argued, the club was not unjustly enriched because, in the belief that the money tendered by Cass was his own personal money, the club accepted the money and altered the position of the club to the detriment of the club by allowing Cass to gamble and by paying his winnings when he won; the club, it is said, was enriched, but not unjustly enriched, and may retain the money which the club fairly and lawfully won. It is well settled that section 18 of the Act of 1845 does not enable a gambler to recover money which he has lost and paid.

The club was a proprietary club and Cass was a member. Cass was not bound to gamble but if he contemplated doing so he was bound to advance cash. Cass could pay cash to the club cashier. In return for cash the cashier issued credit vouchers with a face value equal to the money received. If Cass tendered a credit voucher to a croupier at a gaming table, Cass would be issued by the croupier with plastic chips amounting to the face value of the voucher. Cass could, if he wished, instead of tendering a voucher to a croupier, pay cash to a croupier and receive plastic chips for cash. Gaming on the table was conducted with chips. Cass was not bound to gamble and the croupier was not bound to allow Cass to stake a chip at the table. If Cass staked and lost, the croupier kept the chip which had been staked. If Cass staked and won, the croupier paid out the winnings with chips. If Cass paid cash for a credit voucher which he did not exchange for chips, he could cash the credit voucher with the cashier. If Cass changed a credit voucher for chips or if Cass paid a croupier for chips, then the cashier would cash any chips which Cass did not stake. If Cass acquired chips by winning at a table or acquired chips from a fellow member, the cashier would cash the chips for Cass. If Cass ordered refreshments at the club, he could pay in chips. Thus within the club chips were treated as currency and on leaving the club Cass could exchange chips for money whenever he chose to do so. The chips themselves were worthless and at all times remained the property of the club but the club would redeem them for cash.

The club argues that when Cass paid, for example, £5,000 in cash to the cashier or to the croupier, there came into existence a contract which was not a gaming contract. In consideration for £5,000 paid by Cass, the club agreed to cash any chips retained, won or otherwise acquired and at any time presented for payment. This was a contract, so it was said, in contemplation of gaming and not a contract by way of gaming. If Cass staked a chip and the croupier accepted the stake and played the game, there came into existence a second contract. For example, if the game were roulette, in consideration of the club promising to pay Cass if the ball fell into a red pocket, Cass promised to pay the club if the ball did not fall into a red pocket. When Cass lost he forfeited his staked chip and forfeited the right to the money represented by that chip. When Cass won he was entitled to the return of his staked

*[1991] 2 A.C. 548 Page   562*

chip and to his winnings in chips. But there were, according to the club, two separate contracts. By the first contract, Cass exchanged cash for chips and that was not a contract by way of gaming.

My Lords, when Cass paid money to the cashier, he was issued with a receipt in the form of a credit voucher and then in the form of a chip. The chip did not oblige Cass to avail himself of the facilities of the club and did not oblige the club to allow Cass to gamble or take advantage of any other facilities of the club. If a thief deposits stolen money in a building society, the victim is entitled to recover the money from the building society without producing the pass book issued to the thief. As against the victim, the building society cannot pretend that the building society gave good consideration for the acceptance of the deposit. The building society has been unjustly enriched at the expense of the victim. Of course the building society has a defence if the building society innocently pays out the deposit before the building society realises that the deposit was stolen money. But in the present case the club retained some of the stolen money. The club cannot as against the solicitors retain the stolen money save by relying on the gaming contracts which, as between the club and Cass, entitled the club to retain the solicitors' money which Cass lost at the gaming table. Those gaming contracts were void. The club remains unjustly enriched to the extent of £154,695.

If Cass had been gambling with his own money, the gaming system operated by the club would have ensured that Cass paid his gambling losses contemporaneously and that the club paid their gambling losses in arrears. The gaming contracts were void but section 18 of the Act of 1845 does not, as between gamblers, prevent a gambling loss from being paid contemporaneously or in arrears. A gambling loss, whenever paid, is a completed voluntary gift from the loser to the winner. But Cass was gambling with the money of the solicitors who have never gambled and never made a voluntary gift to the club.

Another way of analysing the situation is this. When Cass entered the club as a member, the club made to him a revocable offer to gamble with him in the manner and upon the terms dictated by the club. Those terms required Cass to pay his gambling stakes in advance and to allow the club to pay their gambling losses in arrears. The revocable offer by the club was accepted by Cass when he staked a chip and became irrevocable when the croupier accepted the chip as a stake. There was only one contract and that was a gaming contract.

The club claims that even if the only consideration given by the club was a gambling consideration, nevertheless the club altered its position to its detriment because the club allowed Cass to gamble and the club paid his winnings. This is another way of relying on a void gaming contract justifying the retention of the solicitors' money. The club has not suffered any detriment. If the club pays £154,695 to the solicitors as a result of this appeal, the club will be in exactly the same position which would have obtained if Cass had not gambled away the solicitors' money. It is true that the club would have been in a better position if Cass had been gambling away his own money, but that plaintive observation does not entitle the club to retain the solicitors' money by which the club remains unjustly enriched to the extent of £154,695.

*[1991] 2 A.C. 548 Page   563*

Cass staked with the club money which he had stolen from the solicitors. The solicitors have been content to assume that in addition Cass staked £20,050 of his own money. Cass also staked money which from time to time he won from the club during the course of his doomed gambling. At the date when the solicitors claimed restitution the club had recovered all its own money and were left with £174,745 net winnings. The club is entitled to assert and the solicitors cannot disprove that £20,050 of the net winnings was money which had belonged to Cass. There remained £154,695 which must have been money stolen from the solicitors. My conclusion is that the club has no right to retain stolen money received by the club from the thief. Repayment by the club to the victim, limited to the net amount of stolen money which the club retains, will not inflict a net loss on the club as a result of the transactions between the club and the thief. In the present case money stolen from the solicitors by Cass has been paid to and is now retained by the club and ought to be repaid to the solicitors. The solicitors will recover part of their stolen money and the club will only lose the winnings the club was not entitled to make out of the solicitors' money.

Counsel produced a number of relevant authorities which must be considered. In *Miller v. Race* (1758) 1 Burr. 452, a bank note made out to bearer and payable on demand was treated as currency. Conversion did not lie because there is no property in currency. Lord Mansfield said, at p. 457:

"So, in the case of money stolen, the true owner cannot recover it, after it has been paid away fairly and honestly upon a valuable and bona fide consideration: but before money has passed in currency, an action may be brought for the money itself."

In the present case the money was received by the club fairly and honestly but not upon a valuable and bona fide consideration.

In *Clarke v. Shee and Johnson* (1774) 1 Cowp. 197 a servant stole money from his master and bought lottery tickets. Lotteries were illegal and void under the Lottery Act 1772. The master recovered from the defendants who were the holders of the lottery and had innocently received the stolen money. The defendants unsuccessfully argued that there was no contract between the master and the defendants and that the defendants had given consideration for the receipt of the money. It was argued that though the defendants were fortunate in that the lottery tickets issued for the stolen money were not winning tickets, the defendants ran the risk "and therefore performed their part of the agreement: consequently, there is no foundation for an action to recover back the money paid." Lord Mansfield said, at pp. 200-201:

"Here the plaintiff sues for his identified property, which has come to the hands of the defendants iniquitously and illegally in breach of the Act of Parliament. Therefore they have no right to retain it; and consequently the plaintiff is well entitled to recover."

Mr. Lightman, who appeared on behalf of the club, sought to distinguish this authority on the ground that the Lottery Act 1772 made the contract between the servant and the defendants illegal and not

*[1991] 2 A.C. 548 Page   564*

merely void and imposed a criminal penalty for breach of the statute. For present purposes, however, it does not seem to me to matter whether the contract upon which the defendant relies as affording consideration for receipt of stolen money is illegal as provided by the Lottery Act 1772 or void as provided by the Gaming Act 1845. In each case the contract cannot be relied upon to support the retention by the defendant of stolen money derived from the plaintiff.

In *Aubert v. Walsh* (1810) 3 Taunt. 277 there was a wager on 15 September 1808 that the war with France would end before 1 July 1810. One party to the wager withdrew in October 1808 and was held entitled to recover his stake from the other party. Lord Mansfield said, at p. 283:

"why should not a man say, you and I have agreed so and so, but the agreement is good for nothing; I cannot bind you, and you cannot bind me, and therefore I desire, before the event happens, that you will pay me back my money:"

In the present case Cass could not bind the solicitors so both before and after the event, they can recover their money to the extent that as between the club and the solicitors, the stakes unjustly enriched the club and were retained by the club.

In *Hudson v. Robinson* (1816) 4 M. & S. 475, a partner fraudulently contracted in the names of the partnership to sell goods to the plaintiff. The fraud received the purchase price from the plaintiff and defaulted in delivery of the goods. It was held that the plaintiff could recover the purchase price from the fraud as money had and received. Lord Ellenborough C.J. said, at p. 478:

"It is said that an action for money had and received is not maintainable in this case. But an action for money had and received is maintainable wherever the money of one man has, without consideration, got into the pocket of another. Here the money of the plaintiffs has got into the pocket of the defendant; and the question is whether this has been without any consideration. The consideration was the supposed right of the defendant to dispose of the goods as partnership property, which was the inducement to the plaintiffs to give this bill, under which they have been obliged to pay the money. The defendant had no such right; therefore the absence of any consideration entitles the plaintiffs to maintain this action, and still more so where the money has got in to the defendant's pocket through the medium of a fraud."

Here the money of the solicitors got into the pocket of the club without any consideration.

In *Bainbrigge v. Browne* (1881) 18 Ch.D. 188, the plaintiff children, under the influence of their father, charged by deed their reversionary interest under a settlement as security for advances made by the defendants to the father. Fry J. held, at p. 197, that undue influence:

"operates against the person who is able to exercise the influence (in this case it was the father) and, in my judgment, it would operate against every volunteer who claimed under him, and also

*[1991] 2 A.C. 548 Page   565*

against every person who claimed under him with notice of the equity thereby created, or with notice of the circumstances from which the court infers the equity."

On the facts the defendants who were not volunteers did not have the requisite notice and were entitled to enforce their security. In the present case the club is in the same position as a volunteer.

In *Shoolbred v. Roberts* [1899] 2 Q.B. 560, an undischarged bankrupt played a match at billiards for £100 a side, the money being deposited with stakeholders. The bankrupt was the winner. It was held that the trustee in bankruptcy of the winner was entitled to recover from the stakeholder the bankrupt's stake of £100 but not the stake of the loser. Phillimore J. held, at p. 564, that on the authorities:

"... I am bound now to hold ... that where people embark in a perfectly lawful game and contest of skill, not trusting to fortune but to skill, to ascertain the comparative eminence of the two persons, the sums which they deposit to make a joint award are to be considered by the law as sums deposited by way of wagering, the contract is null and void, and the winner cannot recover the fund."

A fortiori, the club, as against the solicitors, is not entitled to retain the solicitors' money on the grounds that the club might have lost and paid its wager with Cass.

Phillimore J. also held in *Shoolbred v. Roberts*, at pp. 564-565, that the £100 staked by the bankrupt was his money and was part of his property which his trustee in bankruptcy had a right to recover from the stakeholder. If the bankrupt at any time received from the stakeholder the stake of £100 which had been deposited by the loser, that receipt "must be in the eye of the law a voluntary gift by the stakeholders" or by the loser or possibly by both to the bankrupt; and if the loser should receive it of the bounty of the winner or of the bounty of the stakeholders or at the bounty of both, so far it would not go to the trustee in bankruptcy.

When Cass lost and paid £154,695 to the club as a result of gaming contracts, he made to the club a completed gift of £154,695. The club received stolen money by way of gift from the thief; the club, being a volunteer, has been unjustly enriched at the expense of the solicitors from whom the money had been stolen and the club must reimburse the solicitors.

In *Black v. S. Freedman & Co.* (1910) 12 C.L.R. 105, the High Court of Australia held that money stolen by a husband and handed over to his wife by way of gift to her could be recovered by the victim. O'Connor J. said, at p. 110:

> "Where money has been stolen, it is trust money in the hands of the thief, and he cannot divest it of that character. If he pays it over to another person, then it may be followed into that other person's hands. If, of course, that other person shows that it has come to him bona fide for valuable consideration, and without notice, it then may lose its character as trust money and cannot be recovered. But if it is handed over merely as a gift, it does not matter whether there is notice or not."

*[1991] 2 A.C. 548 Page   566*

Although the decision in this case went on the grounds of trust, the reasoning applies equally to a claim for money had and received.

In *Banque Belge pour l'Etranger v. Hambrouck* [1921] 1 K.B. 321, money stolen by a thief was paid, by way of gift, into the bank account of a woman with whom he was living. When the victim made a claim against the woman and her bankers, there stood to her credit the sum of £315 representing part of the money stolen from the victim. The victim was held entitled to the £315. In that case the woman, as a donee, had become unjustly enriched by the receipt of money stolen from the victim and retained £315, part of that money. She was bound to reimburse the victim. It was argued in favour of the woman, who had no notice of the theft, that she obtained a good title to the money because it was a gift to her from the thief and the fact that she had paid the money into her banking account prevented any following of the money and that an action for money received would therefore not lie. Bankes L.J. said, at p. 327:

> "To accept either of the two contentions with which I have been so far dealing would be to assent to the proposition that a thief who has stolen money, and who from fear of detection hands that money to a beggar who happens to pass, gives a title to the money to the beggar as against the true owner - a proposition which is obviously impossible of acceptance."

The judgments deal with the case on the basis of following trust assets but Atkin L.J. said, at p. 335:

> "as the money paid into the bank can be identified as the product of the original money, the plaintiffs have the common law right to claim it, and can sue for money had and received."

In my opinion the club in the present case are in no better position than the donee in the *Banque Belge case*.

In *Transvaal & Delagoa Bay Investment Co. Ltd. v. Atkinson* [1944] 1 All E.R. 579, money stolen from a company was paid by the thief into a bank account of his wife. All the money was expended, mostly by being returned to the husband. The difficult questions which arise when a donee innocently disposes of stolen money do not arise in the present case where the stolen money has been retained by the club.

In the instant case Alliott J. declined to extend the categories of quasi-contract so as to enable the owner of stolen property to recover the stolen money from the person to whom the thief has lost it gambling: see [1987] 1 W.L.R. 987, 992-993. But the contracts under which the club received the stolen money were void under section 18 of the Act of 1845 and the club was in no better position than a donee. On principle and on authority a donee is bound to reimburse the victim for stolen money received and retained by the donee and, in the circumstances, the club was unjustly enriched to the extent that the solicitors' money was retained by the club. The decision of Alliott J. was upheld by the Court of Appeal (May and Parker L.JJ., Nicholls L.J. dissenting) [1989] 1 W.L.R. 1340. May L.J. held that the club gave valuable consideration for the stolen money when the club issued Cass

*[1991] 2 A.C. 548 Page  567*

with chips which enabled him to gamble and when the club undertook to cash the chips. Parker L.J. considered that a contract by the club to pay cash for gaming chips was consideration for the payment by Cass of cash for the use of gaming chips. The judgments of the majority appeared also to rely on the power of Cass to purchase refreshments with chips. But neither the power to purchase refreshments nor the exercise of that power could constitute consideration for the receipt of £154,695. In my opinion the chips transaction was part of a single contract by virtue of which Cass gambled away money stolen from the solicitors. If there was a separate chips contract it was a contract which was designed and effective to enable money to be gambled, won, lost and paid and as such it was a contract by way of gaming. Nicholls L.J. said, at p. 1383:

> "the chips were not money or money's worth; they were mere counters or symbols used for the convenience of all concerned in the gaming. As tokens, the chips indicated that the holder had lodged cash with the club or, when a cheque had been used, had been given credit by the club, to the extent indicated by the tokens. It is as though the customer had been given a series of receipts in respect of the money handed over by him prior to beginning to play. The money was to go to the winners, or be returned to the customer if not spent on gaming. When the customer played at the table he was playing with the money he had brought with him to the casino, just as much as if he had used the banknotes themselves rather than the chips for which he had exchanged the banknotes preparatory to the start of play. I do not believe that this internal, preliminary, preparatory step, of issuing chips for cash, adopted for considerations of practical convenience, can have the effect in law that the club gave valuable consideration for the money it received, when the position in law under the statute is that if money rather than tokens had been used at the table, the club would not have given valuable consideration. I find such a conclusion repugnant to common sense."

I agree and would allow the appeal.

Included in the sum of £154,695 is £3,735 representing a banker's draft made out to the solicitors and endorsed by Cass to the club for chips which Cass then gambled and lost. The Court of Appeal held that the club had not become holders of the draft in due course and gave judgment for the solicitors. In this House the club cross-appealed. In my opinion the draft represented money derived from the solicitors which has unjustly enriched the club. There is no difference between the cash and the draft received by the club and the cross-appeal must be dismissed.

In the result I would order judgment to be entered for the solicitors for the sum of £154,695.

LORD GRIFFITHS. My Lords, I have had the advantage of reading the speeches of your Lordships. I agree that for the reasons given by Lord Templeman and Lord Goff of Chieveley the appellate solicitors

*[1991] 2 A.C. 548 Page   568*

can recover the sum of £150,960 from the respondent club as representing money stolen from the solicitors and the proceeds of the banker's draft lost by Cass in gaming at the respondent club.

I agree that for the reasons given by Lord Goff of Chieveley, the club converted the banker's draft made out to the solicitors' and that the cross-appeal fails.

LORD ACKNER. My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Templeman and Lord Goff of Chieveley. I agree that the appeal should be allowed for the reasons set out in both these speeches. I have also had the advantage of reading in draft the speech of my noble and learned friend, Lord Bridge of Harwich. I agree with the views which he expresses as to the availability of the defence of change of position to a claim for restitution based on unjust enrichment as developed by my noble and learned friend, Lord Goff of Chieveley in his speech.

I also agree that for the reasons given by my noble and learned friend, Lord Goff of Chieveley the cross-appeal should be dismissed.

LORD GOFF OF CHIEVELEY. My Lords, the appellants, Lipkin Gorman ("the solicitors"), are a firm of solicitors. Norman Barry Cass was a partner in the firm from 1978 to 1980. He had the authority of his partners to draw upon the solicitors' client account, on his signature alone. The account was held at the branch of Lloyds Bank ("the bank") at 62, Brook Street, London W.1.

Cass proved to be a compulsive gambler. He gambled regularly at the casino at the Playboy Club ("the club") which was owned by the respondents, though he also gambled elsewhere. Such was his addiction to gambling that he found his own resources insufficient; and so he helped himself to money in the client account. Without his partners' knowledge, between March and November 1980 he misappropriated large sums of money from the client account.

Cass used various methods to lay his hands on the money in the client account. His principal method was to have a cheque made out by the solicitors' cashier (a man named Chapman who, as the judge found, had been suborned by Cass), drawn on the client account and made payable to cash; Cass would then sign the cheque and Chapman would cash it at the bank and hand the cash to Cass. In addition, Cass caused building society accounts opened by him in the name of the solicitors to be credited with cash drawn from the client account by means of cheques made payable to various building societies; a total of £40,000 was credited to building societies in this way, during the relevant period. Cass then drew cash from the building society accounts. When Cass finally absconded, there was only £600 left in the building society accounts (excluding interest). Lastly, on one occasion Cass procured the issue of a banker's draft for £3,735 ("the banker's draft") drawn on the bank in favour of the solicitors; this he did by issuing a cheque in favour of the bank drawn on the client account. Chapman took delivery of the draft and passed it to Cass. By these means Cass dishonestly acquired a total of £323,222.14 from the client account. From time to

[1991] 2 A.C. 548 Page 569

time, however, he paid back into the client account various sums, totalling £100,313.16, to cover up shortfalls caused by his withdrawals, leaving a net shortfall of £222,908.98. It is accepted that a substantial part of the money so misappropriated by Cass, or of sums derived from it, was exchanged by Cass for gaming chips at the club, as was the banker's draft. In other words, these sums were gambled away by Cass. Indeed the total sum staked by Cass at the gaming tables of the club was no less than £561,014.06. This sum included some money of his own; but it was no doubt so large because of his restaking sums which he won from time to time, his total winnings amounting to £378,294.06. It has been agreed by the club that the net sum won by the club and lost by Cass over a period of about 10 months was £174,745. Over that period, the maximum resources of Cass were £20,050. On the basis that credit is given for the whole of that sum, it has been agreed that at least £154,695 won by the club and lost by Cass was derived from money obtained by Cass from the solicitors' client account.

At the club, Cass would present cash either at the cash desk or at the gaming tables. At the cash desk, he would be given a so-called "cheque credit slip" in exchange for cash: he would then exchange the slip for plastic chips of various denominations. If he presented cash at a gaming table, he would be given chips in exchange for the cash. These chips at all times remained the property of the club. Bets were normally made by putting down chips at the gaming table, but cash could be put down at the gaming table and if so would be accepted for bets, without any chips being used. Chips could also be accepted in lieu of cash for refreshments at the club; but their actual use for this purpose at the club appears to have been very rare, and there was no evidence that Cass ever used them for that purpose. Any unused chips, together with chips representing sums won in gaming, could be exchanged either for cash or a "winnings cheque" drawn on the club's bank. Cass however returned to the club all the winnings cheques he received, receiving in their place fresh cheque credit slips which he then exchanged for chips for the purposes of gaming.

Cass absconded to Israel. In due course he was extradited from Israel; and on 8 June 1984 he was convicted at the Central Criminal Court on 21 counts of theft of money from the solicitors' client account and sentenced to three years' imprisonment.

The solicitors commenced proceedings against both the respondents and the bank. Their claim against the respondents was for the recovery, on various grounds, of the money taken by Cass from the current account and gambled away at the club. They also claimed damages for conversion of the banker's draft. Their claim against the bank was for damages for conversion or for breach of contract, or alternatively as constructive trustees. Before Alliott J. [1987] 1 W.L.R. 987, the solicitors' claim against the respondents failed, except for

the claim for damages for conversion of the banker's draft. Their claim against the bank succeeded in part. In the Court of Appeal the solicitors' appeal from the judge's decision dismissing their claim against the respondents in respect of the money was dismissed by a majority (May and Parker L.JJ., Nicholls L.J. dissenting) [1989] 1 W.L.R. 1340. I shall refer in

[1991] 2 A.C. 548 Page   570

due course to the grounds for this decision; though I wish to record at this stage that Nicholls L.J. would have held the respondents liable in damages for conversion of the money. The respondents' cross-appeal in respect of the banker's draft was also dismissed, but the cross-appeal of the bank succeeded. Your Lordships' House has been concerned only with the appeal of the solicitors from the dismissal of their claim against the respondents, and the respondents' cross-appeal in respect of the banker's draft. The solicitors' claim against the bank has no longer been pursued.

Before the Court of Appeal, and again before your Lordships' House, the solicitors' claim against the respondents was for the full sum of £222,908.98 as money had and received. It was not a claim for conversion of the money; and, despite the view expressed by Nicholls L.J. in his dissenting judgment, I do not consider that such an alternative claim was open to the solicitors. Before the Court of Appeal, though not before the judge, the solicitors relied strongly on *Clarke v. Shee and Johnson*, 1 Cowp. 197, in support of their claim. The majority of the Court of Appeal however distinguished that case and rejected the solicitors' claim on the ground that the respondents received the money in good faith and for valuable consideration, such consideration arising first (*per* May and Parker L.JJ.) from the fact that the club supplied chips in exchange for the money, the contract under which the chips were supplied not being avoided as a contract by way of gaming or wagering under section 18 of the Gaming Act 1845; and second (*per* Parker L.J.) from the fact that, although the actual gaming contracts under which Cass gambled away the money were void under the Act, nevertheless he obtained in exchange for the money the chance of winning and of then being paid and so received valuable consideration from the club. So far as the solicitors' claim for conversion of the banker's draft was concerned, the Court of Appeal rejected a contention by the club that they could escape liability on the ground that they were holders in due course of the draft. I shall consider first the solicitors' appeal in respect of the money, and then the respondents' cross-appeal in respect of the draft; though, as will appear, the appeal and cross-appeal share certain common features.

**The solicitors' appeal**

I turn then to the solicitors' appeal in respect of the money, which they claim from the respondents as money had and received by the respondents to their use. To consider this aspect of the case it is, in my opinion, necessary to analyse with some care the nature of the claim so made.

The solicitors' claim is, in substance, as follows. They say, first, that the cash handed over by the bank to Chapman in exchange for the cheques drawn on the solicitors' client account by Cass was in law the property of the solicitors. That is disputed by the respondents who say that, since the cheques were drawn on the bank by Cass without the authority of his partners, the legal property in the money immediately vested in Cass; that argument was however rejected by the Court of Appeal. If that argument is rejected, the respondents concede for

[1991] 2 A.C. 548 Page   571

present purposes that the cash so obtained by Cass from the client account was paid by him to the club, but they nevertheless resist the solicitors' claim on two grounds: first, that they gave valuable consideration for the money in good faith, as held by a majority of the Court of Appeal; and second that, in any event, having received the money in good faith and having given Cass the opportunity of winning bets and, in some cases, recovering substantial sums by way of winnings, it would be inequitable to allow the solicitors' claim.

At the heart of the solicitors' claim lies *Clarke v. Shee and Johnson*, 1 Cowp. 197; Lofft 756. In that case the plaintiff's clerk received money and negotiable notes from the plaintiff's customers, in the ordinary course of the plaintiff's trade as a brewer, for the use of the plaintiff. From the sums so received by him, the clerk paid several sums, amounting to nearly £460, to the defendant "upon the chances of the coming up of tickets in the State Lottery of 1772," contrary to the Lottery Act 1772. The Court of Queen's Bench held that the plaintiff was entitled to recover the sum of £460 from the defendant as money had and received by him for the use of the plaintiff. The judgment of the court was delivered by Lord Mansfield. He said, at pp. 199-201:

> "This is a liberal action in the nature of a bill in equity; and if, under the circumstances of the
> case, it appears that the defendant cannot in conscience retain what is the subject matter of it,
> the plaintiff may well support this action. . . . the plaintiff does not sue as standing in the place
> of Wood his clerk: for the money and notes which Wood paid to the defendants, are the identi-
> cal notes and money of the plaintiff. Where money or notes are paid bona fide, and upon a val-
> uable consideration, they never shall be brought back by the true owner; but where they come
> mala fide into a person's hands, they are in the nature of specific property; and if their identity
> can be traced and ascertained, the party has a right to recover. It is of public benefit and exam-
> ple that it should: but otherwise, if they cannot be followed and identified, because there it
> might be inconvenient and open a door to fraud. *Miller v. Race*, 1 Burr. 452: and in *Golightly v.
> Reynolds* (1772) Lofft 88 the identity was traced through different hands and shops. Here the
> plaintiff sues for his identified property, which has come to the hands of the defendant iniqui-
> tously and illegally, in breach of the Act of Parliament, therefore they have no right to retain it;
> and consequently the plaintiff is well entitled to recover."

It is the solicitors' case that the present case is indistinguishable from *Clarke v. Shee and Johnson*. In each case, the plaintiff's money was stolen - in that case by his servant, and in the present case by a partner - and then gambled away by the thief; and the plaintiff was or should be entitled to recover his money from the re-cipient in an action for money had and received. It is the respondents' case that the present case is distin-guishable on one or more of the three grounds I have mentioned. I shall consider those three grounds in turn.

*[1991] 2 A.C. 548 Page   572*

**Title to the money**

The first ground is concerned with the solicitors' title to the money received by Cass (through Chapman) from the bank. It is to be observed that the present action, like the action in *Clarke v. Shee and Johnson*, is con-cerned with a common law claim to money, where the money in question has not been paid by the appellant directly to the respondents - as is usually the case where money is, for example, recoverable as having been paid under a mistake of fact, or for a consideration which has failed. On the contrary, here the money had been paid to the respondents by a third party, Cass; and in such a case the appellant has to establish a ba-sis on which he is entitled to the money. This (at least, as a general rule) he does by showing that the money is his legal property, as appears from Lord Mansfield's judgment in *Clarke v. Shee and Johnson*. If he can do so, he may be entitled to succeed in a claim against the third party for money had and received to his use, though not if the third party has received the money in good faith and for a valuable consideration. The cases in which such a claim has succeeded are, I believe, very rare: see the cases, including *Clarke v. Shee and Johnson*, collected in *Goff and Jones, The Law of Restitution*, 3rd ed. (1986), p. 64, note 29. This is probably because, at common law, property in money, like other fungibles, is lost as such when it is mixed with other money. Furthermore, it appears that in these cases the action for money had and received is not usually founded upon any wrong by the third party, such as conversion; nor is it said to be a case of waiver of tort. It is founded simply on the fact that, as Lord Mansfield said, the third party cannot in conscience retain the money - or, as we say nowadays, for the third party to retain the money would result in his unjust enrichment at the expense of the owner of the money.

So, in the present case, the solicitors seek to show that the money in question was their property at common law. But their claim in the present case for money had and received is nevertheless a personal claim; it is not a proprietary claim, advanced on the basis that money remaining in the hands of the respondents is their property. Of course there is no doubt that, even if legal title to the money did vest in Cass immediately on receipt, nevertheless he would have held it on trust for his partners, who would accordingly have been entitled to trace it in equity into the hands of the respondents. However, your Lordships are not concerned with an equitable tracing claim in the present case, since no such case is advanced by the solicitors, who have been content to proceed at common law by a personal action, viz. an action for money had and received. I should add that, in the present case, we are not concerned with the fact that money drawn by Cass from the solicitors' client account at the bank may have become mixed by Cass with his own money before he gambled it away at the club. For the respondents have conceded that, if the solicitors can establish legal title to the money in the hands of Cass, that title was not defeated by mixing of the money with other money of Cass while in his hands. On this aspect of the

*[1991] 2 A.C. 548 Page   573*

case, therefore, the only question is whether the solicitors can establish legal title to the money when received by Cass from the bank by drawing cheques on the client account without authority.

Before your Lordships, and no doubt before the courts below, elaborate argument was advanced by counsel upon this issue. The respondents relied in particular upon two decisions of the Privy Council as showing that where a partner obtains money by drawing on a partnership bank account without authority, he alone and not the partnership obtains legal title to the money so obtained. These cases, *Union Bank of Australia Ltd. v. McClintock* [1922] 1 A.C. 240 and *Commercial Banking Co. of Sydney Ltd. v. Mann* [1961] A.C. 1, were in fact concerned with bankers' cheques; but for the respondents it was submitted that the same principle was applicable in the case of cash. The solicitors argued that these cases were wrongly decided, or alternatively sought to distinguish them on a number of grounds. I shall have to examine these cases in some detail when I come to consider the respondents' cross-appeal in respect of the banker's draft; and, as will then appear, I am not prepared to depart from decisions of such high authority as these. They show that, where a banker's cheque payable to a third party or bearer is obtained by a partner from a bank which has received the authority of the partnership to pay the partner in question who has, however, unknown to the bank, acted beyond the authority of his partners in so operating the account, the legal property in the banker's cheque thereupon vests in the partner. The same must a fortiori be true when it is not such a banker's cheque but cash which is so drawn from the bank by the partner in question. Even so, I am satisfied that the solicitors are able to surmount this difficulty, as follows.

It is well established that a legal owner is entitled to trace his property into its product, provided that the latter is indeed identifiable as the product of his property. Thus, in *Taylor v. Plumer* (1815) 3 M. & S. 562, where Sir Thomas Plumer gave a draft to a stockbroker for the purpose of buying exchequer bills, and the stockbroker instead used the draft for buying American securities and doubloons for his own purposes, Sir Thomas was able to trace his property into the securities and doubloons in the hands of the stockbroker, and so defeat a claim made to them by the stockbroker's assignees in bankruptcy. Of course, "tracing" or "following" property into its product involves a decision by the owner of the original property to assert his title to the product in place of his original property. This is sometimes referred to as ratification. I myself would not so describe it, but it has, in my opinion, at least one feature in common with ratification, that it cannot be relied upon so as to render an innocent recipient a wrongdoer (cf. *Bolton Partners v. Lambert* (1889) 41 Ch.D. 295, 307, *per* Cotton L.J.: "an act lawful at the time of its performance [cannot] be rendered unlawful, by the application of the doctrine of ratification.")

I return to the present case. Before Cass drew upon the solicitors' client account at the bank, there was of course no question of the solicitors having any legal property in any cash lying at the bank. The relationship of the bank with the solicitors was essentially that of debtor

*[1991] 2 A.C. 548 Page   574*

and creditor; and since the client account was at all material times in credit, the bank was the debtor and the solicitors were its creditors. Such a debt constitutes a chose in action, which is a species of property; and since the debt was enforceable at common law, the chose in action was legal property belonging to the solicitors at common law.

There is in my opinion no reason why the solicitors should not be able to trace their property at common law in that chose in action, or in any part of it, into its product, i.e. cash drawn by Cass from their client account at the bank. Such a claim is consistent with their assertion that the money so obtained by Cass was their property at common law. Further, in claiming the money as money had and received, the solicitors have not sought to make the respondents liable on the basis of any wrong, a point which will be of relevance at a later stage, when I come to consider the defence of change of position.

Authority for the solicitors' right to trace their property in this way is to be found in the decision of your Lordships' House in *Marsh v. Keating* (1834) 1 Bing. (N.C.) 198. Mrs. Keating was the proprietor of £12,000 interest or share in joint stock reduced 3 per cent. annuities, standing to her credit in the books of the Bank of England, where the accounts were entered in the form of debtor and creditor accounts in the ledgers of the bank. Under what purported to be a power of attorney given by Mrs. Keating to the firm of Marsh, Sibbard & Co., on which Mrs. Keating's signature was in fact forged by Henry Fauntleroy, a partner in Marsh, Sibbard & Co., an entry was made in the books of the Bank of England purporting to transfer £9,000 of Mrs. Keating's interest or share in the stock to William Tarbutt, to whom, on the instructions of Henry Fauntleroy, the stock had been sold for the sum of £6,018 15s. In due course, the broker who conducted the sale accounted for £6,013 2s. 6d. (being the sale price less commission) by a cheque payable to Marsh & Co. Upon the discovery of the forgery, Mrs. Keating made a claim upon the Bank of England; and the bank requested Mrs. Keating to prove in the bankruptcy of the partners in Marsh & Co. in respect of the sum so received by them. Mrs. Keating then commenced an action, pursuant to an order of the Lord Chancellor, for the purpose of trying the question whether the partners in Marsh & Co. were indebted to her, in which she claimed the sum so received by Marsh & Co. as money had and received to her use. The opinion of the judges was taken, and their opinion was to the effect that Mrs. Keating was entitled to succeed in her claim. Your Lordships' House ruled accordingly. It must follow a fortiori that the solicitors, as owners of the chose in action constituted by the indebtedness of the bank to them in respect of the sums paid into the client account, could trace their property in that chose in action into its direct product, the money drawn from the account by Cass. It further follows, from the concession made by the respondents, that the solicitors can follow their property into the hands of the respondents when it was paid to them at the club.

**Whether the respondents gave consideration for the money**

There is no doubt that the respondents received the money in good faith; but, as I have already recorded, there was an acute difference of

*[1991] 2 A.C. 548 Page   575*

opinion among the members of the Court of Appeal whether the respondents gave consideration for it. Parker L.J. was of opinion that they did so, for two reasons. (1) The club supplied chips in exchange for the money. The contract under which the chips were supplied was a separate contract, independent of the contracts under which bets were placed at the club; and the contract for the chips was not avoided as a contract by way of gaming and wagering under section 18 of the Gaming Act 1845. (2) Although the actual gaming contracts were void under the Act, nevertheless Cass in fact obtained in exchange for the money the chance of winning and of then being paid and so received valuable consideration from the club. May L.J. agreed with the first of these two reasons. Nicholls L.J. disagreed with both.

I have to say at once that I am unable to accept the alternative basis upon which Parker L.J. held that consideration was given for the money, viz. that each time Cass placed a bet at the casino, he obtained in exchange the chance of winning and thus of being paid. In my opinion, when Cass placed a bet, he received nothing in return which constituted valuable consideration. The contract of gaming was void; in other words,

212

it was binding in honour only. Cass knew, of course, that, if he won his bet, the club would pay him his winnings. But he had no legal right to claim them. He simply had a confident expectation that, in fact, the club would pay; indeed, if the club did not fulfil its obligations binding in honour on it, it would very soon go out of business. But it does not follow that, when Cass placed the bet, he received anything that the law recognises as valuable consideration. In my opinion he did not do so. Indeed, to hold that consideration had been given for the money on this basis would, in my opinion, be inconsistent with *Clarke v. Shee and Johnson*, 1 Cowp. 197. Even when a winning bet has been paid, the gambler does not receive valuable consideration for his money. All that he receives is, in law, a gift from the club.

However, the first basis upon which Parker and May L.JJ. decided the point is more difficult. To that I now turn.

In common sense terms, those who gambled at the club were not gambling for chips: they were gambling for money. As Davies L.J. said in *C.H.T. Ltd. v. Ward* [1965] 2 Q.B. 63, 79:

> "People do not game in order to win chips; they game in order to win money. The chips are not money or money's worth; they are mere counters or symbols used for the convenience of all concerned in the gaming."

The convenience is manifest, especially from the point of view of the club. The club has the gambler's money up front, and large sums of cash are not floating around at the gaming tables. The chips are simply a convenient mechanism for facilitating gambling with money. The property in the chips as such remains in the club, so that there is no question of a gambler buying the chips from the club when he obtains them for cash.

*[1991] 2 A.C. 548 Page   576*

But this broad approach does not solve the problem, which is essentially one of analysis. I think it best to approach the problem by taking a situation unaffected by the impact of the Gaming Acts.

Suppose that a large department store decides, for reasons of security, that all transactions in the store are to be effected by the customers using chips instead of money. On entering the store, or later, the customer goes to the cash desk and obtains chips to the amount he needs in exchange for cash or a cheque. When he buys goods, he presents chips for his purchase. Before he leaves the store, he presents his remaining chips, and receives cash in return. The example may be unrealistic, but in legal terms it is reasonably straightforward. A contract is made when the customer obtains his chips under which the store agrees that, if goods are purchased by the customer, the store will accept chips to the equivalent value of the price, and further that it will redeem for cash any chips returned to it before the customer leaves the store. If a customer offers to buy a certain item of goods at the store, and the girl behind the counter accepts his offer but then refuses to accept the customer's chips, the store will be in breach of the contract for chips. Likewise if, before he leaves the store, the customer hands in some or all of his chips at the cash desk, and the girl at the cash desk refuses to redeem them, the store will be in breach of the contract for chips.

Each time that a customer buys goods, he enters into a contract of sale, under which the customer purchases goods at the store. This is a contract for the sale of goods; it is not a contract of exchange, under which goods are exchanged for chips, but a contract of sale, under which goods are bought for a price, i.e. for a money consideration. This is because, when the customer surrenders chips of the appropriate denomination, the store appropriates part of the money deposited with it towards the purchase. This does not however alter the fact that an independent contract is made for the chips when the customer originally obtains them at the cash desk. Indeed that contract is not dependent upon any contract of sale being entered into; the customer could walk around the store and buy nothing, and then be entitled to redeem his chips in full under the terms of his contract with the store.

But the question remains: when the customer hands over his cash at the cash desk, and receives his chips, does the store give valuable consideration for the money so received by it? In common sense terms, the answer is no. For, in substance and in reality, there is simply a gratuitous deposit of the money with the store, with liberty to the customer to draw upon that deposit to pay for any goods he buys at the store. The chips are no more than the mechanism by which that result is achieved without any cash being handed over at the sales counter, and by which the customer can claim repayment of any balance remaining of his deposit. If a technical approach is adopted, it might be said that, since the property in the money passes to the store as depositee, it then gives consideration for the money in the form of a chose in action created by its promise to repay a like sum, subject to draw-down in respect of goods purchased at the store. I however prefer the common sense approach. Nobody would say that the store has purchased the

[1991] 2 A.C. 548 Page   577

money by promising to repay it: the promise to repay is simply the means of giving effect to the gratuitous deposit of the money with the store. It follows that, by receiving the money in these circumstances, the store does not for present purposes give valuable consideration for it. Otherwise a bank with which money was deposited by an innocent donee from a thief could claim to be a bona fide purchaser of the money simply by virtue of the fact of the deposit.

Let me next take the case of gambling at a casino. Of course, if gaming contracts were not void under English law by virtue of section 18 of the Gaming Act 1845, the result would be exactly the same. There would be a contract in respect of the chips, under which the money was deposited with the casino; and then separate contracts would be made when each bet was placed, at which point of time part or all of the money so deposited would be appropriated to the bets.

However, contracts by way of gaming or wagering are void in English law. What is the effect of this? It is obvious that each time a bet is placed by the gambler, the agreement under which the bet is placed is an agreement by way of gaming or wagering, and so is rendered null and void. It follows, as I have said, that the casino, by accepting the bet, does not thereby give valuable consideration for the money which has been wagered by the gambler, because the casino is under no legal obligation to honour the bet. Of course, the gambler cannot recover the money from the casino on the ground of failure of consideration; for he has relied upon the casino to honour the wager - he has in law given the money to the casino, trusting that the casino will fulfil the obligation binding in honour upon it and pay him if he wins his bet - though if the casino does so its payment to the gambler will likewise be in law a gift. But suppose it is not the gambler but the true owner of the money (from whom the gambler has perhaps, as in the present case, stolen the money) who is claiming it from the casino. What then? In those circumstances the casino cannot, in my opinion, say that it has given valuable consideration for the money, whether or not the gambler's bet is successful. It has given no consideration if the bet is unsuccessful, because its promise to pay on a successful bet is void; nor has it done so if the gambler's bet is successful and the casino has paid him his winnings, because that payment is in law a gift to the gambler by the casino.

For these reasons I conclude, in agreement with Nicholls L.J., that the respondents did not give valuable consideration for the money. But the matter does not stop there; because there remains the question whether the respondents can rely upon the defence of change of position.

**Change of position**

I turn then to the last point on which the respondents relied to defeat the solicitors' claim for the money. This was that the claim advanced by the solicitors was in the form of an action for money had and received, and that such a claim should only succeed where the defendant was unjustly enriched at the expense of the plaintiff. If it would be unjust or unfair to order restitution, the claim should fail. It

[1991] 2 A.C. 548 Page   578

was for the court to consider the question of injustice or unfairness, on broad grounds. If the court thought that it would be unjust or unfair to hold the respondents liable to the solicitors, it should deny the solicitors recovery. Mr. Lightman, for the club, listed a number of reasons why, in his submission, it would be unfair to hold the respondents liable. These were (1) the club acted throughout in good faith, ignorant of the fact that the money had been stolen by Cass; (2) although the gaming contracts entered into by the club with Cass were all void, nevertheless the club honoured all those contracts; (3) Cass was allowed to keep his winnings (to the extent that he did not gamble them away); (4) the gaming contracts were merely void not illegal; and (5) the solicitors' claim was no different in principle from a claim to recover against an innocent third party to whom the money was given and who no longer retained it.

I accept that the solicitors' claim in the present case is founded upon the unjust enrichment of the club, and can only succeed if, in accordance with the principles of the law of restitution, the club was indeed unjustly enriched at the expense of the solicitors. The claim for money had and received is not, as I have previously mentioned, founded upon any wrong committed by the club against the solicitors. But it does not, in my opinion, follow that the court has carte blanche to reject the solicitors' claim simply because it thinks it unfair or unjust in the circumstances to grant recovery. The recovery of money in restitution is not, as a general rule, a matter of discretion for the court. A claim to recover money at common law is made as a matter of right; and even though the underlying principle of recovery is the principle of unjust enrichment, nevertheless, where recovery is denied, it is denied on the basis of legal principle.

It is therefore necessary to consider whether Mr. Lightman's submission can be upheld on the basis of legal principle. In my opinion it is plain, from the nature of his submission, that he is in fact seeking to invoke a principle of change of position, asserting that recovery should be denied because of the change in position of the respondents, who acted in good faith throughout.

Whether change of position is, or should be, recognised as a defence to claims in restitution is a subject which has been much debated in the books. It is however a matter on which there is a remarkable unanimity of view, the consensus being to the effect that such a defence should be recognised in English law. I myself am under no doubt that this is right.

Historically, despite broad statements of Lord Mansfield to the effect that an action for money had and received will only lie where it is inequitable for the defendant to retain the money (see in particular *Moses v. Macferlan* (1760) 2 Burr. 1005), the defence has received at most only partial recognition in English law. I refer to two groups of cases which can arguably be said to rest upon change of position: (1) where an agent can defeat a claim to restitution on the ground that, before learning of the plaintiff's claim, he has paid the money over to his principal or otherwise altered his position in relation to his principal on the faith of the payment; and (2) certain cases concerned with bills of exchange, in which money paid under forged bills has been held

*[1991] 2 A.C. 548 Page  579*

irrecoverable on grounds which may, on one possible view, be rationalised in terms of change of position: see, e.g. *Price v. Neal* (1762) 3 Burr. 1355, and *London and River Plate Bank Ltd. v. Bank of Liverpool* [1896] 1 Q.B. 7. There has however been no general recognition of any defence of change of position as such; indeed any such defence is inconsistent with the decisions of the Exchequer Division in *Durrant v. Ecclesiastical Commissioners for England and Wales* (1880) 6 Q.B.D. 234, and of the Court of Appeal in *Baylis v. Bishop of London* [1913] 1 Ch. 127. Instead, where change of position has been relied upon by the defendant, it has been usual to approach the problem as one of estoppel: see, e.g. *R. E. Jones Ltd. v. Waring and Gillow Ltd.* [1926] A.C. 670 and *Avon County Council v. Howlett* [1983] 1 W.L.R. 605. But it is difficult to see the justification for such a rationalisation. First, estoppel normally depends upon the existence of a representation by one party, in reliance upon which the representee has so changed his position that it is inequitable for the representor to go back upon his representation. But, in cases of restitution, the requirement of a representation appears to be unnecessary. It is true that, in cases where the plaintiff has paid money directly to the defendant, it has been argued (though with difficulty) that the plaintiff has represented to the defendant

that he is entitled to the money; but in a case such as the present, in which the money is paid to an innocent donee by a thief, the true owner has made no representation whatever to the defendant. Again, it was held by the Court of Appeal in *Avon County Council v. Howlett* that estoppel cannot operate pro tanto, with the effect that if, for example, the defendant has innocently changed his position by disposing of part of the money, a defence of estoppel would provide him with a defence to the whole of the claim. Considerations such as these provide a strong indication that, in many cases, estoppel is not an appropriate concept to deal with the problem.

In these circumstances, it is right that we should ask ourselves: why do we feel that it would be unjust to allow restitution in cases such as these? The answer must be that, where an innocent defendant's position is so changed that he will suffer an injustice if called upon to repay or to repay in full, the injustice of requiring him so to repay outweighs the injustice of denying the plaintiff restitution. If the plaintiff pays money to the defendant under a mistake of fact, and the defendant then, acting in good faith, pays the money or part of it to charity, it is unjust to require the defendant to make restitution to the extent that he has so changed his position. Likewise, on facts such as those in the present case, if a thief steals my money and pays it to a third party who gives it away to charity, that third party should have a good defence to an action for money had and received. In other words, bona fide change of position should of itself be a good defence in such cases as these. The principle is widely recognised throughout the common law world. It is recognised in the United States of America (see *American Law Institute, Restatement of the Law, Restitution* (1937), section 142, pp. 567-578 and *Palmer, The Law of Restitution* (1978), vol. III, para. 16.8); it has been judicially recognised by the Supreme Court of Canada (see *Rural Municipality of Storthoaks v. Mobil Oil Canada Ltd.* (1975) 55 D.L.R.

*[1991] 2 A.C. 548 Page  580*

(3d) 1); it has been introduced by statute in New Zealand (Judicature Act 1908, section 94B (as amended)), and in Western Australia (see Western Australia Law Reform (Property, Perpetuities and Succession) Act 1962, section 24, and Western Australia Trustee Act 1962, section 65(8)), and it has been judicially recognised by the Supreme Court of Victoria: see *Bank of New South Wales v. Murphett* [1983] 1 V.R. 489. In the important case of *Australia and New Zealand Banking Group Ltd. v. Westpac Banking Corporation* (1988) 78 A.L.R. 157, there are strong indications that the High Court of Australia may be moving towards the same destination (see especially at pp. 162 and 168, *per curiam*). The time for its recognition in this country is, in my opinion, long overdue.

I am most anxious that, in recognising this defence to actions of restitution, nothing should be said at this stage to inhibit the development of the defence on a case by case basis, in the usual way. It is, of course, plain that the defence is not open to one who has changed his position in bad faith, as where the defendant has paid away the money with knowledge of the facts entitling the plaintiff to restitution; and it is commonly accepted that the defence should not be open to a wrongdoer. These are matters which can, in due course, be considered in depth in cases where they arise for consideration. They do not arise in the present case. Here there is no doubt that the respondents have acted in good faith throughout, and the action is not founded upon any wrongdoing of the respondents. It is not however appropriate in the present case to attempt to identify all those actions in restitution to which change of position may be a defence. A prominent example will, no doubt, be found in those cases where the plaintiff is seeking repayment of money paid under a mistake of fact; but I can see no reason why the defence should not also be available in principle in a case such as the present, where the plaintiff's money has been paid by a thief to an innocent donee, and the plaintiff then seeks repayment from the donee in an action for money had and received. At present I do not wish to state the principle any less broadly than this: that the defence is available to a person whose position has so changed that it would be inequitable in all the circumstances to require him to make restitution, or alternatively to make restitution in full. I wish to stress however that the mere fact that the defendant has spent the money, in whole or in part, does not of itself render it inequitable that he should be called upon to repay, because the expenditure might in any event have been incurred by him in the ordinary course of things. I fear that the mistaken assumption that mere expenditure of money may be regarded as amounting to a change of position for present purposes has led in the past to opposition by some to recognition of a defence which in

216

fact is likely to be available only on comparatively rare occasions. In this connection I have particularly in mind the speech of Lord Simonds in *Ministry of Health v. Simpson* [1951] A.C. 251, 276.

I wish to add two further footnotes. The defence of change of position is akin to the defence of bona fide purchase; but we cannot simply say that bona fide purchase is a species of change of position. This is because change of position will only avail a defendant to the

*[1991] 2 A.C. 548 Page   581*

extent that his position has been changed; whereas, where bona fide purchase is invoked, no inquiry is made (in most cases) into the adequacy of the consideration. Even so, the recognition of change of position as a defence should be doubly beneficial. It will enable a more generous approach to be taken to the recognition of the right to restitution, in the knowledge that the defence is, in appropriate cases, available; and while recognising the different functions of property at law and in equity, there may also in due course develop a more consistent approach to tracing claims, in which common defences are recognised as available to such claims, whether advanced at law or in equity.

I turn to the application of this principle to the present case. In doing so, I think it right to stress at the outset that the respondents, by running a casino at the club, were conducting a perfectly lawful business. There is nothing unlawful about accepting bets at a casino; the only relevant consequence of the transactions being gambling transactions is that they are void. In other words, the transactions as such give rise to no legal obligations. Neither the gambler, nor the casino, can go to court to enforce a gaming transaction. That is the legal position. But the practical or business position is that, if a casino does not pay winnings when they are due, it will simply go out of business. So the obligation in honour to pay winnings is an obligation which, in business terms, the casino has to comply with. It is also relevant to bear in mind that, in the present case, there is no question of Cass having gambled on credit. In each case, the money was put up front, not paid to discharge the balance of an account kept for gambling debts. It was because the money was paid over, that the casino accepted the bets at all.

In the course of argument before your Lordships, attention was focused upon the overall position of the respondents. From this it emerged, that, on the basis I have indicated (but excluding the banker's draft), at least £150,960 derived from money stolen by Cass from the solicitors was won by the club and lost by Cass. On this approach, the possibility arose that the effect of change of position should be to limit the amount recoverable by the solicitors to that sum. But there are difficulties in the way of this approach. Let us suppose that a gambler places two bets with a casino, using money stolen from a third party. The gambler wins the first bet and loses the second. So far as the winning bet is concerned, it is readily understandable that the casino should be able to say that it is not liable to the true owner for money had and received, on the ground that it has changed its position in good faith. But at first sight it is not easy to see how it can aggregate the two bets together and say that, by paying winnings on the first bet in excess of both, it should be able to deny liability in respect of the money received in respect of the second.

There are other ways in which the problem might be approached, the first narrower and the second broader than that which I have just described. The narrower approach is to limit the impact of the winnings to the winning bet itself, so that the amount of all other bets placed with the plaintiff's money would be recoverable by him regardless of the substantial winnings paid by the casino to the gambler on the winning

*[1991] 2 A.C. 548 Page   582*

bet. On the broader approach, it could be said that, each time a bet is accepted by the casino, with the money up front, the casino, by accepting the bet, so changes its position in good faith that it would inequitable to require it to pay the money back to the true owner. This would be because, by accepting the bet, the casino has committed itself, in business terms, to pay the gambler his winnings if successful. In such circumstances, the bookmaker could say that, acting in good faith, he had changed his position, by incurring the

risk of having to pay a sum of money substantially larger than the amount of the stake. On this basis, it would be irrelevant whether the gambler won the bet or not, or, if he did win the bet, how much he won.

I must confess that I have not found the point an easy one. But in the end I have come to the conclusion that on the facts of the present case the first of these three solutions is appropriate. Let us suppose that only one bet was placed by a gambler at a casino with the plaintiff's money, and that he lost it. In that simple case, although it is true that the casino will have changed its position to the extent that it has incurred the risk, it will in the result have paid out nothing to the gambler, and so prima facie it would not be inequitable to require it to repay the amount of the bet to the plaintiff. The same would, of course, be equally true if the gambler placed a hundred bets with the plaintiff's money and lost them all; the plaintiff should be entitled to recover the amount of all the bets. This conclusion has the merit of consistency with the decision of the Court of King's Bench in *Clarke v. Shee and Johnson*, 1 Cowp. 197. But then, let us suppose that the gambler has won one or more out of a hundred bets placed by him with the plaintiff's money at a casino over a certain period of time, and that the casino has paid him a substantial sum in winnings, equal, let us assume, to one half of the amount of all the bets. Given that it is not inequitable to require the casino to repay to the plaintiff the amount of the bets in full where no winnings have been paid, it would, in the circumstances I have just described, be inequitable, in my opinion, to require the casino to repay to the plaintiff more than one half of his money. The inequity, as I perceive it, arises from the nature of gambling itself. In gambling only an occasional bet is won, but when the gambler wins he will receive much more than the stake placed for his winning bet. True, there may be no immediate connection between the bets. They may be placed on different occasions, and each one is a separate gaming contract. But the point is that there has been a series of transactions under which all the bets have been placed by paying the plaintiff's money to the casino, and on each occasion the casino has incurred the risk that the gambler will win. It is the totality of the bets which yields, by the laws of chance, the occasional winning bet; and the occasional winning bet is therefore, in practical terms, the result of the casino changing its position by incurring the risk of losing on each occasion when a bet is placed with it by the gambler. So, when in such circumstances the plaintiff seeks to recover from the casino the amount of several bets placed with it by a gambler with his money, it would be inequitable to require the casino to repay in full without bringing into

*[1991] 2 A.C. 548 Page   583*

account winnings paid by it to the gambler on any one or more of the bets so placed with it. The result may not be entirely logical; but it is surely just.

For these reasons, I would allow the solicitors' appeal in respect of the money, limited however to the sum of £150,960.

### The respondents' cross-appeal in respect of the banker's draft

The Court of Appeal unanimously affirmed the decision of the judge that the respondents were liable in damages for the conversion of the banker's draft. Two main issues arose on this aspect of the case. The first issue was whether the legal title to the draft was vested in the solicitors so as to enable them to claim that the draft was converted by the respondents, or that they were alternatively liable, on the basis of waiver of the tort of conversion, to pay to the solicitors the amount of the draft received by them from the bank as money had and received for the use of the solicitors. The second issue was whether, if such legal title was vested in the solicitors, the respondents could then defeat their claim on the ground that they were holders in due course and so protected by <u>section 38(2)</u> of the Bills of Exchange Act 1882. The judge held that the banker's draft, having been originally obtained for a lawful purpose and then improperly indorsed by Cass, was at all material times the property of the solicitors. He further held that, on the facts of the case, the respondents did not become holders in due course. He therefore held the respondents liable in damages for conversion: [1987] 1 W.L.R. 987, 994-995. In the Court of Appeal [1989] 1 W.L.R. 1340, 1360, May L.J. upheld the judge's decision, expressly affirming his conclusion that on the facts the respondents were not holders in due course; and Parker L.J. likewise upheld the judge's decision, expressly affirming his conclusion that the solicitors obtained a good title to the draft. Nicholls L.J. agreed with Parker L.J., at p. 1387, that, for the reasons

given by him, the solicitors obtained a good title to the draft; and he further held that, since (as with the cash exchanged for chips) the respondents did not give value for the draft, they could not become holders in due course under the Act.

I wish to say at once, in agreement with Nicholls L.J. and for the reasons I have already given, that the respondents never gave value for the draft, any more than they gave valuable consideration for the solicitors' money paid to them by Cass. It follows that the respondents were never holders in due course of the draft. The only question remaining is whether the solicitors obtained title to the draft.

On this aspect of the case, the respondents relied strongly on the decision of the Judicial Committee of the Privy Council in *Commercial Banking Co. of Sydney Ltd. v. Mann* [1961] A.C. 1, in which the Board consisted of Viscount Simonds, Lord Reid, Lord Radcliffe, Lord Tucker and Lord Morris of Borth-y-Gest, the advice of the Board being given by Viscount Simonds. In that case, the respondent Mann carried on his profession as a solicitor in Sydney in partnership with a man called Richardson. Mann and Richardson maintained a "trust account" in the name of the partnership with a branch of the Australian and New Zealand Bank in Sydney ("the A.N.Z. bank"). Under the partnership

*[1991] 2 A.C. 548 Page    584*

agreement, all the assets of the partnership were the property of Mann, but cheques might be drawn on the partnership bank account by either partner, Mann having given the necessary authority to the A.N.Z. bank to enable Richardson to draw on the partnership account with it. Richardson, in purported exercise of that authority, drew a number of cheques on that account, in each case there being inserted, after the word "Pay" in the printed form of cheque, the words "Bank cheque favour H. Ward" or "Bank cheque H. Ward;" he also filed application forms for bank cheques in favour of H. Ward to a like amount, purporting to sign them on behalf of the firm. He took the documents to the A.N.Z. bank, which in each case debited the firm's account and issued a bank draft of an equal amount in the form "Pay H. Ward or bearer." Each cheque was then taken by Ward to a branch of the appellant bank, and cashed over the counter. In due course, each of the cheques was paid by the A.N.Z. bank to the appellant bank. From first to last the part played by Richardson was fraudulent; Ward was not a client of the partnership, nor had any client authorised the payment to him of any money held in the trust account. Mann then sued the appellant bank for conversion of the bank cheques, or alternatively to recover the sums received by it from the A.N.Z. bank as money had and received to his use. He succeeded in his claim before the trial judge, whose decision was affirmed by the Court of Appeal of New South Wales. The Privy Council however allowed the appeal, holding (1) that Mann never obtained any title to the cheques, and (2) that he could not obtain title by ratifying the conduct of Richardson in obtaining the cheques from the A.N.Z. bank, without at the same time ratifying the dealings in the cheques by Ward and the appellant bank (a conclusion which could, in my opinion, have been reached on the alternative basis that Mann could not, by ratifying the conduct of Richardson in obtaining the cheques, thereby render the innocent appellant bank a wrongdoer). It followed that Mann's claim for damages for conversion failed, and that his alternative claim for money had and received also failed. In so holding, the Board applied the previous decision of the Privy Council in *Union Bank of Australia Ltd. v. McClintock* [1922] 1 A.C. 240, which they held to be indistinguishable on both points from the case before them.

It was the submission of the respondents in the present appeal that both cases are indistinguishable from the present case, and accordingly that in the present case the solicitors never had sufficient title to the banker's draft to found an action for damages for conversion against the respondents (or a claim for money had and received), and further that they could not make good their title by ratification of Cass's action in obtaining the money from the solicitors' client account at the bank without also ratifying his action in using the money for gambling at the club.

It is of some interest to record the process of reasoning by which the Board in *Mann's case* reached their conclusion on the issue of title. Viscount Simonds said [1961] A.C. 1, 8:

> "It is important to distinguish between what was Richardson's authority in relation on the one hand to the A.N.Z. bank and on the

*[1991] 2 A.C. 548 Page   585*

> other to Mann. No question arises in these proceedings between Mann and the A.N.Z. bank. It is clear that Mann could not as between himself and the bank question Richardson's authority to draw cheques on the trust account. The position as between Mann and Richardson was different. Richardson had no authority, express or implied, from Mann either to draw cheques on the trust account or to obtain bank cheques in exchange for them except for the proper purposes of the partnership. If he exceeded those purposes, his act was unauthorised and open to challenge by Mann. It is in these circumstances that the question must be asked whether, as the judge held, the bank cheques were throughout the property of Mann. It is irrelevant to this question what was the relation between Richardson and Ward and whether the latter gave any consideration for the bank cheques that he received and at what stage Mann learned of the fraud that had been practised upon him. The proposition upon which the respondent founds his claim is simple enough: Richardson was his partner and in that capacity was able to draw upon the trust account and so to obtain from the bank its promissory notes: therefore the notes were the property of the partnership and belonged to Mann, and Richardson could not give a better title to a third party than he himself had."

He then referred to the previous decision of the Privy Council in *McClintock's case* [1922] 1 A.C. 240, and continued, at pp. 10-11:

> "This is a direct decision that, if the acts of McClintock were unauthorised in the relevant sense of that word, the bank cheques did not when issued become the property of the plaintiffs. It appears to their Lordships that the majority of the full court in *McClintock's case* erred in regarding as decisive the fact that as between the plaintiffs and the bank McClintock was authorised to obtain bank cheques, whereas the relevant question was whether McClintock was as between the plaintiffs and himself authorised to obtain the particular cheques that were converted. Upon the verdict of the jury that he was not so authorised, they should have come to the opposite conclusion. In the same way in the present case the judge, having found that Richardson obtained the bank cheques in question in fraud of Mann and without his authority, should have gone on to hold that they did not become the property of Mann. Whether they became his by his subsequent ratification of the acts of Richardson is another question, which their Lordships will examine just as it was examined in *McClintock's case*. Upon what has been called the main question they observe that they could not hold that the respondent acquired a property in the bank cheques without directly contradicting a decision which has in 40 years been the subject of no adverse comment. And they would add that it appears to be in accordance with principle. They agree with the analysis of the transaction which was submitted by counsel for the appellant. In effect Richardson, by means of unauthorised cheques, misappropriated moneys in the trust account and used them to acquire bank cheques from the A.N.Z. bank which bound

*[1991] 2 A.C. 548 Page   586*

that bank to pay Ward or bearer out of its own money the amounts specified in the cheques. Their Lordships were not referred to any case in which in such circumstances property so acquired has been held to belong automatically to the party defrauded. In the present case, as in *McClintock's case*, counsel sought to rely on such cases as *Cundy v. Lindsay* (1878) 3 App.Cas. 459, H.L., but it appears to their Lordships as it must have done to the Board in *McClintock's case*, that the principle that the purchaser of a chattel takes it, as a general rule, subject to what may turn out to be informalities of title has no application to a case of misappropriation of funds by an agent and their subsequent application for his own purposes. That there is a remedy, perhaps more than one, available to the person defrauded is obvious, but that is

not to say that the property so acquired at once belongs to him so that he can sue in conversion a third party into whose hands it has come."

In the Court of Appeal [1989] 1 W.L.R. 1340, 1371F-G, Parker L.J. stated that he had great difficulty in following the reasoning in the two cases. I feel bound to say that I find the reasoning in the passage I have quoted completely clear. Before your Lordships, Mr. O'Brien for the solicitors was bold enough to suggest that your Lordships should hold that these cases were wrongly decided. It would take a great deal to persuade me to do so, having regard to the distinction of the judges involved; and I have heard no argument that persuades me to do so. In my opinion, the crucial question is whether, on the facts of the present case, the solicitors have succeeded in distinguishing *Mann's case* [1961] A.C. 1 on acceptable grounds.

The judge distinguished the case as follows. He held that the draft was originally obtained by Cass for a lawful purpose; he therefore received the draft with the authority of his partners, and the draft then became the property of the solicitors. This finding was strongly challenged by the respondents, both before the Court of Appeal and before your Lordships, on the ground that the point was never pleaded, and that there was in any event no evidence to support the judge's conclusion. Parker L.J. simply rejected the respondents' argument on this point without reasons; but having heard full argument upon it, I am satisfied that the respondents are justified in their complaint. It is plain that the point was never pleaded; indeed the solicitors' pleaded case was that the draft was obtained by Cass as part of his fraudulent design to loot money from the solicitors' client account for his own purposes. If the point had been pleaded, it would have been a matter for investigation at the trial whether the draft had indeed been obtained for a proper purpose, for example for the purpose of completion of a conveyancing transaction. As it was, there was no investigation of this point, and there was no evidence to support the judge's finding.

Parker L.J. sought to distinguish *Mann's case* [1961] A.C. 1 on another ground, viz. that the draft had been obtained from the bank by Chapman and then handed by him to Cass; and that when Chapman received the draft, it was his duty to hand it to the solicitors and the property therefore passed to the solicitors when he obtained possession

*[1991] 2 A.C. 548 Page   587*

of it. The difficulty with this approach is that it appears to proceed on the assumption that Chapman was acting innocently in obtaining the banker's draft from the bank and handing it to Cass; whereas the judge held that he had been suborned by Cass: see [1987] 1 W.L.R. 987, 1018. In my opinion, the receipt by Chapman of the banker's draft was no different than the receipt by Cass himself, and the introduction of Chapman into the picture makes no difference.

However, before your Lordships Mr. O'Brien for the solicitors submitted that *Mann's case* could be distinguished from the present case because the banker's cheques in that case were made payable to a third party (Ward) or bearer, whereas in the present case the banker's draft was made payable to the solicitors. Now it is true that, in *Mann's case*, it cannot have been the intention of the A.N.Z. bank that the property in the banker's cheques should, on delivery to Richardson, immediately pass to Ward. Even so, the point seems to me to be of crucial importance. For the effect of the banker's draft in the present case having been made payable to the solicitors is, in my opinion, that the solicitors had the immediate right to possession of the draft against any other person, including, of course, Cass. On this basis, as it seems to me, the solicitors had vested in them, as from the moment when the banker's draft was delivered to Cass (through Chapman) by the bank, sufficient title to enable them to bring an action for damages for conversion of the draft. Authority for this proposition is to be found in *Bute (Marquess) v. Barclays Bank Ltd.* [1955] 1 Q.B. 202. In that case one McGaw, the manager of three farms belonging to the plaintiff, applied to the Department of Agriculture for Scotland for certain subsidies in respect of the farms. After McGaw had left the plaintiff's employment, the department sent to him, in satisfaction of the application, three warrants in respect of the subsidies. The warrants were made payable to McGaw, but elsewhere on them appeared the words "for the Marquess of Bute." McGaw paid the warrants into his own personal account at a branch of defendant bank, which forwarded

them for collection and paid the proceeds into his account, upon which he then drew. It was held by McNair J. that the plaintiff was entitled to succeed in an action against the defendant bank for damages for conversion. McNair J. held that the words "for the Marquess of Bute" had the effect that, in the circumstances, the warrants were payable to the Marquess of Bute through McGaw. He further held that, in order to succeed in an action for conversion, it was enough that the plaintiff could prove that, at the time of the alleged conversion, he was entitled to immediate possession; and that, as McGaw's employment had terminated before he received the warrants, the plaintiff would have been entitled to require McGaw to deliver the warrants to him when they were received. So also in the present case, as soon as the bank handed over the banker's draft, the solicitors were entitled to require its delivery to them, the draft being made payable to them and neither Chapman nor Cass having any right to retain it against them. It is of some interest to observe that, consistent with this approach, the banker's draft could not be transferred without indorsement by or on behalf of

*[1991] 2 A.C. 548 Page    588*

the solicitors; and that when Cass used the draft at the casino, he purported to indorse it on behalf of the solicitors, although of course he did so without authority.

For this reason, which constitutes another ground upon which Parker L.J. relied in the Court of Appeal, I am of the opinion that the solicitors had sufficient title to enable them to proceed in an action of conversion against Cass, or, in due course, against the respondents. It follows that since, for the reasons I have already given, the respondents cannot claim to have been holders in due course of the banker's draft, their cross-appeal must fail.

I understand that (failing agreement between them) counsel for the parties will make submissions to your Lordships on interest and costs after judgment has been delivered.*

*Appeal allowed.*

*Cross-appeal dismissed.*

Solicitors: Reynolds Porter Chamberlain; Clifford Chance.

A. R.

* *Reporter's Note.* Those matters had not been resolved at the time of going to press.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

# *143  El Ajou v Dollar Land Holdings plc & Anor

 **Positive/Neutral Judicial Consideration**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
2 December 1993

**Report Citation**
[1994] B.C.C. 143

Court of Appeal (Civil Division)

Nourse , Rose and Hoffmann L JJ.

Judgment delivered 2 December 1993

*Knowing receipt of trust funds—Knowledge of company—Plaintiff victim of fraud sought to trace proceeds to company—Whether plaintiff could trace proceeds—Whether knowledge of director was attributable to company.*

This was an appeal by the plaintiff from a judgment of Millett J *[1993] BCC 698* , raising the question whether, for the purposes of establishing a company's liability under the 'knowing receipt' head of constructive trust, the knowledge of one of its directors could be treated as the knowledge of the company.

The plaintiff was one of many victims of a massive share fraud carried out in Amsterdam by three Canadians between 1984 and 1985. He claimed to be able to trace some of the proceeds of the fraud from Amsterdam through intermediate resting places in Geneva, Gibraltar, Panama and Geneva (again) to London, where they were invested in a joint venture to carry out a property development project in Battersea in conjunction with the first defendant, Dollar Land Holdings plc ('DLH'). The plaintiff sought to recover from DLH, alleging that DLH's chairman, 'F', possessed the necessary knowledge attributable to DLH that the funds represented the proceeds of fraud.

On the question of F's knowledge the judge held that F's position as chairman and non-executive director of DLH was insufficient by itself to constitute his knowledge ipso facto the knowledge of DLH. He further held that F did not act as the agent of DLH in obtaining the money from the Canadians: F discovered that the Canadians were fraudsters and that their money had been obtained by fraud at a time when he was acting in his own interest and as a director of another company, and not as a director of DLH. In seeking finance on ordinary commercial terms, and in the absence of anything to put it on inquiry, DLH was not bound to inquire as to the source of the money it was offered; and, that being so, F was under no obligation to tell DLH what he knew. The judge also held that at the time of the relevant transaction (in March 1988) F had ceased to be a director of DLH for nine months, and he had nothing at all to do with the transaction: even if F's knowledge could have been attributed to DLH in 1986, it was wrong to treat DLH as still possessing that knowledge in 1988.

By a respondent's notice, DLH challenged the judge's finding that the plaintiff had established that the money in an account in Geneva, used to secure an advance to finance the project, represented the proceeds of the fraud, which had been remitted from Gibraltar to Panama. The issues on the appeal were: the source of the money in the Geneva account; the identity of the assets received by DLH and the dates when it received them; and whether the admitted knowledge of the frauds on the part of F could be imputed to the company.

© 2021 Thomson Reuters

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

*Held* , allowing the appeal:

1.  The judge's conclusions on the assets received by DLH were correct, as was his finding that the money could be traced to the proceeds of fraud by the Canadians.

2.  The transactions to be considered were those by which DLH received assets representing the moneys fraudulently misapplied. The responsibility for the management and control of those transactions was not to be determined by identifying those who were responsible for deciding that DLH would participate in the project and the nature and extent of that participation, far less by identifying those who were responsible for business decisions generally. Millet J's unchallenged conclusion that the 'moving force' behind the company's *144 activities was 'S', although neither a director nor an employee, did not preclude a finding that F was the company's directing mind and will in relation to some activities.

3.  In relation to the relevant transactions, F as an individual exercised powers on behalf of the company which identified him as the company's directing mind and will. So far as the constitution of DLH was concerned, he committed the company to the transaction as an autonomous act which the company adopted by performing the agreement.

4.  It did not matter that by the time of the relevant transaction F had ceased to be a director. Once his knowledge was treated as being the knowledge of the company in relation to a given transaction, the company continued to be affected with that knowledge for any subsequent stages of the same transaction.

5.  F acquired his knowledge of the fraudulent misapplication as a director of another company. As agent, he was under no obligation to disclose his knowledge to DLH, there being no duty on DLH to enquire as to the source of the offered money. ( *Re David Payne & Co Ltd [1904] 2 Ch 608 applied* .)

The following cases were referred to in the judgments:

*Baldwin v Casella (1872) LR 7 Ex 325* .
*Blackburn, Low & Co v Thomas Vigors (1887) 12 App Cas 531* .
*Blackley v National Mutual Life Association of Australasia Ltd [1972] NZLR 1038* .
*Carew's Estate Act, Re (No. 2) (1862) 31 Beav 39; 54 ER 1051* .
*Dresser v Norwood & Anor (1864) 17 CB (NS) 466; 144 ER 188* .
*Fenwick, Stobart & Co Ltd, Re [1902] 1 Ch 507* .
*Gladstone & Anor v King (1813) 1 M & S 35; 105 ER 13* .
*Hampshire Land Co, Re [1896] 2 Ch 743* .
*Kelly v Cooper & Anor [1993] AC 205* .
*Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705* .
*Payne (David) & Co Ltd, Re [1904] 2 Ch 608* .
*Powles v Page (1846) 3 CB 16; 136 ER 7* .
*R v Andrews-Weatherfoil Ltd [1972] 1 WLR 118* .
*Regina Fur Co Ltd v Bossom [1957] 2 L1 Rep 466* .
*Tanham v Nicholson (1872) LR 5 HL 561* .
*Tesco Supermarkets Ltd v Nattrass [1972] AC 153* .
*Turton v London and North-Western Railway Co (1850) 15 LT(OS) 92* .

© 2021 Thomson Reuters.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

Representation

Michael Beloff QC , Roger Ellis and Sarah Moore (instructed by Bower Cotton & Bower ) for the appellant.
Romie Tager (instructed by Kaufman Kramer Shebson ) for the respondents.

JUDGMENT

Nourse LJ:

Introduction

Of the questions that remain in dispute in this case, the most important is whether, for the purposes of establishing a company's liability under the 'knowing receipt' head of constructive trust, the knowledge of one of its directors can be treated as having been the knowledge of the company. That is essentially a question of company law. There are or have been other questions on tracing and constructive trust.

The company is the first defendant, Dollar Land Holdings plc ('DLH'). The director is Mr Sylvain Ferdman, who was the chairman and one of the three directors of DLH between June 1985 and June 1987. The party who seeks to recover against DLH in constructive trust is the plaintiff, Abdul Ghani El Ajou. He has put his claim at £1.3m. On 12 June 1992, after a trial extending over some 11 days, Millett J delivered a reserved judgment dismissing the plaintiff's action *[1993] BCC 698* . He held that the plaintiff had an equitable right to trace the money into the hands of DLH, but that Mr Ferdman's *145* knowledge of their fraudulent misapplication could not be treated as having been the knowledge of DLH, either on the ground of his having been its directing mind and will or on the ground of his having been its agent in the transaction. The judge found that another person closely concerned with the affairs of DLH, Mr William Stern, did not have the requisite knowledge of the misapplication. The plaintiff now appeals to this court. He does not seek to upset the judge's finding in regard to Mr Stern. DLH has put in a respondent's notice whose primary purpose is to impugn the judge's finding as to one part of the tracing exercise.

Millett J's judgment is reported at *[1993] BCC 698* . Because the report sets out in full the judge's clear and necessarily lengthy statement of the facts and because the issues have narrowed in this court, the facts can now be stated relatively briefly. I will state them mainly in the judge's own words.

The facts

The plaintiff is a wealthy Arab businessman resident in Riyadh. He was the largest single victim, though only one of many victims, of a massive share fraud carried out in Amsterdam between 1984 and 1985 by three Canadians, Allan Lindzon (or Levinson), Lloyd Gaplan and Harry Roth ('the Canadians'). Some of the proceeds of the fraud were passed from Amsterdam through intermediate resting places in Geneva, Gibraltar, Panama and Geneva (again) to London, where in 1986 they were invested in a joint venture to carry out a property development project at Nine Elms in Battersea in conjunction with DLH. The interest of the Canadians in the joint venture was bought out by DLH in 1988, which is a public limited company incorporated in England but resident for tax purposes in Switzerland. It is a holding company. Its principal activities, carried on through its subsidiaries, are property dealing and investment. At the material time it was in a substantial way of business. It denies that in 1986 it had any knowledge that the money which the Canadians invested in the project represented the proceeds of fraud. Moreover, in buying out their interest in 1988 it claims to have been a bona fide purchaser for value without notice of the fraud.

Mr Ferdman is a Swiss national, resident in Geneva. He worked for many years for the Bank of International Credit in Geneva. In 1972 he left the bank and set up his own company, Société d'Administration et de Financement SA ('SAFI'), through which he acted as a fiduciary agent. SAFI was originally owned jointly by Mr Ferdman and an old-established Swiss cantonal bank

© 2021 Thomson Reuters.

3

of good reputation, but in 1982 Mr Ferdman became its sole proprietor. SAFI acted as a fiduciary agent for clients who did not wish their identities to be disclosed. Two of its clients were Mr Singer and Mr Goldhar, who were associates of the Canadians. Mr Ferdman was accustomed to accept funds from clients without questioning their origin, and to act for clients who were anxious to conceal their identity. He regarded the need to preserve his clients' anonymity as paramount–without it he would have had no business – and to this end he was willing on occasion to present himself or SAFI as a beneficial owner and to make false statements to that effect. The judge found that it must have been plain to Mr Ferdman by the end of October 1985 that Singer and Goldhar were implicated in a fraud. Moreover, Mr Ferdman admitted to the judge at the trial that he knew perfectly well that the Canadians were involved with Singer and Goldhar in the fraud and were not just behind them. The Canadians also had a fiduciary agent resident in Geneva who acted for them. He was Mr David D'Albis, an American citizen.

DLH is an English company which was formerly listed on the London Stock Exchange. In June 1985 its entire issued share capital was acquired by Keristal Investments and Trading SA ('Keristal'), a Panamanian company beneficially owned by a Liechtenstein foundation. In the annual reports of DLH Mr Ferdman described himself as the beneficial owner of Keristal, but that was not the case. He was simply preserving  *146*  the anonymity of his principals, the founders and beneficiaries of the Liechtenstein foundation, who were two US citizens resident in New York ('the Americans'). The judge recorded that the plaintiff was satisfied that the Americans had no connection of any kind with the Canadians or their associates or any of the other persons involved in the fraud.

DLH was acquired as a vehicle for the Americans' property dealings in the United Kingdom. Its business activities were under the direction of Mr William Stern, described by the judge as a property dealer who suffered a spectacular and well – publicised bankruptcy as a result of the 1974 property crash. He was engaged in the business of identifying opportunities for property investment and introducing them to investors willing to pay him a fee or a share in the eventual profits. Mr Stern had lived in Geneva as a boy and was acquainted with Mr Ferdman. They became friends, though they lost contact with each other for some years. Mr Stern knew that he was a fiduciary agent and had established SAFI, which he believed still to be jointly owned by Mr Ferdman and a reputable cantonal bank. From time to time he suggested deals to Mr Ferdman and enquired of him whether he had any suitable investors among his clients.

Mr Ferdman introduced the Americans to Mr Stern, who was able to recommend a successful investment in a UK property. The Americans were willing to make further investments in the UK, and Mr Stern suggested that he should look for a suitable English vehicle, if possible a quoted company, which they could acquire and use as a medium for further investment. Mr Stern found DLH and Keristal acquired it as a pure cash shell in June 1985. Mr Ferdman and Mr Favre and Mr Jaton, two fellow directors of SAFI, were appointed to be the directors of DLH and Mr Ferdman its chairman. The judge described the three of them as nominee directors representing the interests of the beneficial owners. They played no part in the conduct of DLH's business which was carried on by Mr Stern in consultation with the Americans. Mr Stern was not a director of DLH, but he was appointed managing director of Dollar Land Management Ltd, one of its subsidiaries. DLH was in a substantial way of business and was able to raise very large sums on the security of its assets. At the end of 1986 it had secured bank loans and other mortgage creditors of more than £10m. By the end of 1987 that figure had risen to more than £30m.

Mr Stern asked Mr Ferdman if he could find an investor willing to put up equity finance for the Nine Elms project. Mr Ferdman, who was to receive from DLH an introductory commission of five per cent of the funds obtained, brought one of the Canadians, Roth, to London in March 1986 and introduced him to Mr Stern, who provided him with a detailed investment proposal which included a profit forecast. All negotiations were conducted between Roth and Mr Stern. Mr Ferdman played no part. By a letter dated 20 March 1986 and addressed to Roth, care of SAFI in Geneva, the terms which had been agreed between him and Mr Stern were set out. Although that letter was signed by Mr Ferdman, it was composed entirely by Mr Stern. I will return to it later in this judgment.

On 25 March Mr Ferdman copied the letter of 20 March (with two variations which the judge inferred were made at the request of the Canadians) by telex to Mr D'Albis, who gave instructions on the same day for £270,000 to be transferred from

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

Geneva to the Royal Bank of Scotland in London for the account of DLH's solicitors, Grangewoods. The judge found that that sum represented proceeds of the fraud and that finding has not been questioned in this court. Subsequently, Mr Ferdman despatched a duplicate of the telex in the form of a letter on DLH's headed paper, and over his own signature, to Yulara Realty Ltd ('Yulara') in Panama. That letter was dated 7 April. Again, I will return to it later. Yulara was a Panamanian company owned by the Canadians, which Mr Ferdman knew was a vehicle for their investment in the Nine Elms *147 project. Mr Ferdman retained on his own files a copy of the letter countersigned by a Panamanian lawyer on behalf of Yulara by way of acceptance.

Contracts for the purchase of the Nine Elms site were exchanged on 26 March. The purchaser was a subsidiary of DLH, Dollar Land (London) Ltd ('DLH London'). The £270,000 which Grangewoods had received on the previous day was used to pay the deposit. On 11 June 1986 DLH London assigned the benefit of the contract to DLH for £100,000 and on the same day DLH entered into a contract for the sale of the site to Regalian Properties (Northern) Ltd ('Regalian'). Completion took place on the same day at a price of £2.7m, £1m of which was recorded as being paid by DLH.

The further funding of the project was complex. Reduced to its essentials, the method adopted was as follows. On 6 May 1986 Keristal (expressed to be represented by Mr Ferdman) and Yulara (expressed to be represented by the Panamanian lawyer) entered into a written loan agreement which was signed by them on behalf of Keristal and Yulara respectively. The agreement recited that Keristal was the holding company of DLH and that Yulara and DLH had entered into an agreement as per the letter dated 7 April. Article 1 was in substance a further recital to the effect that Yulara was making available or had given to Keristal (it is not clear which) the amount of up to $2.5m for as long as the agreement as per the letter of 7 April would be in force. By art. 2 Keristal accepted that amount on terms that it undertook to use the funds (a) 'in order to make a joint venture in a certain real estate investment in London' in accordance with the terms contained in the letter dated 7 April and (b) 'in order to [obtain] a bank guarantee of £1,300,000 to be issued in favour of [DLH London] or another company owned by [DLH]'.

On 12 and 16 May respectively two sums of $1,541,432 and $1,143,000, making a total of $2,684,432, were credited to an account of Keristal ('the Keristal No. 2 account') at Banque Scandinave in Geneva. The account was operated by SAFI and was used exclusively for the purpose of funding the Nine Elms project. The bank statement for the account shows that the first sum came from the Bank of America; the source of the second is not shown. The judge found that both sums were traceable to Panama as proceeds of the fraud. That is the finding which the respondent's notice seeks to impugn. I will return to it shortly.

Pursuant to arrangements made by Mr Ferdman, Scandinavian Bank Group plc in London then agreed to advance £1.3m to Factotum NV ('Factotum'), a shelf company previously incorporated by Mr Ferdman in the Netherland Antilles, which he decided to make use of as a convenient vehicle for channelling the money to DLH. (Factotum is the second defendant in the action, but it has no assets and has never been served.) The advance was supported by a guarantee given by Banque Scandinave secured on the moneys in the Keristal No. 2 account. The whole of the loan from Scandinavian Bank in London to Factotum was drawn down and £1,030,000 was paid into Grangewoods' client account on 29 May. Of those moneys £745,598.60 were used to discharge the amount due from DLH on completion of the purchase of the site on 11 June. The balance was used to discharge obligations of DLH and to make various other payments at the direction of DLH, including payment to Mr Ferdman of his introductory commission of £65,000.

It is clear from the foregoing that the £1,030,000 paid to Grangewoods represented moneys that had been credited to the Keristal No. 2 account. It is also clear that the moneys so credited belonged to the Canadians. What is in dispute is the judge's finding that they represented moneys which Mr D'Albis had sent to Panama from Gibraltar on 30 March and 1 April 1986, a fact that had to be established in order that they could be treated as proceeds of the fraud. It is convenient to deal with that question now.

*148

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

Tracing through Panama

The question was dealt with by the judge between pp. 713 and 715. He said that the plaintiff was unable, by direct evidence, to identify the moneys in the Keristal No. 2 account with the money which Mr D'Albis had sent to Panama only a few weeks before. However, he thought that there was sufficient, though only just, to enable him to draw the necessary inference. At p. 713G, he continued:

'One of the two sums received in the Keristal No. 2 account was $1,541,432 received on 12 May 1986 from Bank of America. That corresponds closely with the sum of $1,600,000 transferred to Bank of America, Panama on 1 April 1986. In relation to the later transaction, Bank of America may, of course, merely have been acting as a correspondent bank in New York and not as the paying bank; and the closeness of the figures could be a coincidence. It is not much, but it is something; and there is nothing in the opposite scale. The source of the other money received in the Keristal No. 2 account is not known, but from the way in which the Canadians appear to have dealt with their affairs, if one sum came from Panama, then the other probably did so too.'

At p. 714C, after considering other points on each side, the judge said that the fact remained that there was no evidence that the Canadians had any substantial funds available to them which did not represent proceeds of the fraud. At p. 715A, he concluded:

'In my judgment, there is some evidence to support an inference that the money which reached the Keristal No. 2 account represented part of the moneys which had been transmitted to Panama by the second tier Panamanian companies some six weeks previously, and the suggestion that it was derived from any other source is pure speculation.'

Mr Tager, for DLH, submitted that neither of the routes followed by the judge led to the conclusion that he reached. He took us carefully through the bank statement for the Keristal No. 2 account. He relied on the fact that there were two separate credits to it of very precise amounts, the second having been made four working days after the first. It had been impossible to identify the source of the second credit. All this suggested that the two credits had come from different sources. There was no necessary connection between the first and the sum of $1.6m that had been sent from Gibraltar to the Bank of America in Panama on 1 April. Mr Tager argued that there were other very substantial funds available to the Canadians. He disputed the judge's view that there was no evidence that they had any substantial funds available to them that did not represent proceeds of the fraud. He submitted that the plaintiff had not discharged the evidential burden of establishing the necessary link. Having carefully considered these and other arguments of Mr Tager, I remain unconvinced that the judge drew the wrong inference. I well appreciate both that the question is of critical importance to the plaintiff's case and that, since it depends almost entirely, if not exclusively, on documentary evidence and undisputed events, we in this court are, in theory at any rate, in as good a position to draw an inference as the judge himself. In practice, however, the judge, after an 11 day trial, was in a much better position than we are. From all that I have seen and heard of the case, I would feel no confidence at all in saying that the judge had drawn the wrong inference.

The assets received by DLH

On the footing that the moneys credited to the Keristal No. 2 account were proceeds of the fraud, it becomes necessary to identify the assets received by DLH and the dates when it received them. The plaintiff's position is a simple one. He says that DLH received £270,000 on 25 March 1986 and a further £1,030,000 in June 1986 (though logically he *149 ought to say on 29 May 1986, when the latter sum was paid into Grangewoods' client account; see further below). The judge considered these questions at pp. 716–717. He thought that the position was somewhat more complicated than the plaintiff would have had it.

As to the £270,000, the judge said, at p. 716G:

© 2021 Thomson Reuters.

'The sum of £270,000 was never received by DLH. It was paid into Grangewoods' client account, and their client at the time must be taken to have been DLH London. DLH London was not a nominee or agent for DLH. As had previously been agreed between Roth and Mr Stern, it was the intended contractual purchaser of the site, and the money was to be used exclusively for the payment of the deposit on exchange of contracts. In my judgment, DLH did not receive the money at all, and DLH London did not receive it beneficially but upon trust to apply it for a specific purpose. DLH London used the money, as it was bound to do, to pay the deposit on the site, and thereby acquired for its own benefit a corresponding interest in the site which it subsequently sold and transferred to DLH. The plaintiff can follow his money through these various transactions, but the relevant asset capable of being identified as having been received by DLH is an interest in the site corresponding to the payment of the deposit.'

This question depends on the true construction and effect of the letter of 20 March 1986. Both Mr Beloff QC, for the plaintiff, and Mr Tager referred to its terms at some length in order to determine whether DLH London had acted as principal or as agent for DLH. Although he was not greatly concerned either way, Mr Beloff submitted that DLH London had acted as agent and that the £270,000 was accordingly received by DLH on 25 March. But in my view the judge was right, as a matter of construction, to conclude that DLH London, and not DLH itself, was the principal, so that it was that company that was Grangewoods' client when the money was received. I therefore agree with the judge that DLH did not receive anything on 25 March, but that on the assignment of the benefit of the contract to it on 11 June it received an interest in the site corresponding to the payment of the deposit.

As to the balance of £1,030,000, the judge said, at p. 717A:

'The sum of £1,030,000 was also paid into Grangewoods' client account, but by then their client had become DLH. The money was disbursed on the instructions and for the benefit of DLH. Only £745,598.60 was used to pay the money due to the vendor on completion, but this was the result of the arrangements which DLH had made with Regalian. So far as Yulara is concerned, the whole £1.3m must be taken to have been disbursed as agreed between them on the acquisition of a 40 per cent interest in the project. Moreover, in my judgment, on a proper analysis of the transaction between Yulara and DLH, Yulara's money should be treated as having been invested in its share of the project, and not in or towards the acquisition of DLH's share.

The investment proved highly successful. In itself it was not a breach of trust and caused the plaintiff no loss. Had he been able to intervene before the Canadians were bought out, he could have claimed the whole of Yulara's interest in the project; but whatever the extent of DLH's knowledge of the source of Yulara's funds, his claim would have been confined to Yulara's interest in exoneration of that of DLH. In the events which have happened, the plaintiff is in my judgment bound to treat his money as represented by Yulara's interest in the project, and must rely exclusively on the transaction on 16 March 1988 when Yulara's interest was bought out by DLH.'

For a reason which will become clear when I deal with the question whether Mr Ferdman was the directing mind and will of DLH, Mr Beloff expressed greater concern *150* at the judge's decision of this question. However, subject to one point, I feel unable to differ from his reasoning on it.

I am puzzled by the judge's suggestion that by the time the £1,030,000 was paid into Grangewoods' client account their client had become DLH. At p. 709F he had found that that payment was made on 29 May, before the assignment of the benefit of the contract by DLH London to DLH on 11 June. However, this point (which was not addressed in argument), though it may be of importance in relation to the date at which DLH must be treated as having had knowledge of the fraud (see below), does not affect the judge's view of the asset received by DLH in respect of the £1,030,000 and the date when it received it.

## Knowledge

It having been established that DLH received assets representing proceeds of the fraud, I come to the question of knowledge. By the end of the hearing there could have been no doubt that Mr Ferdman himself had the requisite knowledge. At p. 718H, the judge said of him:

'He freely admitted that he knew that the persons who were providing the money for the Nine Elms project were the persons who had been behind the fraud in Amsterdam; and that by 7 April 1986, when he signed the letter to Yulara, he knew (or assumed) that the money which he would be receiving into the Keristal No. 2 account was part of the proceeds of the fraud.'

Thus arises the most important question remaining in dispute, which is whether Mr Ferdman's knowledge can be treated as having been the knowledge of DLH. The plaintiff contends that it can and ought to be, first, on the ground that Mr Ferdman was, in relation to DLH's receipt of the assets representing the moneys fraudulently misapplied, its directing mind and will; secondly and alternatively, on the ground that he was its agent in the transaction. Because a company's directing mind and will are often the mind and will of one or more of its directors and because a director is for many purposes an agent of the company, there is a danger of confusion between the two grounds on which the plaintiff relies. But they are, as the judge made clear, quite separate. The plaintiff can succeed on either. The convenient course is to deal with the law and the facts in regard to each of them in turn.

## Directing mind and will

This doctrine, sometimes known as the alter ego doctrine, has been developed, with no divergence of approach, in both criminal and civil jurisdictions, the authorities in each being cited indifferently in the other. A company having no mind or will of its own, the need for it arises because the criminal law often requires mens rea as a constituent of the crime, and the civil law intention or knowledge as an ingredient of the cause of action or defence. In the oft-quoted words of Viscount Haldane LC in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705* at p. 713:

'My Lords, a corporation is an abstraction. It has no mind of its own any more than it has a body of its own; its active and directing will must consequently be sought in the person of somebody who for some purposes may be called an agent, but who is really the directing mind and will of the corporation, the very ego and centre of the personality of the corporation.'

The doctrine attributes to the company the mind and will of the natural person or persons who manage and control its actions. At that point, in the words of Millett J at p. 719B:

'Their minds are its mind; their intention its intention; their knowledge its knowledge.'

*151

It is important to emphasise that management and control is not something to be considered generally or in the round. It is necessary to identify the natural person or persons having management and control in relation to the act or omission in point. This was well put by Eveleigh J in delivering the judgment of the Criminal Division of this court in *R v Andrews-Weatherfoil Ltd [1972] 1 WLR 118* at p. 124C:

'It is necessary to establish whether the natural person or persons in question have the status and authority which in law makes their acts in the matter under consideration the acts of the company so that the natural person is to be treated as the company itself.'

© 2021 Thomson Reuters.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

Decided cases show that, in regard to the requisite status and authority, the formal position, as regulated by the company's articles of association, service contracts and so forth, though highly relevant, may not be decisive. Here Millett J adopted a pragmatic approach. In my view he was right to do so, although it has led me, with diffidence, to a conclusion different from his own.

DLH contends that its directing mind and will in relation to its receipt of the assets representing the moneys fraudulently misapplied were either the mind and will of Mr Stern alone or of Mr Stern and the Americans together. They were not the mind and will of Mr Ferdman. The judge's acceptance of this contention is expressed at p. 719D:

'In 1986 [DLH's] directors were all officers of SAFI, but they were merely nominee directors representing the interests of the Americans. Mr Ferdman was a non-executive director. His only executive responsibilities were to act as a fiduciary agent, represent the interests of the Americans, and ensure that the necessary corporate documentation was in order. The witnesses agreed that, in the early days of DLH, Mr Ferdman played a bigger role than he did [later]; but I do not think that that was due to any change in his role. He was always responsible for the formal paper work, but not for the business. As the business expanded, so his relative importance diminished. Even in 1986, he played no part in business decisions. These were taken by Mr Stern in consultation with the Americans. In my judgment, Mr Ferdman's position as chairman and non-executive director of DLH was insufficient by itself to constitute his knowledge ipso facto the knowledge of DLH.

It has not been alleged, still less established, that the other two officers of SAFI, who with Mr Ferdman constituted the board of DLH in 1986, shared Mr Ferdman's knowledge of the source of the Canadians' money, but in my judgment it would make no difference if they did. Like Mr Ferdman, they were merely nominee directors with non-executive responsibility. They had no authority to take business decisions. In relation to its business affairs in 1986, neither Mr Ferdman alone nor the board as a whole can realistically be regarded as the directing mind and will of DLH.'

In disagreeing with the judge on this question, I start from the position that the transactions to be considered are those by which DLH received assets representing the moneys fraudulently misapplied. The responsibility for the management and control of those transactions is not to be determined by identifying those who were responsible for deciding that DLH would participate in the Nine Elms project and the nature and extent of that participation, far less by identifying those who were responsible for business decisions generally. Neither Mr Stern nor the Americans made any of the arrangements for the receipt or disbursement of the moneys by Grangewoods. Nor did they commit DLH to the obligations correlative to their receipt. None of them had the authority to do so. That was the responsibility of Mr Ferdman. The crucial considerations are that Mr Ferdman made all the arrangements for the receipt and disbursement of the £270,000 and the £1,030,000; that it was he who signed the letter of 20 March to Roth; that it was *152* he who, on 25 March, copied that letter to Mr D'Albis; that it was he who signed and despatched the letter of 7 April to Yulara; that it was he who, on 6 May, signed the agreement with Yulara; and that it was those steps that caused DLH to become involved in the project and enabled it later to acquire the assets representing the moneys fraudulently misapplied.

Each of the steps taken by Mr Ferdman was taken without the authority of a resolution of the board of DLH. That demonstrates that as between Mr Ferdman on the one hand and Mr Favre and Mr Jaton on the other it was Mr Ferdman who had the de facto management and control of the transactions. It may be that that state of affairs involved some breach of the directors' duties to DLH. But that would not enable DLH to say that Mr Favre and Mr Jaton were parties to its directing mind and will in any relevant respect. Mr Tager sought to show that they did perform duties as directors of DLH. No doubt they did. But there is no real evidence that they had any responsibility for the transactions in question. In my view the directing mind and will of DLH in relation to the relevant transactions between March and June 1986 were the mind and will of Mr Ferdman and none other. That means that DLH had the requisite knowledge at that time.

Next, I must consider whether the plaintiff's right to recover is affected by Mr Ferdman's having ceased to be a director of DLH in June 1987. This question is of significance only in relation to the £1,030,000. It has no bearing on the £270,000. At p. 721B, Millett J, having repeated his view that, in regard to the £1,030,000, the relevant transaction was the acquisition by DLH of Yulara's interest in the joint venture on 16 March 1988, continued:

'By then Mr Ferdman had ceased to be a director of DLH for nine months, and he had nothing at all to do with the transaction. Even if, contrary to my judgment, Mr Ferdman's knowledge should be attributed to DLH in 1986, it would be quite wrong to treat DLH as still possessing that knowledge in 1988. As Megarry V-C pointed out in *Re Montagu's Settlement Trust [1987] Ch 264* at p. 284, a natural person should not be said to have knowledge of a fact that he once knew if at the time in question he has genuinely forgotten all about it. In my judgment, where the knowledge of a director is attributed to a company, but is not actually imparted to it, the company should not be treated as continuing to possess that knowledge after the director in question has died or left its service. In such circumstances, the company can properly be said to have "lost its memory".'

While I might agree with the judge that the knowledge of a director, who had known of a misapplication of trust moneys at the time of their misapplication but had genuinely forgotten all about it by the time that they were received by the company, could not be attributed to the company, I am unable to see how that can assist DLH here. The steps that caused DLH to become involved in the project and enabled it later to acquire the asset representing the £1,030,000 were all taken between March and June 1986. Moreover, although the judge held that the plaintiff was bound to treat the £1,030,000 as represented by Yulara's interest in the project, he found, at p. 709F, that that sum had been paid into Grangewoods' client account on 29 May 1986 and had thereafter been wholly disbursed as directed by DLH, £745,000 approximately in satisfaction of the purchase price. In the circumstances, DLH having had the requisite knowledge at the time that it became involved in the project and when the £1,030,000 was disbursed as it directed, it would in my view be unrealistic to hold that it ceased to have that knowledge simply because the mind and will that had been the source of it played no part in the receipt of the asset itself. I am therefore of the opinion that DLH is on this ground liable to the plaintiff in constructive trust.

Agency

Although the views so far expressed are enough to dispose of the appeal in favour of the plaintiff, I turn briefly to the alternative question whether Mr Ferdman's knowledge *153 ought to be imputed to DLH, on the ground that he acted as DLH's agent in the transaction.

Millett J thought that it was not accurate to describe Mr Ferdman as having acted as the agent of DLH in obtaining money from the Canadians. I am not sure that I would agree with him on that question. The real question is whether Mr Ferdman acted as the agent of DLH in the transactions by which it received assets representing the moneys fraudulently misapplied. I find it unnecessary to answer either question. That is because I agree with the judge that, even if Mr Ferdman was DLH's agent, his knowledge could not, as a matter of law, be imputed to it.

It is established on the authorities that the knowledge of a person who acquires it as a director of one company will not be imputed to another company of which he is also a director, unless he owes, not only a duty to the second company to receive it, but also a duty to the first to communicate it: see *Re Hampshire Land Co [1896] 2 Ch 743* and *Re Fenwick, Stobart & Co Ltd [1902] 1 Ch 507* .

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

Mr Ferdman acquired his knowledge of the fraudulent misapplication as a director of SAFI. I do not doubt that he owed a duty to DLH to receive it. But I agree with the judge that he owed no duty to SAFI to communicate it. I also agree with him that the facts of this case are indistinguishable in any material respect from those in *Re David Payne & Co Ltd [1904] 2 Ch 608* .

Conclusion

I would allow the appeal. On that footing, it becomes necessary to consider the relief to which the plaintiff is entitled, a consideration so far made unnecessary by the judge's dismissal of the action. Although it would be possible for this court to deal with that question itself, I think it preferable to remit it for consideration by the judge.

Rose LJ:

I gratefully adopt the recital of facts in the judgment of Nourse LJ. For the reasons which he gives, I agree that the appellant's submissions with regard to the payment of the deposit and the balance of the money fail. The judge's conclusions, namely that the deposit was paid to Dollar Land Holdings London beneficially and that the balance was received by DLH on trust to invest on behalf of Yulara pursuant to a joint venture agreement, were, on the evidence before him, correct. Equally, the judge's finding, which DLH seek to challenge, that the money can be traced to the proceeds of fraud by the Canadians, is, in my view, unimpeachable.

The submissions with regard to the role of Ferdman and whether his knowledge of the fraudulent origin of the invested funds should be attributed to DLH raise considerations of more general importance. In English law the concept of a company's directing mind and will has its origins in the speech of Viscount Haldane LC in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705* at p. 713. In *Tesco Supermarkets Ltd v Nattrass [1972] AC 153* , Lord Diplock at p. 200A identified those who are to be treated in law as being the company as:

'those natural persons who by the memorandum and articles of association or as a result of action taken by the directors, or by the company in general meeting pursuant to the articles, are entrusted with the exercise of the powers of the company.'

Lord Reid at p. 171F said:

'Normally the board of directors, the managing director and perhaps other superior officers of a company carry out the functions of management and speak and act as the company … But the board of directors may delegate some part of their functions of management giving to their delegate full discretion to act independently of instructions from them.'

*154* At p. 190G Lord Pearson said:

'There are some officers of a company who may for some purposes be identified with it, as being or having its directing mind and will, its centre and ego, and its brains … The reference in section 20 of the Trades Descriptions Act 1968 to "any director, manager, secretary or other similar officer of the body corporate" affords a useful indication of the grades of officers who may for some purposes be identifiable with the company …'

There are, it seems to me, two points implicit, if not explicit, in each of these passages. First, the directors of a company are, prima facie, likely to be regarded as its directing mind and will whereas particular circumstances may confer that status

© 2021 Thomson Reuters

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

on non-directors. Secondly, a company's directing mind and will may be found in different persons for different activities of the company.

It follows that Millett J's unchallenged conclusion that Stern, although neither a director nor an employee, was the 'moving force' behind the company's activities does not preclude a finding that Ferdman was the company's directing mind and will in relation to some activities.

In the present case, the company's activity to which Ferdman's knowledge was potentially pertinent was the receipt of over £1m for investment. Ferdman had been appointed by the Americans for two reasons in particular: first, as a Swiss resident operating the formal aspects of the company he was able to confer the tax advantages of non-resident status on DLH on the basis that its 'central management and control' was in Switzerland not England; and secondly because the Americans did not want Stern to be seen to have any official role in the company. Ferdman was a director and chairman of the board and his services were charged for at a higher rate than that for other directors. He instructed accountants and solicitors. He convened meetings. He claimed in the company's accounts to be its ultimate beneficiary. He was a necessary signatory of legal documents and signed the Yulara agreement without needing the authority of a board resolution to do so: by so doing he committed the company to that agreement.

Having regard to these matters, it seems to me to be plain that, for the limited purposes here relevant, i.e. the receipt of money and the execution of the Yulara agreement, he was the directing mind and will of the company. In consequence, his knowledge of the fraud was DLH's knowledge and, in this respect, I differ from Millett J. It is immaterial that by March 1988, when DLH acquired Yulara's interest, Ferdman had ceased to be a director. That cessation did not deprive DLH of its continuing knowledge in relation to the transaction, which embraced both the initial receipt of the money in May 1986 and the ultimate acquisition of Yulara's interest.

If the appellant does not succeed on this point, Mr Beloff's alternative submission based on agency is, in my view, doomed to fail. This court is, in my judgment, bound to hold, on the authority of *Re David Payne [1904] 2 Ch 608* that, qua agent, Ferdman was under no obligation to disclose his knowledge to DLH, there being no duty on DLH to enquire as to the source of the offered money. I agree with Hoffmann LJ's analysis of the three categories of agency cases to which he refers and with his conclusion that they have no application in the present circumstances. To the extent indicated I would allow this appeal.

Hoffmann LJ:

This is a claim to enforce a constructive trust on the basis of knowing receipt. For this purpose the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.

There is no dispute that the first requirement is satisfied. The Canadians bribed the plaintiff's fiduciary agent to give them over US $10m of his money in return for worthless *155* shares. The argument in this appeal has been over, first, which assets were received beneficially by DLH; secondly, whether they are traceable as representing the plaintiff's money; and thirdly, whether the admitted knowledge of the frauds on the part of Mr Ferdman, chairman of DLH, can be imputed to the company.

(1) Identifying the assets beneficially received

© 2021 Thomson Reuters.

12

234

The judge has found as a fact that certain assets received by DLH, namely the benefit of the deposit paid under the contract for the purchase of the Nine Elms site and Yulara's interest in the development, were traceable in equity as proceeds of fraud. Both sides have challenged certain aspects of this finding.

### (a) The deposit

The plaintiff says that the asset received by DLH was not the benefit of the deposit but the money used to pay it. This had been sent on 25 March 1986 to DLH's subsidiary DLH London, which entered into the contract to buy the site and afterwards assigned that contract (with the benefit of the deposit) to DLH. The plaintiff says that DLH London received the money as agent for DLH. The only evidence for this claim is that it was paid pursuant to an agreement between Roth and DLH. But that in my judgment is no reason why DLH London should not have received the money beneficially and this would be consistent with its having been the contracting party and subsequently assigning that contract for a substantial consideration to DLH.

### (b) The main investment

The plaintiff says that the other asset received by DLH was not Yulara's interest in the project, which it acquired on 16 March 1988, but the £1,030,000 invested by Yulara on 29 May 1986. In my judgment the judge was right in holding that money was not received by DLH beneficially but on trust to invest on behalf of Yulara. DLH and Yulara were joint venturers. Yulara was making an equity investment by which it acquired a proprietary interest in half the share of profits due to DLH under its arrangements with Regalian and the benefit of a guarantee by DLH that its capital would be repaid. DLH received no part of this investment beneficially until it bought out Yulara's interest.

### (2) Tracing

DLH challenges the judge's finding that the money can be traced to the proceeds of fraud which the Canadians had remitted to Panama. In my view, this was a finding which the judge was entitled to make. Mr Tager says that it might have been the proceeds of frauds on other people or even the money realised by the Canadians when they sold the business. It might have been, but as against the plaintiff I do not think that the Canadians would have been entitled to say so. Nor is DLH. The mixed fund was impressed with an equitable charge in favour of the plaintiff which was enforceable against the Canadians and persons claiming under them.

### (3) Knowledge

The judge correctly analysed the various capacities in which Mr Ferdman was involved in the transaction between DLH and the Canadians. First, he acted as a broker, introducing the Canadians to DLH in return for a five per cent commission. In this capacity he was not acting as agent for DLH but as an independent contractor performing a service for a fee. Secondly, he was authorised agent of DLH to sign the agreement with Yulara. Thirdly, he was at all material times a director and chairman of the board of DLH. There are two ways in which Mr Ferdman's knowledge can be attributed to DLH. The first is that as agent of DLH his knowledge can be imputed to *156 the company. The second is that for this purpose he *was* DLH and his knowledge was its knowledge. The judge rejected both.

### (a) The agency theory

The circumstances in which the knowledge of an agent is imputed to the principal can vary a great deal and care is needed in analysing the cases. They fall into a number of categories which are not always sufficiently clearly distinguished. I shall mention three such categories because they each include cases on which Mr Beloff placed undifferentiated reliance. In fact, however, they depend upon distinct principles which have no application in this case.

### (i) Agent's knowledge affecting performance or terms of authorised contract

First, there are cases in which an agent is authorised to enter into a transaction in which his own knowledge is material. So for example, an insurance policy may be avoided on account of the broker's failure to disclose material facts within his

© 2021 Thomson Reuters.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

knowledge, even though he did not obtain that knowledge in his capacity as agent for the insured. As Lord Macnaghten said in *Blackburn, Low & Co v Vigors (1887) 12 App Cas 531* at p. 542:

'But that is not because the knowledge of the agent is to be imputed to the principal but because the agent of the assured is bound as the principal is bound to communicate to the underwriters all material facts within his knowledge.'

In this category fall two of the cases upon which Mr Beloff QC relied, namely *Turton v London and North-Western Railway Co (1850) 15 LT(OS) 92* and *Dresser v Norwood (1864) 17 CB(NS) 466* . In the former case the agent was authorised to conclude a contract of carriage on behalf of the principal. The agent's knowledge of the carrier's standard terms of business was held sufficient to enable those terms to be treated as included in the contract. The agent, said Pollock CB, 'made the same contract in this case as if he had made it for himself'. In the latter case, the agent was authorised to enter into a contract for the purchase of wood. His knowledge that the vendor was a factor dealing for a principal was held sufficient to enable the contract to be treated as made with the principal and so preclude the purchaser from relying on a set-off against the factor. Neither are cases of imputation of knowledge. Rather, the agent's knowledge affects the terms or performance of the contract which he concludes on behalf of his principal.

These principles have no application in this case. We are not concerned with the contractual terms upon which DLH received the traceable assets but whether it had the knowledge which would impose a constructive trust. In other words, real imputation of knowledge is required.

(ii) Principal's duty to investigate or make disclosure

Secondly, there are cases in which the principal has a duty to investigate or to make disclosure. The duty to investigate may arise in many circumstances, ranging from an owner's duty to inquire about the vicious tendencies of his dog ( *Baldwin v Casella (1872) LR 7 Ex 325* ) to the duty of a purchaser of land to investigate the title. Or there may be something about a transaction by which the principal is 'put on inquiry'. If the principal employs an agent to discharge such a duty, the knowledge of the agent will be imputed to him. (There is an exception, the scope of which it is unnecessary to discuss, in cases in which the agent commits a fraud against the principal.) Likewise in cases in which the principal is under a duty to make disclosure (for example, to an insurer) he may have to disclose not only facts of which he knows but also material facts of which he could expect to have been told by his agents. So in *Gladstone v King (1813) 1 M & S 35; 105 ER 13* a marine insurance policy was avoided because the master of the ship knew that it had suffered damage, even though he had not in fact communicated this information to the owner. The case of *Regina Fur Co Ltd v Bossom [1957] 2 Ll Rep 466* upon which *157* Mr Beloff strongly relied, also concerned the duty to make disclosure under an insurance policy and therefore falls within the same category.

None of these cases are relevant because in receiving the traceable assets, DLH had no duty to investigate or make disclosure. There was nothing to put it on inquiry.

(iii) Agent authorised to receive communications

Thirdly, there are cases in which the agent has actual or ostensible authority to receive communications, whether informative (such as the state of health of an insured: *Blackley v National Mutual Life Association [1972] NZLR 1038* ) or performative (such as a notice to quit: *Tanham v Nicholson (1872) LR 5 HL 561* ) on behalf of the principal. In such cases, communication to the agent is communication to the principal. These cases also have no application here. Mr Ferdman did not receive information about the frauds in his capacity as agent for DLH. He found it out while acting for the Canadians.

(iv) Agent's duty to principal irrelevant

What it therefore comes to is that Mr Ferdman, an agent of DLH, had private knowledge of facts into which DLH had no duty to inquire. Mr Beloff said that Mr Ferdman nevertheless owed DLH a duty to disclose those facts. He then submits that because he had such a duty, DLH must be treated as if he had discharged it.

I am inclined to agree that Mr Ferdman did owe a duty, both as broker employed by DLH to find an investor and as chairman of the board, to inform DLH that the Yulara money was the proceeds of fraud. I reject Mr Tager's submission, based on *Kelly v Cooper [1993] AC 205* , that no term can be implied in a contract with a Swiss fiduciary agent which requires him to disclose

© 2021 Thomson Reuters.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

that the money for which he is being paid a five per cent procurement commission has been stolen. There is no evidence that Switzerland will enforce a confidence in iniquity any more than this country.

But Mr Beloff's submission that DLH must be treated as if the duty had been discharged raises an important point of principle. In my judgment the submission is wrong. The fact that an agent owed a duty to his principal to communicate information may permit a court to infer as a fact that he actually did so. But this is a rebuttable inference of fact and in the present case the judge found that Mr Ferdman did not disclose what he knew to anyone else acting on behalf of DLH. In some of the cases in the third of the categories I have mentioned, the fact that an agent with authority to receive a communication had a duty to pass the communication on to his principal is mentioned as a reason why the principal should be treated as having received it. I think, however, that the true basis of these cases is that communication to the agent is treated, by reason of his authority to receive it, as communication to the principal. I know of no authority for the proposition that in the absence of any duty on the part of the principal to investigate, information which was received by an agent otherwise than as agent can be imputed to the principal simply on the ground that the agent owed to his principal a duty to disclose it.

On the contrary, I agree with the judge that *David Payne & Co Ltd [1904] 2 Ch 608* at p. 611 is authority against such a proposition. In that case the Exploring Land and Minerals Co lent £6,000 to David Payne & Co Ltd for 30 days on the security of a debenture. One Kolckmann, a stockbroker who was concerned in an ambitious and somewhat dubious scheme of flotation involving David Payne & Co Ltd, was also a director of the Exploring Land Co. In his capacity as stockbroker he knew that the money would not be applied to any authorised purpose of the company but diverted to the use of its controlling shareholder. He actually signed the cheque by which the money was advanced. David Payne & Co Ltd went into liquidation and the liquidator challenged the validity of the debenture on the ground that Kolckmann's knowledge of the ultra  *158 vires purposes for which the money would be used should be imputed to the Exploring Land Co.

Buckley J appears to have assumed that, as a director of the Exploring Land Co, Kolckmann owed a duty to disclose what he knew about the real purposes for which the money would be used. But he regarded this as insufficient to enable that knowledge to be imputed to the company. He said at p. 611 (emphasis added):

'I understand the law to be this: that if a communication be made to his agent *which it would be his duty to hand on to his principals* … and if the agent has an interest which would lead him not to disclose to his principals the information that he has thus obtained, and in point of fact he does not communicate it, you are not to impute to his principals knowledge by reason of the fact that their agent knew something which it was not in his interest to disclose and which he did not disclose.'

It is true that in the Court of Appeal, both Vaughan-Williams LJ and Romer LJ said that Kolckmann owed no duty to impart his knowledge to the Exploring Land Co. Thus Romer LJ said at p. 619:

'I take it that in such a transaction the lending company was not bound to inquire as to the application of the money at all by the borrowing company. That being so, it appears to me that knowledge independently acquired by a director in his personal capacity in respect to a matter which was irrelevant so far as concerned the lending company is knowledge which cannot be imputed to the company, for it was knowledge of something which did not really concern the lending company as a matter of law. Therefore, you cannot imply a duty on the part of the director to have told these facts to the lending company, or a duty on the part of the lending company to have inquired into that question …'

It is however clear from the process of reasoning that what Romer LJ means is that in the absence of a duty to inquire, there was no duty of disclosure on the part of the director on which an outsider could rely for the purpose of imputing his knowledge to the company. I do not think that it would have affected his conclusion if the director had for some other reason (e.g. some internal company rule) owed a duty of disclosure with which he did not in fact comply. I agree with Buckley J that this would have been irrelevant. It follows that in my judgment Millett J was right to hold that Mr Ferdman's position as agent or broker does not enable his knowledge to be imputed to DLH.

*(b) The 'directing mind and will' theory*

The phrase 'directing mind and will' comes from a well-known passage in the judgment of Viscount Haldane LC in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705* which distinguishes between someone who is 'merely a servant or agent' and someone whose action (or knowledge) is that of the company itself. Despite their familiarity, it is worth quoting the terms in which Viscount Haldane said that the directing mind could be identified (at p. 713):

© 2021 Thomson Reuters.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

'That person may be under the direction of the shareholders in general meeting; that person may be the board of directors itself, or it may be, and in some companies it is so, that that person has an authority co-ordinate with the board of directors given to him under the articles of association, and is appointed by the general meeting of the company, and can only be removed by the general meeting of the company. My Lords, whatever is not known about Mr Lennard's position, this is known for certain, Mr Lennard took the active part in the management of this ship on behalf of the owners, and Mr Lennard, as I have said, was registered as the person designated for this purpose in the ship's register.'

*159*

Viscount Haldane therefore regarded the identification of the directing mind as primarily a constitutional question, depending in the first instance upon the powers entrusted to a person by the articles of association. The last sentence about Mr Lennard's position shows that the position as reflected in the articles may have to be supplemented by looking at the actual exercise of the company's powers. A person held out by the company as having plenary authority or in whose exercise of such authority the company acquiesces, may be treated as its directing mind.

It is well known that Viscount Haldane derived the concept of the 'directing mind' from German law (see Gower's Principles of Modern Company Law (5th edn, 1992) p. 194, note 36) which distinguishes between the agents and organs of the company. A German company with limited liability (GmbH) is required by law to appoint one or more directors ( *Geschäftsführer* ). They are the company's organs and for legal purposes represent the company. The knowledge of any one director, however obtained, is the knowledge of the company (Scholz, Commentary on the GmbH Law (7th edn, 1986), section 35 ). English law has never taken the view that the knowledge of a director ipso facto imputed to the company: *Powles v Page (1846) 3 CB 16; 136 ER 7* ; *Re Carew's Estate Act (No. 2) (1862) 31 Beav 39; 54 ER 1051* . Unlike the German *Geschäftsführer* , an English director may as an individual have no powers whatever. But English law shares the view of German law that whether a person is an organ or not depends upon the extent of the powers which in law he has express or implied authority to exercise on behalf of the company.

Millett J did not accept that Mr Ferdman was the directing mind and will of DLH because he exercised no independent judgment. As a fiduciary he acted entirely upon the directions of the American beneficial owners and their consultant Mr Stern. All that he did was to sign the necessary documents and ensure that the company's paper work was in order. This involved seeing that decisions which had really been taken by the Americans and Mr Stern were duly minuted as decisions of the board made in Switzerland.

But neither the Americans nor Mr Stern held any position under the constitution of the company. Nor were they held out as doing so. They signed no documents on behalf of the company and carried on no business in its name. As a holding company, DLH had no independent business of its own. It entered into various transactions and on those occasions the persons who acted on its behalf were the board or one or more of the directors.

It seems to me that if the criterion is whether the candidate for being the 'directing mind and will' was exercising independent judgment, as opposed to acting upon off-stage instructions, not even the board of directors acting collectively would in this case have qualified. It also did what it was told. But Mr Tager was inclined to concede that the board, acting as a board, could properly be regarded as the directing mind and will. It was certainly held out in certain quarters as such. DLH claimed non-resident status from the Inland Revenue on the ground that its 'central management and control' was situated in Switzerland.

The authorities show clearly that different persons may for different purposes satisfy the requirements of being the company's directing mind and will. Therefore the question in my judgment is whether in relation to the Yulara transaction, Mr Ferdman as an individual exercised powers on behalf of the company which so identified him. It seems to me that Mr Ferdman was clearly regarded as being in a different position from the other directors. They were associates of his who came and went. SAFI charged for their services at a substantially lower rate. It was Mr Ferdman who claimed in the published accounts of DLH to be its ultimate beneficial owner. In my view, however, the most significant fact is that Mr Ferdman signed the agreement with Yulara on behalf of DLH.

*160*

There was no board resolution authorising him to do so. Of course we know that in fact he signed at the request of Mr Stern, whom he knew to be clothed with authority from the Americans. But so far as the constitution of DLH was concerned, he committed the company to the transaction as an autonomous act which the company adopted by performing the agreement.

© 2021 Thomson Reuters.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

I would therefore hold, respectfully differing from the judge, that this was sufficient to justify Mr Ferdman being treated, in relation to the Yulara transaction, as the company's directing mind and will. Nor do I think it matters that by the time DLH acquired Yulara's interest in the Nine Elms project on 16 March 1988, Mr Ferdman had ceased to be a director. Once his knowledge is treated as being the knowledge of the company in relation to a given transaction, I think that the company continues to be affected with that knowledge for any subsequent stages of the same transaction. So, for example, if (contrary to the judge's finding) the £1,030,000 sent by Yulara on 29 May 1986 had been received beneficially by DLH as a loan, but Mr Ferdman had resigned or died a week earlier, I do not think that the DLH could have said that it received the money without imputed knowledge of the fraud. And in my judgment the subsequent acquisition of Yulara's interest was sufficiently connected with the original investment to be affected by the same knowledge.

I would therefore allow the appeal. I do not regard this as an unsatisfactory outcome. If the persons beneficially interested in a company prefer for tax or other reasons to allow that company to be for all legal purposes run by off-shore fiduciaries, they must accept that it may incur liabilities by reason of the acts or knowledge of those fiduciaries.

*(Order accordingly)  \*161*

*Limitation.*  **(CAP. 43**  465

# CHAPTER 43.

## LIMITATION.

(*24th August,* 1961.)

20/1961
33/1961

### PART I.

#### PRELIMINARY.

**1.** This Ordinance may be cited as the Limitation Ordinance.

Short title.

**2.** In this Ordinance—

Interpretation.

"action" includes any proceeding in a court of law;

"duty" includes any debt due to Her Majesty;

"foreshore" means the shore and bed of the sea and of any tidal water, below the line of the medium high tide between the spring tides and the neap tides;

"land" includes corporeal hereditaments and rentcharges, and any legal or equitable estate or interest therein, including an interest in the proceeds of the sale of land held upon trust for sale, but save as aforesaid does not include any incorporeal hereditaments;

"parent" has the same meaning as in the Fatal Accidents Act;

Cap. 26.

"personal estate" and "personal property" do not include chattels real;

"rent" includes a rentcharge and a rentservice;

"rentcharge" means any annuity or periodical sum of money charged upon or payable out of land, or a rent service or interest on a mortgage on land;

"settled land" and "tenant for life" have the same meanings respectively as in the Settled Estates Act;

Cap. 230.

proceeds of the sale of land, and to a right to receive a share or interest in the personal estate of a deceased person; and references to the date of the accrual of a right of action shall—

(*a*) in the case of an action for an account, be construed as references to the date on which the matter arose in respect of which an account is claimed;

(*b*) in the case of an action upon a judgment, be construed as references to the date on which the judgment became enforceable;

(*c*) in the case of an action to recover arrears of rent, dower or interest, or damages in respect thereof, be construed as references to the date on which the rent, dower or interest became due.

## PART II.

PERIODS OF LIMITATION FOR DIFFERENT CLASSES OF ACTION.

**3.** The provisions of this Part shall have effect subject to the provisions of Part III which provide for the extension of the periods of limitation in the case of disability, acknowledgment, part payment, fraud and mistake.

*Part II to be subject to provisions of Part III relating to disability, acknowledge-ment, fraud, etc.*

### *Actions of contract and tort and certain other actions.*

**4.** (1) The following actions shall not be brought after the expiration of six years from the date on which the cause of action accrued, that is to say—

*Limitations of actions of contract and tort, and certain other actions.*

(*a*) actions founded on simple contract or on tort;

(*b*) actions to enforce a recognisance;

(*c*) actions to enforce an award, where the submission is not by an instrument under seal;

(*d*) actions to recover any sum recoverable by virtue of any enactment, other than a penalty or forfeiture or sum by way of penalty or forfeiture.

(2) An action for an account shall not be brought in respect of any matter which arose more than six years before the commencement of the action.

(3) An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued:

476          CAP. 43)                    *Limitation.*

of such possession by the subsequent incumbrancer, he may recover by that action all the arrears of interest which fell due during the period of possession by the prior incumbrancer or damages in respect thereof, notwithstanding that the period exceeded six years;

33/1961.

(*b*) where the property subject to the mortgage or charge comprises any future interest or life insurance policy and it is a term of the mortgage or charge that arrears of interest shall be treated as part of the principal sum of money secured by the mortgage or charge, interest shall not be deemed to become due before the right to receive the principal sum of money has accrued or is deemed to have accrued.

(6) This section shall not apply to any mortgage or charge on a ship.

*Actions in respect of trust property or the personal estate of deceased persons.*

Limitation of actions in respect of trust property.

**19.** (1) No period of limitation prescribed by this Ordinance shall apply to an action by a beneficiary under a trust, being an action—

(*a*) in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or

(*b*) to recover from the trustee trust property or the proceeds thereof in the possession of the trustee, or previously received by the trustee and converted to his use.

33/1961.

(2) Subject as aforesaid, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Ordinance, shall not be brought after the expiration of six years from the date on which the right of action accrued:

Provided that the right of action shall not be deemed to have accrued to any beneficiary entitled to a future interest in the trust property, until the interest fell into possession.

(3) No beneficiary as against whom there would be a good defence under this Ordinance shall derive any greater or other benefit from a judgment or order obtained by any other beneficiary than he could have obtained if he had brought the action and this Ordinance had been pleaded in defence.

480          **CAP. 43)**          *Limitation.*

(4) Where there are two or more mortgagors, and the title or right to redemption of one of the mortgagors is acknowledged as aforesaid, the acknowledgment shall be deemed to have been made to all the mortgagors.

(5) An acknowledgment of any debt or other liquidated pecuniary claim shall bind the acknowledgor and his successors but not any other person:

Provided that an acknowledgment made after the expiration of the period of limitation prescribed for the bringing of an action to recover the debt or other claim shall not bind any successor on whom the liability devolves on the determination of a preceding estate or interest in property under a settlement taking effect before the date of the acknowledgment.

(6) A payment made in respect of any debt or other liquidated pecuniary claim shall bind all persons liable in respect thereof:

Provided that a payment made after the expiration of the period of limitation prescribed for the bringing of an action to recover the debt or other claim shall not not bind any person other than the person making the payment and his successors, and shall not bind any successor on whom the liability devolves on the determination of a preceding estate or interest in property under a settlement taking effect before the date of the payment.

(7) An acknowledgment by one of several personal representatives of any claim to the personal estate of a deceased person, or to any share or interest therein, or a payment by one of several personal representatives in respect of any such claim shall bind the estate of the deceased person.

(8) In this section the expression "successor", in relation to any mortgagee or person liable in respect of any debt or claim, means his personal representatives and any other person on whom the rights under the mortgage or, as the case may be, the liability in respect of the debt or claim devolve, whether on death or bankruptcy or the disposition of property or the determination of a limited estate or interest in settled property or otherwise.

Postponement of limitation period in case of fraud or mistake.

**25.** Where, in the case of any action for which a period of limitation is prescribed by this Ordinance, either—

243

*Limitation.* (CAP. 43    481

(*a*) the action is based upon the fraud of the defendant or his agent or of any person through whom he claims or his agent, or

(*b*) the right of action is concealed by the fraud of any such person as aforesaid, or

(*c*) the action is for relief from the consequences of a mistake,

the period of limitation shall not begin to run until the plaintiff has discovered the fraud or the mistake, as the case may be, or could with reasonable diligence have discovered it:

Provided that nothing in this section shall enable any action to be brought to recover, or enforce any charge against, or set aside any transaction affecting, any property which—

(i) in the case of fraud, has been purchased for valuable consideration by a person who was not a party to the fraud and did not at the time of the purchase know or have reason to believe that any fraud had been committed, or

(ii) in the case of mistake, has been purchased for valuable consideration, subsequently to the transaction in which the mistake was made, by a person who did not know or have reason to believe that the mistake had been made.

## PART IV.

### GENERAL.

**26.** (1) This Ordinance and any other enactment relating to the limitation of actions shall apply to arbitrations as they apply to actions in the High Court.

*Application of Ordinance and other limitation enactments to arbitrations.*

(2) Notwithstanding any term in an arbitration agreement to the effect that no cause of action shall accrue in respect of any matter required by the agreement to be referred until an award is made under the agreement, the cause of action shall, for the purpose of this Ordinance and of any other such enactment (whether in their application to arbitrations or to other proceedings), be deemed to have accrued in respect of any such matter at the time when it would have accrued but for that term in the agreement.

## *24  South Carolina Insurance Co. Respondents v Assurantie Maatschappij "de Zeven Provincien" N.V. Appellants
## South Carolina Insurance Co. Respondents v Al Ahlia Insurance Co. and Another Appellants

 Positive/Neutral Judicial Consideration

**Court**
House of Lords

**Judgment Date**
29 July 1986

**Report Citation**
[1986] 3 W.L.R. 398
[1987] A.C. 24



House of Lords

Lord Bridge of Harwich , Lord Brandon of Oakbrook , Lord
Brightman , Lord Mackay of Clashfern and Lord Goff of Chieveley

1986 May 6, 7; July 29

*Injunction—Jurisdiction to grant—Foreign proceedings—Action brought in England—Defendants lodging petition in United States court for pre—trial discovery—Whether defendants to be restrained from proceeding with petition under court's inherent jurisdiction*

The plaintiffs were an American insurance company, and, having reinsured the liability of another American insurance company, U.N.I., they reinsured the risk with the defendants in London. The plaintiffs claimed under the contract of reinsurance and, when the defendants disputed liability, they brought proceedings in the Commercial Court. Before the defence was served, the defendants lodged a petition in a United States district court seeking, inter alia, an order for pre-trial discovery of documents relevant to the claim and the plaintiffs' contract of reinsurance with U.N.I., against persons resident in the United States, who were not parties to the English action. On the plaintiffs' application in the Commercial Court, the judge made an order restraining the defendants from taking any further step in the American proceedings or enforcing any order made therein. On appeal by the defendants, the Court of Appeal dismissed the appeal.  *25

On appeal by the defendants:-

Held, allowing the appeal, that although the power of the High Court to grant injunctions, which was a statutory power conferred by section 37 (1) of the Supreme Court Act 1981 , was very wide it was limited, save for two exceptions irrelevant to the present proceedings, to the situations (Lord Mackay of Clashfern and Lord Goff of Chieveley dubitante) (i) where one party to an action could show that the other party had either invaded, or threatened to invade, a legal or equitable right of the former for the enforcement of which the latter was amenable to the jurisdiction of the court, and (ii) where one party to an action had behaved, or threatened to behave, in an unconscionable manner, that in the circumstances the plaintiffs had failed

© 2021 Thomson Reuters.

South Carolina Insurance Co v Assurantie Maatschappij De..., [1987] A.C. 24 (1986)

to show either that the defendants' conduct towards the plaintiffs was amenable to the jurisdiction of the court, or that it was unconscionable in the sense that it interfered with the due process of the High Court's jurisdiction, and that, accordingly, the injunctions granted would be discharged (post, pp. 31C-D,39H - 40D,41A-D,44A-B,C-D,E,F).

*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A. [1979] A.C. 210* , H.L.(E.), *Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557 ,* H.L.(E.) and *British Airways Board v. Laker Airways Ltd. [1985] A.C. 58* , H.L.(E.) applied.

*Per* Lord Goff of Chieveley. I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute and it is impossible at the present time to foresee every circumstance in which it may be thought right to make the remedy available (post, p. 44G).

*Decision of the Court of Appeal [1986] Q.B. 348; [1985] 3 W.L.R. 739; [1985] 2 All E.R. 1046* reversed.

The following cases are referred to in their Lordships' opinions:

*Bank of Tokyo Ltd. v. Karoon (Note), post, p. 45; [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.*
*British Airways Board v. Laker Airways Ltd. [1985] A.C. 58; [1984] 3 W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)*
*Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557; [1980] 3 W.L.R. 991; [1981] 1 All E.R. 143, H.L.(E.)*
*Court of Commissioner of Patents for Republic of South Africa, In re (1980) 88 F.R.D. 75*
*Deere (John) Ltd. and Deere & Co. v. Sperry Corporation (1985) 754 F. 2d 132*
*MacShannon v. Rockware Glass Ltd. [1978] A.C. 795; [1978] 2 W.L.R. 362; [1978] 1 All E.R. 625, H.L.(E.)*
*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A. [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803 ,* H.L (E.)

The following additional cases were cited in argument:

*Armstrong v. Armstrong [1892] P. 98*
*Erhmann v. Ehrmann [1896] 2 Ch. 611, C.A.*
*Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa) [1980] 2 Lloyd's Rep. 546, C.A.*
*North Carolina Estate Co. Ltd., In re (1889) 5 T.L.R. 328  *26*
*Straker Brothers & Co. v. Reynolds (1889) 22 Q.B.D. 262*
Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2), In re *[1978] A.C. 547; [1978] 2 W.L.R. 81; [1978] 1 All E.R. 434, H.L.(E.)*

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords (Lord Scarman Lord Templeman and Lord Mackay of Clashfern) dated 19 November 1985 by the defendants, Assurantie Maatschappij "De Zeven Provincien" N.V., in the first action, and by the first defendants, Al Ahlia Insurance Co., and by the second defendants, Arabian Seas Insurance Co. Ltd., in the second action brought by the plaintiffs, South Carolina Insurance Co. from the judgment dated 23 May 1985 of the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) which affirmed orders made on 25 April 1985 by Hobhouse J., the effect of which was to restrain the defendants from taking any further steps in proceedings before a Federal District Court of the United States for production and inspection of documents against a number of companies and individuals not party to the present actions.

The facts are set out in the opinion of Lord Brandon of Oakbrook.

*Robert Alexander Q.C.* and *Jonathan Sumption Q.C.* for the defendants. The point raised by this appeal is novel. The question can be stated in this way: in what circumstances (if any) may the English courts restrain a party to an English action from availing himself of the process of a foreign court for the purpose of obtaining evidence relevant to the English action? The most authoritative decisions in this branch of the law are those of this House in *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A. [1979] A.C. 210* ; *Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557* and *British Airways Board v. Laker Airways Ltd. [1985] A.C. 58* .

South Carolina Insurance Co v Assurantie Maatshappij De..., [1987] A.C. 24 (1986)

In the present case the defendants against whom injunctive relief is sought availed themselves of a right open to them under the federal law of the United States and applied to a United States district court for an order requiring persons resident in the United States, but who were not parties to the English proceedings, to give pre-trial discovery of documents relevant to the English action. The particular issue, therefore, in this appeal is whether in the present circumstances it is right for the English court to restrain the defendants from prosecuting further the proceedings in the United States district court.

The rules of procedure in England provide a means whereby discovery can be obtained between parties to an action and witnesses can be subpoenaed to appear at the trial with relevant documents in their possession. The rules of procedure do not provide an exhaustive or exclusive code which prohibit a party from obtaining documents in any way other than those provided by the rules. For example, if a stranger to the action is prepared to give documents voluntarily to a party, that party is entitled to receive them without obtaining a subpoena. Further, a party may use the facilities of the courts of a friendly foreign state if that state is willing for them so to do. The defendants concede that *27 there are limits to this principle. Thus, it is inapplicable where it would be unconscionable for a party to obtain discovery, for example, of documents which in this country are subject to professional privilege.

The documents sought are relevant to the defences pleaded in the action which in turn reflect enquiries which were pursued before the action was brought. The plaintiffs obtained the injunction in spite of refusing the defendants consent to have access to the documents in question. Since then they have granted the defendants access but it is the view of the defendants' solicitors that the strangers to the action have not made proper disclosure. The documents are not in the power or possession or control of the plaintiffs; therefore it is difficult to see why they object to disclosure. If the strangers to the action were in this country they could be required to produce the documents by subpoena duces tecum. As to any suggestion that the defendants could have applied for letters rogatory under R.S.C., Ord. 39, r. 2 , the procedure is cumbersome and expensive and they can be issued only where other efforts have been made to obtain the documents in question.

As stated previously, after the Court of Appeal gave judgment the plaintiffs did arrange for the defendants to have controlled access to certain documents in the possession of certain third parties resident in the United States. This was a facility which the defendants hoped would make the prosecution of the present appeal unnecessary. However, the restrictions imposed upon the defendants' inspection of documents made the facilities which were offered to them most unsatisfactory. They have therefore with regret concluded that certain documents have been withheld in a manner which can be remedied only by the compulsory procedure of the United States district court.

28 United States Code, section 1782, is a clear provision enabling parties to an English action to obtain from the courts of the United States documents for use in proceedings in this country. That being the rule, the question then arises: on what principle should the English court prevent disclosure where the United States courts would allow disclosure directed to a company which is subject to the jurisdiction of the United States courts? It is the plaintiffs' contention that in the circumstances it is unconscionable for the defendants to apply for disclosure of these documents. The Court of Appeal held that in principle a party to litigation in this country should not avail itself of 28 United States Code, section 1782, against non-parties resident in the United States.

Reliance is placed on the following propositions: (i) In principle it is open to the defendants to seek material to enable them to conduct their case and to obtain that material as early as possible. A party can gather evidence for use in litigation either through the use of English procedures or through other means. (ii) There is no objection to these other means including means provided by United States proceedings. This does not, as the Court of Appeal suggested, deprive the English court of control over the proceedings. (iii) Caution is required before the conduct of any foreign proceedings is restrained. (iv) The use of the United States processes could be restrained by injunction if it involved the breach of some legal or equitable right of the party claiming the injunction or was unjust or unconscionable to that other party but not otherwise. The *28 defendants dissent from the general approach of the Court of Appeal in the present case.

As to the authorities, reliance is placed on *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A. [1979] A.C. 210* , 211C-D, 255F-G, 256E-257, *per* Lord Diplock. As to *Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557* , see *per* Lord Scarman, at pp. 572F-G, and 574D. It is to be noted that was a forum conveniens case. In *British Airways Board v. Laker Airways Ltd. [1985] A.C. 58* , the observations of Lord Diplock at pp. 80A-B et seq., and Lord Scarman at p. 95C, show that the category of cases there under discussion have no relevance to the issue in the present case. The defendants would apply by analogy to the present case the observations of Dunn L.J. in *Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa) [1980] 2 Lloyd's Rep. 546* , 551.

South Carolina Insurance Co v Assurantie Maatschappij De..., [1987] A.C. 24 (1986)

On the facts of the present case it is not unreasonable or unjust for the defendants to apply for the documents in question. It is said that the documents would be obtained earlier than if they were obtained by subpoena in the English proceedings. But this is only a quirk of English procedure. The advantage of being able to obtain the documents at an earlier stage of the proceedings is in no way unconscionable to the plaintiffs. This is particularly so since otherwise they are not likely to be obtained at all. The defendants do not accept that the procedure by way of letters rogatory is open to them. Further, it is an expensive procedure. It cannot be unjust or unconscionable for the defendants to take the "direct route" for obtaining these documents.

As to the United States authorities cited by Griffiths L.J. *[1986] Q.B. 348* , 357, those authorities are not contemplating the situation which has arisen in the present case. The principles laid down by the Court of Appeal here it may be said to act unconscionably against the defendants rather than the plaintiffs. [Reference was also made to *In re North Carolina Estate Co. Ltd. (1889) 5 T.L.R. 328* ; *Straker Brothers & Co. v. Reynolds (1889) 22 Q.B.D. 262* , and *Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45* .]

*Kenneth Rokison Q.C., Christopher Symons* and *Thomas Weitzman* for the plaintiffs. Attention is drawn to the width of the inquiry requested by the defendants in the United States proceedings. They are seeking third party discovery which would not be allowed at all in England. The United States court will not allow that which would not be allowed by the court hearing the substantive issue between the parties. The defendants are in effect seeking to take part of the English proceedings out of the jurisdiction and control of the English court. The difference between the disclosure of documents as a result of letters of request and the present case is that the defendants here have first gone to the foreign court and requested that court to make an order in English proceedings.

In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and *2) [1978] A.C. 547* , is the antithesis of the present case. The House there held that an English court will not, even when so requested by a foreign court, make an order in respect of an English person or company requiring that person or company to give *\*29* documentary or testamentary discovery for the purposes of the foreign proceedings. The present case is the reverse position since although the American court is being asked to assist the English court, the American court is being asked to admit a wider class of documents than is allowable under English procedure. It is thus an even stronger case than the *Westinghouse* case. The correct way for the defendants to proceed in the present issue is under R.S.C., Ord. 39, r. 1 . Further, Ord. 38, r. 9 specifically relates to depositions in any cause or matter and links them to those under Ord. 39, r. 1.

The approach of Griffiths L.J. in the Court of Appeal is adopted. The plaintiffs are prejudiced by the American procedure because the defendants can obtain documents which could not be obtained under English procedure. Further, the plaintiffs are necessarily prejudiced by the costs and expense of the American proceedings for they are bound to take part in those proceedings to protect their interests. The question also arises whether, if the English court would not make an order for third party discovery as sought by the defendants, the American court would make any order at all. It is plain from the American decisions in *In re Court of Commissioner of Patents for Republic of South Africa (1980) 88 F.R.D. 75* , 77, and *John Deere Ltd. and Deere & Co. v. Sperry Corporation (1985) 754 F. 2d 132* , 135, 136, that a United States court will only grant an applicant an order under 28 United States Code, section 1782, if it is satisfied that an order of the same nature would be made in like circumstances by the foreign court seised of the dispute at that stage of the proceedings. The effect of those decisions is that any American court properly advised as to English law on discovery would deny the defendants' request as being for third party discovery which is not allowable under English procedure. If it be said that this question can be left for the United States district court to decide, the answer is that it is better for the English court to deal with the matter and "nip it in the bud." It may be that the United States court would not be properly advised as to the relevant English law.

The English court has jurisdiction to restrain a party to proceedings pending in England from seeking or continuing to seek interlocutory orders in a foreign jurisdiction for the purposes of those proceedings. The English court has an inherent jurisdiction to control its own proceedings. Further, it is well established that where proceedings are pending before the English court, and proceedings are brought in a foreign jurisdiction which concern the same issues, the English court has a discretionary jurisdiction either to stay the English proceedings or to restrain by injunction a party to those proceedings from continuing to proceed in the foreign court. This jurisdiction was recognised by this House in *British Airways Board v. Laker Airways Ltd. [1985] A.C. 58* , 80D-F *per* Lord Diplock. This jurisdiction is commonly invoked in the so-called "forum conveniens" cases, where there is a choice of forum for determination of substantive issues between the parties. See *per* Lord Scarman, at p. 95D. This jurisdiction must also exist where the foreign proceedings are of a purely interlocutory nature, but which overlap with the normal interlocutory processes before the English court. Indeed, it is an obvious and an "a fortiori" case. Thus here the United States *\*30* proceedings are only ancillary proceedings and therefore there is no reason why the English court should not have granted the injunction appealed against.

© 2021 Thomson Reuters.

South Carolina Insurance Co v Assurantie Maatschappij De..., [1987] A.C. 24 (1986)

*The Lisboa [1980] 2 Lloyd's Rep. 546* is distinguishable because that was a case where proceedings were started in Venice in order to obtain security if the action was subsequently instituted in Italy. That case cannot be described as one of a foreign court's interlocutory jurisdiction being invoked in English proceedings. It was not an interlocutory application for the purposes of English proceedings. The line of cases cited by Robert Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45* , is closer to the present case. The present case is one where it is proper to grant an injunction to protect the jurisdiction of the English court.

*Armstrong v. Armstrong [1892] P. 98* lays down the correct approach to the present problem; the principles stated there are applicable to the present case. The essential question is: who should have control over the present matter? The true answer is that it should be the English court which should have control.

Suppose that in the present case the plaintiffs had attempted in the United States Court to obtain pre-trial depositions from the defendants' employees. Such an application would surely be restrained because it would be so alien to English procedure. So also third-party discovery is alien to English procedure. The matter can be tested by the following example. If a party went to an English court and asked it to issue letters rogatory in relation to third parties' documents under Order 39 , such an application would be dismissed. If the party then went to the United States court and requested it under 28 United States Code, section 1782, the English court should intervene on the ground that it was vexatious; the party having failed before the English court, it cannot obtain the evidence by utilising a foreign jurisdiction. But the answer cannot be any different merely because the party in question goes to the United States court first as in the present case.

*Erhmann v. Ehrmann [1896] 2 Ch. 611* , shows that the English court will not grant letters rogatory except in relation to evidence which is directly relevant to the issues in the case. Wider "discovery" will not be made the subject of letters rogatory - let alone in respect of documents held by a third party.

In conclusion, it is the plaintiffs' contention that they have a legal or equitable right which it is appropriate for the English court to protect by injunction, namely the right, as parties to proceedings in the English court, to have those proceedings conducted in accordance with the procedural laws and practices of England, and of no other jurisdiction. Moreover, it is their contention that the defendants' application for interlocutory relief in the United States is unconscionable and unjust to the plaintiffs. If granted, it would allow the defendants to take advantage of procedural steps and remedies available under English procedural law, while at the same time avoiding some of the restrictions on those steps and remedies which would nevertheless continue to impinge upon the plaintiffs.

*Symons* followed.  *31*

*Alexander Q.C.* in reply. In the present case it is accepted that there is an advantage under the foreign proceedings which cannot be obtained in the English proceedings. It is this factor which distinguishes the present case from *Armstrong v. Armstrong [1892] P. 98* , as applied by Robert Goff L.J. in the *Tokyo Bank* case ( *Note) [1987] A.C. 45* . The defendants rely on the principle on which they opened this appeal, namely, that the plaintiffs can only succeed if they can show that the defendants' application before the United States court is unconscionable. As to the principle adumbrated by Griffiths L.J. below, the manner in which a party gathers evidence is for that party. It may gather it voluntarily or in pursuance of a contract. These methods do not deprive the English court in any way of control of its own proceedings.

[Reference was also made to In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)*[1978] A.C. 547* , 562B-F.]

Their Lordships took time for consideration. 29 July.

LORD BRIDGE OF HARWICH.

My Lords, for the reasons given in the speech of my noble and learned friend, Lord Brandon of Oakbrook, with which I agree, I would allow this appeal.

LORD BRANDON OF OAKBROOK.

© 2021 Thomson Reuters.

South Carolina Insurance Co v Assurantie Maatschappij De..., [1987] A.C. 24 (1986)

My Lords, the question for decision in this appeal is a novel one and can be stated in this way. An action between A and B is pending before an English court. While it is pending B, exercising a statutory right potentially available to him under the federal law of the United States, applies to a district court of the United States for an order that persons resident in the United States, who are not parties to the action before the English court, should give him pre-trial discovery of documents relevant to the issues in that action. In those circumstances, is it right for the English court, on the application of A, to grant an injunction against B prohibiting him from prosecuting further his proceedings in the United States district court? Hobhouse J. at first instance, and the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) on appeal from him, have held that it is right for such an injunction to be granted. The parties enjoined (for in the instant case there are three of them) now bring a further appeal with the leave of your Lordships' House.

The background of the case is to be found in what can conveniently be described as a three-tier insurance arrangement. The company which first insured the relevant risks was a United States company, United National Insurance Co. ("United National"). United National re-insured the risks which it had insured with another United States company, South Carolina Insurance Co. ("South Carolina"). South Carolina in turn re-re-insured the risks which it had re-insured with a number of other insurance companies in the London market. These other insurance companies included a Dutch company, Assurantie Maatschappij "De Zeven Provincien" (Seven Provinces) and two Middle or Far Eastern companies, Al Ahlia Insurance Co. ("Al Ahlia") and Arabian Seas Insurance Co. ("Arabian Seas"). In or about 1984 South Carolina called *32 upon Seven Provinces, Al Ahlia and Arabian Seas to pay substantial sums which South Carolina claimed to be due from them under the contracts of re-re-insurance concerned. Seven Provinces, Al Ahlia and Arabian Seas refused to make the payments asked for, denying that they were liable to do so.

As a result South Carolina brought two actions in the Commercial Court here in order to recover the sums which they claimed to be payable, together with interest on such sums. In the first action, which was begun on 12 December 1984, Seven Provinces is the sole defendant. In the second action, which was begun on 28 February 1985, Al Ahlia is the first defendant and Arabian Seas is the second defendant. It was the original intention of the solicitors acting for South Carolina to seek summary judgment in both actions under R.S.C., Order 14 . However, at an application to fix a date for the hearing of the Order 14 proceedings against Seven Provinces, counsel for the latter indicated that a number of substantial defences would be raised to South Carolina's claim. These defences included (1) misrepresentation or non-disclosure regarding the retention position on the part of South Carolina; (2) non-disclosure of a previous bad loss record on the business concerned; (3) excessive deductions from premiums; and (4) payment of claims outside the limits of the relevant treaty.

The underwriting agent for United National through whom business was placed with it was Pacific General Agency Inc. ("P.G.A."). The loss adjusters who investigated the claims made against United National were Arthur Campbell-Husted and Co. ("Campbell-Husted"). The principal place of business of both P.G.A. and Campbell-Husted is in the State of Washington.

My Lords, Seven Provinces, Al Ahlia and Arabian Seas ("the re-re-insurers") are, by reasons of their position, remote from the facts in dispute, and obliged to rely for detailed information about them on such documents as they can obtain from South Carolina or P.G.A. and Campbell-Husted. The latter two, however, were not the agents of South Carolina in connection with the relevant transactions; it follows that discovery of documents in the two actions in England would not extend to relevant documents held by them. In this situation, if the re-re-insurers are to achieve their legitimate object of inspecting and copying where necessary, relevant documents held by P.G.A. and Campbell-Husted, some other means have to be found to enable them to do so.

In November 1984, after South Carolina had put forward its claims against the re-re-insurers, but before the two actions in England were begun, the latter had asked P.G.A. if they could inspect the documents in which they were interested at Seattle on 7 December 1984. P.G.A. referred the request to their principal, United National, which in turn consulted South Carolina. It appears that, on the advice of South Carolina's English solicitors, the request for inspection was, in effect, refused. The two actions in England were subsequently begun.

My Lords, 28 United States Code, section 1782, provides:

"Assistance to foreign and international tribunals and to litigants before such tribunals. (a) The district court of the district in *33 which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or

© 2021 Thomson Reuters.

statement. The order may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure ."

On 28 March 1985, before the re-re-insurers had served their points of defence and counterclaim in the two actions against them in England they applied by motion to the district court of the United States, Western District of Washington, at Seattle, for an order under section 1782 above. The motion, the title of which referred to the two actions in England, asked for an order against P.G.A. and Campbell-Husted involving two matters. The first matter was the production and inspection of numerous specified classes of documents of the kind which could reasonably be expected to have come into being in the course of the transaction of the insurance business which had led to United National, having settled claims itself, to recover from South Carolina as its reinsurers, and to South Carolina then claiming to recover over from the re-re-insurers. The second matter was the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by deposition. The motion was supported by a memorandum and an affidavit.

Notice of the re-re-insurers' motion was served on P.G.A. and Campbell-Husted. South Carolina was also served with notice of the motion, or otherewise made aware of its having been lodged. Neither P.G.A. nor Campbell-Husted appeared before the district court to resist the application. South Carolina, however, did so appear, and having indicated their objection to it, was given until 29 April 1985 to file its affidavit in opposition. It is to be inferred from the foregoing that neither P.G.A. nor Campbell-Husted objects to producing the documents listed in the motion for inspection, and where necessary for copying, by the re-re-insurers, and that it is only the objection of South Carolina that has stood in the way of their doing so.

On 24 April 1985, before the date fixed for filing its affidavit in opposition in the United States district court, South Carolina issued summonses in the two actions in England. By their summonses South Carolina sought (1) an order that the re-re-insurers should withdraw their application to the United States district court, (2) an injunction *34 restraining the re-re-insurers from proceeding further with such application, and (3) a declaration that the application was an abuse of the process of the English court.

My Lords, the summonses were heard by Hobhouse J. on 25 April 1985. He declined to make the declaration asked for, but granted South Carolina injunctions restraining the re-re-insurers until further order from taking any further steps in their motion before the United States district court and from enforcing any order made by that court on such motion. The main ground on which Hobhouse J. decided to grant such in functions appears from pp. 10 and 11 in Appendix I to the printed case. Having set out what he called the framework of the matter, he said:

"It involves a question of principle as to whether or not the English court should retain the control of its own procedure and the proceedings that are before it. I have no doubt that the answer to be given to that question is that the English court should retain that control."

The decision of Hobhouse J. was, as I indicated earlier, affirmed by the Court of Appeal *[1986] Q.B. 348* . Griffiths L.J. gave the principal judgment, with which Slade and Lloyd L.JJ. both agreed. The main reason which Griffiths L.J. gave for his decision was similar to that relied on by Hobhouse J. He said, at p. 358:

"Once the parties have chosen or accepted the court in which their dispute is to be tried they must abide by the procedure of that country and that court must be master of its own procedure. Litigation is expensive enough as it is, and if a party fighting a case in this country has to face the prospect of fighting procedural battles in whatever other jurisdiction his opponent may find a procedural advantage it may impose intolerable burdens, and encourage the worst and most oppressive form of procedural forum shopping. We should set our face against any such situation developing.

"Severe dislocation to the timetable of the English litigation is a readily foreseeable consequence of unrestrained access to foreign procedural remedies. This is likely to cause hardship or inconvenience not only to the other party to that litigation but will also affect other litigants whose cases are listed upon forecasts dependent upon litigation being conducted in accordance with our own rules of procedure. As the judge said, the court will lose control of its own proceedings. Furthermore, one party might be able to gain a very unfair advantage in the English procedure if he was able to take the

© 2021 Thomson Reuters.

deposition of and cross-examine a witness whom he would never call on his own behalf at the trial, for example, the employees or business associates of his opponent. I think Mr. Sumption [counsel for the re-re-insurers] recognised this when he said he would be content to accept the stay in respect of his application to take the depositions of the witnesses from P.G.A. and Arthur Campbell-Husted & Co. I am therefore satisfied that as a matter of principle the court must have an inherent jurisdiction to make any necessary  *35  order to ensure that the litigation is conducted in accordance with its own procedures."

My Lords, before examining the question whether Hobhouse J. and the Court of Appeal were right or wrong to grant the injunctions now appealed against, it is necessary to draw attention to a number of preliminary matters.

The first matter to which attention needs to be drawn is the existence of an essential difference between the civil procedures of the High Court in England on the one hand, and of courts of the United States on the other, with regard to what may be compendiously described as pre-trial discovery. Under the civil procedure of the High Court in England, pretrial discovery may take two forms. The first form, which is far and away the more common, is by way of disclosure and inspection of relevant documents under R.S.C., Ord. 24 . The second form, which is comparatively rare, is by way of the asking and answering on oath of interrogatories under R.S.C., Ord. 26 . Such discovery is, however subject to two important limitations, one relating to its scope and the other to the stage of an action at which it normally takes place. So far as the scope of discovery is concerned, it is limited to the disclosure and inspection of documents in the possession or power of the parties to the action, or to the asking and answering on oath of interrogatories as between such parties. So far as the stage of an action at which discovery normally takes place is concerned, it is the general rule that the two forms of discovery to which I have referred do not take place until the formal pleadings by both sides have been completed and the issues in disputes thereby fully and clearly defined. In this connection, however, it is right to say that the court has power to order either form of discovery at any stage of an action, including a stage earlier than the completion of pleadings; but such power is rarely exercised and then only on special grounds, for instance when discovery is needed in order that justice may be done in interlocutory proceedings.

Because of the first limitation to which I have referred, there is no way in which a party to an action in the High Court in England can compel pre-trial discovery as against a person who is not a party to such action, either by way of the disclosure and inspection of documents in his possession or power, or by way of giving oral or written testimony. I would, however, stress the word "compel" which I have used in the preceding sentence, for there is nothing to prevent a person who is not a party to an action from voluntarily giving to one or other or both parties to it either disclosure and inspection of documents in his possession or oral or written testimony.

The procedure of the High Court in England, while not enabling parties to an action to compel pre-trial discovery as against a person who is not a party to such action, nevertheless affords ample means by which such a person, provided that he is within the jurisdiction of the court, can be compelled either to give oral testimony, or to produce documents in his possession or power, at the trial of the action itself. Under R.S.C., Ord. 38, Part II , such a person may be compelled to give oral testimony at the trial by the issue and service on him of a subpoena  *36  ad testificandum, or to produce documents in his power or possession (so long as they are adequately described and defined) by the issue and service on him of a subpoena duces tecum. The issue of such subpoenas is in the first instance a ministerial rather than a judicial act, and a party may therefore issue subpoenas of either kind as he thinks fit; the court, however, has power to set aside any subpoena on proper grounds, for instance, irregularity of form, irrelevance, oppressiveness or abuse of the process.

The procedure of the High Court in England includes a further power of the court, conferred on it by R.S.C., Ord. 38, r.13, to order any person to attend any proceedings in a cause or matter and produce any document to be specified or described in the order, the production of which appears to the court to be necessary for the purpose of that proceeding. It has, however, long been established that this rule is not intended to be used, and cannot properly be used, to enable a party to an action to obtain pre-trial disclosure and inspection of documents in the possession or power of a person who is not a party to such action. It is a rule of limited application, involving the production of a document or documents to the court itself rather than to either of the parties to an action.

My Lords, the civil procedure of courts in the United States differs essentially from that in the High Court in England in that under it parties to an action can compel, as against persons who are not parties to it, a full measure of pre-trial discovery, including both the disclosure and production for inspection and copying of documents, and also the giving of oral or written testimony. This power of compulsion can be, and regularly is, used at an early stage of an action.

South Carolina Insurance Co v Assurantie Maatshappij De..., [1987] A.C. 24 (1986)

The second matter to which attention needs to be drawn is that 28 United States Code, section 1782, as appears from its terms which I set out earlier, expressly provides that an order made under it may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing; and that, to the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Procedure .

Reference was made in the two courts below and again in your Lordships' House to certain United States authorities which bear on the exercise of a district court's powers under section 1782. In a decision of the United States District Court of Pennsylvania, *In re Court of the Commissioner of Patents for Republic of South Africa (1980) 88 F.R.D. 75* , 77, Judge Newcomer said:

"[1, 2] It is of great concern to this court that counsel for opponent has not been able to represent to this court that the documents and testimony for which opponents request a discovery order are discoverable under South African law. Indeed, discussions with counsel lead this court to suspect that these materials would *not* be available through South African procedures. Clearly, this court should not by its exercise of the discretion allowed it under section  *37  1782 allow litigants to circumvent the restrictions imposed on discovery by foreign tribunals. Few actions could more significantly impede the development of international co-operation among courts than if the courts of the United States operated to give litigants in foreign cases processes of law to which they are not entitled in the appropriate foreign tribunals."

Further in *John Deere Ltd. and Deere & Co. v. Sperry Corporation (1985) 754 F.2d 132* , 135, Judge Garth, giving the judgment of the United States Court of Appeals for the Third Circuit, said:

"As a co-operative measure, section 1782 cannot be said to ignore those considerations of comity and sovereignty that pervade international law. A grant of discovery that trenched upon the clearly established procedures of a foreign tribunal would not be within section 1782."

My Lords, it was contended for South Carolina, on the basis of these authorities, that the re-re-insurers' application to the district court of the United States was bound to fail. The ground relied on was that, since the procedure of the High Court in England did not enable parties to an action to compel pre-trial discovery against persons not parties to it, the district court would not permit the re-re-insurers to circumvent that limitation by granting them an order for such discovery under section 1782.

It appears to me that there may well be considerable force in this contention. It is not possible, however, for your Lordships, on the limited material before you, to decide for yourselves in advance how the United States district court would see fit to exercise the discretion conferred on it by section 1782, in the particular circumstances of this case, and having regard to the characteristics of civil procedure in the High Court in England which I endeavoured to summarise earlier.

The third matter to which attention needs to be drawn concerns certain changes in the positions of the parties which have occurred since the original hearing of South Carolina's two summonses before Hobhouse J. The first change of position relates to the memorandum lodged in support of the re-re-insurers' application to the United States district court, in which they asserted:

"As evidenced by the attached affidavit of Francis Otley Mackie the petitioners herein are seeking this court's assistance in obtaining information and documentation which is necessary, material and relevant to litigation pending in the courts of England for use in those proceedings. The affidavit further establishes that were all the parties residents of England, the requested discovery would be permitted pursuant to the rules of procedure and discovery in England. Accordingly, the petitioners' motion for taking of testimony and the production of documents should be granted."

Mr. Mackie, whose affidavit is referred to at the beginning of the above passage, is a partner in the firm of solicitors acting for the re-re-insurers in the two actions in England. The relevant part of that affidavit is paragraph 12, in which Mr. Mackie deposed, inter alia, as follows:  *38

"Discovery of such documentation and testimony is permitted according to the English rules of procedure. ... Petitioners would be able to obtain writs of subpoena duces tecum issued by the High Court of England ... directing these entities to produce the documents requested and directing them individually to appear and give testimony at depositions."

© 2021 Thomson Reuters.

These statements in the re-re-insurers' memorandum and Mr. Mackie's affidavit were criticised by Hobhouse J. and by Griffiths L.J. in the Court of Appeal as giving such an incomplete and inaccurate account of the procedure of the High Court in England with regard to discovery as seriously to mislead the United States district court. Griffiths L.J., however, expressly acquitted Mr. Mackie of any deliberate intention to mislead. Before your Lordships Mr. Robert Alexander, who appeared as leading counsel for the appellant re-re-insurers, accepted unreservedly that the passages in question were incomplete and inaccurate, and as a consequence liable to mislead. The main error, as will be apparent, is the failure to distinguish clearly between compelling a person not a party to an action to give pre-trial discovery on the one hand, and compelling him to give oral evidence and produce documents at the trial itself on the other hand. I think that it is right for your Lordships to say that the criticisms of that error made by the two courts below were fully justified and that it is most unfortunate that it should ever have occurred. That said, however, having regard to the admission of such error freely made by Mr. Alexander for the re-re-insurers, and having regard further to the summary which I endeavoured to give earlier of the relevant procedure of the High Court in England, it seems to me that the error is no longer of significance in the consideration of this appeal.

The second change of position concerns the scope of the re-re-insurers' application to the United States district court. As I indicated earlier, that application as originally framed covered two distinct matters: first, the production and inspection of specified classes of documents; and, secondly, the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by depositions. On the face of the motion it appeared that what the re-re-insurers were seeking in relation to the second of these matters was the taking of oral evidence from the persons named relevant to the issues in the English actions, such evidence to be recorded in depositions. Before the Court of Appeal, however, Mr. Sumption for the re-re-insurers expressly abandoned any intention to achieve this end, and before your Lordships Mr. Alexander made it clear that the appearance of the named persons was only sought for the purpose of their producing and identifying the relevant documents held by P.G.A. and Campbell-Husted, and in no way for the purpose of their giving oral evidence to be recorded in depositions with regard to issues of fact arising in the English actions.

The third change of position arises from the stage which the two actions in England have now reached. At the time when South Carolina's applications first came before Hobhouse J. the re-re-insurers had not yet served their points of defence and counterclaim, so that the issues between the parties had not yet been defined by pleadings and no *39 discovery of documents as between the parties had yet taken place. Hobhouse J. regarded this as a significant matter in exercising the discretion to grant injunctions which he held that he had. During the hearing before the Court of Appeal, however, the re-re-insurers served points of defence and counterclaim, and since then discovery of documents as between the parties has taken place. The actions in England are, therefore, much further advanced than they were when South Carolina's applications first came before the judge.

The fourth change of position is this. Following the decision of the Court of Appeal South Carolina arranged for the re-re-insurers to have controlled access to certain documents held by P.G.A. and Campbell-Husted. According to the re-re-insurers, however, substantial restrictions were imposed by South Carolina on the documents which they were allowed to inspect under this arrangement. It is the re-re-insurers' case, therefore, that their application to the United States district court remains necessary in order to enable them to have inspection of other documents to which, by reason of the control exercised by South Carolina, they have not so far had access. Your Lordships were not asked to go into the details of these matters, which are in dispute between the parties, and it is right, I think, for the purposes of this appeal for your Lordships to proceed on the basis that the re-re-insurers have at least an arguable case with regard to them.

The fifth and final matter to which attention should be drawn is that the judge of the United States district court before whom the re-re-insurers' application under section 1782 is pending has helpfully directed that further proceedings in that application should be stayed until the determination first of the re-re-insurers' appeal to the Court of Appeal, and then of their further appeal to your Lordships' House.

My Lords, having drawn attention to these various preliminary matters, I turn to consider whether the injunctions granted by Hobhouse J. and affirmed by the Court of Appeal should be allowed to stand. I put the question in that form because of the various ways described by me above in which the positions of the parties have changed since the original hearing before Hobhouse J.

As appears from the passages from the judgments of Hobhouse J. and Griffiths L.J. which I set out earlier, both courts below treated South Carolina's applications for injunctions as raising matters of principle for decision. I have no doubt that they were right so to treat them. Putting the point differently, the question which your Lordships have to decide is whether the circumstances

of the case are such as to give the court power to grant the injunctions at all, and not whether, there being such power, it was a proper exercise of discretion to grant them rather than to refuse them.

In considering the question which I have formulated, it will be helpful in the first place to state certain basic principles governing the grant of injunctions by the High Court. The first basic principle is that the power of the High Court to grant injunctions is a statutory power conferred on it by section 37 (1) of the Supreme Court Act 1981 , which provides that "the High Court may by order (whether interlocutory or final) grant an injunction in all cases in which it appears to the court to  *40  be just and convenient to do so." That provision is similar to earlier provisions of which it is the successor, namely, section 45 (1) of the Supreme Court of Judicature (Consolidation) Act 1925 and section 25 (8) of the Supreme Court of Judicature Act 1873 . The second basic principle is that, although the terms of section 37 (1) of the Act of 1981 and its predecessors are very wide, the power conferred by them has been circumscribed by judicial authority dating back many years. The nature of the limitations to which the power is subject has been considered in a number of recent cases in your Lordships' House: *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A. [1979] A.C. 210* ; *Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557* ; and *British Airways Board v. Laker Airways Ltd. [1985] A.C. 58* . The effect of these authorities, so far as material to the present case, can be summarised by saying that the power of the High Court to grant injunctions is, subject to two exceptions to which I shall refer shortly, limited to two situations. Situation (1) is when one party to an action can show that the other party has either invaded, or threatens to invade, a legal or equitable right of the former for the enforcement of which the latter is amenable to the jurisdiction of the court. Situation (2) is where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable. The third basic principle is that, among the forms of injunction which the High Court has power to grant, is an injunction granted to one party to an action to restrain the former from beginning, or if he has begun from continuing, proceedings against the former in a foreign court. Such jurisdiction is, however, to be exercised with caution because it involves indirect interference with the process of the foreign court concerned.

The latter form of injunction may be granted in such circumstances as to constitute an exception to the second basic principle stated above. This may occur where one party has brought proceedings against another party in a foreign court which is not the forum conveniens for the trial of the dispute between them, as that expression was defined and applied in *MacShannon v. Rockware Glass Ltd. [1978] A.C. 795* . In such a case the party who has brought the proceedings in the foreign court may not by doing so, have invaded any legal or equitable right of the other party, nor acted in an unconscionable manner. The court nevertheless has power to restrain him from continuing his foreign proceedings on the ground that there is another forum in which it is more appropriate, in the interests of justice, that the dispute between the parties should be tried. The present case, however, is not concerned with a choice between two competing forums for the trial of a dispute, and the exception to which I have just referred is therefore not relevant to it.

The power of the court to grant *Mareva* injunctions may also, before it was statutorily recognised, have been a further exception to the second basic principle stated above. That power, however, has now been expressly recognised by section 37 (3) of the Supreme Court Act 1981 , and again the present case is in no way concerned with it.

Ignoring these exceptions, therefore, and applying the basic principles which I have stated to the present case, the first question for consideration is whether South Carolina has shown that what I have  *41  described above as situation (1) exists. Has South Carolina shown that the re-re-insurers, by beginning and intending to prosecute their application to the United States district court, has invaded, or threatened to invade, a legal or equitable right of South Carolina for the enforcement of which the re-re-insurers are amenable to the jurisdiction of the court? It was contended by Mr. Rokison on behalf of South Carolina that South Carolina did indeed have such a legal or equitable right, but it appeared to me that he had great difficulty in formulating the legal or equitable right on which he relied. Neither of the courts below decided as they did on the basis that the re-re-insurers had by their conduct invaded a legal or equitable right of South Carolina, and I cannot see how such a case can be made out. I would therefore hold that South Carolina has not shown that situation (1) exists.

The second question for consideration is whether South Carolina has shown that what I have described above as situation (2) exists. Has South Carolina shown that the re-re-insurers, by beginning and intending to prosecute their application to the United States district court, have acted in a manner which is unconscionable? It is difficult, and would probably be unwise, to seek to define the expression "unconscionable conduct" in anything like an exhaustive manner. In my opinion, however, it includes, at any rate, conduct which is oppressive or vexatious or which interferes with the due process of the court.

Although neither Hobhouse J. at first instance, nor Griffiths L.J. in the Court of Appeal, stated in terms that they thought it right to grant injunctions on the ground that the conduct of the re-re-insurers in making their application to the United States district court was unconscionable, it seems to me to be implicit in their reasons that they regarded it as being so. Hobhouse J.

South Carolina Insurance Co v Assurantie Maatshappij De..., [1987] A.C. 24 (1986)

based his decision expressly on the need for the court to retain control of its own process, with the necessary implication that the re-re-insurers' conduct was an interference with such control and therefore an interference with the due process of the court. Griffiths L.J. based his decision on three grounds: first (like Hobhouse J.), that the court must retain control of its own process; secondly, that the civil procedure of United States courts is significantly different from that of English courts, and the parties, by submitting to the jurisdiction of an English court, must be taken to have accepted its procedure; and, thirdly, that unrestricted access to foreign procedural remedies was liable to produce hardship in the form of increased costs and inconvenience. I shall consider each of these grounds in turn.

I consider, first, the ground that the re-re-insurers' conduct was an interference with the court's control of its own process. It is not clear to me why this should be so. Under the civil procedure of the High Court the court does not, in general, exercise any control over the manner in which a party obtains the evidence which he needs to support his case. The court may give him help, certainly; for instance by discovery of documents inter partes under R.S.C., Ord. 24; by allowing evidence to be obtained or presented at the trial in various ways under Orders 38 and 39 ; and by the issue of subpoenas under Part II of Order 38 , to which I referred earlier. Subject, however, to the help of the court in these various ways, the basic principle underlying the preparation and *42 presentation of a party's case in the High Court in England is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used. It was not in dispute that, if P.G.A. and Campbell-Husted, uninfluenced by the control exercised over them by South Carolina on the advice of the latter's English solicitors, had freely and voluntarily allowed the re-re-insurers to inspect, and where necessary to copy, all the documents referred to in the latter's application, it could not possibly have been said that there had been any interference with the English court's control of its own process. That being so, I cannot see why, since the Federal law of the United States authorises an application of the kind made by the re-re-insurers in this case, the making of such application, which may or may not succeed in whole or in part, should be regarded as being such an interference either. I cannot, therefore, agree with the first ground of decision relied on by the Court of Appeal.

I consider, secondly, the ground that the procedure of United States courts is significantly different from that of English courts, and the parties, by submitting to the jurisdiction of an English court, must be taken to have accepted its procedure. It is, no doubt, true that the re-re-insurers, by entering unconditional appearances in the two English actions, can be said in a certain sense to have accepted the procedure of that court. Your Lordships were not, however, informed of any ground on which the re-re-insurers could, with any prospect of success, have contested the jurisdiction of the High Court in England in respect of the disputes which are the subject matter of the two actions concerned. Be that as it may, I cannot see that the re-re-insurers, by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case. It was said that the re-re-insurers could have applied to the High Court under R.S.C., Ord. 39, r. 2 , for letters of request to issue to the proper judicial authorities in the United States. But 28 United States Code, section 1782, allows an application to be made either indirectly by the foreign court concerned or directly by an interested party, and I can see no good reason why the re-re-insurers should not have chosen whichever of these two alternatives they preferred. It is, I think, of the utmost importance to appreciate that the reason why English procedure does not permit pre-trial discovery of documents against persons who are not parties to an action is for the protection of those third parties, and not for the protection of either of the persons who are parties to the action. I cannot, therefore, agree with the second ground of decision relied on by the Court of Appeal.

I consider, thirdly, the ground that unrestrained access to foreign procedural remedies was liable to cause hardship in the form of increased costs and inconvenience. So far as increased costs are concerned, Griffiths L.J. was referring to increased costs incurred or to be incurred *43 by South Carolina in contesting the proceedings in the United States district court. If, however, the re-re-insurers are right in their contention that they have not yet, by reason of the control exercised by South Carolina, had access to all the documents to which they believe that they need access in order to prepare their case in the two English actions, it can reasonably be said that any liability for increased costs incurred by South Carolina is in a sense self-imposed. If they had been willing to permit P.G.A. and Campbell-Husted to allow the re-re-insurers to inspect, and where necessary copy, all the documents to which the latter had sought access, the making or prosecution of the re-re-insurers' application to the United States district court would not have been necessary. In this connection it is right to stress what I have already stated earlier, that P.G.A. and Campbell-Husted, left to themselves, would voluntarily have given the re-re-insurers permission to inspect, and where necessary copy, all the documents to which the latter sought access. It was said for South Carolina that the documents not so far disclosed were not relevant to the issues in the two English actions. If that is so, I cannot help asking myself why South Carolina has gone to such lengths to prevent the disclosure of such documents. So far as inconvenience is concerned, it is apparent that Griffiths L.J. had two kinds of inconvenience in mind: first inconvenience in relation to the two actions immediately concerned in the form of delay in getting them tried and possible prolongation of the trial when it took place; and,

secondly, inconvenience to other litigants by reason of the consequent dislocation of the time-table for the trial of other cases in the congested list of the Commercial Court. So far as delay is concerned, it is perhaps ironical that the only result of South Carolina seeking to obtain injunctions against the re-re-insurers has been to increase greatly whatever delay the re-re-insurers' application, if allowed to proceed unopposed, might otherwise have caused. I recognise that the re-re-insurers' application may result in some increased costs to South Carolina, but these could, as I indicated earlier, have easily been avoided by a different attitude on South Carolina's part. I recognise also that some inconvenience of the two kinds to which I have referred may arise from the re-re-insurers' application; but, if there is a reasonable possibility that such inconvenience is the price of justice being fully done at the trial of the two English actions, then it seems to me to be a price which must necessarily be paid. In any event, I cannot see how the re-re-insurers' application, made in what may prove to be a just cause, can, solely on the ground that it occasions the extra costs and inconvenience under discussion, be categorised as an interference with the court's control of its own process. The court can control any excessive delay by fixing such date for the trial of the two actions as may be just, and nothing which the re-re-insurers can do can take away or interfere with the court's control in this respect. As to increased costs these will, no doubt, be a matter for the consideration of the Commercial judge at the conclusion of the trial, and I do not think it would be right for your Lordships to express any views, one way or the other, about such matter. For these reasons I cannot agree with the third ground of decision relied on by the Court of Appeal. *44

My Lords, the result of the views which I have expressed is that there was, in my opinion, no such interference with the procedure of the English High Court by the re-re-insurers as would amount to unconscionable conduct on their part, and so justify, in accordance with the basic principles which I stated earlier, the exercise of the court's power to grant injunctions against them. It follows that I would allow the appeal and set aside the orders of Hobhouse J. dated 25 April 1985 and of the Court of Appeal dated 23 May 1985. As regards costs in your Lordships' House, I have no doubt that South Carolina should pay the costs of the re-re-insurers. As regards costs in the two courts below, different considerations may apply, first, because of the breadth of the re-re-insurers' application to the United States district court as originally framed, and, secondly, because of the misleading nature, in the respect to which I referred earlier, of the memorandum and affidavit lodged in support of such application. I therefore think it desirable that, in relation to those costs, your Lordships should have the assistance of further argument from counsel on either side.


LORD BRIGHTMAN.

My Lords, in this appeal I respectfully differ from the conclusion reached by the Court of Appeal. I have had the privilege of studying in advance the speech of my noble and learned friend, Lord Brandon of Oakbrook, and I find myself wholly convinced by his reasons for moving that this appeal should be allowed. I agree with the orders that he proposes should be made.


LORD MACKAY OF CLASHFERN.

My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Brandon of Oakbrook and Lord Goff of Chieveley. I agree that it would be wise to make the reservation on the matter to which Lord Goff of Chieveley has drawn attention but, like him, I agree with the conclusion reached by Lord Brandon of Oakbrook and with the reasons he has given for reaching that conclusion.


LORD GOFF OF CHIEVELEY.

My Lords, I find myself to be in respectful agreement with the conclusion reached by my noble and learned friend Lord Brandon of Oakbrook, on this appeal, and with the reasons given by him for reaching that conclusion. I wish, however, to draw attention to one matter upon which I have certain reservations, and to which I attach importance.

I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute; and it is impossible for us now to foresee every circumstance in which it may be thought right to make the remedy available. In particular, I do not regard the exercise of the power to restrain a person from commencing or continuing proceedings in a foreign forum as constituting an exception to certain limited categories of case in which it has been said that the power may alone be exercised. In my opinion, restraint of proceedings in a foreign forum simply provides one example of circumstances in which, in the interests of justice, the power to grant an injunction may be exercised. I have *45 elsewhere explained in detail, for reasons which it is unnecessary for me to repeat in the present case, why, on the basis of a line of established authority, I am at present inclined to the opinion that an injunction has generally been granted in such

South Carolina Insurance Co v Assurantie Maatshappij De..., [1987] A.C. 24 (1986)

circumstances for the purpose of protecting the English jurisdiction, and why I doubt, with all respect, whether the speech of my noble and learned friend, Lord Scarman, in *Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557*, contains the last word on the subject. I refer, in this connection, to my judgment in *Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45*.

Even so, I can see no basis for the grant of an injunction in the present case. In particular, in agreement with my noble and learned friend Lord Brandon of Oakbrook, and respectfully differing from Hobhouse J. and the Court of Appeal, I do not consider that the grant of the injunction can be justified as necessary to protect the English jurisdiction on the facts of the present case. In this, I find myself entirely in agreement with the reasons expressed in the speech of my noble and learned friend, Lord Brandon of Oakbrook. I therefore agree that the appeal should be allowed.

**Representation**

Solicitors: Clyde & Co. ; Herbert Smith & Co .

*Appeal allowed with costs. (J.A.G. )*

(c) Incorporated Council of Law Reporting for England & Wales

Solicitors Regulation Authority

SRA Code of Conduct 2011 forms part of Edition 2 of the Handbook, which was published and came into effect on 23 December 2011. SRA Code of Conduct 2011 was previously published as part of Edition 1 of the Handbook, which came into effect on 6 October 2011, unless otherwise noted.

## SRA Code of Conduct 2011

## Introduction to the SRA Code of Conduct

### Overview

Outcomes-focused regulation concentrates on providing positive outcomes which when achieved will benefit and protect *clients* and the public. The SRA Code of Conduct (the Code) sets out our outcomes-focused conduct requirements so that you can consider how best to achieve the right outcomes for your *clients* taking into account the way that your *firm* works and its *client* base. The Code is underpinned by effective, risk-based supervision and enforcement.

Those involved in providing legal advice and representation have long held the role of trusted adviser. There are fiduciary duties arising from this role and obligations owed to others, especially the *court*. No code can foresee or address every issue or ethical dilemma which may arise. You must strive to uphold the intention of the Code as well as its letter.

### The Principles

The Code forms part of the Handbook, in which the 10 mandatory *Principles* are all-pervasive. They apply to all those we regulate and to all aspects of *practice*. They define the fundamental ethical and professional standards that we expect of all *firms* and individuals (including owners who may not be *lawyers*) when providing legal services. You should always have regard to the *Principles* and use them as your starting point when faced with an ethical dilemma.

Where two or more *Principles* come into conflict the one which takes precedence is the one which best serves the public interest in the particular circumstances, especially the public interest in the proper administration of justice. Compliance with the *Principles* is also subject to any overriding legal obligations.

You must:

1. uphold the rule of law and the proper administration of justice;
2. act with integrity;
3. not allow your independence to be compromised;
4. act in the best interests of each *client*;
5. provide a proper standard of service to your *clients*;
6. behave in a way that maintains the trust the public places in you and in the provision of legal services;
7. comply with your legal and regulatory obligations and deal with your regulators and ombudsmen in an open, timely and co-operative manner;
8. run your business or carry out your role in the business effectively and in accordance with proper governance and sound financial and risk management principles;

9. run your business or carry out your role in the business in a way that encourages equality of opportunity and respect for diversity; and

10. protect *client* money and *assets*.


## Structure of the Code

The Code is divided into 5 sections:

- You and your client
- You and your business
- You and your regulator
- You and others
- Application, waivers and interpretation

Each section is divided into chapters dealing with particular regulatory issues, for example, client care, *conflicts of interests*, and *publicity*.

These chapters show how the *Principles* apply in certain contexts through mandatory and non-mandatory provisions.


## Mandatory provisions

The following provisions are mandatory:

- the outcomes;
- the application and waivers provisions in Chapter 13;
- the interpretations; and
- the transitional provisions in Chapter 15.

The outcomes describe what *firms* and individuals are expected to achieve in order to comply with the relevant *Principles* in the context of the relevant chapter. In the case of *in-house* and *overseas practice*, we have set out at the end of each chapter which outcomes apply and in some cases have specified different outcomes.

In respect of *in-house practice*, different outcomes may apply depending on whether you are acting for your employer or for a *client* other than your employer as permitted by rules 4.1 to 4.10 of the SRA Practice Framework Rules.

The outcomes contained in each chapter are not an exhaustive list of the application of all the *Principles*. We have tried to make them as helpful as possible.


## Non-mandatory provisions

The following provisions are non-mandatory:

- indicative behaviours;
- notes.

The outcomes are supplemented by indicative behaviours. The indicative behaviours specify, but do not constitute an exhaustive list of, the kind of behaviour which may establish compliance with, or contravention of the *Principles*. These are not mandatory but they may help us to decide whether an outcome has been achieved in compliance with the *Principles*.

O(5.4)   you do not place yourself in contempt of *court*;

O(5.5)   where relevant, *clients* are informed of the circumstances in which your duties to the *court* outweigh your obligations to your *client*;

O(5.6)   you comply with your duties to the *court*;

O(5.7)   you ensure that evidence relating to sensitive issues is not misused;

O(5.8)   you do not make or offer to make payments to witnesses dependent upon their evidence or the outcome of the case.

**Indicative behaviours**

Acting in the following way(s) may tend to show that you have achieved these outcomes and therefore complied with the *Principles*:

IB(5.1)   advising your *clients* to comply with *court* orders made against them, and advising them of the consequences of failing to comply;

IB(5.2)   drawing the *court's* attention to relevant cases and statutory provisions, and any material procedural irregularity;

IB(5.3)   ensuring child witness evidence is kept securely and not released to *clients* or third parties;

IB(5.4)   immediately informing the *court*, with your *client's* consent, if during the course of proceedings you become aware that you have inadvertently misled the *court*, or ceasing to act if the *client* does not consent to you informing the *court*;

IB(5.5)   refusing to continue acting for a *client* if you become aware they have committed perjury or misled the *court*, or attempted to mislead the *court*, in any material matter unless the *client* agrees to disclose the truth to the *court*;

IB(5.6)   not appearing as an advocate, or acting in litigation, if it is clear that you, or anyone within your *firm*, will be called as a witness in the matter unless you are satisfied that this will not prejudice your independence as an advocate, or litigator, or the interests of your *clients* or the interests of justice.

Acting in the following way(s) may tend to show that you have not achieved these outcomes and therefore not complied with the *Principles*:

IB(5.7)   constructing facts supporting your *client's* case or drafting any documents relating to any proceedings containing:

(a)   any contention which you do not consider to be properly arguable; or

(b)   any allegation of fraud, unless you are instructed to do so and you have material which you reasonably believe shows, on the face of it, a case of fraud;

IB(5.8)   suggesting that any *person* is guilty of a crime, fraud or misconduct unless such allegations:

(a)   go to a matter in issue which is material to your own *client's* case; and

(b)   appear to you to be supported by reasonable grounds;

IB(5.9)   calling a witness whose evidence you know is untrue;

261

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ATTORNEY GENERAL OF )
THE BRITISH VIRGIN ISLANDS, )
                          )
      *Applicant,* )
                          )
for Judicial Assistance to Obtain Evidence )
for Use in a Foreign Proceeding Pursuant )
to 28 U.S.C. § 1782. )         Case No. 1:19-mc-164-RCL
                          )
v. )
                          )
LESTER HYMAN, ESQ., )
                          )
      *Defendant-Intervenor.* )
                          )

## MEMORANDUM OPINION

      The Attorney General of the British Virgin Islands ("the applicant") has applied for judicial assistance to obtain evidence for use in a foreign proceeding pursuant to 28 U.S.C. § 1782 ("Section 1782"). ECF No. 1. The evidence sought would be used in a contemplated civil lawsuit in the British Virgin Islands ("BVI") against Lester Hyman, a member of the District of Columbia Bar who represented the British Virgin Islands Government ("BVIG") for approximately thirty years. The Court previously granted Mr. Hyman's motion to intervene and oppose the application, making him a defendant-intervenor in this case. ECF No. 8. Upon consideration of all memoranda filed by both the applicant and Mr. Hyman (ECF Nos. 1, 2-1, 3, 4, & 5-1), the Court will **GRANT IN PART AND DENY IN PART** the application for judicial assistance under Section 1782. Specifically, the Court will **DENY WITHOUT PREJUDICE** all requests for discovery from persons or entities other than Mr. Hyman. The Court will also **DENY WITHOUT PREJUDICE** the two overly broad requests for discovery from Mr. Hyman

1

(detailed below and in the accompanying Order). The Court will **GRANT** all other requests for discovery from Mr. Hyman (detailed below and in the accompanying Order).

## BACKGROUND[1]

The applicant seeks assistance from this Court in obtaining evidence for contemplated civil proceedings against Lester Hyman in the BVI. ECF No. 1 ¶ 2. Mr. Hyman is a member of the District of Columbia Bar who represented the BVIG in an attorney-client capacity from 1987 to July 30, 2017, at which point the BVIG terminated Mr. Hyman. *Id.* The applicant is contemplating bringing a civil action in the BVI against Mr. Hyman for fraud in equity, breach of fiduciary care and loyalty, and negligence. *Id.* Legal professional ethics rules and case law in the BVI impose heightened pleading standards when alleging fraud or dishonesty, meaning that the pleading must be particularized and supported by cogent evidence. *Id.* at ¶ 3. Because the allegations the applicant is contemplating are very serious, the Attorney General would like to conduct investigations and discovery to ensure the accuracy of its founding pleading for use before the Eastern Caribbean Supreme Court at the BVI ("BVI High Court"). *Id.*

According to the applicant, while acting within the scope of his legal representation, Mr. Hyman introduced certain business promoters from the United States to the BVIG in late 2013 or early 2014. *Id.* at ¶ 4. These promoters proposed starting an airline that would operate nonstop commercial flights between Miami and the BVI. *Id.* The BVIG ultimately invested $7,200,000 in the airline, but it never went into operation, and the other investors never invested any money before burning up the BVIG's investment. *Id.* at ¶ 5. The BVIG's investigations suggest that Mr.

---

[1] These facts are taken from the Section 1782 application (ECF No. 1) and serve merely as context for the remainder of the Memorandum Opinion. The Court takes no position on whether the applicant could prove these allegations in either a U.S. court or in the BVI High Court.

Hyman was a paid Director of the failed airline and personally profited an undisclosed $10,000

in director's fees, $2,500 for each in-person meeting, and stock options. *Id.* at ¶ 6. Mr. Hyman

was also likely a paid Director of at least one of the airline's shareholder companies. *Id.*

Additionally, Mr. Hyman apparently received a secret $200,000 finder's fee from the airline

and/or its promoters for putting the deal together with the BVIG. *Id.* Mr. Hyman did not disclose

any of this information to the BVIG. *Id.*

After the BVIG terminated Mr. Hyman, he attempted to recharacterize his role from that

of attorney to that of "honest mediator," but he later admitted to working on both sides of the

transaction. *Id.* The BVIG cites numerous emails between Mr. Hyman and the then-Premier of

the BVI which show that he failed to disclose important red flags about the airline investment to

his client. *Id.* at ¶ 7. Mr. Hyman also attempted to convince the then-Premier to sign a side letter

containing clauses adverse to the BVIG's interests. *Id.* at ¶ 9. Mr. Hyman then pushed the BVIG

to enter into the airline venture. *Id.*

In June of 2019, the BVIG's current attorneys requested the BVIG's client file from Mr.

Hyman. *Id.* at ¶ 10. Despite having had the BVIG as a client for thirty years, Mr. Hyman

responded that there was neither a client file nor any form of written communications ever

created because all of his meetings were in person or over the phone. *Id.* The BVIG, however, is

in possession of many emails and documents between the BVIG and Mr. Hyman regarding the

failed airline venture, thus suggesting that Mr. Hyman's response was inaccurate. *Id.*

Additionally, when asked by the BVIG's current attorneys about the renumeration that he

received as director of the failed airline venture, he responded that he believed he was paid about

$500; however, the director that the BVIG was entitled to place on the airline's Board of

Case 1:21-mc-20544-RNS   Document 1-17   Entered on FLSD Docket 02/09/2021   Page 266 of
291
Case 1:19-mc-00184-RCL   Document 1-1   Filed 05/28/19   Page 4 of 13

Directors has provided an email from the airline setting out director compensation, which

included a payment of $10,000, $2,500 per in-person meeting, and stock options. *Id.* at ¶ 11.

Because of the heightened pleading standard that applies to the contemplated lawsuit, the

applicant requests the Court's assistance so that it may better support its claim against Mr.

Hyman. *Id.* at ¶ 13. The applicant specifically requests the following:

- An Order that the applicant may serve subpoenas *duces tecum* on Lester S. Hyman, Esq., compelling the production of: (1) His entire client file for the BVI, which shall also include any documents, correspondence, or any other material that should be in the client file but that Mr. Hyman may not as of yet have included in the client file; (2) For the period of January 1, 1987 to the present, copies of all documents (whether in electronic or hard copy form) evidencing, describing, or otherwise mentioning any retainers, letters of engagement, letters of instructions, or any other document setting out the nature of the agreement(s) between Mr. Hyman and the BVI for the provision of legal advice or other services to the BVI; (3) For the period from September 1, 2013 to the present, copies of all account statements, payment advice slips, checks, wire transfer confirmations, cash receipt slips, or any other financial document (whether in electronic or hardy copy form) in respect to any Bank Account of Mr. Hyman, including documents or communications of any kind showing information regarding any and all payments or deposits made by electronic funds transfer, banker's draft, check, or cash for the credit of any Bank Account of Mr. Hyman;[2] (4) For the period from August 1, 2013 to the present, copies of all documents and information (whether in electronic or hard copy form) in Mr. Hyman's possession, custody, or control arising from or in connection with Mr. Hyman's provision of legal or other services to the BVI including, but not limited to, documents and information relating to the failed airline venture; (5) For the period from January 1, 1987 to December 31, 2017, copies of all annual reports (or similar) issued by Mr. Hyman to the BVI that set out a summary of the services rendered by Mr. Hyman in exchange for his $100,000 annual retainer; (6) For the period from August 1, 2013 to the present, copies of all communications (whether in electronic or hardy copy form) in Mr. Hyman's possession, custody, or control between Mr. Hyman and any of the Operator Parties;[3] and (7) For the years 2014, 2015, 2016, 2017, and 2018, copies of all U.S. federal income tax returns (including all schedules to such tax returns) filed by Mr. Hyman as well as a statement

---

[2] A "Bank Account of Mr. Hyman" is any account held at any bank, savings and loan association, credit union, securities broker-dealer, or other financial institution that is held in the name of Mr. Hyman or any legal entity, in which Mr. Hyman holds or has held, directly or indirectly, legally or beneficially, a fifty percent or greater interest.
[3] The "Operator Parties" include: (1) BV Airways Inc.; (2) Castleton Holdings LLC; (3) Colchester Aviation LLC; (4) Colchester Aviation Ltd.; (5) Raptor Aviation Ltd.; (6) any shareholders (whether indirect or direct, corporate or individual, legal or beneficial), directors, officers, or any other related party or affiliate of, or acting on behalf of or in conjunction with, any of the enumerated five legal entities; (7) Bruce Bradley; (8) Jamaal Brown; (9) Adam Frieman; (10) Scott Weisman; (11) Jerry Willoughby; and/or (12) any party acting on behalf of or in conjunction with any of the five enumerated individuals.

setting out a detailed breakdown of the sources, nature, and amounts of income realized by Mr. Hyman in those years.

- An Order that the applicant may serve subpoenas *duces tecum* on any information technology person or entity residing or found in the District of Columbia that has provided, at any time since January 1, 2014, any information technology service, to include also anyone or any entity that has maintained and/or provided backup services of any computer, server, information technology device, and/or email correspondence, to Mr. Hyman and/or any legal entity, in which Mr. Hyman holds or has held, directly or indirectly, legally or beneficially, a fifty percent or greater interest, compelling the production of: (1) Any document, spreadsheet, presentation, email correspondence (whether draft or actually sent or received), or any other electronic file that is part of, or should be part of, Mr. Hyman's client file for the BVI; and (2) For the period from January 1, 2014 to the present, copies of all documents, spreadsheets, presentations, and other electronic files that were saved at any time during the period and that relate in any way to the BVI, Mr. Hyman's representation thereof, and/or any of the Operator Parties and all email correspondence during the period to or from, or saved as a draft by, Mr. Hyman and/or any person affiliated in any way with any legal entity, in which Mr. Hyman holds or has held, directly or indirectly, legally or beneficially, a fifty percent or greater interest, that relate in any way to the BVI, Mr. Hyman's representation thereof, and/or any of the Operator Parties.

- An Order that the applicant may serve subpoenas *duces tecum* on any bank, savings and loan association, credit union, securities broker-dealer, or other financial institution residing or found in the District of Columbia that holds or has held a Bank Account of Mr. Hyman at any time since September 1, 2013, compelling the production of: For the period from September 1, 2013, to the present, copies of all wire transfer records, debit advices, credit advices, remittance advices, statements of account, correspondence, emails, checks, demand drafts, or any other documents processed or held with respect to any Bank Account of Mr. Hyman.

- An Order that the applicant may serve subpoenas *duces tecum* on any income tax preparer, advisor, or accountant residing or found in the District of Columbia who prepared, advised, or assisted with Mr. Hyman's U.S. federal income tax returns and/or related materials for the years 2014, 2015 2016, 2017, and/or 2018, compelling the production of: Copies of all correspondence, emails, documents, tax returns, schedules to the same, and any other records in electronic or hard copy form that show the quantum, sources, and nature of Mr. Hyman's income from January 1, 2014, to December 31, 2018.

- An Order that the applicant may serve subpoenas *ad testificandum* on Mr. Hyman, compelling him to testify by way of sworn deposition regarding all matters relating to: (1) Any aspect, fact, or other thing arising out of or in any way connected with his representation of the BVI as its attorney; and (2) Any aspect, fact, or other thing connected in any way, also including any aspect, fact, or other thing regarding the BVI's and/or Mr. Hyman's communications and relationships, with any of the Operator Parties.

ECF No. 1-3.

# LEGAL STANDARD

Section 1782 is designed to "provide federal-court assistance in gathering evidence for

use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).

Section 1782 applies to "documentary and other tangible evidence as well as testimony." *Id.* at

248. Section 1782(a) reads:

> The district court of the district in which a person resides or is found may order him
> to give his testimony or statement or to produce a document or other thing for use
> in a proceeding in a foreign or international tribunal, including criminal
> investigations conducted before formal accusation. The order may be made
> pursuant to a letter rogatory issued, or request made, by a foreign or international
> tribunal or upon the application of any interested person and may direct that the
> testimony or statement be given, or the document or other thing be produced, before
> a person appointed by the court. By virtue of his appointment, the person appointed
> has power to administer any necessary oath and take the testimony or statement.
> The order may prescribe the practice and procedure, which may be in whole or part
> the practice and procedure of the foreign country or the international tribunal, for
> taking the testimony or statement or producing the document or other thing. To the
> extent that the order does not prescribe otherwise, the testimony or statement shall
> be taken, and the document or other thing produced, in accordance with the Federal
> Rules of Civil Procedure.

Essentially, Section 1782 requires that before granting these applications, courts must find that

three factors are met: (1) a person, from whom evidence is sought, reside or be found in the

District of this Court; (2) the evidence be for use in a foreign proceeding; and (3) the request be

pursuant to a foreign tribunal request or upon application of an interested party. *Intel*, 542 U.S. at

264. As long as these three mandatory factors are met, courts have broad discretion in deciding

whether to grant or deny these applications.

Four additional factors exist to guide the exercise of that broad discretion: (1) whether the

person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature

of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of

the foreign government, the court, or agency abroad to federal-court judicial assistance; (3)

6

whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States; and (4) whether the § 1782(a) request is unduly intrusive or burdensome. *Id.* at 264-65. The Court's discretion is further informed by the twin Congressional aims of "providing efficient means of assistance to participants in international litigation in our federal courts and to encourage foreign countries by example to provide similar means of assistance to our courts." *Id.* at 252.

**ANALYSIS**

As explained below, the Court finds that while all requests for discovery from Mr. Hyman satisfy the mandatory factors, the discretionary factors support granting only some of those requests. The requests for discovery from persons or entities other than Mr. Hyman fail to meet the first of Section 1782's mandatory factors and therefore must be denied.

## I. MANDATORY FACTORS

The Court finds that all three of Section 1782's mandatory factors are satisfied with respect to the requests for discovery from Mr. Hyman. The requests for discovery from any other person or entity fail because the applicant has not properly shown that any other person or entity resides in or is found in the District of Columbia.

### A. Although Mr. Hyman Undisputedly Resides in the District of Columbia, the Applicant Has Failed to Establish that Any Other Person or Entity from Whom Discovery is Sought Resides in or is Found in the District of Columbia.

The applicant seeks discovery from Mr. Hyman as well as from unnamed and unknown IT professionals, banks, and income tax preparers, advisers, and/or accountants who assisted with any of Mr. Hyman's 2014-2018 tax returns. Mr. Hyman does not dispute that he resides in

7

the District of Columbia. ECF No. 2-1 at 5. Therefore, the applicant's request for discovery from Mr. Hyman clearly satisfies the first mandatory factor.

Mr. Hyman asserts that the requests for discovery from persons or entities other than Mr. Hyman are too broad and do not provide any information about "the unnamed and unknown entities from which [the applicant] seeks discovery." *Id.* at 6. He maintains that the correct standard for "residing in" or being "found in" the district requires the applicant to show that the Court has general personal jurisdiction over the entity or person from whom discovery is sought. He then suggests that because very few banks are headquartered in the District of Columbia, the Court will not have general jurisdiction over the banks. Mr. Hyman similarly disputes whether the applicant can establish general jurisdiction over the unnamed IT professionals and tax assistants from whom it seeks information. Essentially, he argues that as a matter of law, specific jurisdiction will not suffice under the first mandatory factor, and the applicant cannot show general jurisdiction over these third parties.

The D.C. Circuit does not appear to have spoken directly on the issue of whether the first mandatory factor requires a finding of general personal jurisdiction rather than specific personal jurisdiction, but other Courts of Appeals as well as the D.C. District Court have found that either general or specific personal jurisdiction will suffice for the first mandatory factor.[4] *See, e.g., In re del Valle Ruiz*, 939 F.3d 520, 527 (2d Cir. 2019) (finding that the "statutory scope" of the first mandatory factor "extends to the limits of personal jurisdiction consistent with due process" and thus encompasses both general and specific jurisdiction); *In re De Leon*, 2020 U.S. Dist. LEXIS

---

[4] Mr. Hyman claims that in *In re Masters*, 315 F. Supp. 3d 269 (D.D.C. 2018), the Court found that only personal jurisdiction in the form of general jurisdiction will suffice for the first mandatory factor. Mr. Hyman's reading of *In re Masters* is patently incorrect. Although Judge Reggie Walton found that the Court lacked general jurisdiction over the banks in question, he specifically refrained from ruling on the legal issue of whether specific jurisdiction would also suffice, as it was clear that specific jurisdiction did not exist in that case. *In re Masters*, 315 F. Supp. 3d at 274-75.

37270, at *4-5 (D.D.C. Mar. 4, 2020) (quoting *In re del Valle Ruiz* in determining that the first

mandatory factor "extends to the limits of personal jurisdiction consistent with due process")

(Chutkan, J.). The Court agrees with both the Second Circuit and Judge Chutkan that the first

mandatory factor encompasses personal jurisdiction in either form.

     Although the Court finds that either general or specific jurisdiction will suffice, the

applicant is presently unable to provide the names of any of Mr. Hyman's banks, IT

professionals, tax assistants, etc. The Court recognizes that this is because the applicant has not

yet been able to depose Mr. Hyman and obtain this information. The applicant has specified that

it only seeks discovery from entities that are incorporated or headquartered in the District of

Columbia or from entities that worked with Mr. Hyman directly through their District of

Columbia branches or offices. ECF No. 3 at 11. Although this theoretically covers only those

entities over whom this Court has general or specific jurisdiction, the Court cannot grant a

blanket subpoena and trust that the applicant will make the proper determination about personal

jurisdiction before serving that subpoena on a person or entity. It is the Court who must decide

questions of personal jurisdiction on a case-by-case basis, not the applicant. Because the

applicant cannot name any specific person or entity other than Mr. Hyman, the Court must deny

the application with respect to any person or entity other than Mr. Hyman.

     The Court will, however, deny that portion of the application *without* prejudice. As

explained in this Memorandum Opinion, the Court will grant the request to depose Mr. Hyman,

meaning that the applicant should be able to learn the names of specific banks, IT professionals,

tax assistants, etc. Once it has these names, the applicant may refile the portion of its Section

1782 application seeking information from these other persons or entities. At that point, the

applicant will be able to name the exact persons or entities that it would like to subpoena and

explain why the Court has personal jurisdiction (either general or specific) over each one. The Court will not discuss the requests for information from persons or entities other than Mr. Hyman any further in this Memorandum Opinion, as such a discussion will only be proper if the applicant can first establish that those persons or entities "reside in" or are "found in" the District of Columbia.

### B. The Evidence Sought is for Use in a Foreign Proceeding.

The applicant seeks discovery for use in a contemplated civil suit against Mr. Hyman in the BVI, specifically in the BVI High Court. ECF No. 1 ¶ 24. The BVI High Court is clearly a foreign tribunal within the meaning of Section 1782. *See, e.g.*, *In re Ming Yang*, 2019 U.S. Dist. LEXIS 146853, at *1-3 (N.D. Cal. Aug. 28, 2019) (granting an application under Section 1782 for evidence to be used in a proceeding before the BVI High Court). Mr. Hyman does not appear to dispute the BVI High Court's status as a foreign tribunal.

Mr. Hyman does, however, argue that granting the applicant's request would be improper because the foreign proceeding has not yet been initiated. ECF No. 2-1 at 6-7. This argument fundamentally misunderstands the second mandatory factor. The Supreme Court specifically stated in *Intel* that "the 'proceeding' for which discovery is sought under § 1782(a) must be in reasonable contemplation, but need not be 'pending' or 'imminent.'"[5] 542 U.S. at 247. The D.C. Circuit has further confirmed that the second mandatory factor merely asks whether there is "sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially." *In re Letter of Request from the Crown Prosecution Serv.*, 870 F.2d 686, 692 (D.C. Cir. 1989). The contemplated proceeding in the BVI High Court meets this test,

---

[5] Mr. Hyman's assertion that the application must be denied because foreign proceedings are not "reasonably imminent" is thus an incorrect statement of the law. ECF No. 2-1 at 6.

and the fact that the Attorney General of the BVI has not yet filed its civil suit against Mr. Hyman is not fatal to the request. The Declaration of Martin Kenney asserts that the proceedings against Mr. Hyman will likely "be launched within sixty days following the conclusion of discovery hereunder." ECF No. 1-1 ¶ 76. This case is thus similar to *In re Application of Furstenberg Fin. SAS v. Litai Assets LLC*, where the Eleventh Circuit found that foreign proceedings were reasonably contemplated because the applicants stated that they would be filing proceedings in Luxembourg within 45 days of receiving the Section 1782 discovery. 877 F.3d 1031, 1035 (11th Cir. 2017).

The applicant has explained that it is requesting this evidence before filing its lawsuit to better ensure that it can meet the BVI's heightened pleading standard for claims involving fraud or dishonesty. Mr. Hyman argues that if the applicant cannot meet the BVI's heightened pleading standard without the discovery that it seeks from this Court, then no lawsuit is reasonably contemplated, and the application must be denied. This argument is flawed for two reasons. First, the applicant never stated that it *cannot* survive the heightened pleading standard without this evidence; rather, it has suggested that this evidence would be extremely useful in *ensuring* that it meets that standard. Second, even if the applicant could not meet the heightened pleading standard without this evidence, that would not automatically mean that the application must be denied. *See, e.g.*, *LEG Q LLC V. RSR Corp.*, 2017 U.S. Dist. LEXIS 140280, at *2-5 (N.D. Tex. Aug. 31, 2017) (granting the Section 1782 request for the express purpose of enabling the applicant to meet England's heightened pleading standard).

Furthermore, to adopt Mr. Hyman's reasoning would be to ignore the Supreme Court's determination in *Intel* that the foreign proceeding does not have to be underway for the Court to grant relief. Mr. Hyman argues that if the applicant *could* meet the pleading standard without this

11

evidence, the Court must deny the motion and let the BVI High Court handle discovery once the applicant files its lawsuit there. At the same time, however, Mr. Hyman argues that if the applicant *could not* meet the pleading standard without this evidence, then no lawsuit is reasonably contemplated and the Court must deny the motion. By this logic, an applicant could never obtain Section 1782 relief when a foreign proceeding is not already underway. Such a holding would not be in accordance with the Supreme Court's express ruling that an application can be granted even when a foreign proceeding has not yet begun. Therefore, regardless of whether the applicant could meet the heightened pleading standard without the requested discovery, the Court is satisfied that the civil suit against Mr. Hyman in the BVI High Court is in reasonable contemplation. The applicant has thus met the second mandatory factor with respect to requests for discovery from Mr. Hyman.

### C. The Applicant is an Interested Party.

The third mandatory factor requires that the request come from either the foreign tribunal or an interested party. The applicant intends to initiate proceedings in the BVI as a claimant and seeks to benefit by obtaining monetary damages should it prevail in the contemplated proceeding. ECF No. 1 ¶ 26. Mr. Hyman concedes that this undoubtedly meets the standard for an interested party. ECF No. 2-1 at 5. Therefore, the applicant has clearly met the third mandatory factor. Because all three mandatory factors are satisfied with respect to the applicant's requests for discovery from Mr. Hyman, the Court may analyze these requests under the four discretionary factors.

12

## II. DISCRETIONARY FACTORS

The Court finds that the balance of the discretionary factors weighs in favor of granting the application with respect to some but not all of the applicant's requests for discovery from Mr. Hyman.

### A. The First Discretionary Factor Weighs in the Applicant's Favor.

The first discretionary factor asks the Court to consider whether the person from whom discovery is sought is a participant in the foreign proceeding in which the evidence will be used. Once the applicant files its contemplated lawsuit, Mr. Hyman will undoubtedly be a participant. Although normally being a participant in the foreign proceeding would weigh against granting the application because the BVI High Court could order production of this evidence on its own, *Intel*, 524 U.S. at 264, the critical distinction in this case is that the BVI High Court does not yet have jurisdiction over Mr. Hyman. Rather, the applicant seeks discovery to help it meet the heightened pleading standard for claims involving fraud or dishonesty. Therefore, the underlying rationale of the first discretionary factor—compelling production of evidence that the foreign tribunal lacks authority to compel—still applies. *See In re Ambercroft Trading Ltd.*, 2018 U.S. Dist. LEXIS 98175, at *10-11 (N.D. Cal. Oct. 3, 2018). The evidence that the applicant seeks is currently "unobtainable absent § 1782(a) aid." *Intel*, 524 U.S. 264. Because the BVI High Court cannot presently order Mr. Hyman to appear for a deposition or turn over any documents, and in light of the unique procedural posture of this matter, the Court finds that the first discretionary factor weighs in favor of granting the application.[6]

---

[6] Even if this factor did not weigh in the applicant's favor, this is not the only factor to be weighed, meaning that the Court's ultimate decision would likely remain unchanged.

### B. The Second Discretionary Factor Weighs in the Applicant's Favor.

The second discretionary factor asks the Court to consider the nature of the foreign

tribunal and whether the foreign court is receptive to assistance from a U.S. federal court. The

BVI High Court has implicitly recognized the admissibility of evidence procured via Section

1782, and Mr. Hyman does not dispute that the second discretionary factor weighs in favor of

granting the application. ECF No. 2-1 at 7. Additionally, the Court sees no evidence suggesting

that the BVI High Court would not be receptive to evidence procured via Section 1782. The

Court thus finds that the second discretionary factor clearly weighs in favor of granting the

application.

### C. The Third Discretionary Factor Weighs in the Applicant's Favor.

The third discretionary factor asks the Court to consider whether the application conceals

an attempt to circumvent foreign proof-gathering restrictions or other policies of the foreign

country or the United States. As previously explained, the BVI High Court has no objection to

parties using evidence obtained via Section 1782. Nevertheless, Mr. Hyman argues that although

this evidence would be discoverable in the BVI High Court or in a U.S. court once the applicant

filed its lawsuit and reached the discovery stage, it is improper to allow the applicant to obtain

this evidence before filing its lawsuit. Mr. Hyman notes that even though the BVI has a

heightened pleading standard for these types of allegations, neither BVI nor U.S. courts allow

pre-discovery, even where heightened pleading is required.

The case law that Mr. Hyman cites, however, is not on point,[7] and his arguments are not

in accordance with the relevant case law. For example, in *In re Ambercroft*, the Northern District

---

[7] Much of the case law that Mr. Hyman cites is presented in a misleading fashion, with quotes being selectively cherry-picked and holdings being taken out of context (or holdings being misstated altogether).

of California specifically held that the question of whether pre-discovery would be allowed in the BVI is irrelevant to the third discretionary factor, and "the fact that pre-discovery may not be allowed under Eastern Caribbean Supreme Court Civil Procedure does not suggest that Petitioner is trying to circumvent proof-gathering restrictions." *In re Ambercroft Trading Ltd.*, 2018 U.S. Dist. LEXIS 171366, at *21 (N.D. Cal. Oct. 3, 2018) (finding that the third discretionary factor weighed in favor of granting the application even though the lawsuit had not yet been filed in the BVI). The question posed by the third discretionary factor is not whether the BVI would permit pre-discovery, but whether BVI law affirmatively prohibits the applicant from obtaining relief under Section 1782. *See Intel*, 542 U.S. at 244 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions; such reasons do not necessarily signal objection to aid from the United States federal courts.").

Furthermore, Section 1782 does not impose an exhaustion requirement, meaning that the applicant does not need to request discovery from the foreign tribunal before filing its Section 1782 request. *See In re Maley Hungarian Airlines*, 964 F.2d 97, 99 (2d Cir. 1992). By the same logic, courts have also rejected "any implicit requirement that any evidence sought in the United States must be discoverable under the laws of the foreign country." *In re Application of Aldunate*, 3 F.3d 54, 59 (2d Cir. 1993). As the Second Circuit has explained, "[p]roof-gathering restrictions are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate*" discovery of the requested information. *Mees v. Buiter*, 793 F.3d 291, 303 n.20 (2d Cir. 2015). There is no indication that the BVI prohibits use of this material, and thus there can be no attempt to circumvent a foreign proof-gathering restriction. Because there is no evidence that the applicant is attempting to

15

circumvent any proof-gathering restrictions or policies in either the BVI or the U.S., the third discretionary factor weighs in favor of granting the application.[8]

### D. Under the Fourth Discretionary Factor, Two of the Applicant's Requests for Discovery from Mr. Hyman are Unduly Burdensome and Overly Broad.

The fourth discretionary factor asks the Court to consider whether granting the application would be overly burdensome or intrusive for the person from whom information is sought. With respect to any information that is in (or should be in) the client file, Mr. Hyman cannot credibly argue that turning over that information is unduly burdensome or intrusive. The BVIG has a right to this information, and regardless of whether Mr. Hyman failed to maintain a client file or is simply withholding it, Mr. Hyman cannot refuse to turn over information that should be in that file. The applicant should also be able to obtain any information pertaining to Mr. Hyman's relationship with the failed airline, as that is directly relevant to the contemplated lawsuit. Therefore, as set forth in the Conclusion of this Memorandum Opinion and in the accompanying Order, the Court will grant the requests that are specifically tailored to Mr. Hyman's relationship with the airline and the BVI.

Some of the applicant's requests, however, are too broad, which makes them overly burdensome and invasive. The two requests for discovery from Mr. Hyman with which the Court is concerned are:

- For the period from September 1, 2013 to the present, copies of all account statements, payment advice slips, checks, wire transfer confirmations, cash receipt slips, or any other financial document (whether in electronic or hard copy form) in respect of any Bank Account of Mr. Hyman, including documents or communications of any kind showing information regarding any and all

---

[8] Even if this factor did not weigh in the applicant's favor, this is not the only factor to be weighed, meaning that the Court's ultimate decision would likely remain unchanged.

payments or deposits made by electronic funds transfer, banker's draft, check, or cash for the credit of any Bank Account of Mr. Hyman.[9]

- For the years 2014, 2015, 2016, 2017, and 2018, copies of all U.S. federal income tax returns (including all schedules to such tax returns) filed by Mr. Hyman as well as a statement setting out a detailed breakdown of the sources, nature, and amounts of income realized by Mr. Hyman in those years.

These requests would reveal a great deal of personal financial information that is entirely unrelated to the contemplated civil suit against Mr. Hyman. Although the Court understands that the applicant has requested to see all of Mr. Hyman's financial documents out of concern that he will hide any unlawful or unethical transactions, at this time, the Court cannot allow the applicant to have unfettered access to his bank records and tax returns, most of which are unlikely to have any bearing on the contemplated lawsuit.[10]

Of course, granting an applicant's Section 1782 request for personal financial information from another person is not unprecedented. For example, the Southern District of Florida granted an applicant's Section 1782 request for personal financial records from another person—despite that person's objections—because his banking records were relevant to whether he had conspired to hide funds, which was the subject of the foreign proceeding. *In re H.M.B. Ltd.*, 2018 U.S. Dist. LEXIS 111108, at *28-31 (S.D. Fla. July 2, 2018).[11] In that case, however, the Court did not grant the applicant's full request; rather, the Court determined that some of the financial requests were too broad and thus narrowed the scope of its Order to grant discovery only for financial records that were directly relevant to the foreign proceeding. *Id.* In doing so, the

---

[9] A "Bank Account of Mr. Hyman" is any account held at any bank, savings and loan association, credit union, securities broker-dealer, or other financial institution that is held in the name of Mr. Hyman or any legal entity, in which Mr. Hyman holds or has held, directly or indirectly, legally or beneficially, a fifty percent or greater interest.
[10] It is true that this is only one of four discretionary factors to consider, and as a matter of law the Court could still choose to grant these requests in spite of their broad nature; however, the Court does not want to subject Mr. Hyman to such invasive discovery at this time.
[11] Although this explanation comes from Magistrate Judge Jonathan Goodman's Report & Recommendation, Judge Marcia Cooke adopted the Report & Recommendation in its entirety. *See In re H.M.B. Ltd.*, U.S. Dist. LEXIS 145522 (S.D. Fla. Aug. 24, 2018).

17

Southern District of Florida chose to assume responsibility for narrowing the wording of the request and ensuring that it would not be unduly burdensome or intrusive. The D.C. Circuit, however, has been clear that the District Court is not "obligat[ed] to trim [the] discovery request" after determining that it is "overbroad" or "vague." *Lazaridis v. Int'l Ctr. for Missing & Exploited Children*, 473 Fed. App'x 2, 4 (D.C. Cir. 2012).

In light of *Lazaridis*, the Court could simply deny the two problematic requests outright, as this Court has no interest in assuming responsibility for trimming them itself; however, the Court will instead allow the applicant an opportunity to correct its own mistakes. The Court will deny the two specific requests at issue but allow the applicant to refile a more narrowly tailored request for financial and/or tax information that is *directly relevant* to the airline venture and the contemplated lawsuit. At this time, the Court believes that the applicant is entitled to financial information specifically pertaining to the airline venture and the contemplated civil suit, but not to financial information extending beyond those matters. Therefore, the applicant will need to reword its requests to ask only for information that is relevant to its contemplated lawsuit.

If, at a later date, the applicant wishes to refile the two requests as *currently* worded, it will need to make a strong showing that such invasive discovery is warranted. For example, if the applicant rewords its request for financial records and the Court grants it, but the applicant can prove that Mr. Hyman withholds information covered by that narrowly tailored request, the Court would then consider requiring Mr. Hyman to turn over all of the financial records sought in this initial request. For now, however, the applicant raises only speculative concerns about whether Mr. Hyman would comply with a more narrowly tailored request, making the discovery requests for *all* financial information (as currently worded) premature.

18

As for all other requests for discovery from Mr. Hyman, the Court finds that those are relevant to the contemplated litigation and thus are not overly broad or burdensome, so the fourth factor weighs in favor of granting those requests.[12]

### E. The Twin Aims of Section 1782 Weigh in the Applicant's Favor.

The twin aims of Section 1782 ask the Court to consider whether granting the application would further the goals of "providing efficient means of assistance to participants in international litigation in our federal courts" and "encourag[ing] foreign countries by example to provide similar means of assistance to our courts." *Intel*, 542 U.S. at 252. Although these twin aims are not their own separate factor, it is useful to note that they will be furthered by the Court's ruling. For the reasons already stated above, the Court finds that granting the applicant's request for discovery from Mr. Hyman would assist the BVIG with its lawsuit against Mr. Hyman. The Court also believes that granting this request will make foreign countries (especially the BVI, which has a provision similar to Section 1782) more likely to reciprocate should our government make a similar request in their courts.[13] Therefore, the Court finds that granting discovery from Mr. Hyman will further the twin aims of Section 1782.

---

[12] Even if this factor did not weigh in favor of granting part of the application, this is not the only factor to be weighed, meaning that the Court's ultimate decision would likely remain unchanged.

[13] Although reciprocity is not "a predicate" to granting an application, *Deere Ltd. v. Sperry Corp.*, 574 F.2d 132, 135 (3d Cir. 1985), it is worth noting that the Court's decision may ultimately foster reciprocity.

19

## CONCLUSION

Based on the foregoing, the Court will **GRANT IN PART AND DENY IN PART** the application for judicial assistance to obtain evidence for use in a foreign proceeding pursuant to 28 U.S.C. § 1782 (ECF No. 1).

The Court will **DENY WITHOUT PREJUDICE** the requests for discovery from persons or entities other than Mr. Hyman, which the applicant may refile once it learns the identities of the specific persons or entities from which it seeks information. The applicant should ensure that its requests for discovery from these third parties are narrowly tailored and seek only financial/tax information that is directly relevant to the contemplated lawsuit. The current wording of these requests asks for:

- An Order that the applicant may serve subpoenas *duces tecum* on any information technology person or entity residing or found in the District of Columbia that has provided, at any time since January 1, 2014, any information technology service, to include also anyone or any entity that has maintained and/or provided backup services of any computer, server, information technology device, and/or email correspondence, to Mr. Hyman and/or any legal entity, in which Mr. Hyman holds or has held, directly or indirectly, legally or beneficially, a fifty percent or greater interest, compelling the production of: (1) Any document, spreadsheet, presentation, email correspondence (whether draft or actually sent or received), or any other electronic file that is part of, or should be part of, Mr. Hyman's client file for the BVI; and (2) For the period from January 1, 2014 to the present, copies of all documents, spreadsheets, presentations, and other electronic files that were saved at any time during the period and that relate in any way to the BVI, Mr. Hyman's representation thereof, and/or any of the Operator Parties and all email correspondence during the period to or from, or saved as a draft by, Mr. Hyman and/or any person affiliated in any way with any legal entity, in which Mr. Hyman holds or has held, directly or indirectly, legally or beneficially, a fifty percent or greater interest, that relate in any way to the BVI, Mr. Hyman's representation thereof, and/or any of the Operator Parties.[14]
- An Order that the applicant may serve subpoenas *duces tecum* on any bank, savings and loan association, credit union, securities broker-dealer, or other financial institution

---

[14] The "Operator Parties" include: (1) BV Airways Inc.; (2) Castleton Holdings LLC; (3) Colchester Aviation LLC; (4) Colchester Aviation Ltd.; (5) Raptor Aviation Ltd.; (6) any shareholders (whether indirect or direct, corporate or individual, legal or beneficial), directors, officers, or any other related party or affiliate of, or acting on behalf of or in conjunction with, any of the enumerated five legal entities; (7) Bruce Bradley; (8) Jamaal Brown; (9) Adam Frieman; (10) Scott Weisman; (11) Jerry Willoughby; and/or (12) any party acting on behalf of or in conjunction with any of the five enumerated individuals.

20

residing or found in the District of Columbia that holds or has held a Bank Account of Mr. Hyman at any time since September 1, 2013, compelling the production of: For the period from September l, 2013, to the present, copies of all wire transfer records, debit advices, credit advices, remittance advices, statements of account, correspondence, emails, checks, demand drafts, or any other documents processed or held with respect to any Bank Account of Mr. Hyman.[15]

- An Order that the applicant may serve subpoenas *duces tecum* on any income tax preparer, advisor, or accountant residing or found in the District of Columbia who prepared, advised, or assisted with Mr. Hyman's U.S. federal income tax returns and/or related materials for the years 2014, 2015 2016, 2017, and/or 2018, compelling the production of: Copies of all correspondence, emails, documents, tax returns, schedules to the same, and any other records in electronic or hard copy form that show the quantum, sources, and nature of Mr. Hyman's income from January 1, 2014, to December 31, 2018.

The Court will **DENY WITHOUT PREJUDICE** the two overly broad requests for discovery from Mr. Hyman. The applicant may immediately file a more narrowly tailored request for financial/tax information that is directly relevant to the airline and the contemplated lawsuit. If, at a later date, the applicant wants to refile these requests as currently worded, for the reasons explained in this Memorandum Opinion, it will need to make a strong showing that such broad discovery is warranted. The current wording of these requests asks for:

- An Order that the applicant may serve *duces tecum* on Lester S. Hyman, Esq., compelling the production of: (1) For the period from September 1, 2013 to the present, copies of all account statements, payment advice slips, checks, wire transfer confirmations, cash receipt slips, or any other financial document (whether in electronic or hardy copy form) in respect to any Bank Account of Mr. Hyman, including documents or communications of any kind showing information regarding any and all payments or deposits made by electronic funds transfer, banker's draft, check, or cash for the credit of any Bank Account of Mr. Hyman; and (2) For the years 2014, 2015, 2016, 2017, and 2018, copies of all U.S. federal income tax returns (including all schedules to such tax returns) filed by Mr. Hyman as well as a statement setting out a detailed breakdown of the sources, nature, and amounts of income realized by Mr. Hyman in those years.

---

[15] A "Bank Account of Mr. Hyman" is any account held at any bank, savings and loan association, credit union, securities broker-dealer, or other financial institution that is held in the name of Mr. Hyman or any legal entity, in which Mr. Hyman holds or has held, directly or indirectly, legally or beneficially, a fifty percent or greater interest.

As set forth below and in the accompanying Order, the Court will **GRANT** the application with respect to all other requests for discovery from Mr. Hyman.

It will be **ORDERED** that the applicant may serve subpoenas *duces tecum* on Lester S. Hyman, Esq., compelling the production of: (1) His entire client file for the BVI, which shall also include any documents, correspondence, or any other material that should be in the client file but that Mr. Hyman may not as of yet have included in the client file; (2) For the period of January 1, 1987 to the present, copies of all documents (whether in electronic or hard copy form) evidencing, describing, or otherwise mentioning any retainers, letters of engagement, letters of instructions, or any other document setting out the nature of the agreement(s) between Mr. Hyman and the BVI for the provision of legal advice or other services to the BVI; (3) For the period from August 1, 2013 to the present, copies of all documents and information (whether in electronic or hard copy form) in Mr. Hyman's possession, custody, or control arising from or in connection with Mr. Hyman's provision of legal or other services to the BVI including, but not limited to, documents and information relating to the failed airline venture; (4) For the period from January 1, 1987 to December 31, 2017, copies of all annual reports (or similar) issued by Mr. Hyman to the BVI that set out a summary of the services rendered by Mr. Hyman in exchange for his $100,000 annual retainer; and (5) For the period from August 1, 2013 to the present, copies of all communications (whether in electronic or hardy copy form) in Mr. Hyman's possession, custody, or control between Mr. Hyman and any of the Operator Parties.[16]

---

[16] The "Operator Parties" include: (1) BV Airways Inc.; (2) Castleton Holdings LLC; (3) Colchester Aviation LLC; (4) Colchester Aviation Ltd.; (5) Raptor Aviation Ltd.; (6) any shareholders (whether indirect or direct, corporate or individual, legal or beneficial), directors, officers, or any other related party or affiliate of, or acting on behalf of or in conjunction with, any of the enumerated five legal entities; (7) Bruce Bradley; (8) Jamaal Brown; (9) Adam Frieman; (10) Scott Weisman; (11) Jerry Willoughby; and/or (12) any party acting on behalf of or in conjunction with any of the five enumerated individuals.

It will be **ORDERED** that the applicant may serve subpoenas *ad testificandum* on Mr. Hyman, compelling him to testify by way of sworn deposition regarding all matters relating to: (1) Any aspect, fact, or other thing arising out of or in any way connected with his representation of the BVI as its attorney; and (2) Any aspect, fact, or other thing connected in any way, also including any aspect, fact, or other thing regarding the BVI's and/or Mr. Hyman's communications and relationships, with any of the Operator Parties.

A separate Order accompanies this Memorandum Opinion.

Date: May 23, 2020

/s/ Royce C. Lamberth
Royce C. Lamberth
United States District Court Judge

23



British Virgin Islands
Business Companies
Act, 2004 and Related
Legislation

Last Updated: October 2018

BVI BUSINESS COMPANIES ACT 2004

## PART XV - TRANSITIONAL AND MISCELLANEOUS PROVISIONS

**244.    [REPEALED]**[432] [433] [434]

**245.    Jurisdiction**

For purposes of determining matters relating to title and jurisdiction but not for purposes of taxation, the situs of the ownership of shares, debt obligations or other securities of a company is in the Virgin Islands.

**246.    Declaration by court**

(1)    A company may, without the necessity of joining any other party, apply to the Court, by summons supported by an affidavit, for a declaration on any question of interpretation of this Act or of the memorandum or articles of the company.

(2)    A person acting on a declaration made by the Court as a result of an application under subsection (1) shall be deemed, in so far as regards the discharge of any fiduciary or professional duty, to have properly discharged his duties in the subject matter of the application.

**247.    Judge in Chambers**

A Judge of the High Court may exercise in Chambers any jurisdiction that is vested in the Court by this Act and in exercise of that jurisdiction, the judge may award costs as may be just.

**248.    Transitional provisions**

The transitional provisions set out in Schedule 2 apply.

**249.    Amendment of Schedules**

(1)    The Cabinet[435] may, on the advice of the Commission, by order amend the Schedules to this Act in such manner as it considers necessary.

(2)    An order made under subsection (1) shall be subject to a negative resolution of the House of Assembly[436].

**250.    Repeals and amendments**

The enactments set out in the second column of Schedule 3 to this Act are repealed or amended to the extent specified in the third column with effect from the date specified in the fourth column.

**251.    Act binding on Crown**

This Act is binding on the Crown.

# EASTERN CARIBBEAN
# SUPREME COURT



# CIVIL PROCEDURE RULES
# 2000

**The Caribbean Law Publishing Company**
Kingston

1

(b)an affidavit in support of the claim, if these Rules so require; and

(c) if permission has been given under rule 8.2 to serve the claim form without the statement of claim – a copy of the order giving permission.

## General rule as to service of claim form out of jurisdiction

7.2 A claim form may be served out of the jurisdiction only if –

(a) rule 7.3 allows; and

(b) the court gives permission.

## Service of claim form out of jurisdiction in specified proceedings

7.3     (1) The court may permit a form to be served out of the jurisdiction if the proceedings are listed in this Rule.

*Features which may arise in any type of claim*

(2) A claim form may be served out of the jurisdiction if a claim is made –

(a)     Against someone on whom the claim form has been or will be served, and –

(i)     there is between the claimant and that person a real issue which it is reasonable for the court to try; and

(ii)     the claimant now wishes to serve the claim form on another person who is outside the jurisdiction and who is necessary or proper party to claim;

(b)     for an injunction ordering the defendant to do or refrain from doing some act within the jurisdiction; or

(c)     for a remedy against a person domiciled or ordinarily resident within the jurisdiction.

*Claims about contracts*

(3) A claim form be served out of the jurisdiction if –

(a)     a claim is made in respect of a breach of contract committed within the jurisdiction;

70

288

(b)      a claim is made in respect of a contract where the contract –

(i)      contains a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract; or

(ii)      is by its terms or by implication governed by the law of any Member State Territory;

(iii)      was made by or through an agent trading or residing within the jurisdiction; or

(iv)      was made within the jurisdiction; or

(c)      the claim is for a declaration that no contracts exists, where, if the contract did exist, it would fulfill one or more of the conditions in sub-paragraph (b) of this Rule.

*Claims in tort*

(4) A claim form may be served out of the jurisdiction if a claim in tort is made and the act causing the damage was committed within the jurisdiction or the damage was sustained within the jurisdiction.

*Enforcement*

(5)      A claim form may be served out of the jurisdiction if a claim is made to enforce any judgment or arbitral award which was made by a foreign court or tribunal and is amenable to be enforced at common law.

*Claims about property within the jurisdiction*

(6) A claim form may be served out of the jurisdiction if the whole subject matter of the claim relates to property within the jurisdiction.

*Claims about companies*

(7) A claim form may be served out of the jurisdiction if the subject matter of the claim relates to –

(a) the constitution, administration, management or conduct of the affairs; or

(b) the ownership or control of a company incorporated within the jurisdiction.

*Claims about trusts*

71

(8) A claim form may be served out of the jurisdiction if –

    (a) a claim is made for a remedy against the defendant as constructive trustee and the defendant's alleged ability arises out of acts committed within the jurisdiction;

    (b) a claim is made for –

        (i) any remedy which might be obtained in proceedings for the administration of the estate of; or

        (ii) in probate proceedings as defined in Part 68 relating to; a person who died domiciled within the jurisdiction; or

    (c) a claim is made for any remedy which might be obtained in proceedings to execute the trust of a written instrument and the

        (i) trusts ought to be executed according to the law of any Member State or Territory; and

        (ii) person on whom the claim is to be served is a trustee of the trusts.

*Claims of restitution*

(9) A claim is made for restitution where the defendant's alleged ability arises out of acts committed within the jurisdiction or out of acts which, wherever committed, where to the detriment of a
person domiciled within the jurisdiction

*Claims under an enactment conferring jurisdiction on the Court*

(10) A claim is made under an enactment which confers jurisdiction on the court and the proceedings are not covered by any of the other grounds referred to in this Rule.


## Proceedings which include other types of claim

7.4 If the claimant makes a claim which falls within –

    (a) rule 7.3(3) (claims about contracts);